**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VER TECHNOLOGIES HOLDCO LLC, *et al.*,[1] | ) | Case No. 18-10834 (KG) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DECLARATION OF LAWRENCE YOUNG,**
**CHIEF RESTRUCTURING OFFICER OF VER TECHNOLOGIES HOLDCO LLC,**
**IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Lawrence Young, Chief Restructuring Officer of VER Technologies HoldCo LLC, hereby declare under penalty of perjury:

1.     I am a Managing Director at AlixPartners LLP ("AlixPartners") and have served as the Chief Restructuring Officer of VER Technologies HoldCo LLC ("VER HoldCo"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "VER") since February 5, 2017.  I have over 25 years of experience providing restructuring and reorganization services for companies, their creditors, and other stakeholders.

2.     I am generally familiar with the Debtors' day-to-day operations, businesses and financial affairs, and books and records.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and certain motions and applications filed contemporaneously therewith.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  VER Technologies HoldCo LLC (7239); CPV Europe Investments LLC (2533); FAAST Leasing California, LLC (7857); Full Throttle Films, LLC (0487); Maxwell Bay Holdings LLC (3433); Revolution Display, LLC (6711); VER Finco, LLC (5625); VER Technologies LLC (7501); and VER Technologies MidCo LLC (7482).  The location of the Debtors' service address is: 757 West California Avenue, Building 4, Glendale, California 91203.

3.    Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including the AlixPartners team working under my supervision, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

## Preliminary Statement

4.    Over the course of 30 years, the Debtors have become one of the largest suppliers of rental production equipment and solutions in the world.  With over 290,000 separate pieces of rental equipment located across the United States, Canada, and Europe, the Debtors lease lighting, sound, rigging, and video equipment to various customers in the corporate, hotel, television, cinema, and live music sectors.  Although initially the Debtors primarily specialized in rentals with no equipment customization, over the course of the past three years, the Debtors have expanded their product and service offerings, branching out into partial and full service equipment customization to support their customers.

5.    As the Debtors expanded into new service lines, so did the operational challenges they faced.  These challenges, combined with certain non-recurring factors discussed further herein, led to significant losses, which the Debtors were required to finance with borrowings from the Prepetition ABL Facility (as defined herein).  Beginning in October 2016 and continuing through the Petition Date, the Debtors' outstanding balance under the Prepetition ABL Agreement (as defined herein) exceeded $270.0 million and as a result, at the beginning of each business day, any balances in the Debtors' primary depository accounts were automatically swept to the ABL Agent (as defined herein) and applied to the outstanding balance on the

Prepetition ABL Facility (as defined herein).   This cash dominion arrangement further exacerbated the Debtors' liquidity situation.

6.      In an effort to resolve these operational and liquidity issues, commencing in the first half of 2017, the Debtors began proactively exploring their options, considering all available strategic alternatives to improve the Debtors' liquidity position and recapitalize their balance sheets.   These alternatives included a discussion regarding a potential going-concern sale or merger outside of a chapter 11 proceeding, a going-concern sale or merger through a chapter 11 proceeding, and a stand-alone restructuring of the balance sheet with the consent of a steering committee of the Debtors' ABL and Prepetition Term Loan Facility (each as defined herein) lenders, either in or outside of chapter 11.   In the interim, faced with an inability to continue operating without additional liquidity, the Debtors sought bridge financing from their Prepetition Term Loan Facility lenders to enable them to continue to pursue their restructuring alternatives. Ultimately, certain of the Debtors' Prepetition Term Loan Facility lenders provided this liquidity, enabling the Debtors to extend their filing runway with enough time to execute a restructuring support agreement with a strategic partner and certain of the Debtors' key stakeholders.   That restructuring support agreement (the "RSA") is attached hereto as **Exhibit A**.

7.      The RSA, which was signed by a steering committee of Prepetition Term Loan Facility lenders representing over two-thirds of the Prepetition Term Loan Facility (as defined below) claims, the Term DIP Lenders, holders of two tranches of promissory notes, and the strategic partner, provides the basis for a consensual chapter 11 plan followed immediately by a merger of the reorganized equity into the strategic partner.   Through the RSA, the Debtors have lined up DIP Facilities (as defined below) of $364.7 million to continue operations and preserve the value of the estates, and can proceed with a prearranged chapter 11 plan that provides the

Debtors with (a) a restructuring of more than $760 million in funded debt and (b) a merger with a strategic partner to enable the combined company to emerge as a stronger combined business, better able to meet evolving client needs and offer solutions, resources, and expertise in ways neither the Debtors nor the strategic partner could achieve independently.

8.     To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these chapter 11 cases, this declaration is organized into five parts.  **Part I** of this declaration describes the Debtors' business history and operations.  **Part II** of this declaration describes the Debtors' capital structure.  **Part III** of this declaration details the circumstanc*es* surrounding the commencement of these chapter 11 cases.  **Part IV** of this declaration describes the Debtors' prepetition restructuring efforts.  **Part V** of this declaration sets forth the relevant facts in support of each First Day Motion (as defined below).

**Part I**
**VER's Background**

**I.     The Debtors' Historical Operations**.

9.     Full Throttle Films, the predecessor to VER, was founded in 1982 by Vincent Dundee and Scott Dundee.  Over the course of the next three decades, VER grew through strategic acquisitions and operational diversifications into one of the world's leading video equipment rental companies.  Initially, the Debtors provided video rental and film production and editing services.  By the early 1990s, VER's focus shifted from video rental and film production and editing services to renting audio visual equipment.  In its early years as an equipment rental company, VER focused on providing "dry-hire" rentals (*i.e.*, rental equipment with no customization) to the corporate market.  "Dry-hire" rentals remain one of VER's core competencies and account for a significant portion of the Debtors' revenue.

4

10.    In the late 1990s, VER capitalized on the fledgling reality television market shunned by other providers and leased cameras and equipment to the first season of *Survivor*. Since then, VER has become a dominant player in the reality television sector and has used that dominance as a foothold into other sectors, including scripted television and feature films.

11.    Since its inception, VER has explored opportunities to expand its geographic footprint to service new markets.  As part of initial expansion efforts, VER rolled out more service-oriented offerings or "wet-hire" rentals, which allowed VER to begin servicing live events and concerts.  Concurrently, the Debtors also expanded their product offerings to include audio and lighting equipment.  Over the course of the ensuing decade, VER continued to hone the core rental business and, in a move to further support their clients' needs, in 2012, VER launched design and engineering divisions to provide in-house product development, customization, and modification services.  In 2014, VER further expanded offerings to include LED technology and began providing LED environments, which are digital backdrops for filming fixtures or performers.  Following over three decades of expansion, the Debtors now have 35 offices located across North America and Europe.

## II.    The Debtors' Current Operations.

12.    Today, the Debtors, together with their non-Debtor subsidiaries, are one of the largest suppliers of rental production equipment and solutions in the world, having recently completed projects on six continents.  Through their North American and European offices, the Debtors and their non-Debtor subsidiaries rent and provide support services for a broad variety of audio, video, and lighting equipment, including, among other things, microphones, monitors, speakers, cameras, lenses, automated lighting equipment, spotlights, special effects technology, and LED technology.  The Debtors' domestic locations consist of six hubs and 21 branch locations, including a design and engineering facility, a machine shop, an LED calibration

facility, six camera preparation facilities, and VER HoldCo's corporate headquarters in Glendale, California.

**A.     Rental Business**.

13.     The Debtors' core business segment has been, and continues to be, equipment rentals.  In 2017, the Debtors' global rental business accounted for approximately $386 million of the Debtors' revenue.  The Debtors' rental operations typically follow a five stage cycle:

> i.     **Sale Process**.  The first step in the rental process is driven by the Debtors' sales teams.  The Debtors' rentals are predominately driven by rental demands for specific items through inbound calls and proactive sales force marketing.  Although the entertainment industry is dominated by short-term projects, approximately 56 percent of the Debtors' business comes from recurring clients.

> ii.    **Rental Order**.  Once the rental order is generated, the logistics team ensures that the appropriate equipment is made available to the desired warehouse and then stages the equipment for delivery.  Depending on the type of rental, the Debtors devote a varied amount of time and resources at this stage to modify the equipment to meet the customers' needs.

> iii.   **Delivery to Customer**.  Once the rental order is aggregated at the Debtors' warehouse, the equipment is shipped to the customer's venue where, in some cases, it is set up and/or managed by the Debtors' employees.

> iv.    **Customer Service**.  During the lifetime of the rental, the Debtors provide 24/7 customer service with a guaranteed response time of 15 minutes.  Depending on the type of rental, the Debtors may also manage the equipment for the customer during the life of the rental.  The Debtors provide warranties for the life of the rental in case the equipment malfunctions.

> v.     **Project Completion**.  At the conclusion of the rental, the equipment is packaged for transportation and delivered back to the appropriate warehouse.  Once returned, the equipment is inspected for damages, cleaned, repaired, and repacked for storage or its next project.

14.     Each rental order generally falls into one of three categories:  (a) "dry-hire" rentals or pure equipment rentals which exclude any service; (b) prepared hires, where the Debtors provide some support in modifying the customers' equipment; and (c) full-service hires.  Each category includes a varying degree of customization.  For example, pure equipment rentals

are rental transactions where a customer orders the required equipment, and the Debtors package and ship that equipment to the customer. The Debtors' initial business model was based on "dry-hire" rentals, which still account for a significant portion of the Debtors' revenue. Although "dry-hire" rentals have a low impact on the Debtors' workforce, such rentals are executed on a short time frame and require a significant amount of logistical support and coordination across the Debtors' infrastructure.

15.     On the other end of the spectrum are full service hires. There, the Debtors and potentially other third-parties work with the customer on a daily basis to support the customer's usage of the Debtors' equipment. The Debtors utilize their in-house design and engineering department to create hundreds of custom parts every month. Through their fabrication and manufacturing expertise, as well as through their sophisticated design and drafting technology, the Debtors are able to serve the needs of their customers in a more efficient manner than their competitors. After the Debtors prepare the equipment, including by making any customizations or modifications that may be required by the customer, the Debtors ship the goods and provide on-site support for the length of the rental.

16.     Prepared hires, which fall in the middle of the spectrum between pure equipment rentals and full-service hires, are rentals that require the Debtors to consult with their customers on the configuration and compatibility of the Debtors' equipment to the customer's needs, but do not require the same level of service as full-service clients.

## B.     LED Business.

17.     The LED business provides highly customized LED walls for public displays, architectural installations, and commercial settings. In 2017, the Debtors' LED business accounted for approximately $33.1 million in revenue.

18.     The Debtors' LED business is driven by cutting-edge proprietary technology and intellectual property, including over 140 design and utility patents.   In addition, the Debtors closely protect trade secret technology for specialty processing, thinness of panels, color fidelity, and low power consumption.   The design and engineering department allows the Debtors to take on the most complicated applications requiring involvement from the initial design stage through execution.   In addition, the Debtors have established long-term relationships with reliable LED manufacturers that provide the Debtors with materials on favorable trade terms, without which the Debtors likely would have lacked the liquidity to expand into the LED sector.

### C.      Resale Business.

19.     In May 2017, the Debtors launched a used asset sales department.   In just a few short months, used asset sales have become an integral part of the Debtors' business model. Since its inception, the resale department has launched a full-scale e-commerce website, built an online VER brand, "ShopVER", and completed over $4.0 million in cash sales in 2017.   The primary intent behind the program was to improve cash flow, raise the quality standards of the Debtors' inventory by cycling out old equipment for new equipment, and increase the Debtors' offerings to customers.   The program also frees up valuable square footage across multiple facilities, providing the Debtors with the opportunity to reduce rental costs.   Currently, all revenue earned from the sale of used assets is being allocated back to capital expenditure budgets for each product group.   This encourages product teams and rental agents to look for opportunities to maximize the useful life of the equipment and sell used equipment.

### III.     The Debtors' Rental Customers.

20.     Today, the Debtors have a record number of new clients, which generally fall into three categories:   (a) corporate and hotel; (b) television and cinema; and (c) live music.

A.      **Corporate and Hotel**.

21.      In both the corporate and hotel markets, clients utilize the Debtors to supplement their inventory of audio visual equipment when their in-house equipment is not sufficient for their needs, or to otherwise procure high-end specialty equipment for events.  Combined, these two segments are spread across approximately 30 local markets and accounted for roughly 57 percent of the Debtors' 2017 revenue.

22.      The Debtors have built strong relationships with both the audio visual rental customer base, which includes approximately 4,500 companies across the United States, and the hotel customer base, which is focused on nine large audio visual companies that operate at over 1,200 hotels, resorts, and convention centers.  The Debtors' relationships with some of these customers span approximately 30 years.  Although the Debtors' corporate and hotel clients account for approximately 50 percent of the Debtors' revenue, they also have historically averaged the shortest rental periods, averaging 18 days.

B.      **Television and Cinema**.

23.      The Debtors' television and cinema customers account for approximately 28 percent of the Debtors' rental revenue and comprise three main segments:  (a) scripted (both cinema and TV); (b) unscripted (primarily reality, talk, and game shows); and (c) broadcast (primarily live sports and news television programming).  As discussed above, the Debtors have maintained a significant market share of the unscripted segment since the onset of reality television in the mid-1990s.

24.      The Debtors have used their position in the unscripted sector to expand into the scripted and broadcast sectors.  The Debtors' recent broadcast work includes the 2018 Super Bowl broadcast, where the Debtors provided equipment and a team of nearly 100 employees.  The Debtors' television and cinema sector is relationship-driven and longer-term success is often

dependent on building lasting relationships with production teams before their shows are popular. To that end, the Debtors have established long-term relationships with production executives who use the Debtors for their new projects. Indeed, approximately 50 percent of the Debtors' television and cinema customers are repeat clients. The average length of a television and cinema rental is approximately 42 days.

C.    **Live Music**.

25.    The live music sector accounts for approximately 11 percent of the Debtors' rental revenue. The Debtors serve over 350 live music customers per year, including "blue chip" concert tours (*e.g.*, Justin Bieber, Coldplay), music festivals, special music events, and one-off performances. Live music customers generally rent lighting, audio, LED, and video equipment, and 80 percent of the live music customers use the Debtors' crewing services to staff and run their events. Historically, the top five percent of the Debtors' live music clients accounted for nearly 70 percent of total billings due to the scale and duration of major tours. The average length of a live music rental is approximately 47 days.

IV.    **Inventory**.

26.    The Debtors have one of the largest, most advanced inventories of rental production equipment in the world, including over $1.2 billion of equipment consisting of over 290,000 pieces. The depth and breadth of the Debtors' inventory differentiates them from regional and niche competitors. The Debtors' equipment inventory is concentrated in five key product groups, which are utilized across customer markets: audio, audio visual ("A/V") equipment, cameras, LED, and lighting.

A.    **Equipment Life Cycle**.

27.    The Debtors' equipment usage generally follows a three stage life cycle: (a) procurement; (b) rental; and (c) sale. In the procurement stage, the Debtors engage a select

group of specialized equipment vendors to source their equipment, typically on an order-by-order basis and without long-term or volume contracts. Once the equipment is procured, it is added to the Debtors' asset management system so it can be tracked throughout its lifespan and evaluated to determine the return on assets ("ROA").

28.     The rental stage is when the Debtors rent the equipment to their customers. During the rental stage, the Debtors track and manage three key metrics:  weekly ROA, utilization, and rental life.  By tracking and managing the weekly ROA, the Debtors are able to control pricing to ensure rates cover job costs and overhead.  Managing utilization allows the Debtors to appropriately allocate assets to locations and markets with the highest demand.  The Debtors' goal in tracking the rental life is to retain assets until optimal disposal opportunity while also minimizing maintenance cost.  Although the asset life varies based on the equipment type, the average age of the Debtors' equipment is approximately 8.5 years.

29.     The final stage in the life cycle of the Debtors' equipment is the sale stage.  As discussed more fully above, the Debtors' used asset sales team was formed in the second quarter of 2017.  By the end of 2017, the sales team executed approximately $4.0 million of sales.  The sale stage attempts to time asset sales to maximize value by leveraging the Debtors' diverse network of buyers through multiple channels.  Sales are either direct sales through the sales team or online sales through their website ShopVER.com or other online channels.

**B.     Capital Expenditures**.

30.     Given the expanding market needs and changes in technology, the Debtors regularly acquire new rental equipment in the ordinary course of business to maintain the functionality of their rental equipment inventory.  Through capital expenditures, the Debtors have also expanded their rental equipment offerings to better serve their customers.  In the 12

months ending on December 31, 2017, the Debtors acquired approximately $57.0 million in rental equipment inventory.

## Part II
## Overview of the Debtors' Capital Structure

31.    A summary chart depicting the Debtors' corporate and capital structure is attached hereto as **Exhibit B**.  As of the Petition Date, the Debtors' capital structure consisted of outstanding funded-debt obligations in the aggregate principal amount of approximately $760.77 million, consisting of the Prepetition ABL Facility, the First Out Loans, the Prepetition Term Loan Facility, the New FTF Inc. Note, and the Catterton Notes (each as defined herein). The following table summarizes the Debtors' funded-debt obligations at the time of filing:

| Funded Debt | Maturity | Principal Amount Outstanding |
|---|---|---|
| Prepetition ABL Facility | December 2019 | $296.3 million |
| Prepetition Term Loan Facility | March 2020 | $424.2 million |
| First Out Loans | March 2020 | $14.0 million |
| New FTF Inc. Note | December 2017 | $18.75 million |
| Catterton Notes - March 9, 2017 | June 2020 | $2.5 million |
| Catterton Notes - February 9, 2017 | June 2020 | $5.0 million |
| | **Total** | $760.77 million |

## I.    The 2014 Transaction.

32.    In late 2014, Vincent Dundee's and Scott Dundee's majority ownership of VER came to an end.  On December 11, 2014, *L* Catterton Partners (together with their affiliates and subsidiaries, collectively, "Catterton"), made a majority investment in VER through a leveraged buyout (the "2014 Transaction"), infusing needed liquidity into the Debtors and beginning a strategic partnership that survives today.  The 2014 Transaction was primarily funded by the Prepetition ABL Facility and Prepetition Term Loan Facility (each as defined herein) as well as

the New FTF Inc. Note (as defined herein) and cash from Catterton co-investors.  The original founders of VER, Vincent Dundee and Scott Dundee, still remain minority investors.

## II.    Prepetition ABL Facility.

33.    In connection with the 2014 Transaction, VER Technologies LLC ("VER Technologies"), as lead borrower, certain of the other Debtors, as additional borrowers,[2] the guarantors party thereto,[3] various lenders, and Bank of America, N.A. (the "ABL Agent"), as administrative and collateral agent, entered into that certain Credit Agreement dated as of December 11, 2014 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition ABL Agreement").  The Prepetition ABL Agreement provides for a senior secured asset-based revolving credit facility (the "Prepetition ABL Facility") with a maximum commitment of $300 million, the availability of which is subject to a borrowing base calculation.  The Prepetition ABL Facility also provides that a portion of the maximum commitments are available for the issuance of standby letters of credit in an aggregate stated amount at any time outstanding not to exceed $100.0 million and for swing-line loans in an aggregate principal amount not to exceed $30.0 million.  The Prepetition ABL Facility accrues interest at the London Inter-bank Offered Rate (the "LIBOR Rate") plus an applicable margin based on the amount of availability under the Prepetition ABL Facility, currently 2.75 percent.  The Prepetition ABL Facility matures in 2019.  Obligations under the Prepetition ABL Facility are secured by a first priority lien on substantially all of the Debtors'

---

[2]    The additional borrowers under the Prepetition ABL Facility are CPV Europe Investments, LLC, FAAST Leasing California, LLC, Full Throttle Films, LLC, Maxwell Bay Holdings LLC, Revolution Display, LLC, VER Finco, LLC, and VER Flex Solutions, LLC.

[3]    The guarantors under the Prepetition ABL Facility are VER Technologies MidCo LLC, VER GmbH, FAAST Equipment Leasing Limited, VER Holland B.V., and Verrents UK Limited (collectively, the "ABL Guarantors").

assets (the "<u>ABL Collateral</u>").  Each of the ABL Guarantors has guaranteed all obligations under the Prepetition ABL Facility.

34.      On December 30, 2016, the Debtors entered into that certain Second Amendment to the Credit Agreement, dated December 30, 2016, pursuant to which the Debtors' equity sponsor, Catterton, provided a letter of credit in the amount of $30.0 million in support of the Debtors' obligations under the Prepetition ABL Facility (the "<u>Catterton Letter of Credit</u>") issued by Silicon Valley Bank for the benefit of the secured lenders under the Prepetition ABL Facility. On April 27, 2017, VER Technologies, as borrower, issued a promissory note to Catterton Partners VII L.P., as lender, in an amount equal to the lesser of $30.0 million, bearing an interest of 12 percent per annum, or the amount that has been drawn under the Catterton Letter of Credit.

35.      The Prepetition ABL Facility is used to fund the Debtors' daily operations.  Each day, the Debtors make a request to the ABL Agent to transfer available funds under the Prepetition ABL Facility into the Debtors' primary operating account.  As discussed above, after the Debtors' outstanding balance under the Prepetition ABL Agreement exceeded $270.0 million in October 2016, any balances in the Debtors' primary depository accounts were swept to the ABL Agent at the beginning of each day, and applied to the outstanding balance on the Prepetition ABL Facility.  This cash dominion arrangement continues through the Petition Date. As of the Petition Date, approximately $296.3 million remained outstanding under the Prepetition ABL Facility, including the amount of issued Letters of Credit.

**III.    Prepetition Term Loan Facility and First Out Loans**.

36.    Also in connection with the 2014 Transaction, VER Technologies, as lead borrower, certain of the Debtors, as additional borrowers,[4] the guarantors party thereto,[5] and the lenders party thereto arranged by GSO Capital Partners, L.P. ("GSO") and Wilmington Trust, National Association, as administrative agent and collateral agent, entered into that Credit Agreement dated as of December 11, 2014 (as amended, amended and restated, supplemented, or otherwise modified, from time to time prior to the Petition Date, the "Prepetition Term Loan Agreement").  Pursuant to the Prepetition Term Loan Agreement, on December 11, 2014, the lenders thereunder funded term loans in an original principal amount of $400 million (the "Prepetition Term Loan Facility") that currently bear interest at an annual rate equal to the LIBOR Rate (which shall not be less than one percent) plus an applicable margin of 8.75 percent.

37.    The Prepetition Term Loan Agreement was amended effective February 6, 2018, to permit cash advances to the Debtors. On February 6, 2018, February 23, 2018, March 17, 2018, and March 28, 2018, the Debtors requested and received term loan advances totaling an aggregate original principal amount of $14 million (the "First Out Loans") at an annual interest rate equal to the LIBOR Rate (which shall not be less than one percent) plus an applicable margin of 13.25 percent, which shall be paid in kind.  The Prepetition Term Loan Facility is subordinated, to the extent set forth in the Prepetition Term Loan Agreement, to the payment in full of the obligations in respect of the First Out Loans.  The relative rights of the parties to the

---

[4]    The additional borrowers include CPV Europe Investments, LLC, FAAST Leasing California, LLC, Full Throttle Films, LLC, Maxwell Bay Holdings LLC, Revolution Display, LLC, VER Finco, LLC, and VER Flex Solutions, LLC.

[5]    The guarantors include Debtor VER Technologies MidCo LLC, and non-Debtors VER GmbH, FAAST Equipment Leasing Limited, VER Holland B.V., and Verrents UK Limited.

Prepetition ABL Facility and the Prepetition Term Loan Facility are governed by that certain Intercreditor Agreement, dated as of December 11, 2014.

38.     As of the Petition Date, the Debtors have approximately $424.2 million in principal outstanding under the Prepetition Term Loan Facility in addition to the $14 million in principal outstanding under the First Out Loans.  The Debtors made interest payments in kind instead of cash for the first two quarterly interest payments for 2017, increasing the principal amount outstanding to approximately $424.2 million.  In addition, the Debtors estimate that there is approximately $33.2 million in accrued but unpaid interest on account of the second two quarterly payments for 2017 and the first quarterly payment for 2018.  The Prepetition Term Loan Facility and First Out Loans mature in 2020 and are secured by second-priority liens on substantially all of the Debtors' assets.

39.     On March 27, 2018, the Debtors chose to preserve liquidity and forgo the first quarter interest payment due under the Prepetition Term Loan Agreement.  The failure to pay the interest payment for five business days following the date of nonpayment constitutes an event of default under the Prepetition Term Loan Agreement and a corresponding event of default under the Prepetition ABL Agreement.

**IV.     New FTF Inc. Note**.

40.     As of the Petition Date, the Debtors have approximately $18.75 million in principal amount outstanding pursuant to that certain Unsecured Subordinated Promissory Note, dated December 11, 2014 (as amended and restated on February 23, 2015, the "New FTF Inc. Note") among VER Technologies, as issuer, and New FTF, Inc., as seller.  The New FTF Inc. Note matured in 2017 and required quarterly coupon payments through December 31, 2017, at an interest rate of five percent plus two percent when the notes are in default.  The New FTF Inc. Note is unsecured and subordinated to the Prepetition ABL Facility, First Out Loans, and the

16

Prepetition Term Loan Facility.  Pursuant to the subordination terms of the New FTF Inc. Note, holders of the Prepetition ABL Facility, First Out Loans, and Prepetition Term Loan Facility must receive payment in full in cash before payments can be received under the New FTF Inc. Note.  Because the payment of the New FTF Inc. Note is blocked pursuant to the subordination terms, the Debtors did not pay the New FTF Inc. Note when it matured on December 31, 2017. As a result, the New FTF Inc. Note is currently in default.

**V.      Catterton Notes**.

41.      As of the Petition Date, the Debtors have approximately $7.5 million in principal amount outstanding under promissory notes provided by various Catterton entities (collectively, the "Catterton Notes").   VER Finco, LLC, as borrower, and Catterton Partners VII Special Purpose, L.P., Catterton Partners VII L.P., and Catterton Partners VII Offshore, L.P., as lenders, are parties to that certain Demand Promissory Note, dated as of February 9, 2017 (as amended and restated on April 27, 2017) in an original principal amount of $5 million.  VER Finco, LLC, as borrower, and Catterton Partners VII, L.P., Catterton Partners VII Special Purpose, L.P., and Catterton Partners VII Offshore, L.P., as lenders, are also parties to that certain Demand Promissory Note, dated as of March 9, 2017 (as amended and restated on April 27, 2017) in an original principal amount of $2.5 million.  The Catterton Notes mature in 2020 and bear interest at a rate of 12 percent per annum, paid quarterly in kind.  The Catterton Notes are unsecured and subordinated to the Prepetition ABL Facility, the First Out Loans, the Prepetition Term Loan Facility, and the New FTF Inc. Note.

**VI.      Equity**.

42.      As of the Petition Date, Catterton directly or indirectly holds 92.9 percent of the common equity interest in VER HoldCo.  Vincent Dundee, Scott Dundee, Vincent's wife, Judith

Dundee, and Steve Hankin, VER Holdco's former chief executive officer, directly or indirectly hold the remaining common equity interest in VER HoldCo.

## Part III
## Events Leading to the Chapter 11 Cases

43.    In 2014, the Debtors were the dominant player in the pure rental corporate market.  In the ensuing years, the Debtors aggressively expanded into full-service markets and instituted various operating model changes, which resulted in deteriorated margins and cash flow.

### I.    **Prepetition Challenges**.

44.    Over the course of the last three years, a number of key prepetition challenges have contributed to the Debtors' tight liquidity position.  For example, as the Debtors expanded into the full service market, they created service channel conflict that damaged relationships with key pure rental corporate customers.  For example, certain of these customers increasingly saw the Debtors as a competitor.  Such competitive tension resulted in reduced rentals from these customers.

45.    Contemporaneously with the reduced demand from pure rental corporate customers, certain organizational changes led to significantly increased labor costs.  Between 2015 and 2016, the Debtors' employee salary and benefits obligations grew by $28 million.  Most of these obligations were on account of new hires in the Debtors' products and operations teams as part of a shift from a branch-based business structure to a product-based business structure.  This change also resulted in off-site, remote decision-making, resulting in a lack of accountability at a local level.  The corresponding growth in the rental business was approximately $10 million, or less than half of the Debtors' increased workforce costs.

46.     In addition, between 2015 and 2016, the Debtors purchased approximately $238 million of new rental equipment.  These purchases were disproportionally underutilized or purchased for segments that historically earned a lower ROA, which drove negative cash flow and further increased the Debtors' liquidity constraints.  Further, in 2016, the Debtors rolled out a new hub and spoke distribution model, which resulted in extensive rent increases and the build out of higher-end local tech centers ahead of sufficient local demand.  This rollout also inadvertently resulted in an uptick of "no-charge" orders totaling approximately $3.4 million of missed revenue and damaged certain client relationships.  Finally, during their expansion in 2015 and 2016, the Debtors also invested in new facilities that were unexpectedly not supported by market demand.

## II.     **Market Headwinds**.

47.     In 2017, the Debtors' liquidity continued to tighten due to a series of market headwinds.  More specifically, sale rumors impacted revenues, caused staff attrition, damaged morale, and reduced productivity.  The instability associated with uncertainty surrounding the potential transaction resulted in the loss of various multi-million dollar clients, particularly in the live music segment.  In addition, the Debtors lost key employees, including certain key executives, revenue generators, and product experts.  These issues were exacerbated by a depression in the rental rates of certain of the Debtors' most popular LED panels as a result of a new Chinese manufacturer flooding the market.  The Debtors' liquidity was also negatively impacted by missing "even-year" events such as the Olympics or political elections, that left an approximately $2.4 million EBITDA gap for 2017.  Finally, the Debtors' rental business was negatively affected by inclement weather in the southeast, including hurricanes Harvey and Irma.  These storms caused devastation and impacted certain of the Debtors' customers, which drove an estimated shortfall of $1.7 million in EBITDA.  These headwinds, combined with the prepetition

challenges and the liquidity constraints required in connection with the Debtors' entry into cash dominion under their Prepetition ABL Facility, have resulted in ongoing negative financial trends, including recurring operational losses, working capital deficiencies, and declining net equity.

**Part IV**
**Restructuring Efforts**

48.     The Debtors have taken steps to address these operational and liquidity issues.  In the first half of 2017, in addition to undergoing certain managerial changes, the Debtors, together with their advisors, engaged with various constituencies, including Production Resource Group, Inc. ("PRG"), GSO, and Bank of America Merrill Lynch, in good-faith discussions regarding various restructuring alternatives.  The goal of these discussions was to explore all viable in-court and out-of-court restructuring alternatives that would meaningfully deleverage the Debtors' balance sheet, result in improved liquidity, and provide for necessary operational changes.  These discussions culminated in the execution of the RSA, attached hereto as **Exhibit A**.

I.      **Retention of Restructuring Advisors**.

49.     In March 2017, the Debtors retained Kirkland & Ellis LLP to assist with a strategic review of their operations and capital structure. In January 2018, the Debtors also retained AlixPartners (including a Chief Restructuring Officer) to serve as restructuring advisors and PJT Partners LP ("PJT") to serve as their investment banker.

II.     **Appointment of the Independent Director**.

50.     As part of their efforts to evaluate and develop a value-maximizing restructuring for all stakeholders, the board of directors of VER HoldCo (the "Board") appointed Eugene Davis as their independent director as of February 5, 2018 (the "Independent Director").  Since his appointment, Mr. Davis has played a key role in the restructuring negotiations, including

considering all aspects of the RSA.  In addition, on March 26, 2018, the Board approved the formation of a special committee with Mr. Davis as the sole member to review potential estate claims and causes of action in connection with the 2014 Transaction.

## III.    Prepetition Financing.

51.    Given the Debtors' tight liquidity position, additional financing was needed to provide the Debtors sufficient time to evaluate and negotiate restructuring alternatives with various stakeholders and to ensure a smooth transition into chapter 11.  On February 5, 2018, the Board unanimously approved an amendment to the Prepetition Term Loan Facility to borrow the First Out Loans.  Under the terms of the amendment, certain lenders under the Prepetition Term Loan Facility, including GSO, agreed to provide $5.0 million of immediate financing with the possibility of contributing up to $10.0 million of additional financing in such lenders' sole discretion.  On February 6, 2018, certain lenders under the Prepetition Term Loan Facility, including GSO, provided the initial $5.0 million of financing.  On February 23, 2018, certain lenders under the Prepetition Term Loan Facility, including GSO, provided an additional $5.0 million in financing.  On March 7, 2018, certain lenders under the Prepetition Term Loan Facility, including GSO, provided an additional $2.0 million in financing.  Finally, on March 28, 2018, certain lenders under the Prepetition Term Loan Facility, including GSO, provided an additional $2.0 million in financing in order to facilitate ongoing restructuring discussions and to provide a smooth transition into chapter 11.

## IV.    Summary of the RSA.[6]

52.    As noted above, on April 5, 2018, the Debtors entered into the RSA attached hereto as **Exhibit A**.  The RSA has the support of Prepetition Term Loan Facility lenders

---

[6] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the RSA and the term sheets attached thereto.

representing over two-thirds of the Prepetition Term Loan claims, the Term DIP Lenders, the strategic partner, and holders of two tranches of promissory notes.  The Debtors also secured the DIP Facilities (as defined below) that, collectively with the RSA, will allow the Debtors to proceed with this case by providing the Debtors with $364.7 million to continue operations and preserve the value of the estate, and sets the stage for a prearranged chapter 11 plan that provides the Debtors with (a) a restructuring of more than $760 million in funded debt and (b) a merger with PRG, the strategic partner.  PRG is a leading provider of entertainment and event technology solutions.  PRG provides comprehensive services to an array of clients in the live music, television, film, Broadway, sports, gaming, corporate experiential, and live events markets.  A merger with PRG will enable the Debtors to emerge as a stronger company, better able to meet evolving client needs and offer solutions, resources, and expertise in ways neither the Debtors nor PRG could achieve independently.

53.    The RSA also contemplates a timeline with the following material milestones (among others) for the Debtors to implement a financial restructuring of existing debt and certain other obligations of the Debtors through a prearranged chapter 11 plan (including any related documents such as supplements thereto, the "Plan"):

- No later than twenty-five (25) days after the Petition Date, the Debtors shall have filed with the Bankruptcy Court the Plan contemplated by the RSA together with the disclosure statement related thereto.

- No later than twenty-five (25) days after the Petition Date, the Debtors shall have filed with the Bankruptcy Court their schedules of assets and liabilities and statement of financial affairs.

- No later than sixty (60) days after the Petition Date, the Debtors shall obtain an order of the Bankruptcy Court approving the adequacy of the disclosure statement.

- No later than one hundred (100) days after the Petition Date, the Plan shall have been confirmed by an order of the Bankruptcy Court.

- No later than one hundred fifteen (115) days after the Petition Date, the effective date of the Plan shall have occurred.

## V.    **DIP Facilities**.

54.     In conjunction with the RSA, the Debtors have obtained commitments for $364.7 million in the aggregate of senior and junior debtor-in-possession financing, consisting of a $300 million senior secured superpriority ABL facility and a $64.7 million (including up to $50 million in new money) priming second-lien secured delayed-draw term loan facility (together, the "DIP Facilities"), in addition to the consensual use of cash collateral.  The DIP Facilities were preceded by a marketing process designed to secure postpetition financing on the best available terms.  In addition to providing the Debtors with incremental liquidity, the DIP Facilities will provide the Debtors with access to the use of the prepetition lenders' cash collateral on a consensual basis, and will maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders.  The terms of the DIP Facilities are described in further detail in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code and (B) Utilize Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "DIP and Cash Collateral Motion"), filed contemporaneously herewith and incorporated by reference herein.

55.     The provisions of the DIP Facilities were extensively negotiated, and I believe that entry into those facilities is in the best interests of the Debtors' estates.  The Debtors have an urgent need for the DIP Facilities, which will ensure the Debtors are able to maintain their operations while pursuing a value-maximizing transaction.  Without prompt postpetition

financing and access to cash collateral, the Debtors will be unable to pay wages for their employees, preserve and maximize the value of their estates, and administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

56.     Indeed, in determining the Debtors' debtor-in-possession financing needs, I reviewed and analyzed the Debtor's 13-week and long-term cash flow forecasts.  These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including the effect of the chapter 11 filing on the operations of the business, fees and interest expenses associated with the DIP Facilities, professional fees, and required operational payments.  Based on the Debtors' liquidity forecast, I do not expect the Debtors to be able to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected costs of these chapter 11 cases. In fact, the Debtors were generating insufficient liquidity in the weeks leading up to these chapter 11 cases and were only able to fund their operations during that time because the Prepetition Term Loan Facility lenders provided $14 million of First Out Loans under the Prepetition Term Loan Facility to bridge the Debtors to the Petition Date.

57.     The Debtors' need for the DIP Facilities, as well as details regarding the terms of the DIP Facilities, are outlined in further detail in the Leone Declaration in support of the DIP and Cash Collateral Motion, filed contemporaneously herewith.

**Part V**
**Relief Sought in the Debtors' First Day Motions**

58.     To minimize the adverse effects of the commencement of these chapter 11 cases on their business, the Debtors have requested various types of relief in their "first day" motions and applications filed contemporaneously herewith (collectively, the "First Day Motions").  The

24

First Day Motions seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption to the Debtors' operations caused by their bankruptcy filings, thereby preserving the value of the Debtors' estates for the benefit of their stakeholders.  These First Day Motions include:

- *Debtors' Motion Seeking Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Permitting the Debtors to Modify the Automatic Stay in their Sole Discretion to Proceed with Litigation or Contested Matters Commenced Prepetition, (III) Approving the Form and Manner of Notice, and (IV) Granting Related Relief;*

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief;*

- *Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. §156(c) Authorizing and Approving the Employment and Retention of Kurtzman Carson Consultants LLC as Claims and Noticing Agent to the Debtors and Debtors in Possession Effective Nunc Pro Tunc to the Petition;*

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor; (II) Authorizing the Debtors to Modify Certain Personal Identification Information for Individual Creditors; and (III) Limiting Notice Requirements Under Bankruptcy Rule 2002; and (IV) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief;*

- *Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Programs in the Ordinary Course of Business;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code and (B) Utilize Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief;*

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Honor the Terms of Their Premium Financing Agreement and Pay Premiums Thereunder, and (D) Enter Into New Premium Financing Agreements in the Ordinary Course of Business, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief; and*

- *Debtors' Motion for Entry of an Order Authorizing Debtors to File Under Seal the Fee Letter Related to DIP and Exit Facilities.*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors, and (II) Granting Related Relief*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Certain Foreign Vendors, Shippers, Lien Claimants, and 503(b)(9) Claimants, and (II) Granting Related Relief*

59.     These First Day Motions seek authority to, among other things, obtain the use of cash collateral on an interim basis, honor employee-related wages and benefit obligations, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

60.    Several of these motions request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm . . ."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

61.    I am familiar with the contents and substance of each First Day Motion (including the exhibits thereto), and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge.  I believe that the relief sought in each First Day Motion:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful reorganization; and (c) best serves the interests of the Debtors' stakeholders.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated:    April 5, 2018
          Glendale, California

                                        By: _____
                                            Lawrence Young
                                            Chief Restructuring Officer
                                            VER Technologies HoldCo LLC

**Exhibit A**

**Restructuring Support Agreement**

**EXECUTION VERSION**

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE (AS DEFINED HEREIN).  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

---

### VER Technologies HoldCo, LLC, *et al.*

### Restructuring Support Agreement

### April 5, 2018

---

This Restructuring Support Agreement (together with any exhibit or schedule attached hereto, as each may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms hereof, this "<u>Agreement</u>"),[1] dated as of April 5, 2018, is entered into by and among the following parties, each in the capacity set forth on its signature page to this Agreement:

(i)     VER Technologies HoldCo, LLC ("<u>HoldCo</u>"); CPV Europe Investments LLC; FAAST Leasing California, LLC; Full Throttle Films, LLC; Maxwell Bay Holdings LLC; Revolution Display, LLC; VER Finco, LLC; VER Technologies LLC; and VER Technologies MidCo LLC (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>");

(ii)    the Term DIP Agent and the Term DIP Lenders;

(iii)   the Prepetition Term Loan Agent and the undersigned Prepetition Term Loan Lenders (each a "<u>Supporting Term Loan Lender</u>" and, collectively, the "<u>Supporting Term Loan Lenders</u>"), which hold at least 66 2/3% of the Prepetition Term Loan Claims;

(iv)    PRG Holdings, LLC ("<u>PRG Holdings</u>"), Production Resource Group, Inc. ("<u>PRG, Inc.</u>") and Production Resource Group II, LLC ("<u>PRG Holdings II</u>" and together with PRG Holdings and PRG, Inc., "<u>PRG</u>"); and

(v)     Catterton Partners VII, L.P., Catterton Partners VII Special Purpose, L.P., and Catterton Partners VII Offshore, L.P., Catterton Management Company L.L.C.

---

[1]   Capitalized terms used but not defined herein shall have the meanings given to such terms elsewhere in this Agreement or in the Term Sheet (including any exhibits thereto), as applicable.

each, to the extent applicable, as holders of the Catterton Claims and holders of equity interests in the Debtors (each a "Catterton Party" and, collectively, the "Catterton Parties").

This Agreement collectively refers to the Debtors, the Term DIP Agent, the Term DIP Lenders, the Supporting Term Loan Lenders, PRG and Catterton Parties as the "Parties," and individually as a "Party."

## RECITALS

**WHEREAS**, on April 5, 2018 (the "Petition Date"), the Debtors shall commence voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, the Parties have engaged in good-faith, arm's-length negotiations regarding the Restructuring pursuant to the terms and conditions set forth in this Agreement and the Restructuring Term Sheet attached hereto as **Exhibit A** (the "Term Sheet") (as may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms of this Agreement); and

**WHEREAS**, the Parties have agreed to support the Restructuring, on the terms and conditions set forth in this Agreement and the Term Sheet.

**NOW, THEREFORE**, in consideration of the promises, mutual covenants, and agreements set forth herein, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

## AGREEMENT

1.  RSA Effective Date.  This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties hereto, on the first date (such date, the "RSA Effective Date") that this Agreement has been executed by (a) each Debtor, (b) the Supporting Term Loan Lenders who collectively hold at least two-thirds of the aggregate principal amount of the Prepetition Term Loan Claims, (c) each of the Term DIP Agent and the Term DIP Lenders, (d) PRG, and (e) each of the Catterton Parties.

2.  Exhibits and Schedules Incorporated by Reference.  Each of the exhibits or schedules attached hereto (collectively, the "Exhibits and Schedules") is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between the terms of this Agreement (without reference to the Exhibits and Schedules) and the Term Sheet, the terms of this Agreement shall govern.

3.  Definitive Documentation and Deliveries at the Effective Date.

(a)  The definitive documents and agreements governing the Restructuring (collectively, the "Definitive Documentation") shall consist of all documents (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by and referenced

herein in this <u>Section 3(a)</u>, <u>Section 3(b)</u> and <u>Section 3(c)</u> below and in the Term Sheet including, without limitation, the documents comprising the Plan (including any supplements to the Plan) and the Confirmation Order.

(b)     On the Effective Date, subject to the satisfaction of the applicable conditions set forth in <u>Section 23</u>,   the applicable Party shall, or shall cause their subsidiaries to, effect the transactions to be performed by such Party set forth on **<u>Exhibit B</u>** in the manner and order set forth therein (the "<u>Transactions</u>") and shall deliver, or cause to be delivered, to the other Parties, each document and agreement set forth or otherwise reasonably required to effect and consummate or cause to be effected and consummated  the Transactions.

(c)     On the Effective Date, subject to the satisfaction of the applicable conditions set forth in <u>Section 23</u>, each Party shall deliver, or cause to be delivered, to the other Parties, certified copies of the resolutions duly adopted by such Party's governing body authorizing the execution, delivery and performance of this Agreement and the other Definitive Documentation to which such Party is a party, and the consummation of the transactions contemplated hereby and thereby.

(d)     The Definitive Documentation identified in <u>Section 3(a)</u>, <u>Section 3(b)</u> and <u>Section 3(c)</u> shall each be consistent in all material respects with, and shall otherwise conform to, the terms and conditions set forth in this Agreement (and the respective Exhibits and Schedules attached hereto) and shall be in form and substance reasonably acceptable to the Debtors, the Requisite Supporting Term Loan Lenders, and PRG; *provided* that all Definitive Documentation that has a material impact on the Term DIP Lenders shall be in form and substance reasonably acceptable to them. As used in this Agreement:  (i) "<u>Requisite Supporting Term Loan Lenders</u>" means, as of the relevant date, Supporting Term Loan Lenders that collectively hold greater than 50% of the aggregate outstanding principal amount of the Prepetition Term Loan Claims held by Supporting Term Loan Lenders; and (ii) "<u>Majority Term DIP Lenders</u>" means, as of the relevant date, Term DIP Lenders holding greater than 50% of the aggregate outstanding principal amount of the outstanding obligations under the Term DIP Facility.

4.     Commitment of the Term DIP Agent and Term DIP Lenders.

(a)     <u>General Affirmative Commitments</u>.  Each Term DIP Agent and Term DIP Lender shall, from the RSA Effective Date until the Termination Date:

(i)     use reasonable best efforts to support and cooperate with the other Parties in support of the Plan, Transactions and the Restructuring and use reasonable best efforts to take all actions necessary or appropriate to implement the Plan and consummate the Restructuring and the Transactions in accordance with the Plan and the terms and conditions of this Agreement;

(ii)     give any other notice, order, instruction, or direction to any applicable agent necessary to give effect to its commitments hereunder; and

(iii)     negotiate in good faith to execute all Definitive Documentation that is subject to negotiation as of the RSA Effective Date and take any and all necessary and appropriate actions in furtherance of its commitments hereunder.

(b)     <u>General Negative Commitments</u>.  Each Term DIP Agent and Term DIP Lender shall not, directly or indirectly, from the RSA Effective Date until the Termination Date:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring or any motion or other pleading or document filed by a VER Entity in the Bankruptcy Court that is consistent with this Agreement and the Term Sheet attached hereto;

(ii)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring contemplated herein against the VER Entities other than to enforce this Agreement or any Definitive Documentation or as otherwise permitted under this Agreement;

(iii)     either itself or through any representatives or agents solicit or induce any proposal, offer, bid, term sheet, or discussion with respect to a new money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Debtor or the debt, equity, or other interests in any one or more Debtors that is an alternative to the Restructuring other than an alternate, standalone plan supported by the Debtors and the Supporting Term Loan Lenders (collectively, an "<u>Alternative Restructuring Proposal</u>") from or with any entity (and shall immediately inform the Parties of any notification of an Alternative Restructuring Proposal); or

(iv)     object to, delay, impede, or take any other action to interfere with the VER Entities' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

(c)     <u>Commitments with Respect to the Chapter 11 Cases</u>.  Each Term DIP Lender agrees in respect of all of its Claims or Interests from the RSA Effective Date until the occurrence of the Termination Date that it shall:

(i)     consent to the treatment for Term DIP Facility Claims under the Plan that is consistent with the Term Sheets; and

(ii)     elect not to affirmatively "opt out" of being a releasing party by either (a) timely delivering its duly executed and completed ballot(s) indicating such election or (b) by refraining from objecting to the Plan's third-party release provisions, as applicable.

5.     Commitment of the Prepetition Term Loan Agent and Supporting Term Loan Lenders.

(a)     <u>General Affirmative Commitments</u>.  Each Prepetition Term Loan Agent and Supporting Term Loan Lender shall, from the RSA Effective Date until the occurrence of the Termination Date:

    (i)     use reasonable best efforts to support and cooperate with the other Parties in support of the Plan, Transactions and the Restructuring and use reasonable best efforts to take all actions necessary or appropriate to implement the Plan and consummate the Restructuring and the Transactions in accordance with the Plan and the terms and conditions of this Agreement;

    (ii)     give any other notice, order, instruction, or direction to any applicable agent necessary to give effect to its commitments hereunder; and

    (iii)     negotiate in good faith to execute all Definitive Documentation that is subject to further negotiation as of the RSA Effective Date and take any and all necessary and appropriate actions in furtherance of its commitments hereunder; and

    (iv)     effect and consummate or cause to be effected and consummated (in the manner set forth therein) the Transactions set forth on **<u>Exhibit B</u>** to be performed by the Supporting Term Loan Lenders on or prior to the Effective Date, subject (in the case of Transactions to be effected and consummated on the Effective Date) to the prior satisfaction (or waiver by the Requisite Supporting Term Loan Lenders) of all the conditions set forth in <u>Section 23(a)</u> and <u>(c)</u>.

(b)     <u>General Negative Commitments</u>.  Each Supporting Term Loan Lender shall not, directly or indirectly, from the RSA Effective Date until the occurrence of the Termination Date:

    (i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring or any motion or other pleading or document filed by a VER Entity in the Bankruptcy Court that is consistent with this Agreement and the Term Sheet attached hereto;

    (ii)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring contemplated herein against the VER Entities other than to enforce this Agreement or any Definitive Documentation or as otherwise permitted under this Agreement;

    (iii)     unless there is a successful challenge to their security interest in any equity interest of the Debtors in any of the Non-Debtor Obligors, initiate, or have initiated on its behalf, any litigation or proceeding of any kind, or otherwise exercise or enforce their rights with respect to an Event of Default, as defined in the Prepetition Term Loan Agreement, respectively, against any Non-Debtor Obligors;

    (iv)     either itself or through any representatives or agents solicit or induce any Alternative Restructuring Proposal from or with any entity (and shall immediately inform the Parties of any notification of an Alternative Restructuring Proposal) unless requested by the Debtors; or

      (v)      object to, delay, impede, or take any other action to interfere with the VER Entities' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code, other than as expressly permitted under this Agreement.

(a)      <u>Forbearance and Waiver</u>. Unless and until this Agreement is terminated, the Supporting Term Loan Lenders and the Prepetition Term Loan Agent hereby waive any and all rights and remedies against the Non-Debtor Obligors arising under the Prepetition Term Loan Facility, including but not limited to any such rights and remedies as the result of events of default thereunder arising in connection with the filing of the Chapter 11 Cases (the "<u>Term Loan Forbearance</u>"). The Term Loan Forbearance will terminate as to any Non-Debtor Obligor if there is a successful challenge to any security interest in favor of the Prepetition Term Loan Lenders in any equity interest in the Non-Debtor Obligor.

(c)      <u>Commitments with Respect to the Chapter 11 Cases</u>. Each Supporting Term Loan Lender that is entitled to vote to accept or reject the Plan agrees in respect of all of its Claims or interests from the RSA Effective Date until the occurrence of the Termination Date that it shall, when properly solicited to do so under the Bankruptcy Code:

      (i)      vote each of its Claims or Interests now or hereafter owned by such Supporting Term Loan Lender or for which the Supporting Term Loan Lender now or hereafter serves as the nominee, investment manager, or advisor or beneficial holder of such Claims or interests to accept the Plan by timely delivering its duly executed and completed ballot accepting the Plan;

      (ii)      elect not to affirmatively "opt out" of being a releasing party by either (a) timely delivering its duly executed and completed ballot(s) indicating such election or (b) by refraining from objecting to the Plan's third-party release provisions, as applicable; and

      (iii)      *provided* the Plan is not modified in a manner materially contrary to this Agreement, not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above.

6.      Commitment of the Debtors.

(a)      <u>General Affirmative Commitments</u>. Subject to <u>Section 17</u> hereof and except as (x) consented to by PRG and the Requisite Supporting Term Loan Lenders in accordance with the terms of this <u>Section 6</u>, (such consent shall not be unreasonably withheld, conditioned or delayed), (y) reasonably required by this Agreement, the Plan, the Transactions, the Restructuring or any other Definitive Documentation or (z) required by law (including any applicable bankruptcy law) or any court order, the Debtors shall, from the RSA Effective Date until the Termination Date:

      (i)      use reasonable best efforts to support and cooperate with the other Parties in support of the Plan, Transactions and the Restructuring and use reasonable best efforts to take all actions necessary or appropriate to implement the Plan and consummate

the Restructuring and the Transactions in accordance with the Plan and the terms and conditions of this Agreement, including obtaining an order confirming the Plan;

(ii)     use reasonable best efforts (taking into account that the Debtors are commencing the Chapter 11 Cases) to (A) conduct the Debtors' business in the ordinary course in all material respects, (B) preserve the operations, organization and goodwill of the business and its relationships with government entities, customers, suppliers, vendors, lessors, licensors, licensees, contractors, distributors, agents, employees and others having business dealings with the business, and (C) maintain in full force and effect policies of insurance comparable in amount and scope of coverage to that maintained as of the date of this Agreement by or on behalf of such Debtor in all material respects;

(iii)    negotiate in good faith to execute all Definitive Documentation that is subject to negotiation as of the RSA Effective Date;

(iv)     effect and consummate or cause to be effected and consummated (in the manner set forth therein) the Transactions set forth on **Exhibit B** to be performed by the Debtors on or prior to the Effective Date, subject (in the case of Transactions to be effected and consummated on the Effective Date) to the prior satisfaction (or waiver by the Debtors) of all of the conditions set forth in Section 23(a) and (c);

(v)      obtain orders of the Bankruptcy Court in respect of the Restructuring, including obtaining entry of an order confirming the Plan;

(vi)     complete the Restructuring within the "Milestones" specified in the Term Sheet;

(vii)    timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(viii)   timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(ix)     promptly notify the Parties of any governmental or third-party complaints, litigations, hearings, or investigations (or communications indicating that the same may be contemplated or threatened) relating to the Debtors that have a reasonable likelihood of having an adverse impact on the ability to consummate the Restructuring; and

(x)      use reasonable best efforts to (A) support and take such actions as are necessary or appropriate in furtherance of the solicitation, confirmation, and consummation of the Plan and the Restructuring in accordance with this Agreement or any of the Definitive Documentation; and (B) support the release, exculpation, and

indemnification provisions set forth in the Term Sheet and to be memorialized in the Definitive Documentation.

(b)    <u>General Negative Commitments</u>.  Subject to <u>Section 17</u> hereof and except as (w) consented to by PRG and the Supporting Term Loan Lenders in accordance with the terms of this <u>Section 6</u>, (such consent shall not be unreasonably withheld, conditioned or delayed), (x) reasonably required by this Agreement, the Plan, the Transactions, the Restructuring or any other Definitive Documentation, (y) required by law (including any applicable bankruptcy law) or any court order or (z) set forth in <u>Section 6(b)</u> of Debtors' disclosure schedule attached as **<u>Exhibit E</u>** to this Agreement (the "<u>Debtors' Disclosure Schedule</u>"), the Debtors shall not, and shall cause their subsidiaries not to, from the RSA Effective Date until the Termination Date:

(i)    amend or modify, or file a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with this Agreement;

(ii)    subject to applicable law and the limitations set forth in Section 10 hereof, solicit or induce any Alternative Restructuring Proposal from or with any entity; or

(iii)    take any of the following actions with respect to the Debtors' business:

(1)    make or commit to make any capital expenditure with respect to the Debtors' business other than as contemplated by the DIP Budget as in effect on the RSA Effective Date, or as modified from time to time, with the consent of PRG, or fail to make any capital expenditures in line with such DIP Budget other than any variances therefrom that do not, in the aggregate, exceed 5% of the aggregate of the budget for capital expenditures for the duration of the Chapter 11 Cases;

(2)    other than as contemplated by the DIP Budget, enter into any Contract for or relating to the Debtors' business with annual expenditures in excess of $250,000;

(3)    other than as contemplated by the DIP Budget, sell or otherwise dispose of any assets, other than dispositions of inventory and obsolete or damaged assets or assets that have low utilization in the ordinary course (including assets disposed of through the "used asset" sale program) that do not exceed $500,000 in the aggregate;

(4)    grant or voluntarily create any lien other than (A) adequate protection liens of the Prepetition ABL Lenders, (B) adequate protection liens of the Prepetition Term Loan Agent or the Prepetition Term Lenders, (C) liens of any Term DIP Lender, or (D) liens that may arise by operation of law or that will be discharged prior to the Effective Date or otherwise by operation of the order confirming the Plan;

(5)    other than in the ordinary course, (A) grant any licenses or other rights to or under any Intellectual Property of the Debtors, which, for the avoidance of doubt, does not include the grant of an exclusive license therefor or (B) acquire, abandon, permit to lapse, or otherwise dispose of any material Intellectual Property;

(6)    except in accordance with the DIP Budget, subject to the provisions of the Term Sheet or any KEIP or KERP approved by the Court and in accordance with the Term Sheet, (A) grant to any employee any increase in salary, a bonus, or other compensation or benefits in excess of $10,000 or grant or announce any incentive equity or equity-based awards, (B) grant to any employee any increase in severance or termination pay, (C) enter into any employment, bonus, retirement, consulting, severance, or termination agreement with any employee or increase employee (1099 or W2) costs, in each case in excess of $100,000, (iv) hire any new employee who will earn an annual salary in excess of $100,000, (v) establish, adopt, enter into or amend in any respect or increase benefits under any benefit plan, (vi) accelerate any rights or benefits under any benefit plan or (vii) agree to pay to any employee any pension, retirement allowance, or other employee benefit not required by any existing benefit plan as in effect on the date hereof,

(7)    other than any critical vendor payment authorized through the Debtors' "first day" motions not to exceed $200,000, waive, release, assign, settle, or compromise any material claim, litigation, or arbitration relating to the Debtors' business (other than claims related to sales, use and VAT taxes) in excess of $200,000 individually or $1,000,000 in the aggregate, to the extent that such waiver, release, assignment, settlement, or compromise (A) imposes any binding obligation or restriction, whether contingent or realized, on the business, or (B) waives or releases any material rights or claims;

(8)    except in accordance with the DIP Budget, subject to the provisions of the Term Sheet, any KEIP or KERP agreement approved by the Court and in accordance with the Term Sheet, institute any new grant pursuant to an existing, or increase (including any increase in coverage), any existing, profit-sharing, bonus, incentive, deferred compensation, severance, insurance, pension, retirement, medical, hospital, disability, welfare, or other benefit or compensation plan, program, policy, contract, agreement, or arrangement with respect to current or former directors, officers, or employees of the Debtors;

(9)    (i) amend or waive any performance or vesting criteria or (ii) accelerate vesting exercisability of any compensation payable or benefits to become payable or provided to any current or former director, officer, or employee of the Debtors;

(10)    except as described on <u>Debtors' Disclosure Schedule 6(b)(10)</u>, make loans, advances or payments to, or forgive any loans advances or amounts owed by or make  or relinquish any guarantees for the benefit of, or investments with, any member of senior management, director, holder of equity interests or affiliates of any Debtor or any subsidiary, any entity in which such person owns any beneficial interests, or any members of such person's immediate family, or any affiliates of such person;

(11)    recognize any union or other labor organization or enter into any collective bargaining or similar Contracts with respect to the any current or former employees of the Debtors;

(12)    (other than as contemplated in the DIP Budget) implement or announce any material employee layoffs that would be reasonably likely to implicate the Worker Adjustment Retraining and Notification Act of 1988, as amended (the "<u>WARN Act</u>"), or any similar legal requirement;

(13)    other than as expressly permitted by the RSA or any Definitive Documentation, set aside, make or pay any dividend or other distribution in respect of the capital stock, membership interests or other equity interests of the Debtors, or repurchase, redeem or otherwise acquire any outstanding shares of the capital stock, membership interests or other securities of, or other ownership interests in, the Debtors or make any payment to Catterton or its affiliates;

(14)    except pursuant to, or as permitted by, the DIP Credit Agreement or except in the ordinary course in the case of trade or similar obligations, incur any indebtedness (including any borrowings with the Non-Debtor Obligors), enter into any material guarantee, indemnity, or other agreement to secure any obligation of a third party;

(15)    other than as contemplated by the DIP Budget, close any facilities, or conduct any liquidation, auction, or similar sale;

(16)    (A) make, change, or rescind any material tax election (unless required by law) or change its fiscal year or financial or tax accounting methods, policies, or practices (unless required by law), or settle any material tax action (other than claims related to sales, use and VAT taxes) claim, or liability with respect to taxes, (B) prepare and file or cause to be prepared and filed any tax return in a manner inconsistent with past practice (unless required by law), (C) amend any tax return, (D) surrender any claim for a refund of taxes, or (E) consent to (except to the extent specifically requested in writing by a tax authority) or request any extension or waiver of the limitation period applicable to any tax claim;

(17)    make any change in any method of accounting or accounting policies other than such changes as are required by United States generally accepted accounting principles ("GAAP");

(18)    make any change in the nature, scope or operations of the Debtors' business that would be adverse to the Debtors' business in any material respect, including by designing, developing, marketing, manufacturing, selling or distributing any products of the Debtors' business not otherwise included in the Debtors' business prior to the RSA Effective Date;

(19)    suspend or revoke the Restructuring; or

(20)    authorize, or commit or agree to take, any of the foregoing actions.

If a Debtor desires to take any action described in this Section 6(b)(ii)(1-7), such Debtor may, prior to any such action being taken, request PRG's and the Supporting Term Lenders' consent (which shall not be unreasonably withheld, conditioned or delayed) via an electronic mail sent to the individuals and addresses listed in Section 36. PRG and the Supporting Term Lenders shall be deemed to have consented to such action unless PRG and the Supporting Term Lenders notify (as the case may be) Debtors in writing (email is sufficient) by 11:59 p.m. (prevailing eastern time) on the third (3rd) business day after delivery of such email request that PRG or the Supporting Term Lenders, as the case may be, does not consent to such action.

7.    Commitment of the Catterton Parties.

(a)    <u>General Affirmative Commitments</u>.  Each Catterton Party shall from the RSA Effective Date until the occurrence of the Termination Date:

(i)    use reasonable best efforts to support and cooperate with the other Parties in support of the Plan, Transactions and the Restructuring and use reasonable best efforts to take all actions necessary or appropriate to implement the Plan and consummate the Restructuring and the Transactions in accordance with the Plan and the terms and conditions of this Agreement;

(ii)    negotiate in good faith to execute all Definitive Documentation that is subject to negotiation as of the RSA Effective Date and take any and all necessary and appropriate actions in furtherance of its commitments hereunder;

(iii)    effect and consummate or cause to be effected and consummated (in the manner set forth therein) the Transactions set forth on **Exhibit B** to be performed by the Catterton Parties on or prior to the Effective Date, subject (in the case of Transactions to be effected and consummated on the Effective Date) to the prior satisfaction (or waiver by the Catterton Parties) of all the conditions set forth in Section 23(a) and (c); and

       (iv)     give any notice, order, instruction, or direction to any applicable agent necessary to give effect to its commitments hereunder.

(b)    <u>General Negative Commitments</u>.  Each Catterton Party shall not, directly or indirectly, from the RSA Effective Date until the occurrence of the Termination Date:

       (i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring or any motion or other pleading or document filed by a VER Entity in the Bankruptcy Court that is consistent with this Agreement and the form of Term Sheet attached hereto;

       (ii)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring contemplated herein against the VER Entities other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

       (iii)   either itself or through any representatives or agents solicit or induce any Alternative Restructuring Proposal from or with any entity (and shall immediately inform the Parties of any notification of an Alternative Restructuring Proposal); or

       (iv)    object to, delay, impede, or take any other action to interfere with the VER Entities' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

(c)    <u>Commitments with Respect to the Chapter 11 Cases</u>.  Each Catterton Party that is entitled to vote to accept or reject the Plan agrees in respect of all of its Claims or interests from the RSA Effective Date until the occurrence of the Termination Date that it shall, when properly solicited to do so under the Bankruptcy Code:

       (i)     vote each of its Claims or Interests now or hereafter owned by such Catterton Party or for which the Catterton Party now or hereafter serves as the nominee, investment manager, or advisor or beneficial holder of such Claims or interests to accept the Plan by timely delivering its duly executed and completed ballot accepting the Plan;

       (ii)    elect not to affirmatively "opt out" of being a releasing party by either (a) timely delivering its duly executed and completed ballot(s) indicating such election or (b) by refraining from objecting to the Plan's third-party release provisions, as applicable; and

       (iii)   *provided* the Plan is not modified in a manner contrary to this Agreement that would have a material adverse effect on Catterton, not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above.

(d)    <u>Commitments with Respect to Letter of Credit</u>.  The Debtors intend to refinance the Prepetition ABL Loan with a new debtor-in-possession credit facility (the "<u>ABL DIP Loan</u>") obtained by the Debtors in the Chapter 11 Cases. Catterton confirms that, effective as of the closing of the ABL DIP Loan, the Letter of Credit will support the ABL DIP

Loan; *provided* that, the lenders party to the ABL DIP Loan agree not to draw on the Letter of Credit except as provided in the ABL DIP Facility Term Sheet for the ABL DIP Loan. Any subrogation right of Catterton in connection with the Letter of Credit shall be subordinated to the obligations owing to the Prepetition Term Loan Lenders upon the same terms as the right is currently subordinated to those obligations.

8.    Commitment of PRG.

(a)    <u>General Affirmative Commitments</u>.  PRG shall from the RSA Effective Date until the occurrence of the Termination Date:

(i)    use reasonable best efforts to support and cooperate with the other Parties in support of the Plan, Transactions and the Restructuring and use reasonable best efforts to take all actions necessary or appropriate to implement the Plan and consummate the Restructuring and the Transactions in accordance with the Plan and the terms and conditions of this Agreement;

(ii)    negotiate in good faith to execute all Definitive Documentation that is subject to negotiation as of the RSA Effective Date and take any and all necessary and appropriate actions in furtherance of its commitments hereunder;

(iii)    effect and consummate or cause to be effected and consummated (in the manner set forth therein) the Transactions set forth on **<u>Exhibit B</u>** to be performed by PRG on or prior to the Effective Date, subject (in the case of Transactions to be effected and consummated on the Effective Date) to the prior satisfaction (or waiver by PRG and any other applicable Party or Parties) of all of the conditions set forth in <u>Section 23(a)</u> and <u>(b)</u>; and

(iv)    give any notice, order, instruction, or direction to any applicable agent necessary to give effect to its commitments hereunder.

(b)    <u>General Negative Commitments</u>.  PRG shall not, directly or indirectly, from the RSA Effective Date until the occurrence of the Termination Date:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring or any motion or other pleading or document filed by a VER Entity in the Bankruptcy Court that is consistent with this Agreement and the Term Sheet attached hereto;

(ii)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring contemplated herein against the VER Entities other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(iii)    either itself or through any representatives or agents solicit or induce any Alternative Restructuring Proposal from or with any entity (and shall immediately inform the Parties of any notification of an Alternative Restructuring Proposal); or

(iv)     object to, delay, impede, or take any other action to interfere with the VER Entities' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

9.     Financing Commitments.

(a)     PRG shall, and shall cause each of its affiliates to, use its respective reasonable best efforts to obtain the Effective Date Debt Financing by the Effective Date on the terms and conditions described in the Effective Date Debt Financing Commitments, including using its reasonable best efforts to (i) comply with its obligations under the applicable Effective Date Debt Financing Commitments and any definitive agreements related thereto that are entered into prior to the Effective Date (together with the Effective Date Debt Financing Commitments, the "Effective Date Financing Documents"), (ii) maintain in effect the applicable Effective Date Financing Documents (*provided*, that, PRG shall be entitled to amend, modify or replace any such Effective Date Financing Document to the extent such amendment or modification or replacement is not prohibited hereunder), (iii) negotiate and enter into definitive agreements with respect to the applicable Effective Date Financing Documents on terms and conditions (including the "market flex" provisions) contained therein or otherwise not materially less favorable to PRG in the aggregate than those contained in the applicable Effective Date Financing Documents, (iv) satisfy all conditions and covenants applicable to PRG contained in the applicable Effective Date Financing Documents within their control, including the payment of any commitment, engagement or placement fees required as a condition to the Effective Date Debt Financing, (v) enforce all of its rights under or with respect to the applicable Effective Date Financing Documents (*provided*, that, PRG shall not be required to commence or pursue litigation, and neither the Debtors nor any other Party hereto shall have the right to compel PRG to commence or pursue litigation, to enforce the obligations of Effective Date Lenders with respect to the applicable Effective Date Financing Documents) and (vi) upon the satisfaction or waiver of the conditions to the availability of the Effective Date Debt Financing set forth in the applicable Effective Date Financing Documents, consummate the Effective Date Debt Financing at or prior to the Effective Date. PRG shall keep the Debtors and the Supporting Term Loan Lenders informed on a reasonably current basis and in reasonable detail of the status of its efforts to arrange the Effective Date Debt Financing.  Prior to the Effective Date, PRG shall give the Debtors and the Supporting Term Loan Lenders prompt notice upon receiving any written notice from the Effective Date Lenders or otherwise having knowledge of any breach or default (or any event or circumstance that, with or without notice, lapse of time or both, would reasonably be expected to give rise to any breach or default) by any party of any of the Effective Date Financing Documents or any termination of any of the Effective Date Financing Documents. Prior to the Effective Date, PRG shall not, without the prior written consent of the Debtors and the Supporting Term Loan Lenders, amend, modify, supplement or waive any of the conditions or contingencies to funding contained in the Effective Date Financing Documents or any other provision of, or remedies under, the Effective Date Financing Documents, in each case to the extent such amendment, modification, supplement or waiver would reasonably be expected to have the effect of (A) adversely affecting in any respect the ability of PRG to timely consummate the Transactions, (B) imposing new or additional conditions or contingencies or expanding

the conditions or contingencies to the funding of the Effective Date Debt Financing on the Effective Date or (C) delaying the Effective Date.

(b)     If all or any portion of the Effective Date Debt Financing becomes unavailable, PRG shall use its reasonable best efforts to (i) arrange to promptly obtain the Effective Date Debt Financing or such portion of the Effective Date Debt Financing from alternative sources in an amount sufficient, when added to any portion of the Effective Date Debt Financing that is available, to pay in cash all amounts required to be paid by PRG in connection with the transactions contemplated by this Agreement as described on **Exhibit B** ("Alternative Effective Date Debt Financing") and (ii) obtain a new financing commitment letter (the "Alternative Debt Commitment Letter") and a new definitive agreement with respect thereto that provides, in the case of clause (i) and (ii), for financing (A) on terms not materially less favorable (including with respect to pricing, fees, amortization, covenants, economic and non-economic terms, conditionality, enforceability and availability and funding of any Effective Date Debt Financing Commitment), in the aggregate, to PRG, (B) containing conditions to draw and other terms that would reasonably be expected to affect the availability thereof that (1) are not more onerous, than those conditions and terms contained in the Effective Date Debt Financing Commitments as of the RSA Effective Date, (2) would not reasonably be expected to delay, impede or prevent the Effective Date and (3) do not adversely affect the ability of PRG to enforce its rights against other parties to the Alternative Debt Commitment Letter (including all definitive documentation) relative to the ability of PRG to enforce its rights against the other parties to the Effective Date Debt Financing Commitments as in effect on the RSA Effective Date or in the related definitive agreements and (C) in an amount that is sufficient, when added to any portion of the Debt Financing that is available, to pay in cash all amounts required to be paid by PRG in connection with the transactions contemplated by this Agreement.  PRG shall also be entitled to obtain alternative Effective Date Debt Financing from alternative sources if such alternative Effective Date Debt Financing (i) is on more favorable terms, including with respect to amount, availability and conditionality, than the applicable Effective Date Debt Financing it replaces or supplements and (ii) satisfies the conditions above to Alternative Effective Date Debt Financing.  If such alternative Effective Date Debt Financing satisfies both of such conditions (i) and (ii), it shall be considered Alternative Effective Date Debt Financing.  In any such event, the term "Effective Date Debt Financing" as used in this Agreement shall be deemed to include any Alternative Effective Date Debt Financing, and the term "Effective Date Debt Financing Commitments" as used in this Agreement shall be deemed to include any Alternative Debt Commitment Letter.

(c)     Prior to the Effective Date, the Debtors shall, and shall cause their respective subsidiaries to use reasonable best efforts and shall direct their representatives and advisors to use commercially reasonable efforts to, provide such cooperation with the arrangement and borrowing of the Effective Date Debt Financing as may be reasonably requested by PRG (*provided*, that such requested cooperation does not unreasonably interfere with the ongoing operations of the Debtors and their respective subsidiaries), including: (i) participation in, and assisting with the preparation for, a reasonable number of meetings, drafting sessions, rating agency presentations and due diligence sessions with the Effective Date Lenders and other potential providers of the Effective Date Debt Financing; (ii) furnishing PRG and Effective Date Lenders with (x) the audited financial statement of

VER and its subsidiaries for fiscal years 2014, 2015 and 2016 and (y) interim financial statements of VER and its subsidiaries for the fiscal month and year-to-date period most recently ended at least 30 days prior to the Closing Date; (iii) assisting PRG and its Effective Date Lenders in the preparation of (A) a customary bank information memorandum and other materials reasonably and customarily requested to be used in connection with obtaining or marketing the Effective Date Debt Financing; and (B) materials for rating agency presentations; (iv) reasonably cooperating with the due diligence efforts of the Effective Date Lenders and other potential providers of the Effective Date Debt Financing; (v) facilitating the pledge and perfection of liens and security interests, including delivering possessory collateral (such as certificated equity and promissory notes) to the Effective Date Lenders, subject to the occurrence of the Effective Date; (vi) executing and delivering reasonable and customary certificates, management representation letters, authorization letters and other documentation required by the Effective Date Lenders and the definitive documentation related to the Effective Date Debt Financing, subject to the occurrence of the Effective Date; (vii) providing any required information under applicable "know your customer", anti-money laundering rules and regulations and the USA PATRIOT Act of 2001; and (viii) assisting, and cooperating with, PRG in satisfying the conditions to the Effective Date Debt Financing set forth in the Effective Date Financing Documents; *provided*, that none of the Debtors shall be required to pay any commitment or other similar fee or incur any other liability in connection with the Effective Date Debt Financing or Alternative Effective Date Debt Financing; *provided*, further, that the effectiveness of any documentation executed by any Debtor with respect thereto shall be subject to the consummation of the Transactions. PRG acknowledges and agrees that none of the Debtors, Catterton, Supporting Term Loan Lenders nor any of their respective affiliates or any of their respective directors, officers, employees, representatives and advisors (including legal, financial and accounting advisors) shall have any responsibility for, and shall not be required to incur any liability (personal or otherwise) to any person under or in connection with, the arrangement of the Effective Date Debt Financing or any Alternative Effective Date Debt Financing that PRG may raise in connection with the Transactions that, in the case of the Debtors, would be effective prior to the Effective Date. PRG shall indemnify and hold harmless the Debtors, Catterton, Supporting Term Loan Lenders and their respective affiliates and directors, officers, employees, representatives and advisors (including legal, financial and accounting advisors) from and against any and all losses suffered or incurred by them in connection with the arrangement of the Effective Date Debt Financing or any Alternative Effective Date Debt Financing and any information utilized in connection therewith (other than information provided by the Debtors expressly for use in connection therewith), except for any of the foregoing to the extent the same is the result of fraud, intentional misrepresentation, willful misconduct, bad faith or gross negligence of any such persons in connection with this Agreement or the transactions contemplated hereby. The Debtors hereby consent to the use of the logos of the Debtors in connection with the marketing and arranging of the Effective Date Debt Financing, *provided* that such logos are used solely in a manner that is not reasonably likely to harm or disparage the Debtors or their reputation, goodwill or marks.

(d)    Notwithstanding anything herein, or in the Term Sheet, to the contrary, nothing shall (a) prohibit the Debtors from receiving a commitment from the Prepetition ABL Agent to

provide exit financing in connection with an alternative, standalone plan of reorganization that does not contemplate consummation of the Transactions; or (b) prohibit the Debtors, the Supporting Term Loan Lenders and Catterton from supporting such an alternate, standalone plan in the event that this RSA is terminated for any reason, including as the result of the failure of PRG to obtain committed Effective Date Debt Financing.

10.    The Debtors' Termination Events.  The Debtors may in their sole discretion, elect to terminate this Agreement upon delivery of written notice to all Parties in accordance with Section 36 hereof at any time after the occurrence of, and during the continuation of, any of the following events; *provided* that this Agreement may not be terminated in accordance with this Section 10 by the Debtors if the failure of any of the conditions hereunder to consummate the Transaction to be satisfied is primarily attributable to a breach by the Debtors of their respective representations, warranties, obligations or covenants under this Agreement:

(a)    a willful breach by any Party (other than the Debtors) of any provision set forth in this Agreement that would have a material adverse effect on the Restructuring that (to the extent curable) remains uncured (whether by such Party or any other such Party) for a period of twenty (20) consecutive business days after the receipt by such breaching Party of written notice of such breach;

(b)    the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring;

(i)    any other Party (i) amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with this Agreement; or (ii) suspends or revokes the Restructuring;

(ii)    the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or the dismissal of one or more of the Chapter 11 Cases of the Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Debtors, PRG and the Requisite Supporting Term Loan Lenders;

(iii)    the appointment of, a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(iv)    the Effective Date of the Plan shall not have occurred within 180 days of the Petition Date;

(v)    the special committee formed by the board of VER Technologies Holdco LLC to investigate potential claims related to the leverage buyout of the Company in 2014 concludes following such investigation that pursuing the Restructuring or Transaction, or granting the releases set forth in the Restructuring Term Sheet and herein, on behalf of any of the Debtors would, based upon advice of counsel, constitute a breach of the disinterested directors' fiduciary duties or applicable law; or

(vi)    the board of directors, board of managers, or a similar governing body or fiduciary of any Debtor, on its own, or the Debtors, collectively, otherwise determines in good faith based on advice of counsel that taking any action, or refraining from taking any action, in connection with the Restructuring would constitute a breach of its or their fiduciary obligations under applicable law, or would otherwise be inconsistent with applicable law.

(c)    Any Party hereto fails to comply with its Affirmative or Negative Commitments contained in this Agreement in any material respect.

11.    <u>Catterton Parties' Termination Events</u>. The Catterton Parties may in their sole discretion, elect to terminate their commitments under this Agreement, including pursuant to <u>Section 7</u> hereof, to the extent any of the rights and preferences of the Catterton Parties pursuant to this Agreement are adversely affected, upon delivery of written notice to all Parties in accordance with <u>Section 36</u> hereof; *provided* that if the Catterton Parties so elect to terminate, this Agreement will otherwise remain in full force and effect with respect to the other parties hereto.

12.    <u>PRG's and the Requisite Supporting Term Loan Lenders' Termination Events</u>. PRG and the Requisite Supporting Term Loan Lenders may jointly (but not unilaterally, except to the extent set forth in <u>Section 12(a)</u> below) terminate this Agreement upon joint delivery of written notice to all other Parties in accordance with <u>Section 36</u> hereof at any time after the occurrence of, and during the continuation of, any of the following events, but in any event, if this Agreement is terminated in accordance with the foregoing (except in the event that this Agreement automatically terminates after the Restructuring is consummated), the Debtors shall have three days to cure any default resulting in the termination of the Restructuring Support Agreement during which time the Term Loan Forbearance shall remain in effect; *provided* that this Agreement may not be terminated in accordance with this <u>Section 12</u> by PRG and the Requisite Supporting Term Loan Lenders if the failure of any of the conditions hereunder to consummate the Transaction to be satisfied is primarily attributable to a breach by PRG or the Requisite Supporting Term Loan Lenders of their respective representations, warranties, obligations or covenants under this Agreement:

(a)    a willful breach by (i) any Party, other than PRG or any Supporting Term Loan Lender, (ii) PRG (in which event the Requisite Supporting Term Loan Lenders may terminate this Agreement unilaterally) or (iii) the Requisite Supporting Term Loan Lenders (in which event PRG may terminate this Agreement unilaterally) in each case of any provision set forth in this Agreement that would have a material adverse effect on the Restructuring that (to the extent curable) remains uncured for a period of twenty (20) consecutive business days after the receipt by such breaching Party of written notice of such breach;

(b)    the Definitive Documentation is not in form and substance consistent with this Agreement (or to the extent not specified in this Agreement, reasonably acceptable to PRG and the Requisite Supporting Term Loan Lenders);

(c)    the occurrence of an Event of Default under, and as defined in, the DIP Credit Agreement and either (i) the acceleration of all obligations or (ii) the exercise of material remedies in respect of the collateral thereunder;

(d)     the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or the dismissal of one or more of the Chapter 11 Cases of the Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Debtors, PRG and the Requisite Supporting Term Loan Lenders;

(e)     the appointment of, a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(f)     the Debtors propose, support, assist, solicit, or file a pleading seeking approval of any alternative restructuring transaction for the Debtors;

(g)     the Debtors' loss of the exclusive right to file a plan of reorganization;

(h)     the Debtors do not commence their Chapter 11 Cases by April 6, 2018;

(i)     the proposed Plan and related disclosure statement are not filed within 25 days after the Petition Date;

(j)     the Debtors do not file their schedules of assets and liabilities and statement of financial affairs within 25 days after the Petition Date;

(k)     the bar date for the filing of non-governmental prepetition claims does not occur within 55 days after the Petition Date;

(l)     the Bankruptcy Court does not enter an order approving the adequacy of the disclosure statement within 60 days after the Petition Date;

(m)     the Bankruptcy Court does not enter an order confirming the Plan of Reorganization within 100 days after the Petition Date;

(n)     the Effective Date of the Plan of Reorganization does not occur within 115 days after the Petition Date;

(o)     the Debtors fail to comply with their Affirmative or Negative Commitments contained in Section 6 of this Agreement in all material respects;

(p)     any VER Entity (i) amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with this Agreement; or (ii) suspends or revokes the Restructuring;

(q)     the Bankruptcy Court enters an order denying approval of confirmation of the Plan or confirming a chapter 11 plan setting forth an alternative transaction to the Restructuring;

(r)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring; *provided* that the Debtors shall have five (5) business days after issuance of such ruling or order to seek relief that

would allow consummation of the Restructuring in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, or (ii) is reasonably acceptable to PRG and the Requisite Supporting Term Loan Lenders;

(s)     any foreign subsidiary of the Company is placed into a bankruptcy, insolvency, or similar proceeding whether voluntary or involuntary without the consent of PRG and Supporting Term Loan Lenders; or

(t)     all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (as amended, the "HSR Act") have not expired or terminated within 90 days after the Petition Date.

13.     The Term DIP Agent's Termination Events. The Term DIP Agent, at the direction of the Majority Term DIP Lenders, shall terminate this Agreement upon delivery of written notice to all other Parties in accordance with Section 36 hereof at any time after the occurrence of, and during the continuation of, any of the following events; *provided* that this Agreement may not be terminated in accordance with this Section 13 by the Term DIP Agent if the failure of any of the conditions hereunder to consummate the Transaction to be satisfied is primarily attributable to a breach by the Term DIP Agent or the Majority Term DIP Lenders of their respective representations, warranties, obligations or covenants under this Agreement:

(a)     a willful breach by any Party, other than the Term DIP Agent or a Term DIP Lender, of any provision set forth in this Agreement that would have a material adverse effect on the Restructuring as it relates to the Term DIP Lenders that (to the extent curable) remains uncured for a period of five (5) consecutive business days after the receipt by such breaching Party of written notice of such breach;

(b)     if, within forty-five (45) days of the Petition Date, PRG shall have failed to obtain commitment letters, in form and substance reasonably acceptable to the Term DIP Lenders, for Effective Date Debt Financing in an amount necessary to consummate the Restructuring and the Transactions, including the payment in full of the Prepetition ABL Loan, the ABL DIP Loan, the Term DIP Loan, the Additional First Out Prepetition Term Loan and any debt of PRG and its subsidiaries required to be retired or refinanced upon the Effective Date, including, in each case, all fees related to the foregoing required to be paid on the Effective Date; or

(c)     the occurrence of an Event of Default under, and as defined in, the Term DIP Credit Agreement that is not cured or waived pursuant to its terms.

14.     Mutual Termination; Automatic Termination.   This Agreement may be terminated by mutual written agreement by and among the Debtors, PRG and the Requisite Supporting Term Loan Lenders. Notwithstanding anything in this Agreement to the contrary, this Agreement shall automatically terminate upon the occurrence of the Effective Date and the consummation of the transactions contemplated to occur on the Effective Date. For the avoidance of doubt other than the Debtors pursuant to Section 10, the Catterton Parties pursuant to Section 11, PRG and Supporting Term Loan Lenders acting pursuant to Section 12, or the Term DIP Agent acting pursuant to Section 13, no Party may unilaterally terminate this Agreement.

15.    <u>Effect of Termination</u>.  The date on which one or more of the Parties elect to terminate this Agreement in accordance with <u>Sections 10, 11, 12, 13</u>, or <u>14</u> hereof shall be referred to as the "<u>Termination Date</u>".  Upon the occurrence of the Termination Date, all Parties' obligations under this Agreement shall be terminated effective immediately, and such Parties shall be released from their commitments, undertakings, and agreements hereunder; *provided* that nothing herein will relieve any Party from any liability for any willful and material breach of the provisions of this Agreement prior to such termination.  Nothing in this <u>Section 15</u> will be deemed to impair the right of any Party to compel specific performance by another Party of its obligations under this Agreement.  Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party or ability of any Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests.

16.    <u>Cooperation and Support;HSR</u>.

(a)    Each Party hereby covenants and agrees to cooperate with the other Parties in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) with respect to, (a) all matters relating to their rights hereunder; (b) all matters concerning the implementation of the Plan, Transactions and the Restructuring; (c) the pursuit, approval, and support of the Restructuring (including confirmation of the Plan and consummation of the Transactions); and (d) the filing of any tax returns in connection with this Agreement and the Transactions and any proceeding relating to the foregoing.  Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to any such tax return or proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Each Party agrees to retain all books and records with respect to tax matters relating to any tax period beginning on or before the RSA Effective Date until the expiration of the applicable statute of limitations (including any extensions thereof), and to abide by all record retention agreements entered into with any tax authority.  Notwithstanding the foregoing, nothing in this Agreement shall be construed to require the Supporting Term Loan Lenders to provide funding to the VER Entities other than as set forth in the DIP Credit Agreement.

(b)    If applicable, PRG and the Debtors shall, and shall cause their respective controlled Affiliates to (i) make or cause to be made the filings required of such Party or any of its Affiliates under any Laws with respect to the transactions contemplated by this Agreement and to pay any fees due by such Party in connection with such filings, as promptly as is reasonably practicable, and in any event within ten (10) Business Days after the RSA Effective Date (with the understanding that PRG and the Debtors shall each pay one-half of all HSR Act filings fees), (ii) reasonably cooperate with the other Parties and furnish all information in such Party's possession that is necessary in connection with such other Party's filings, (iii) use reasonable best efforts to cause the expiration or termination of the notice or waiting periods under the HSR Act and, if applicable, any other Laws with respect to the transactions contemplated by this Agreement as promptly as is reasonably practicable, (iv) promptly inform the other Party of (and, at the other Party's reasonable

request, supply to such other Party) any communication (or other correspondence or memoranda) from or to, and any proposed understanding or agreement with, any governmental authority in respect of such filings, (v) consult and cooperate with the other Party in connection with any analyses, appearances, presentations, memoranda, briefs, arguments and opinions made or submitted by or on behalf of any Party in connection with all meetings, actions, discussions and proceedings with governmental authorities relating to such filings, including, subject to applicable Law, permitting the other Party to review in advance any proposed written communication between it and any governmental authority, (vi) comply, as promptly as is reasonably practicable, with any requests received by such Party or any of its Affiliates under the HSR Act and any other Laws for additional information, documents or other materials (unless, upon advice of counsel, such requests could not reasonable be anticipated to be completed prior to the Effective Date), (vii) use commercially reasonable efforts to resolve any objections as may be asserted by any governmental authority with respect to the transactions contemplated by this Agreement, and (viii) use reasonable best efforts to contest and resist any action or proceeding instituted (or threatened in writing to be instituted) by any governmental authority challenging the transactions contemplated by this Agreement as in violation of any Law. If a Party or any of its Affiliates intends to participate in any meeting or discussion with any governmental authority with respect to such filings or the transactions contemplated by this Agreement, it will give the other Parties reasonable prior notice of, and an opportunity to participate in, such meeting or discussion. Notwithstanding anything to the contrary contained in this Section 16(b), under no circumstances shall this Section 16(b) be construed so as to require PRG or the Debtors to take any of the following actions: (x) proposing, negotiating, committing to or effecting, by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of any assets, business, or business lines of PRG (or any of its affiliates, including the Debtors after the Effective Date) or the Debtors, (y) creating or terminating relationships, ventures, contractual rights or obligations of PRG or its affiliates (including the Debtors after the Effective Date) or the Debtors or (z) otherwise taking any other structural or conduct remedy.

17.    VER Entities' Fiduciary Duties.    Notwithstanding anything to the contrary in this Agreement, if any Debtor or any Debtors' board of directors, board of managers, directors, managers, officers, members, or other similar governing body or fiduciary, determines, upon the advice of counsel, that taking any action, or refraining from taking any action, required by this Agreement would reasonably be expected to be a breach of its or their fiduciary obligations under applicable law, the Debtors may elect not to proceed with the Restructuring the Plan or the Transactions and any such action or inaction pursuant to such exercise of fiduciary duties shall not be deemed to constitute a breach of this Agreement.

18.    Reservation of Rights.    Except as expressly provided in this Agreement, this Agreement does not, in any manner, waive, limit, impair or restrict (i) the ability of any Party to protect and preserve its rights, remedies and interests including, without limitation, its claims against any of the other Parties or (ii) any right of any Supporting Term Loan Lender under the Prepetition Term Loan Agreement or any other applicable agreement, instrument or documents that relates to the Prepetition Term Loan Claims except as set forth herein.  This Agreement does not prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with

this Agreement and the Definitive Documents and are not for the purpose of hindering, delaying or preventing the consummation of the Restructuring.

19.     No Solicitation.  Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for acceptances or rejections of the Plan.  The acceptance of the Plan by each of the Supporting Term Loan Lenders and each of the Catterton Parties will not be solicited until they have received a disclosure statement and the solicitation materials with respect to the Plan in accordance with applicable law, and will be subject to sections 1125, 1126, and 1127 of the Bankruptcy Code.

20.     Press Releases and Communications. No press release or public announcement related to this Agreement or the Transactions, any other announcement or communication to the employees, consultants, customers or suppliers of any Party hereto, shall be issued or made by any Party hereto or any of their controlled affiliates without the joint approval of all the Parties hereto, unless required by legal requirement (upon the advice of counsel) in which case each Party shall have the right to review such press release, announcement or communication prior to its issuance, distribution or publication.

21.     Confidential Information.

(a)     Each Party hereto acknowledges that it may be in possession of the Confidential Information of other Parties.  Each Party hereto agrees that, for a period of five years commencing on the RSA Effective Date, it shall, and shall cause its respective affiliates to, keep all such Confidential Information of any other Party strictly confidential; *provided* that this Section 21 shall not restrict any Party from disclosing Confidential Information that pertains solely to such Party or (except with respect to the Debtors) its direct or indirect equityholders.  Each Party hereto acknowledges and agrees that the Confidential Information is proprietary and confidential in nature.  For purposes of this Agreement, "Confidential Information" means, with respect to each Party and their respective affiliates, any information that is not publicly available concerning their respective business, operations, assets, liabilities, financial condition and affairs, including "know how", trade secrets, customer lists, supplier lists, details of consultant and employment Contracts, pricing policies, operational methods, marketing plans or strategies, product development techniques or plans, business acquisition plans and acquisition candidates, technical processes, designs and design projects, processes, inventions, software, source codes, object codes, systems documentation and research projects and other business affairs.

(b)     Notwithstanding the foregoing, Confidential Information shall not include any information which (A) has become publicly known and made generally available through no wrongful act of any Party hereto (including a breach of this Section 21), (B) has been received by any Party hereto from a third party who is authorized to make such disclosure and, to the knowledge of such Party after reasonable inquiry, is not subject to any contractual fiduciary or other confidentiality obligation to any respective Party or their respective Subsidiaries, (C) is independently developed by a Party without use of the Confidential Information; or (D) is required to be disclosed by applicable legal requirements, legal process or regulatory or oversight body, after providing prompt written notice of such request (if permitted by applicable legal requirements) so that each Party may seek an appropriate protective order

or other appropriate remedy; *provided* that such Party shall use his, her or its reasonable best efforts to obtain, at the reasonable request and at the cost of each other Party, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as each Party shall designate.

(c)    PRG and  HoldCo hereby acknowledge and agree that effective as of the Effective Date (unless this Agreement is terminated prior to the Effective Date), that certain Confidentiality and Non-Disclosure Agreement, dated as of August 22, 2017, between Holdco and PRG LLC shall be terminated and of no further force or effect (it being acknowledged and agreed that such agreement shall otherwise remain in full force and effect).

(d)    The Parties may disclose Confidential Information to their advisors, representatives and any providors of financing as necessary to consummate the Restructuring and the Transactions, *provided* that such other parties who receives Confidential Information shall be informed of the confidential nature of the Confidential Information and shall be instructed to keep such information confidential in accordance with the terms of this Section 21, as if they were a party to this Agreement and such Party that discloses such Confidential Information to their advisors, representatives and any providors of financing shall be responsible for any breach of the terms of this Agreement by such advisors, representatives and any providors of financing.

(e)    The direct or indirect equityholders of any party hereto shall be an express third party beneficiary of this Section 21.

22.    Representations and Warranties.

(a)    Each of the Supporting Term Loan Lenders hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)    such Party, if an entity, is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, formation, or incorporation (as applicable) and that it has all requisite corporate, partnership, limited liability company or similar organizational power and authority to execute and deliver this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement;

(ii)    the execution and delivery by it of this Agreement, and the performance of its obligations hereunder, have been duly authorized by all necessary corporate, partnership, limited liability company or other similar organizational action on its part;

(iii)    the execution, delivery, and performance by it of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it or its certificates of incorporation, bylaws, or other similar organizational or governing documents, or those of any of its affiliates, (B) result in a breach of, or constitute (with or without due notice or lapse of time or both) a default under any material

contractual obligation to which it or any of its affiliates is a party, or (C) require any registration or filing with, consent or approval of, or notice to, or other action of, with or by, any federal, state, or other governmental authority or regulatory body, except such filings and/or approvals as may be necessary or required by the Bankruptcy Court or under the Bankruptcy Code, the Securities Acts, or any "blue sky" laws;

(iv)    such Party is not a party to any pending or undisclosed agreement, understanding, negotiation, or discussion (in each case, whether oral or written) with respect to any Alternative Restructuring Proposal;

(v)    this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(vi)    as of the date of this Agreement, it (A) is either (1) the sole beneficial owner of the principal amount of Prepetition Term Loan Claims set forth below its signature hereto, or (2) has sole investment or voting discretion with respect to the principal amount of Prepetition Term Loan Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement, (B) has full power and authority to act on behalf of, vote, and consent to matters concerning such Claims and dispose of, exchange, assign, and transfer such Claims, and (C) holds no Claims or interests that are not identified below its signature hereto, in each case except as this provision may be specifically waived, in writing by the VER Entities.

(b)    Each Debtor hereby represents and warrants on a joint and several basis (and not on behalf of any other person or entity other than the Debtors) that the following statements are true, correct, and complete to the best of its actual knowledge, as of the RSA Effective Date:

(i)    except as expressly provided in this Agreement or the Bankruptcy Code, such Party, if an entity, is duly organized and validly existing, under the laws of its jurisdiction of organization, formation, or incorporation (as applicable) and that it has all requisite corporate, partnership, limited liability company or similar organizational power and authority to execute and deliver this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar organizational action on its part;

(iii)    the execution, delivery, and performance by it of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it or its certificates of incorporation, bylaws, or other similar organizational or governing documents, or those of any of its affiliates, (B) result in a breach of, or constitute

(with or without due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its affiliates is a party, or (C) require any registration or filing with, consent or approval of, or notice to, or other action of, with or by, any federal, state, or other governmental authority or regulatory body, except such filings and/or approvals as may be necessary or required by the Bankruptcy Court or under the Bankruptcy Code, the Securities Acts, or any "blue sky" laws;

(iv)     such Debtor is not a party to any pending or undisclosed agreement, understanding, negotiation, or discussion (in each case, whether oral or written) with respect to any Alternative Restructuring Proposal; and

(v)     this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability.

(c)     Except as disclosed in the Debtors' Disclosure Schedule, each of the Debtors represents and warrants as of the date hereof, on a joint and several basis to PRG and the Supporting Term Loan Lenders regarding the Debtors and their subsidiaries, and for the avoidance of doubt, to no other Party hereto as follows:

(i)     <u>Absence of Certain Developments</u>. Except (x) in the ordinary course of business consistent with past practice, (y) in connection with the consummation of the Restructuring, or (z) as contemplated by this Agreement, in each case since December 31, 2017 until the date of this Agreement none of the Debtors nor any of their subsidiaries have:

(A)     mortgaged, pledged or subjected to any lien, any of the assets or properties, except to the extent permitted by the Prepetition Term Loan Agreement;

(B)     sold, assigned, leased or transferred any of the material tangible assets or property, except to the extent permitted by the Prepetition Term Loan Agreement;

(C)     settled or compromised any proceeding or cancelled any debts or waived any rights of value, except to the extent permitted by the Prepetition Term Loan Agreement;

(D)     changed any of its accounting policies, practices or procedures, including any cash management practices, in any material respect, except as required by GAAP;

(E)     amended or modified its charter or bylaws or other organizational documents;

(F)     acquired (by merger, consolidation or other combination, or acquisition of stock or assets or otherwise) any corporation, partnership or other business organization, or any division thereof;

(G)     made loans, advances or payments to, guarantees for the benefit of, or investments with, any member of senior management, director, holder of equity interests or affiliates of any Debtor or any subsidiary, any entity in which such person owns any beneficial interests, or any members of such person's immediate family, or any affiliates of such person or entered into any VER Affiliated Transaction;

(H)     (i) made, changed or revoked any material tax election (other than the making of any election in a manner consistent with past practice), (ii) settled or compromised any claim, notice, audit report or assessment in respect of taxes, (iii) filed any amendment to a tax return or filed any tax return other than in a manner consistent with prior practice except as otherwise required by law, (iv) changed or adopted any tax accounting period or tax accounting method, (v) entered into any tax closing agreement, (vi) consented to any extension or waiver of the limitations period applicable to any tax claim or assessment, or (vii) surrendered any right to claim a tax refund;

(I)     incurred or committed to incur (specifically after the date of this Agreement or as otherwise consented to by PRG in accordance with Section 6) any capital expenditures or authorization or commitment with respect thereto or make or delay or fail to make any capital expenditure in excess of the amount thereof permitted by Section 6;

(J)     other than in connection with intercompany arrangements among Holdco and its subsidiaries or VER Affiliate Leases, declared, set aside or paid any dividends on or make any other distributions (whether in cash, securities or property) to securityholders or affiliates; and

        (21)    (i) taken any action to amend or waive any performance or vesting criteria or (ii) accelerate vesting exercisability of any compensation payable or benefits to become payable or provided to any current or former director, officer, or employee of the Debtors or to forgive in writing any amounts owed by any such person to the Debtors;

        (22)    recognized any union or other labor organization, entered into any collective bargaining or similar Contracts, appraised or opposed any union organizing campaign, settled any material grievances or unfair labor practice charges, filed any unfair labor practice charges, in each case, with respect to the any current or former employees of the Debtors;

(K)     granted or made any equity awards that may be settled in capital stock, equity interests or any other securities of the Debtors' business, or the value of which is linked directly or indirectly, in whole or in part, to the price or

value of any capital stock, equity interests, or other securities of the Debtors' business;

(L)    implemented or announced any material employee layoffs that would be reasonably likely to implicate the WARN Act, or any similar legal requirement.

(M)    agreed, entered into any legally binding agreement or contract (including any loan or credit agreement, note, bond, mortgage, indenture, lease, sublease, license, sublicense or purchase order) (a "Contract") to; or, committed to do any of the foregoing.

(ii)    Property and Assets.

(A)    Except, in each case, where such failure would not reasonably be expected to result in a Material Adverse Effect, the Debtors and their subsidiaries own and hold pursuant to valid and enforceable leases or otherwise have the right to use all assets (including tangible personal property) necessary for the conduct of the business of the Debtors and their subsidiaries as presently conducted and all such material assets are free from material defects, have been maintained in accordance with customary maintenance practices, are in good operating condition and repair, subject only to ordinary wear and tear, and are usable in the ordinary course of business and conform in all material respects to all applicable legal requirements relating to their use and operation.

(B)    No Debtor nor any of their subsidiaries own any real property.

(C)    The real property demised by the leases described on Debtors' Disclosure Schedule 22(c)(ii)(C) (the "VER Real Property Leases") constitutes all of the real property leased or subleased by the Debtors and their subsidiaries or used or intended to be used by the Debtors and their subsidiaries to conduct their respective business as now conducted (the "VER Leased Real Property"). Debtors' Disclosure Schedule 22(c)(ii)(C) sets forth the addresses of the VER Leased Real Property and a true and complete list of all VER Real Property Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each such VER Leased Real Property (including the date and the name of the parties to such lease document). The VER Real Property Leases are legal, valid, binding, and in full force and effect, enforceable in accordance with their terms with respect to Debtors and their subsidiaries, as applicable, subject to proper authorization and execution of such VER Real Property Lease by the other party thereto, and, to such Debtor's actual knowledge, with respect to each other party to such VER Real Property Lease. Except as set forth in Debtors' Disclosure Schedule 22(c)(ii)(C), with respect to each of the VER Real Property Leases: (i) no Debtors nor their subsidiaries nor, to such Debtors' or their subsidiaries' actual knowledge, any other

party to the VER Real Property Leases is in material breach or default under any of such VER Real Property Leases (including by virtue of the consummation of the Transactions); (ii) the other party to such VER Real Property Lease is not an affiliate of, and otherwise does not have any material economic interest in, any Debtor or any subsidiary (any VER Real Property Lease set forth on Debtor' Disclosure Schedule 22(c)(ii)(C)(ii), a "VER Affiliate Lease"); (iii) the Debtors and their subsidiaries have a good and valid leasehold interest in all material VER Leased Real Property and have not collaterally assigned, mortgaged, deeded in trust or granted any other material lien or security interest in such VER Real Property Lease or any interest therein other than liens in the ordinary course of business; and (iv) the Debtors and their subsidiaries have not subleased, licensed, or otherwise granted any person the right to use or occupy such VER Leased Real Property.

(D)     Except as set forth on Debtors' Disclosure Schedule 22(c)(ii)(D), the buildings, structures, improvements, fixtures, building systems and equipment, and the components thereof, included in the VER Leased Real Property are in operating condition (in all material respects) and repair sufficient for the operation of the business of the Debtors and their subsidiaries, as applicable, as currently conducted.

(iii)    Tax Matters.

(A)     Except as would not reasonably be expected to result in a Material Adverse Effect and except as set forth on Debtors' Disclosure Schedule 22(c)(iii)(A), to the best of Debtors' actual knowledge, the Debtors and their subsidiaries have timely filed all tax returns required to be filed by them, all such tax returns are complete and correct in all respects and all material taxes required to have been paid by Debtors and their subsidiaries (whether or not shown as due and payable on such tax returns) have been paid.  To the best of Debtors' actual knowledge, no written claim has ever been made by a tax authority in a jurisdiction where Debtors and their subsidiaries do not file a tax return that Debtors and their subsidiaries (as the case may be) are subject to a material amount of taxation by that jurisdiction.

(B)      Except as would not reasonably be expected to result in a Material Adverse Effect, to the best of Debtors' actual knowledge  and except as set forth on Debtors' Disclosure Schedule 22(c)(iii)(B) (i) no deficiencies for taxes of Debtors and their subsidiaries have been claimed, proposed or assessed in writing by any tax authority that have not been finally settled or paid, (ii) there are no pending, or to the Debtors' and their subsidiaries' actual knowledge threatened, proceedings, actions or claims for or relating to any liability in respect of taxes of Debtors and their subsidiaries, and (iii) Debtors and their subsidiaries have not waived any statute of limitations with respect to material taxes or agreed to any extension of time with respect to any tax assessment or deficiency for any open tax year (other than any

such extension arising by reason of the filing of any tax return pursuant to an extension obtained in the ordinary course of business).

(C)     Except as would not reasonably be expected to result in a Material Adverse Effect, the Debtors and their subsidiaries are not, to the best of Debtors' actual knowledge, (i) a party to or bound by any tax allocation or sharing agreement (other than customary tax indemnification provisions in commercial Contracts not primarily relating to taxes or tax distribution provisions in their limited liability company operating agreements), (ii) a member of an affiliated group filing a consolidated federal income tax return, (iii) with any liability for the taxes of any person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or foreign law) as a transferee or successor or by Contract (other than customary Tax indemnification provisions in commercial Contracts not primarily relating to taxes or tax distribution provisions in their limited liability company operating agreements), or (iv) engaged in any "listed transaction" as defined in the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986 (the "Code").

(D)     Debtors' Disclosure Schedule 22(c)(iii)(D) sets forth the classification for United States federal income tax purposes of each of the Debtors and their subsidiaries.   No entity classification election pursuant to Treasury Regulations Section 301.7701-3 has been filed with respect to the Debtors and their subsidiaries.

(E)     For purposes of this Section 22(c)(iii), any reference to a Debtor and its subsidiaries shall include any predecessor to such entity that existed prior to the Restructuring.

(iv)     Contracts and Commitments.

(A)     Debtors' Disclosure Schedule 22(c)(iv)(A) lists, as of the date of this Agreement, each of the following Contracts by which the Debtors and their subsidiaries are bound other than any "employee benefit plan" (as such term is defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), and each pension, retirement, profit-sharing, savings, health and welfare, disability, fringe benefit, bonus, incentive, commission, stock option or other equity or equity-based, deferred compensation, severance, retention, employment, change of control, vacation or other paid or unpaid leave, and each other benefit or compensation plan, policy, Contract (including any consulting agreement), agreement, program, or arrangement, that is maintained, sponsored or contributed to (or required to be contributed to) by any Debtor or any subsidiary or with respect to which any Debtor or any subsidiary has any liability, other than a VER Foreign Plan or VER Multiemployer Plan (the "VER Employee Benefit Plans") and VER Foreign Plans (such Contracts and agreements, "VER Material Contracts"):

(1)     any Contract, note, debenture, guarantee, mortgage, loan agreement or indenture relating to indebtedness or the mortgaging, pledging or placing any lien on any material assets or group of material assets of the Debtors and their subsidiaries, or any letter of credit arrangements, or any guarantee therefore, in each case in excess of $5,000,000;

(2)     any Contract pursuant to which a Debtor or a subsidiary is reasonably expected to be required to pay or entitled to be paid, or any Contract pursuant to which in the last 12 months any Debtors or their subsidiaries has paid or received as payment, an amount in excess of $5,000,000;

(3)     any Contract with any governmental entity requiring payments in excess of $750,000;

(4)     any Contract relating to the ownership of, investments in or loans and advances to, any person, including investments in joint ventures and minority equity investments requiring payments in excess of $500,000;

(5)     any Contract relating to the acquisition (by merger, consolidation or other combination, or acquisition of stock or assets or otherwise) of any corporation, partnership or other business organization, or any division thereto;

(6)     any power of attorney or other similar Contracts or grant of agency granted by any Debtor or their subsidiaries (other than powers of attorney regarding European commercial Contracts, powers of attorney in connection with Intellectual Property or otherwise given in the ordinary course of business with respect to tax, freight and customs filings and with corporate filing services);

(7)     any Contract for the employment (excluding offer letters and independent contractors) or engagement of any individual on a full time, part time, consulting or other basis providing annual compensation (including base salary, commissions and bonuses) in excess of $150,000;

(8)     any Contract or arrangement with (i) any equityholder or affiliate of a Debtor or any director or officer of a Debtor or its subsidiaries (other than for employment), or (ii) any affiliate of any equityholder, director, officer, or subsidiary of a Debtor;

(9)     any Contract with a "Most Favored Nation" or other similar provision;

(10)     any Contract containing covenants limiting the freedom of any of the Debtors or their subsidiaries to compete in any line of business or in any geographic area or obligates any Debtor or its subsidiaries to purchase any product or service exclusively from a single party

(11)     any collective bargaining agreement or other agreement with any labor organization, works council or trade association; or

(12)     any settlement, conciliation, or similar agreement with any governmental entity or pursuant to which any Debtor or a subsidiary is required to fulfill any non-monetary obligations after the date of this Agreement or make any payment in excess of $500,000.

(B)     The Debtors have made available to PRG and the Supporting Term Loan Lenders copies of all VER Material Contracts and except as set forth on Debtors' Disclosure Schedule 22(c)(iv)(B) (i) each VER Material Contract is in all material respects legal, valid, binding and enforceable in accordance with its terms with respect to each Debtor and its subsidiaries, as applicable, and, to such Debtor's or subsidiaries' actual knowledge, each other party to such VER Material Contract is in full force and effect in all material respects; (ii) no Debtor or any subsidiary, or to such Debtor's or subsidiaries' actual knowledge, any other party thereto, is in material breach, violation or default in any material respect under any VER Material Contract; and (iii) no Debtor nor any subsidiary has received written, or, to such Debtor's or subsidiaries' actual knowledge, oral notice of cancellation or termination or reduction of the quantity of any goods or services purchased or supplied, or, other than pursuant to the terms of any VER Material Contract existing as of the date hereof, change in material terms (including, pricing, term and volume) of any VER Material Contract.

(v)     Intellectual Property.

(A)     Debtors' Disclosure Schedule 22(c)(v)(A) contains a list of all (i) issued patents and patent applications, (ii) trademark registrations and trademark applications; and (iii) registered domain names (jointly the "Intellectual Property").

(B)     Except as would not reasonably be expected to result in a Material Adverse Effect, the Debtors and their subsidiaries own, free and clear of all liens, or possess the valid and enforceable right to use all Intellectual Property that is necessary for or used in the conduct of the business of each of the Debtors and their subsidiaries as currently conducted.

(C)     Except as set forth on Debtors' Disclosure Schedule 22(c)(v)(C) to the Debtors' and their subsidiaries' actual knowledge, the conduct of each Debtor's and their subsidiaries' business does not infringe, misappropriate, or otherwise violate, and has not, in the three year period prior to the date

of this Agreement, infringed, misappropriated, or otherwise violated, the Intellectual Property of any person, except, in each case, as would not reasonably be expected to result in a Material Adverse Effect. No Debtor nor any subsidiary has, during the three year period prior to the date of this Agreement, received any written notices (including unsolicited demands or offers to take an Intellectual Property license) (i) alleging infringement, misappropriation or violation by any of the Debtors or their subsidiaries from any third party with respect to Intellectual Property or (ii) challenging the validity, enforceability, use, registrability or ownership of any Intellectual Property owned by any Debtor or their subsidiaries except, in each case, as would not reasonably be expected to result in a Material Adverse Effect. To the Debtors' and their subsidiaries' actual knowledge, no third party is infringing, misappropriating or otherwise violating any Intellectual Property owned by any of the Debtors or their subsidiaries. No such Intellectual Property is subject to any outstanding order, judgment, or decree adversely affecting any Debtors' or their subsidiaries' use thereof or rights thereto except, in each case, as would not reasonably be expected to result in a Material Adverse Effect.

(D)    Each of the Debtors and their subsidiaries takes commercially reasonable actions (including executing non-disclosure and Intellectual Property assignment agreements) (i) to protect and maintain their Intellectual Property assets, (ii) to protect the confidentiality, integrity and security of the computer software of whatever kind or purpose, including object code, source code, tools, developers kits, utilities, graphical user interfaces, menus, images, icons, data, databases, and forms, and all software stored or contained therein or transmitted thereby, and related documentation ("Software") and hardware, servers, networks and other information technology systems owned or used by the Debtors and their subsidiaries (the "VER IT Systems"); and (iii) to protect the VER IT Systems from any unauthorized use, access, interruption or modification by third parties, except, in each case, as would not reasonably be expected to result in a Material Adverse Effect. To the Debtors' and subsidiaries' actual knowledge, there have been no material unauthorized intrusions or breaches of security of the VER IT Systems in the past three years. The VER IT Systems are sufficient for the operation of the business of the Debtors and their subsidiaries as currently conducted. The conduct of the business of each of the Debtors and their subsidiaries and the collection, use, disclosure, storage, security and dissemination of personally identifiable information in connection therewith, have not violated in any material respect, and each of the Debtors and their subsidiaries have complied at all times in all material respects with, all applicable legal requirements and all contractual obligations relating to data protection or privacy, except, in each case, as would not reasonably be expected to result in a Material Adverse Effect.

(vi)    Litigation. Debtors' Disclosure Schedule 22(c)(vi) lists all material proceedings pending or that have occurred since December 31, 2017 or, to the Debtors' and their

subsidiaries' actual knowledge, threatened against any Debtor or any subsidiary since December 31, 2017, at law or in equity, or before any governmental entity, and no Debtor nor any subsidiary is subject to any material outstanding judgment, order or decree of any court or governmental body.

(vii)    VER Employee Benefit Plans.

(A)    <u>Debtors' Disclosure Schedule 22(c)(vii)(A)</u> sets forth a complete and correct list of each material VER Employee Benefit Plan and each material VER Foreign Plan (but excluding any employment Contracts or consultancy agreements for employees or consultants outside the United States where the employee or consultant earns less than $50,000 per annum). Except as would not reasonably be expected to result in a Material Adverse Effect, each VER Employee Benefit Plan complies in all respects with its terms and the applicable requirements of ERISA, the Code and other applicable legal requirements, except as would not reasonably be expected to result in a Material Adverse Effect, other than routine claims for benefits, there is no material proceeding pending or, threatened against or with respect to a VER Employee Benefit Plan or material VER Foreign Plan.

(B)    With respect to each VER Employee Benefit Plan (but excluding any employment Contracts or consultancy agreements for employees or consultants outside the United States where the employee or consultant earns less than $50,000 per annum), the Debtors have provided or otherwise made available to PRG true and complete copies for each of the Debtors and their subsidiaries, as applicable: (i) the current plan documents, including all amendments thereto, if written, or a description of such VER Employee Benefit Plan, if not written; (ii) the three most recent annual report (Form 5500 series) filed with the Department of Labor; (iii) the most recent determination or prototype opinion letter, if any, issued by the Internal Revenue Service; (iv) all current employee handbooks or manuals; (v) all current summary plan descriptions; (vi) all material communications received from or sent to the Internal Revenue Service or the Department of Labor (including a written description of any oral communication) within the last calendar year; and (iv) any related trust or funding agreement.

(C)    Each VER Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code either (i) has received a current favorable determination letter from the Internal Revenue Service as to its qualified status or (ii) may rely upon a current prototype opinion letter from the Internal Revenue Service.

(D)    Within the past six years, no Debtor nor any subsidiary maintained, sponsored, contributed to, had any obligation to contribute to, or had any liability under or with respect to: (i) except as set forth on <u>Debtors' Disclosure Schedule 22(c)(vii)(D)</u>, any multiemployer plan (as defined in Section 3(37) or 4001(a)(3) of ERISA) (each, a "<u>VER Multiemployer</u>

Plan"), (ii) a "multiple employer plan" (within the meaning of Sections 210, 4063, 4064 or 4066 of ERISA or Section 413(c) of the Code), or (iii) a "multiple employer welfare arrangement" (as such term is defined in Section 3(40) of ERISA).  No Debtor nor any subsidiary has, or within the past six years incurred, any liability solely as a result of being considered a single employer under Section 414 of the Code with any other person.

(E)     Except as set forth on <u>Debtors' Disclosure Schedule 22(c)(vii)(E)</u> and other than any VER Multiemployer Plan, no Debtor nor any subsidiary maintains, sponsors, contributes to, has any obligation to contribute to, or has any liability under or with respect to any "defined benefit plan" as defined in Section 3(35) of ERISA or any other plan subject to the funding requirements of Section 412 of the Code or Section 302 or Title IV of ERISA.

(F)     With respect to each VER Multiemployer Plan,  (i) all contributions required to be paid by any VER Acquired Entity prior to the RSA Effective Date have been paid in accordance with the terms of the VER Multiemployer Plan and applicable collective bargaining agreement, (ii) no Debtor nor any subsidiary has made or suffered a "complete withdrawal" or a "partial withdrawal" (as such terms are respectively defined in Sections 4203 and 4205 of ERISA)  or has incurred any withdrawal liability under Title IV of ERISA whether or not assessed, and (iii) no Debtor nor any subsidiary has received any notification that any such plan has been terminated, is insolvent (within the meaning of Section 4245 of ERISA) or is in endangered or critical status (within the meaning of Section 437 of the Code or Section 305 of ERISA). No Debtor nor any subsidiary is a party to any agreement intended to comply with Section 4204 of ERISA. With respect to each VER Multiemployer Plan, the Debtors have provided to PRG copies of any material correspondence between each applicable Debtor or subsidiary and the VER Multiemployer Plan, including the most recent withdrawal liability estimates. All work performed by any Debtor or a subsidiary with respect to which contributions have been or are made or required to be made to any VER Multiemployer Plan is and has been work performed in the entertainment industry primarily on a temporary or project-by-project basis, as determined under and for purposes of Title IV of ERISA, and each VER Multiemployer Plan to which contributions have been or are made or required to be made by such Debtor or subsidiary is a plan that primarily covers employees in the entertainment industry for such purposes.

(G)     Except as set forth on <u>Debtors' Disclosure Schedule 22(c)(vii)(G)</u>, no Debtor nor any subsidiary has any liability with respect to the provision of post-retirement or post-termination medical, health, or life insurance benefits for any person (other than in accordance with Part 6 of Subtitle B of Title I of ERISA or Section 4980B of the Code or comparable state legal

requirement "<u>COBRA</u>") and for which the beneficiary pays the entire premium cost).

(H)     No amount that could be received as a result of or in connection with the consummation of the Transactions would reasonably be expected to be an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code); and no Debtor nor any subsidiary has any obligation to gross-up, indemnify or otherwise reimburse any individual with respect to any tax, including under Sections 409A or 4999 of the Code. Except as set forth on <u>Debtors' Disclosure Schedule 22(c)(vii)(H)</u>, the Transactions, alone or in a combination with any other event, will not (i) result in or entitle any employee, officer, director or other individual service provider of any Debtor or any subsidiary  (whether current, former or retired) to any payment (whether in cash, property or the vesting of property) or benefit, including severance pay, termination pay or withdrawal liability, (ii) accelerate the time of payment, funding or vesting, or increase the amount of, or require the funding of, compensation or benefits due to any employee, officer, director or other individual service provider of any Debtor or any subsidiary (whether current, former or retired) or (iii) limit the ability of any Debtor or any subsidiary to amend or terminate any VER Employee Benefit Plan.

(I)     Except as would not reasonably be expected to result in a Material Adverse Effect, with respect to each VER Employee Benefit Plan, all contributions (including all employer contributions and employee salary reduction contributions), distributions, reimbursements and premium payments that are due have been timely made and all contributions, distributions, reimbursements and premium payments for any period ending on or before the RSA Effective Date that are not yet due have been made or properly accrued.

(J)     Except as would not reasonably be expected to result in a Material Adverse Effect, any individual who performs services for a Debtor or any subsidiary and who is not treated as an employee for federal income tax purposes by such Debtor or any subsidiary is not an employee under applicable legal requirements or for any purpose including for tax withholding purposes or VER Employee Benefit Plan participation purposes. Except as would not reasonably be expected to result in a Material Adverse Effect, no Debtor nor any subsidiary has any liability by reason of an individual who performs or performed services for such Debtor or any subsidiary in any capacity being improperly excluded from participating in a VER Employee Benefit Plan.

(K)     Except as would not reasonably be expected to result in a Material Adverse Effect,  with respect to each benefit or compensation plan, policy, Contract, agreement, program, or arrangement maintained by any Debtor or any subsidiary that is subject to the legal requirements of any jurisdiction

outside of the United States   (the "<u>VER Foreign Plans</u>"), (i) such VER Foreign Plan complies in form and operation with its terms and all applicable legal requirements, (ii) all employer and employee contributions to each VER Foreign Plan required to have been made by any Debtor or any subsidiary by applicable Legal Requirements or by the terms of such VER Foreign Plan have been   timely made, or, if applicable, accrued in accordance with normal accounting practices, (iii) each VER Foreign Plan required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities, and (iv) no VER Foreign Plan is a defined benefit plan (as defined in ERISA, whether or not subject to ERISA).

(L)    There are no pending, or assertions of any potential, litigations, claims, or proceedings of any type against any of the Debtors with respect to any VER Employee Benefit Plan, VER Multiemployer Plan, or any similar plan.

(M)    The Debtors have no legally binding plan or commitment to create any additional VER Employee Benefit Plan, VER Multiemployer Plan or VER Foreign Plan or to modify or change any existing VER Employee Benefit Plan, VER Multiemployer Plan or VER Foreign Plan that would be reasonably expected to result in material liabilities to the Debtors, except as may be required by applicable legal requirements.

(viii)    Insurance<u>.  Debtors' Disclosure Schedule 22(c)(viii)</u> lists each material insurance policy maintained by each Debtor or any subsidiary.  All of such insurance policies are in full force and effect, and no Debtor nor any subsidiary is in default with respect to their respective obligations under any of such insurance policies except as would not reasonably be expected to result in a Material Adverse Effect.  There are no material outstanding unpaid claims under any such policy.

(ix)    Compliance with Laws; Foreign Corrupt Practices Act.

(A)    Except as set forth on <u>Debtors' Disclosure Schedule 22(c)(ix)(A)</u> and to the best of Debtors' actual knowledge, each Debtor or any subsidiary is, and for the past three years has been, in compliance in all material respects with all legal requirements to which such Debtor or subsidiary is subject. To the best of Debtors' actual knowledge, no Debtor nor any subsidiary has received any currently unresolved notice, action or assertion from any governmental entity, nor has any currently unresolved notice, action or assertion been filed, commenced or, to the Debtors' actual knowledge, threatened against such Debtor or any subsidiary alleging that such Debtor or any subsidiary is not in material compliance with any applicable legal requirements or orders, judgments, injunctions or decrees.

(B)    To the best of Debtors' actual knowledge, no Debtor nor any subsidiary nor any director, officer or employee of any Debtor or any subsidiary, nor any agent acting on behalf of such Debtor or any subsidiary, has provided,

offered, gifted or promised, directly or indirectly, anything of value to any government official, political party or candidate for government office, nor provided or promised anything of value to any other person while knowing that all or a portion of that thing of value would or will be offered, given, or promised, directly or indirectly, to any government official, political party or candidate for government office in violation of any U.S. and non-U.S. Laws relating to the prevention of corruption and bribery, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the UK Bribery Act of 2010 ("<u>Anti-Corruption Laws</u>").

(C)    To the best of Debtors' actual knowledge, no Debtor nor any subsidiary, nor any director, officer, or employee of any Debtor or of any subsidiary, nor any agent acting on behalf of any of the foregoing is or has been in the last three (3) years: (i) designated on any list of any U.S. or applicable non-U.S. governmental entity, including without limitation the U.S. Department of the Treasury Office of Foreign Assets Control's ("<u>OFAC</u>") Specially Designated Nationals and Blocked Persons List, (ii) participating in any transaction involving such designated person or entity, or any country currently, or that was in the last three years, subject to comprehensive sanctions under the U.S. sanctions administered by OFAC (Cuba, Iran, North Korea, Sudan, Syria, or the Crimea region of Ukraine) or (iii) exporting (including deemed exportation) or re-exporting, directly or indirectly, any commodity, software, technology, or services in violation of any U.S. or applicable non-U.S. law, statute, order of a governmental entity, regulation, rule, permit, license, directive, ruling, order, decree, ordinance, award, or other decision or requirement, including any amendments, having the force or effect of law, of any arbitrator, court, government or government agency or instrumentality or other governmental entity, concerning the importation, exportation, re-exportation, or deemed exportation of products, technical data, technology and/or services, and the terms and conduct of transactions and making or receiving of payment related to such importation, exportation, re-exportation or deemed exportation, including, but not limited to, the laws, regulations, and programs administered or enforced by U.S. Customs and Border Protection, the Export Administration Regulations, the International Traffic in Arms Regulations, the embargoes and restrictions on transactions with designated countries and entities administered or enforced by OFAC, including persons and entities designated on OFAC's list of Specially Designated Nationals and Blocked Persons, and the anti-boycott regulations administered by Commerce and the U.S. Department of the Treasury ("<u>Customs and International Trade Laws</u>").

(D)    Without limiting the foregoing, to the best of Debtors' actual knowledge, for the past three (3) years each Debtor and its subsidiaries have (i) been in compliance in all material respects with all applicable Anti-Corruption Laws and Customs and International Trade Laws and (ii) not received any written notice from any governmental entity that it is subject to any civil or

criminal investigation, audit or any other inquiry involving or otherwise relating to any actual or potential violation of Anti-Corruption Laws or the Customs and International Trade Laws.

(x)     Environmental Matters.

(A)     Except as would not reasonably be expected to result in a Material Adverse Effect, each Debtor and its subsidiaries are now, and for the three years prior to the date of this Agreement have been, in compliance with all applicable legal requirements governing pollution or protection of the environment, natural resources, or human health or safety, including, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, release, threatened release, control, or cleanup of, or exposure to, any Hazardous Materials ("Environmental Requirements").

(B)     Except as would not reasonably be expected to result in a Material Adverse Effect, no Debtor nor any subsidiary has, within the three years prior to the date of this Agreement, received any written notice from any governmental entity or any other person that alleges that such Debtor or subsidiary is or was in material violation of Environmental Requirements or has any material liability or potential material liability arising under or relating to Environmental Requirements, including any investigatory, remedial or corrective obligation, relating to such Debtor or any subsidiary or their current or former facilities or operations, and to the Debtors' actual knowledge, no such notice is threatened.

(C)     Except as would not reasonably be expected to result in a Material Adverse Effect, no Debtor nor any subsidiary has (i) released, disposed of or arranged for the release or disposal of, transported, treated, stored, used, handled, or exposed any person to any wastes, pollutants, contaminants or hazardous, dangerous or toxic substances or materials, including petroleum and petroleum products and any other substance or material that is regulated pursuant to any Environmental Requirement or the use or release of which could result in liability under any Environmental Requirement ("leases"), or (ii) owned or operated any property or facility (including the VER Leased Real Property) that is or has been contaminated by any Hazardous Material.

(D)     No Debtor nor any subsidiary has assumed, provided an environmental indemnity with respect to or otherwise become subject to any material liability of any other person under any Environmental Requirement.

(xi)     VER Affiliated Transactions.

(A)     Except as shall be terminated effective as of the Effective Date, no member of senior management, director, holder of equity interests or affiliate (other than the Debtors or any of their subsidiaries) of any Debtor or any entity in

which such person owns any beneficial interests, or any members of such person's respective immediate families, or any affiliates of the foregoing (a) is a party to any Contract, commitment or transaction (whether verbal, written or implied) with any Debtor or any subsidiary, (b) has any interest in any property (whether tangible or intangible) owned or used by any Debtor or any subsidiary or (c) has any financial interest in, or is a director, officer, or employee or service provider of, any client, supplier, customer, lessor, lessee or competitor of any Debtor or any subsidiary (each of the foregoing, an "<u>VER Affiliated Transaction</u>").

(B)    Except as set forth on <u>Debtors' Disclosure Schedule 22(c)(xi)(B)</u>, pursuant to the requirements of applicable legal requirements or with respect to any VER Employee Benefit Plan, each Debtor and its subsidiaries have no liabilities to any former employee of such Debtor and its subsidiaries that will require payment after the RSA Effective Date.

(xii)    Employees.

(A)    Within the past three years, except as would not reasonably be expected to result in a Material Adverse Effect (i) no Debtor nor any subsidiary has experienced any strike, work stoppage, lockout, or other material labor dispute, and to the Debtors' actual knowledge no such strike, work stoppage, lockout or other material labor dispute is currently threatened against or affecting such Debtor or subsidiary; (ii) no Debtor nor any subsidiary has experienced any material grievance, material labor-related arbitration, claim of unfair labor practices, or other collective bargaining dispute; (iii) to Debtors' actual knowledge, no union organizing activity has occurred or been threatened by or on behalf of any labor union, labor organization, works council, trade union, or group of employees with respect to employees of each of the Debtors and their subsidiaries; and (iv) no collective bargaining agreement or other agreement with any labor organization, labor union, works council or trade union has been in effect with respect to each of the Debtors and their subsidiaries, and no Debtor nor any subsidiary has negotiated any collective bargaining or other agreement in respect of employees of such Debtor or subsidiary.

(B)    No Debtor nor any subsidiary has implemented any employee layoffs in the past three years that would be reasonably likely to implicate the WARN Act, or any similar legal requirement.

(C)    Except as would not reasonably be expected to result in a Material Adverse Effect, each Debtor and its subsidiaries has paid in full or properly accrued all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of their respective employees or other service providers. Except as would not reasonably be expected to result in a Material Adverse Effect, each of the Debtors and its subsidiaries is, and has been for the last three years, in compliance with all applicable legal requirements relating to

employment and employment practices, including, but not limited to, workers' compensation, terms and conditions of employment, worker classification, wages and hours, discrimination, immigration and citizenship (including completion and processing of Forms I-9 for all employees in accordance with applicable legal requirements), retaliation, "whistleblower" rights, civil rights, the Fair Labor Standards Act, unemployment and the payment of social security and other taxes, collective bargaining, and the WARN Act. OK.

(xiii)   Brokerage.  Except as set forth on <u>Debtors' Disclosure Schedule 22(c)(xiii)</u> no broker, finder, financial advisor, investment banker or other person is entitled to any brokerage commissions, finders' fees or similar compensation in connection with this Agreement or the Transactions based on any arrangement or agreement made by or on behalf of any Debtor or any subsidiary.

(xiv)   Governmental Licenses and Permits.  <u>Debtors' Disclosure Schedule 22(c)(xiv)</u> contains a list of all material permits and licenses of governmental entities (collectively, the "<u>VER Licenses</u>") owned or possessed by the Debtors and their subsidiaries and no other such permits and licenses of governmental entities are required in the conduct of their respective businesses as currently conducted or used by such Debtor or its subsidiaries in the conduct of their businesses as currently conducted, except as would not reasonably be expected to be material to such Debtor or its subsidiaries.  All of such VER Licenses held by or issued to the Debtors or their subsidiaries are in full force and effect, and such Debtor or its subsidiaries that is a party thereto is in compliance in all material respects with each such VER License held by or issued to it. No material action is pending, nor to the Debtors' actual knowledge is threatened, to suspend, revoke, revise, limit, restrict or terminate any of such VER Licenses or declare any such VER License invalid.

(xv)   Warranty. Except as would not reasonably be expected to result in a Material Adverse Effect, no Debtor nor any subsidiary has any liability (and has not received written notice of any proceeding, charge, complaint, claim or demand against it giving rise to any such material liability) for damages in connection with any express or implied warranties made by such Debtor or a subsidiary within the last three years.

(xvi)   <u>Financial Statements</u>.

(A)   The Debtors have furnished or made available to PRG and the Supporting Term Loan Lenders (i) the audited consolidated balance sheets of the Debtors as of the fiscal years ended December 31, 2016, 2015 and 2014, together with the audited consolidated statements of operations and comprehensive income (loss) cash flows and stockholders' equity of the Debtors for the periods then ended, and the related notes thereto (the "<u>Audited Financial Statements</u>")   and (ii) the unaudited consolidated balance sheet as of December 31, 2017 and February 28, 2018 (the "<u>Latest Balance Sheet</u>"), together with the related unaudited consolidated

statements of operations and comprehensive income (loss) cash flows and stockholders' equity of the Debtors for the periods then ended (the "Unaudited Financial Statements", and together with the Audited Financial Statements, the "Financial Statements"). The Financial Statements, together with the notes thereto, have been prepared in accordance with GAAP in all material respects (subject, in the case of the Unaudited Financial Statements, to the absence of footnotes and to customary year-end adjustments) consistently applied throughout the periods specified therein and fairly present, in all material respects, the consolidated and combined financial position of the Debtors at the dates thereof and the consolidated and combined results of operations of the Debtors for the respective periods indicated in accordance with GAAP.

(B)     There is no liability of the Debtors or their subsidiaries of a nature required to be reflected on a balance sheet prepared in accordance with GAAP other than liabilities that are (i) liabilities incurred in the ordinary course of business since the date of the Latest Balance Sheet; (ii) liabilities disclosed in the Debtors' Disclosure Schedules; and (iii) liabilities for fees and expenses incurred in connection with the consummation of the Transactions.

(xvi)   <u>No recourse/Survival of representations and warranties of Debtors and their subsidiaries</u>. The foregoing representations and warranties of the Debtors and their subsidiaries will terminate immediately and automatically upon the RSA Effective Date and neither PRG nor any other Party hereto shall have any recourse for any breach of the foregoing representations and warranties; *provided*, that, the foregoing sentence shall not limit the right a Party may have to (x) terminate this Agreement pursuant to <u>Section 14</u> as and to the extent provided therein or (y) elect not to effect the Transactions due to the failure of the condition set forth in Section 23(b)(i), as and to the extent set forth therein. No Debtor (or any subsidiary thereof) nor any other person makes any express or implied representation or warranty in respect or on behalf of such Debtor or subsidiary, and each Debtor disclaims any such representation or warranty, whether by a subsidiary or any of their respective officers, directors, employees, agents or representatives or any other person, with respect to the execution and delivery of this Agreement or the consummation of the Transactions contemplated hereby or the business or assets of each Debtor and its subsidiaries, notwithstanding the delivery or disclosure to PRG or any of their respective officers, directors, employees, agents or representatives or any other person of any documentation or other information with respect to the foregoing.

(d)     Other than the right a Party may have to (x) terminate this Agreement pursuant to <u>Section 14</u> as and to the extent provided therein or (y) elect not to effect the Transactions due to the failure of the condition set forth in Section 23(b)(i), as and to the extent set forth therein, each of the Parties hereto agrees that they shall have no recourse for the breach of any representation or warranty set forth in the foregoing <u>Section 22(c)</u>, which such representations shall not survive the RSA Effective Date nor the consummation of the Transactions. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN <u>SECTION</u>

22(C), THE DEBTORS EXPRESSLY DISCLAIM (AND THE OTHER PARTIES ACKNOWLEDGE AND AGREE TO SUCH DISCLAIMER) ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE OR QUALITY OF THEIR BUSINESSES OR THEIR ASSETS, AND THE DEBTORS SPECIFICALLY DISCLAIM ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THEIR ASSETS, ANY PART THEREOF, THE WORKMANSHIP THEREOF, AND THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT, IT BEING UNDERSTOOD THAT SUCH SUBJECT ASSETS ARE BEING ACQUIRED "AS IS, WHERE IS" ON THE RSA EFFECTIVE DATE, AND IN THEIR PRESENT CONDITION, AND PRG AND THE SUPPORTING TERM LOAN LENDERS HAVE RELIED SOLELY ON THEIR OWN EXAMINATION AND INVESTIGATION THEREOF. FURTHER, EXCEPT AS SET FORTH IN SECTION 22(C), THE DEBTORS HEREBY EXPRESSLY DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, LEGAL OR CONTRACTUAL, EXPRESS OR IMPLIED, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO PRG AND THE SUPPORTING TERM LOAN LENDERS OR THEIR OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA).

(e)    Each of the Term DIP Lenders and the Term DIP Agent hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)    such Party, if an entity, is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, formation, or incorporation (as applicable) and that it has all requisite corporate, partnership, limited liability company or similar organizational power and authority to execute and deliver this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement;

(ii)    the execution and delivery by it of this Agreement, and the performance of its obligations hereunder, have been duly authorized by all necessary corporate, partnership, limited liability company or other similar organizational action on its part;

(iii)    the execution, delivery, and performance by it of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it or its certificates of incorporation, bylaws, or other similar organizational or governing documents, or those of any of its affiliates, (B) result in a breach of, or constitute (with or without due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its affiliates is a party, or (C) require any registration or filing with, consent or approval of, or notice to, or other action of, with or by, any federal, state, or other governmental authority or regulatory

body, except such filings and/or approvals as may be necessary or required by the Bankruptcy Court or under the Bankruptcy Code, the Securities Acts, or any "blue sky" laws;

(iv)    such Party is not a party to any pending or undisclosed agreement, understanding, negotiation, or discussion (in each case, whether oral or written) with respect to any Alternative Restructuring Proposal; and

(v)    this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability.

(f)    PRG hereby represents and warrants for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)    such Party, if an entity, is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, formation, or incorporation (as applicable) and that it has all requisite corporate, partnership, limited liability company or similar organizational power and authority to execute and deliver this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement;

(ii)    the execution and delivery by it of this Agreement, and the performance of its obligations hereunder, have been duly authorized by all necessary corporate, partnership, limited liability company or other similar organizational action on its part;

(iii)    the execution, delivery, and performance by it of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it or its certificates of incorporation, bylaws, or other similar organizational or governing documents, or those of any of its affiliates, (B) result in a breach of, or constitute (with or without due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its affiliates is a party, or (C) require any registration or filing with, consent or approval of, or notice to, or other action of, with or by, any federal, state, or other governmental authority or regulatory body, except such filings and/or approvals as may be necessary or required by the Bankruptcy Court or under the Bankruptcy Code, the Securities Acts, or any "blue sky" laws;

(iv)    such Party is not a party to any pending or undisclosed agreement, understanding, negotiation, or discussion (in each case, whether oral or written) with respect to any Alternative Restructuring Proposal;

(v)    Attached hereto as **<u>Exhibit D</u>** are true, complete and correct copies of executed commitment letters and corresponding customarily redacted fee letters (none of which redacted terms affect the amount or availability of the Effective Date Debt

Financing that will be available for borrowing on the Effective Date or impose any conditions on the receipt of the Effective Date Debt Financing on the Effective Date) from the financial institutions identified therein (the "Effective Date Lenders") to provide, subject to the terms and conditions therein, debt financing in the amounts set forth therein (the "Effective Date Debt Financing Commitments", as each may be amended or replaced from time to time to the extent permitted by Section 9(a) or 9(b) for the purpose of funding the Transactions (being collectively referred to as the "Effective Date Debt Financing").  As of the RSA Effective Date, each of the Effective Date Debt Financing Commitments is a legal, valid and binding obligation of PRG, and to the knowledge of PRG, the other parties thereto, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting creditors' rights generally and except insofar as the availability of equitable remedies may be limited by applicable law.  As of the RSA Effective Date, each of the Effective Date Debt Financing Commitments is in full force and effect, and none of the Effective Date Debt Financing Commitments has been withdrawn, rescinded or terminated or otherwise amended or modified in any respect, and no such amendment or modification is contemplated.  As of the RSA Effective Date, PRG is not in breach of any of the terms or conditions set forth in any of the Effective Date Debt Financing Commitments and, to the knowledge of PRG, no event has occurred that, with or without notice, lapse of time or both, would reasonably be expected to constitute a breach, default or failure to satisfy any condition precedent set forth therein.  As of the RSA Effective Date, PRG (i) has no reason to believe that any event has occurred that (with or without notice or lapse of time, or both) would constitute a breach or default under any of the Effective Date Debt Financing Commitments, (ii) is not aware of any fact, event or other occurrence that makes any of the representations or warranties of PRG in any of the Effective Date Debt Financing Commitments inaccurate in any material respect and (iii) has no reason to believe that any of the conditions to the Effective Date Debt Financing that are set forth in the Effective Date Debt Financing Commitments will not be satisfied on a timely basis or that the Effective Date Debt Financing contemplated by the Effective Date Debt Financing Commitments will not be made available on the Effective Date. As of the RSA Effective Date, no Effective Date Lender has notified PRG of its intention to terminate all or any portion of the Effective Date Debt Financing Commitments or not to provide the Effective Date Debt Financing.  Assuming (i) the entire amount of the Effective Date Debt Financing is funded on the Effective Date in accordance with the Effective Date Debt Financing Commitments, (ii) the satisfaction in full of (x) all of the conditions to the funding of the Effective Date Debt Financing set forth in the Effective Date Debt Financing Commitments and (y) all of the conditions set forth in Section 23 hereof, the net cash proceeds from the Effective Date Debt Financing will be sufficient to consummate the Transactions contemplated to occur on the Effective Date, including the payment of any fees and expenses of or payable by PRG, the Debtors or the Term DIP Lenders, and any other amounts required to be paid in connection with the consummation of the Transactions contemplated to occur on the Effective Date. PRG has paid in full any and all commitment or other fees required by the Effective

Date Debt Financing Commitments that are due as of the RSA Effective Date, and will pay, after the RSA Effective Date, all such fees as they become due. As of the RSA Effective Date, there are no conditions precedent or contingencies to the obligations of the parties under the Effective Date Debt Financing Commitments (including pursuant to any "flex" provisions in the related fee letter or otherwise) to make the full amount of the Effective Date Debt Financing available to PRG on the terms therein except as expressly set forth in the unredacted portion of the Effective Date Debt Financing Commitments. As of the RSA Effective Date, there are no side letters or other agreements, understandings, Contracts or arrangements (written, oral or otherwise) between PRG and the Effective Date Lenders related to the Effective Date Debt Financing (other than the Effective Date Debt Financing Commitments). As of the RSA Effective Date, neither PRG nor Effective Date Lender has any right to impose, and none of any Effective Date Lender or PRG has any obligation to accept, any condition precedent, contingency or requirement to the funding of the Effective Date Debt Financing on the Effective Date other than any of the conditions expressly set forth in the unredacted portions of the Effective Date Debt Financing Commitments nor any reduction to the aggregate amount available under the Effective Date Debt Financing Commitments on the Effective Date (nor any term or condition which would have the effect of reducing the aggregate amount available under the Effective Date Debt Financing Commitments on the Effective Date). As of the RSA Effective Date, subject to each Party's (other than PRG) compliance with this Agreement and the satisfaction (or waiver by PRG) of the conditions set forth in <u>Section 23</u> (other than those conditions that by their nature are to be satisfied at the Effective Date, but subject to the satisfaction or waiver of such conditions), PRG has no reason to believe that it will be unable to satisfy on a timely basis any conditions to the funding of the full amount of the Effective Date Debt Financing on the Effective Date or that the Effective Date Debt Financing will not be available on the Effective Date; and

(vi)     This Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability.

(g)     Each of the Catterton Parties hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)     such Party, if an entity, is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, formation, or incorporation (as applicable) and that it has all requisite corporate, partnership, limited liability company or similar organizational power and authority to execute and deliver this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement;

(ii)     the execution and delivery by it of this Agreement, and the performance of its obligations hereunder, have been duly authorized by all necessary corporate,

partnership, limited liability company or other similar organizational action on its part;

(iii)  the execution, delivery, and performance by it of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it or its certificates of incorporation, bylaws, or other similar organizational or governing documents, or those of any of its affiliates, (B) result in a breach of, or constitute (with or without due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its affiliates is a party, or (C) require any registration or filing with, consent or approval of, or notice to, or other action of, with or by, any federal, state, or other governmental authority or regulatory body, except such filings and/or approvals as may be necessary or required by the Bankruptcy Court or under the Bankruptcy Code, the Securities Acts, or any "blue sky" laws;

(iv)  such Party is not a party to any pending or undisclosed agreement, understanding, negotiation, or discussion (in each case, whether oral or written) with respect to any Alternative Restructuring Proposal;

(v)  this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(vi)  as of the date of this Agreement, it (A) is either (1) the sole beneficial owner of the principal amount of the Catterton Claims set forth below its signature hereto, or (2) has sole investment or voting discretion with respect to the principal amount of the Catterton Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Catterton Claims to the terms of this Agreement, (B) has full power and authority to act on behalf of, vote, and consent to matters concerning such Claim and dispose of, exchange, assign, and transfer such Claim, and (C) holds no Claims or interests that are not identified below its signature hereto, in each case except as this provision may be specifically waived, in writing by the VER Entities.

23.  Conditions to Obligation of the Parties to Consummate the Transactions.

(a)  The respective obligations of each Party to effect the Transactions shall be subject to the satisfaction or waiver at or prior to the Effective Date of the following conditions:

(i)  There shall not be in effect any order, judgment, writ, injunction, stipulation, settlement, award or decree of any by a governmental authority restraining, enjoining, having the effect of making the Transactions illegal or otherwise prohibiting the consummation of the Transactions; *provided*, *however*, that each Party shall have used reasonable best efforts to prevent the entry of any such injunction or other order or the commencement of any such proceeding or lawsuit

47

and to appeal as promptly as possible any injunction or other order that may be entered;

(ii)     All necessary filings under the HSR Act shall have been made and all applicable waiting periods thereunder shall have expired or been terminated; and

(iii)     No law shall have been enacted, entered, promulgated and remain in effect that prohibits or makes illegal the consummation of the transaction.

(b)     PRG's and the Supporting Term Loan Lenders' obligation to effect the Transactions shall be subject to the satisfaction or waiver on or prior to the Effective Date of all of the following conditions:

(i)     the representations and warranties of the Debtors set forth herein shall be true and correct in all respects (and PRG and the Supporting Term Loan Lenders agree that they shall not be entitled to assert a breach or inaccuracy of any representation or warranty by the Debtors of which PRG and the Supporting Term Loan Lenders had knowledge before the date of this Agreement) as of the RSA Effective Date (in each case disregarding any all materiality and Material Adverse Effect qualifications contained therein), except to the extent that the failure of such representations and warranties to be so true and correct, individually, or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect with respect to the Debtors;

(ii)     the Debtors shall have performed and complied in all material respects with all covenants required to be performed or complied with by the Debtors under this Agreement on or prior to the Effective Date;

(iii)     prior to or at the Effective Date, the Debtors shall have delivered the Definitive Documentation required to be delivered by Debtors as of the Effective Date in form and substance consistent with this agreement and, to the extent not specified in this Agreement, reasonably acceptable to PRG and the Supporting Term Loan Lenders;

(iv)     since the RSA Effective Date, no fact, event or circumstance shall have occurred which has had a Material Adverse Effect with respect to the Debtors;

(v)     prior to the Effective Date, Full Throttle Films, LLC and Revolution Display, LLC (i) shall cause (A) the termination of Full Throttle Films, LLC's and Revolution Display, LLC's respective 401(k) Plans (the "401(k) Plan") and (B) the vesting, in-full, of account balances in the 401(k) Plan held by active employees of Full Throttle Films, LLC and Revolution Display, LLC, as applicable, as determined immediately prior to the Effective Date; (ii) will adopt a resolution approving such actions; and (iii) will provide evidence that the actions set forth in this Section 23(b)(v) have been taken;

(vi)     PRG shall have received the proceeds of the Effective Date Debt Financings in an amount sufficient to pay in cash all amounts required to be paid by PRG in connection with the Restructuring and the Transactions, including the payment in

full of the Prepetition ABL Loan, the ABL DIP Loan, the Term DIP Loan, the Additional First Out Prepetition Term Loan and any debt of PRG and its subsidiaries required to be retired or refinanced upon the Effective Date, including, in each case, all fees related to the foregoing required to be paid on the Effective Date; or

(vii)    the condition set forth in the first paragraph of Item 4 (the "Item 4 Condition") under the heading "Conditions Precedent to Closing of the Credit Facility" in the term sheet attached to that certain Commitment Letter, dated April 5, 2018, between Ally Bank and Production Resource Group, L.L.C., as in effect on the date hereof (the "Ally Commitment Letter"), shall have been satisfied on and as of the Effective Date for the period referred to therein; *provided*, that, solely for the purposes of determining whether the condition set forth this clause (vii) shall have been satisfied, the minimum Adjusted EBITDA and Proforma Adjusted EBITDA thresholds set forth in the Item 4 Condition shall be deemed to be $2,500,000 lower than the minimum Adjusted EBITDA and Proforma Adjusted EBITDA thresholds set forth in the Item 4 Condition in the Ally Commitment Letter.

(viii)    For the purposes hereof, "Material Adverse Effect" shall mean any change, effect, event, occurrence or development that, individually or in the aggregate has or would reasonably be expected to have a materially adverse effect on the business, assets, liabilities, financial condition or results of operations of the Debtors, taken as a whole; *provided*, *however*, that none of the following, either alone or in combination, shall be considered in determining whether there has been a Material Adverse Effect: (i) any change, effect, event, occurrence or development that generally affects the industry or markets in which each respective Debtor operates, (ii) any change in national or international political, economic or social conditions or the financial, banking and securities markets, including events, circumstances, changes or effects caused by any outbreak or escalation of war, act of foreign enemies, hostilities, terrorist activities, or acts of nature, (iii) any failure by each respective Debtor to meet forecasts (*provided* any facts and circumstances that may have contributed to such failure may be taken into account), (iv) any change, effect, event, occurrence or development arising or resulting from the announcement or execution of this Agreement, the Plan, the Restructuring or the consummation of the transactions contemplated hereby or thereby (including the Transactions) or the commencement of the Chapter 11 Cases (including by reason of the identity of PRG or any communication by PRG or any of its affiliates regarding their respective plans or intentions with respect to the business of any Debtor, and including the impact thereof on relationships with customers, suppliers, distributors, partners or employees or others having relationships with any Debtor or its subsidiaries) or litigation arising from or relating to this Agreement, the Plan, the Restructuring, the consummation of the transactions contemplated hereby or thereby (including the Transactions) or the commencement of the Chapter 11 Cases, or any change, effect, event, occurrence or development that precipitated, caused or contributed to, in whole or in part, the Debtors commencing the Chapter 11 Cases, (v) any change, after the date hereof, in any law, GAAP or accounting standards or interpretations thereof and (vi) any change, effect, event, occurrence or development to the extent

arising from or relating to the identity of PRG; *provided*, that, in the case of clauses (i), (ii) and (v), any such fact, change, event, circumstance or occurrence that has a disproportionate impact on each respective Debtor to other persons operating in the industries in which each respective Debtor operates shall not be excluded from the determination of whether there has been a Material Adverse Effect.

(c)    Debtors' obligation to effect the Transactions shall be subject to the satisfaction or waiver on or prior to the Effective Date of all of the following conditions:

(i)    the representations and warranties of PRG and the Supporting Term Loan Lenders set forth herein shall be true and correct in all material respects as of the RSA Effective Date, except to the extent such representations and warranties are made on and as of a specified date, in which case the same shall continue on the RSA Effective Date to be true and correct as of the specified date;

(ii)    PRG and the Supporting Term Loan Lenders shall have performed and complied in all material respects with all covenants required to be performed or complied with by them under this Agreement on or prior to the Effective Date; and

(iii)    prior to or at the Effective Date, PRG and the Supporting Term Loan Lenders shall have delivered the Definitive Documentation required to be delivered by PRG and the Supporting Term Loan Lenders as of the Effective Date in form and substance reasonably acceptable to the Debtors.

24.    <u>Transfer of Claims</u>.

(a)    From the RSA Effective Date until the Termination Date, each Supporting Term Loan Lender agrees that it will not, directly or indirectly, sell, contract to sell, give, assign, hypothecate, pledge, encumber, grant a security interest in, offer, sell any option or Contract to purchase, or otherwise transfer or dispose of, any economic, voting, or other rights in or to, by operation of law or otherwise (collectively, "Transfer"), all or any portion of its Prepetition Term Loan Claims now or hereafter owned, unless the transferee is (i) a Supporting Term Loan Lender or (ii) prior to such Transfer, agrees in writing to be bound by all of terms of this Agreement (including with respect to any Debtor Claims or interest it may have held prior to such Transfer) by executing and providing to all Parties hereto a transfer agreement in the form attached hereto as **Exhibit C** within two Business Days of the execution of an agreement (or trade confirmation) in respect of such Transfer, in which case such transferee shall be deemed a Joining Party for all purposes under this Agreement.

(b)    From the RSA Effective Date until the Termination Date, each Term DIP Lender agrees that it will not, directly or indirectly, Transfer all or any portion of its DIP Facility Claim now or hereafter owned, unless the transferee is (i) a Term DIP Lender or (ii) prior to such Transfer, agrees in writing to be bound by all of terms of this Agreement (including with respect to any Debtor Claims or interest it may have held prior to such Transfer) by executing and providing to all Parties hereto a transfer agreement in the form attached hereto as **Exhibit C** within two Business Days of the execution of an agreement (or trade

confirmation) in respect of such Transfer, in which case such transferee shall be deemed a Joining Party for all purposes under this Agreement.

(c)     From the RSA Effective Date until the Termination Date, each Catterton Party agrees that it will not, directly or indirectly, Transfer all or any portion of its Catterton Claims now or hereafter owned, unless the transferee is (i) a Catterton Party or (ii) prior to such Transfer, agrees in writing to be bound by all of terms of this Agreement (including with respect to any Debtor Claims or interest it may have held prior to such Transfer) by executing and providing to all Parties hereto a transfer agreement in the form attached hereto as **Exhibit C** within two Business Days of the execution of an agreement (or trade confirmation) in respect of such Transfer, in which case such transferee shall be deemed a Joining Party for all purposes under this Agreement.

(d)     Any Transfer of any Supporting Term Loan Lender's Prepetition Term Loan Claims, any Term DIP Lender's DIP Facility Claims, or any Catterton Claims that does not comply with the foregoing shall be deemed void *ab initio*; *provided* that, for the avoidance of doubt, upon any purchase, acquisition, or assumption by any Party of any Claims or interests, such Claims or interests shall automatically be deemed to be subject to all the terms of this Agreement.

(e)     This Agreement shall in no way be construed to preclude the Supporting Term Loan Lenders, Term DIP Lenders, or Catterton Parties from acquiring additional Claims or interests; *provided* that such additional Claims or interests shall automatically and immediately upon acquisition by such Parties be deemed subject to the terms of this Agreement (regardless of when notice of such acquisition is given to any party).

25.     <u>Joinder</u>.  Any affiliate of PRG or any holder of a Prepetition Term Loan Claim, DIP Facility Claim, or Catterton Claim (each such holder, a "<u>Joining Party</u>") may join as a party to this Agreement by executing a signature page hereto.  Upon such execution, such Joining Party agrees to be bound by the terms and conditions hereof, and shall be deemed PRG or a Supporting Term Loan Lender, Term DIP Lender, or Catterton Party, as applicable, under the terms of this Agreement, with all the rights and obligations of such applicable Party.  The Joining Party makes the representations and warranties of PRG, a Supporting Term Loan Lender, a Term DIP Lender, or Catterton Party, as the case may be, set forth in the Agreement to the other Parties hereto as of the date such Joining Party executes a signature page hereto.

26.     Access to Information.

(a)     Prior to the Effective Date, the Debtors shall (i) give the other Parties and their authorized representatives, upon reasonable advance notice and during regular business hours, reasonable access to all books, records, reports, plans, certificates, files, documents and information related to the assets, personnel, officers and other facilities and properties of the Debtors' business, (ii) permit the other Parties to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the other Parties may reasonably request; and (iii) cause the officers of Debtors to furnish the other Parties with such unaudited financial and operating data and other information with respect to the Debtors' business as is regularly prepared in the ordinary course that the other Parties

may from time to time reasonably request; *provided*, *however*, that (A) any such access shall be conducted at such requesting Party's expense, in accordance with law (including any applicable antitrust law or reference to the Bankruptcy Code), under the supervision of Debtors' personnel and in such a manner as to maintain confidentiality and not to interfere with the normal operations of the businesses of the Debtors and their affiliates and (B) Debtors will not be required to provide to any other Party access to or copies of any employee records to the extent such would be in violation of any applicable law.

(b)     Prior to the Effective Date, the other Parties shall have the right, upon reasonable advance notice and as it may reasonably request, to meet with Debtors' management level personnel for the purposes of discussing the integration of the Debtors' business with PRG in accordance with the Transactions.

(c)     Notwithstanding anything contained in this Agreement or any other agreement between the Debtors and the other Parties executed on or prior to the date hereof, but without limiting the scope of the representations or warranties contained herein, Debtors shall not have any obligation to make available to the other Parties or their respective representatives, or provide the other Parties or their respective representatives with (i) any information if making such information available would (A) jeopardize any attorney-client, solicitor-client or other legal privilege or (B) potentially cause Debtors to be found in contravention of any applicable law or contravene any fiduciary duty or agreement (including any confidentiality agreement to which Debtors or any of their affiliates are a party), it being understood that Debtors shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the other Parties to occur without so jeopardizing privilege or contravening such law, duty or agreement.

(d)     As requested by PRG from time to time, Debtors shall use reasonable best efforts to cooperate with PRG in connection with PRG contacting suppliers, landlords, and customers of the Debtors' business at the sole cost and expense of PRG.

Notwithstanding the foregoing, nothing in this Section 26 shall give any Party any right to manage, control, direct, or be involved in the management of any Debtor prior to the Effective Date and the consummation of the Restructuring.

27.     Waiver. If the transactions contemplated herein are or are not consummated, or following the occurrence of the Termination Date, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses, and the Parties expressly reserve any and all of their respective rights, remedies, claims, and defenses. The Parties acknowledge that this Agreement, the Plan, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement, the Plan, any related documents, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

28.     Relationship Among Parties. Notwithstanding anything herein to the contrary, the duties and obligations of the Parties arising under this Agreement shall be several, not joint. No Party

shall have any responsibility by virtue of this Agreement for any trading by any other entity.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement.

29.    <u>Specific Performance</u>.

(a)    The Parties agree that any Party hereto would suffer irreparable damage prior to the Termination Date in the event that the Restructuring or Transactions contemplated hereby is not consummated in accordance with the terms of this Agreement, and that money damages or other legal remedies would not be an adequate remedy for any such damages. Accordingly, the Parties acknowledge and hereby agree that in the event of any breach or threatened breach by any Party of their covenants or obligations set forth in this Agreement, any Party will be entitled to an injunction or injunctions to prevent or restrain breaches or threatened breaches of this Agreement by the other Parties, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of the other Parties, in addition to any other remedy to which the Parties are entitled at law or in equity, including the Debtors' right to terminate this Agreement pursuant to <u>Section 10</u> and to seek money damages. The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches or threatened breaches of this Agreement by any Party. Each party hereby waives (i) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate and (ii) any requirement under any law to post a bond or other security as a prerequisite to obtaining equitable relief.  In the event that any of the Parties prevail in any action commenced to enforce the terms of this <u>Section 29</u>, all fees, costs and expenses, including reasonable attorneys' fees and court costs, incurred by such Party in such action will be reimbursed by the applicable non-prevailing Party.

(b)    Notwithstanding anything to the contrary contained in this Agreement, if an award of damages is sought against a Party for any alleged breach of this Agreement by another Party occurring prior to the Effective Date, the Parties agree that such damages shall be limited to actual or direct damages and will not include consequential, indirect, special or punitive damages.

30.    <u>Governing Law and Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions that would require the application of the law of any other jurisdiction, except where preempted by the Bankruptcy Code.  By its execution and delivery of this Agreement, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.  By executing and delivering this Agreement, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

31.    <u>Waiver of Right to Trial by Jury</u>.  Each of the Parties irrevocably waives any right to have a jury participate in resolving any dispute, whether sounding in Contract, tort or otherwise,

between any of the Parties arising out of, connected with, relating to, or incidental to the relationship established between any of them in connection with this Agreement. Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

32.    <u>Legal Representation</u>. In any dispute or proceeding arising under or in connection with this Agreement, the Debtors and their affiliates shall have the right, at their election, to retain the firm of Kirkland & Ellis LLP to represent them in any such matter, and the other Parties, for themselves, and their respective successors and assigns, hereby irrevocably waive to any representation by such counsel in connection with the Plan, Transactions, the Restructuring or this Agreement.

33.    <u>Assignment</u>. Except as set forth in <u>Section 24</u>, neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned by any of the Parties hereto without the prior written consent of all the other Parties.

34.    <u>Successors and Assigns</u>.  Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective successors, heirs, executors, administrators, representatives, and permitted assigns.

35.    <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

36.    <u>Notices</u>.  All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing.  Any notice of termination or breach shall be delivered to all other Parties.

(a)    If to any VER Entity:

> c/o Catterton Partners
> 599 West Putnam Avenue
> Greenwich, CT 06839
> Attention: J. Michael Chu and Marc Magliacano
> Email: michaelc@catterton.com
>        marcm@catterton.com
>
> *With a copy to, which shall not constitute notice:*
>
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attention: Joshua Kogan, Esq.; Cristine Pirro Schwarzman, Esq.
> Email: <u>joshua.kogan@kirkland.com; cristine.pirro@kirkland.com</u>
>
> Kirkland & Ellis LLP
> 300 North LaSalle

Chicago, Illinois 60654
Attn: Ryan Blaine Bennett, Esq.; Eric D. Sievertsen, Esq
E-mail: ryan.bennett@kirkland.com; eric.sievertsen@kirkland.com

(b)      If to any Supporting Term Loan Lender:

Wilmington Trust, National Association
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890
Attention: VER Technologies Administrator
Telephone No.: 302-636-5048
E-mail: JKAnderson@WilmingtonTrust.com


*With a copy to, which shall not constitute notice:*

GSO Capital Partners
345 Park Avenue
New York, New York 10154
Attn:  Justin Hall
Telephone No.: 212-503-6977
E-mail:  justin.hall@gsocap.com


*With a copy to, which shall not constitute notice:*

Alston & Bird LLP
Bank of America Plaza
101 South Tryon Street, Suite 4000
Charlotte, NC 28280
Attention: Jason J. Solomon
Telephone No.: (704) 444-1295
E-Mail: Jason.Solomon@alston.com


*With a copy to, which shall not constitute notice:*

Morgan, Lewis & Bockius LLP
399 Park Avenue
New York, NY 10022
Attention: Frederick Eisenbiegler, Esq.
Telephone No.: (704) 444-1295
E-Mail: Frederick.Eisenbiegler@morganlewis.com
Telephone No.: (212) 309-6720

(c)      If to the Term DIP Agent and the Term DIP Lenders:

Wilmington Trust, National Association

Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890
Attention: VER Technologies Administrator
Telephone No.: 302-636-5048
E-mail: JKAnderson@WilmingtonTrust.com


*With a copy to, which shall not constitute notice:*

GSO Capital Partners
345 Park Avenue
New York, New York 10154
Attn:  Justin Hall
Telephone No.: 212-503-6977
E-mail:  justin.hall@gsocap.com


*With a copy to, which shall not constitute notice:*

Alston & Bird LLP
Bank of America Plaza
101 South Tryon Street, Suite 4000
Charlotte, NC 28280
Attention: Jason J. Solomon
Telephone No.: (704) 444-1295
E-Mail: Jason.Solomon@alston.com

*With a copy to, which shall not constitute notice:*

Morgan, Lewis & Bockius LLP
399 Park Avenue
New York, NY 10022
Attention: Frederick Eisenbiegler, Esq.
Telephone No.: (704) 444-1295
E-Mail: Frederick.Eisenbiegler@morganlewis.com
Telephone No.: (212) 309-6720

(d)      If to PRG:

Robert A. Manners
Executive Vice President & General Counsel
Production Resource Group, LLC
200 Business Park Drive, Suite 109
Armonk, New York 10504
rmanners@prg.com

*With a copy to, which shall not constitute notice:*

Morrison Cohen LLP
909 Third Avenue
New York, NY 10022
Attn: Joseph T. Moldovan; jmoldovan@morrisoncohen.com
Robert Dakis; rdakis@morrisoncohen.com

Greenberg Traurig, LLP
MetLife Building
 200 Park Avenue, New York, NY 10166
Attn: Todd E. Bowen; bowent@gtlaw.com

In addition to Robert Manners, but only with respect to Section 6(b)(ii)(1-7):

If to PRG with respect to Section 6(b)(ii)(1-7)
Scott R. Hansen
Chief of Asset Strategy
Production Resource Group
200 Business Park Drive, Suite 109
Armonk, NY 10504
(845) 567-5847 phone
shansen@prg.com

and

Nicole Scano-Schwiebert
Executive Vice President, Chief Administrative Officer
Production Resource Group, LLC
539 Temple Hill Road
New Windsor, NY 12553
845-567-5726 phone
nscano@prg.com

*provided* that Mr. Hansen or Ms. Scano-Schwiebert may designate additional notice parties for notices pursuant to Section 6(b)(ii)(1-7).


(e)    If to the Catterton Parties:

c/o Catterton Partners
599 West Putnam Avenue
Greenwich, CT 06839
Attention: J. Michael Chu and Marc Magliacano
Email: michaelc@catterton.com
          marcm@catterton.com

*With a copy to, which shall not constitute notice:*

King & Spalding LLP
1185 Avenue of the Americas
New York, New York 10036
Attention: Jeffrey D. Pawlitz, Esq.; Michael R. Handler, Esq.
Email: jpawlitz@kslaw.com; mhandler@kslaw.com

37.    <u>Entire Agreement</u>.  This Agreement (including the Exhibits, Schedules, and Definitive Documentation) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

38.    <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

39.    <u>Survival</u>.  Notwithstanding the termination of this Agreement, the agreements and obligations of the parties hereto in <u>Section 17</u> and <u>Section 19</u> shall survive such termination and shall continue in full force and effect for the benefit of the Parties hereto in accordance with the terms hereof.

40.    <u>References</u>.  All references herein to a "Party" or "Parties" are to a party or parties to this Agreement unless otherwise specified. All references to days or months shall be deemed references to calendar days or months.  All references to "$" or "dollars" shall be deemed references to United States dollars.  Unless the context otherwise requires, any reference to a "Section," "Exhibit," or "Schedule" shall be deemed to refer to a section of this Agreement, exhibit to this Agreement or a schedule to this Agreement, as applicable.  Any reference to any federal, state, county, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  For all purposes of and under this Agreement, (i) the words "include," "includes" and "including" shall be deemed to be immediately followed by the words "without limitation"; (ii) words (including defined terms) in the singular shall be deemed to include the plural and vice versa; (iii) words of one gender shall be deemed to include the other gender as the context requires; (iv) "or" is not exclusive; and (v) the terms "hereof," "herein," "hereto," "herewith" and any other words of similar import shall, unless otherwise stated,

be construed to refer to this Agreement as a whole (including the exhibits hereto) and not to any particular term or provision of this Agreement, unless otherwise specified.

41.    <u>Amendments</u>.  Except as otherwise provided herein, no provision of this Agreement (including the Exhibits and Schedules) or any Definitive Documentation may be modified, amended, waived or supplemented without the prior written consent of the Debtors, the Requisite Supporting Term Loan Lenders, the Catterton Parties and PRG.

42.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

43.    <u>Headings</u>.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

44.    <u>Interpretation</u>.  This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof shall not be effective in regard to the interpretation hereof.  The Parties were each represented by counsel during the negotiating and drafting of this Agreement.

[*Signatures follow*]

**Debtors**

**VER TECHNOLOGIES HOLDCO LLC**

By: _____
Name:  Lawrence Young
Title:  Chief Restructuring Officer

**VER TECHNOLOGIES MIDCO LLC**

By: _____
Name:  Lawrence Young
Title:  Chief Restructuring Officer

**VER TECHNOLOGIES LLC**

By: _____
Name:  Lawrence Young
Title:  Chief Restructuring Officer

**REVOLUTION DISPLAY, LLC**

By: _____
Name:  Lawrence Young
Title:  Chief Restructuring Officer

**FULL THROTTLE FILMS, LLC**

By: _____
Name:  Lawrence Young
Title:  Chief Restructuring Officer

**VER FINCO, LLC**

By:  VER Technologies LLC
Its:  Sole Member

By: _____
Name:  Lawrence Young
Title:  Chief Restructuring Officer

*[Signature Page to Restructuring Support Agreement]*

**FAAST LEASING CALIFORNIA, LLC**

By: VER Technologies LLC
Its: Sole Member

By: _____
Name: Lawrence Young
Title: Chief Restructuring Officer

**CPV EUROPE INVESTMENTS LLC**

By: VER Technologies LLC
Its: Sole Member

By: _____
Name: Lawrence Young
Title: Chief Restructuring Officer

**MAXWELL BAY HOLDINGS  LLC**

By: _____
Name: Lawrence Young
Title: Chief Restructuring Officer

**Prepetition Term Loan Agent**

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
in its capacity as Prepetition Term Loan Agent

By:_____

Name: Jennifer Anderson
Title: Vice President

**Supporting Term Loan Lender**

**GSO COF II FACILITY (LUXEMBOURG) S.À.R.L.**

By: _____
Name:
Title: A Manager

By: _____
Name:                    Elliot Eisenberger
Title: B Manager              Manager B

Principal Amount of Prepetition Term Loan Claims:

($)____108,670,082.36_____

*[Signature Page to Restructuring Support Agreement]*

Supporting Term Loan Lender

**GSO COF II FACILITY (LUXEMBOURG) S.À.R.L.**

By:
Name:
Title: A Manager

By:
Name:
Title: B Manager


Principal Amount of Prepetition Term Loan Claims:

($)_____108,670,082.36_____

*[Signature Page to Restructuring Support Agreement]*

<u>**Supporting Term Loan Lender**</u>

**GSO SPECIAL SITUATIONS MASTER FUND LP**

By: GSO Capital Partners LP, its investment advisor

By: _____

Name: _____

Title: MARISA J. BEENEY
AUTHORIZED SIGNATORY

Principal Amount of Prepetition Term Loan Claims:

($)_____51,431,893.87_____

**Supporting Term Loan Lender**

**GSO CACTUS CREDIT OPPORTUNITIES FUND LP**

By: GSO Cactus Credit Opportunities Associates LLC, its general partner

By: _____
Name: _____
Title:  MARISA J. BEENEY
        AUTHORIZED SIGNATORY


Principal Amount of Prepetition Term Loan Claims:


($) _____39,324,449.96_____


*[Signature Page to Restructuring Support Agreement]*

**Supporting Term Loan Lender**

## GSO AIGUILLE DES GRANDS MONTETS FUND II LP

By: GSO Capital Partners LP as Attorney-in-Fact

By: _____
Name:
Title:      MARISA J. BEENEY
            AUTHORIZED SIGNATORY


Principal Amount of Prepetition Term Loan Claims:

($)    31,571,727.03
_____

*[Signature Page to Restructuring Support Agreement]*

<u>**Supporting Term Loan Lender**</u>

**GSO CHURCHILL PARTNERS LP**

By: GSO Capital Partners LP, its Investment Advisor

By: _____

Name:          MARISA J. BEENEY
Title:          AUTHORIZED SIGNATORY

Principal Amount of Prepetition Term Loan Claims:

($)_____43,987,080.52_____

*[Signature Page to Restructuring Support Agreement]*

<u>**Supporting Term Loan Lender**</u>

**GSO PALMETTO OPPORTUNISTIC INVESTMENT PARTNERS LP**

By: GSO Capital Partners LP, as Investment Manager

By: _____
Name:    MARISA J. BEENEY
Title:    AUTHORIZED SIGNATORY

Principal Amount of Prepetition Term Loan Claims:

($)____20,695,921.40_____

*[Signature Page to Restructuring Support Agreement]*

**Supporting Term Loan Lender**

**STEAMBOAT CREDIT OPPORTUNITIES MASTER FUND LP**

By: GSO Capital Partners LP, its Investment Manager

By: _____
Name:    MARISA J. BEENEY
Title:     AUTHORIZED SIGNATORY

Principal Amount of Prepetition Term Loan Claims:

($)_____14,493,743.01_____

**Supporting Term Loan Lender**

**GSO CREDIT-A PARTNERS LP**

By: GSO Capital Partners LP, its Investment Manager

By: _____
Name:    MARISA J. BEENEY
Title:    AUTHORIZED SIGNATORY


Principal Amount of Prepetition Term Loan Claims:


($)    62,615,609.08
_____

<u>Supporting Term Loan Lender</u>

**GSO COASTLINE CREDIT PARTNERS LP**

By: GSO Capital Partners LP, its Investment Manager

By: _____

Name: MARISA J. BEENEY

Title: AUTHORIZED SIGNATORY

Principal Amount of Prepetition Term Loan Claims:

($)_____17,594,832.18_____

*[Signature Page to Restructuring Support Agreement]*

**Supporting Term Loan Lender**

**CONSUMER PROGRAM ADMINISTRATORS INC.**

By: _____

Name:  Timothy Wong

Title:  Director

Principal Amount of Prepetition Term Loan Claims:

($)   10,996,770.11 _____

**Supporting Term Loan Lender**

**ABR REINSURANCE LTD**

By: _____

Name: Timothy Wong

Title: Director

Principal Amount of Prepetition Term Loan Claims:

($)__10,996,770.11_____

**Supporting Term Loan Lender**

IRVING LLC

By: _Doug Ostrover_

Name:

Title:

Principal Amount of Prepetition Term Loan Claims:

($)___26,514,984.37_____

**DIP Agent**

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
in its capacity as DIP Agent

By: _____
Name:  Jennifer Anderson
Title: Vice President

**DIP Lender**

**GSO COF II FACILITY (LUXEMBOURG) S.À.R.L.**

By:
Name: TONY WHITTAKER
Title: A Manager

By:
Name:
Title: B Manager

**DIP Lender**

**GSO COF II FACILITY (LUXEMBOURG) S.À.R.L.**

By: _____
Name:
Title: A Manager

By: _____
Name:
Title: B Manager

Elliot Eisenberger
Manager B

**DIP Lender**

**GSO SPECIAL SITUATIONS MASTER FUND LP**

By: GSO Capital Partners LP, its investment advisor

By: _____
Name:        MARISA J. BEENEY
Title:         AUTHORIZED SIGNATORY

**DIP Lender**

## GSO CACTUS CREDIT OPPORTUNITIES FUND LP

By: GSO Cactus Credit Opportunities Associates LLC, its general partner

By: _____

Name:

Title:       MARISA J. BEENEY
             AUTHORIZED SIGNATORY

**DIP Lender**

**GSO AIGUILLE DES GRANDS MONTETS FUND II LP**

By: GSO Capital Partners LP as Attorney-in-Fact

By: _____

Name:

Title:

MARISA J. BEENEY
AUTHORIZED SIGNATORY

*[Signature Page to Restructuring Support Agreement]*

**DIP Lender**

**GSO CHURCHILL PARTNERS LP**

By: GSO Capital Partners LP, its Investment Advisor

By: _____
Name:    MARISA J. BEENEY
Title:    AUTHORIZED SIGNATORY

**DIP Lender**

**GSO PALMETTO OPPORTUNISTIC INVESTMENT PARTNERS LP**

By: GSO Capital Partners LP, as Investment Manager

By: _____
Name:      MARISA J. BEENEY
Title:       AUTHORIZED SIGNATORY

**DIP Lender**

**STEAMBOAT CREDIT OPPORTUNITIES MASTER FUND LP**

By: GSO Capital Partners LP, its Investment Manager

By: _____
Name:        MARISA J. BEENEY
Title:        AUTHORIZED SIGNATORY

**DIP Lender**

**GSO CREDIT-A PARTNERS LP**

By: GSO Capital Partners LP, its Investment Manager

By: _____
Name:
Title:

MARISA J. BEENEY
AUTHORIZED SIGNATORY

**DIP Lender**

**GSO COASTLINE CREDIT PARTNERS LP**

By: GSO Capital Partners LP, its Investment Manager

By: _____
Name:
Title:    MARISA J. BEENEY
         AUTHORIZED SIGNATORY

**DIP Lender**

**CONSUMER PROGRAM ADMINISTRATORS INC.**

By: _____

Name:  Timothy Wong

Title:  Director

**DIP Lender**

**ABR REINSURANCE LTD**

By: _____
Name:  Timothy Wong
Title:  Director

**DIP Lender**

**IRVING LLC**

By: _Doug Ostrover_

Name:

Title:

**PRG**

**PRODUCTION RESOURCE GROUP, INC.**

By: _____
Name: Robert Manners
Title: Executive Vice President


**PRODUCTION RESOURCE GROUP II, LLC**

By: _____
Name: Robert Manners
Title: Executive Vice President


**PRG HOLDINGS, LLC**

By: _____
Name: Robert Manners
Title: Executive Vice President


*[Signature page to Restructuring Support Agreement]*

**Catterton Partners VII, L.P.**

_____

By:_____
Name:  David McPherson
Title:  Authorized Person

Principal Amount of Catterton Claims:

February 9, 2017 Promissory Note Made by VER Finco LLC in the amount of $3,674,943.0

March 9, 2017 Promissory Note Made by VER Finco LLC in the amount of $1,837,471.50

**Catterton Partners VII, Special Purpose, L.P.**

_____

By:_____

Name:  David McPherson

Title:  Authorized Person


February 9, 2017 Promissory Note Made by VER Finco LLC in the amount of $6,017.00

March 9, 2017 Promissory Note Made by VER Finco LLC in the amount of $3,008.50

**Catterton Partners VII Offshore, L.P.**

By: _____
Name: David Mc Pherson
Title: Authorized Person

February 9, 2017 Promissory Note Made by VER Finco LLC in the amount of $1,319,040.00

March 9, 2017 Promissory Note Made by VER Finco LLC in the amount of $659,520

**CP-VER Aggregating, L.P.**

By: _____
Name: David McPherson
Title: Authorized Person

**CP-VER Holdings Inc.**


By: _____
Name:  David McPherson
Title:  Authorized Person

**Catterton Management Company, L.L.C.**

By:_____
Name: David McPherson
Title: AuThorized Person

**Vault Co.**

By:_____

Name: David McPherson
Title:    Authorized Person

**<u>Exhibit A</u> to the Restructuring Support Agreement**

**Term Sheet**

## VER TECHNOLOGIES HOLDCO, LLC, ET AL.
## RESTRUCTURING TERM SHEET

## APRIL 5, 2018

This Term Sheet (including the appendices hereto, this "***Term Sheet***")[1] sets forth the principal terms of a financial restructuring (the "***Restructuring***") of existing debt and certain other obligations of the Company to be implemented through a prearranged chapter 11 plan (including any related documents such as supplements thereto, the "***Plan***") and subsequent Merger (as defined below) with the agreement of all necessary parties to the Restructuring and approval of the bankruptcy court ("***Bankruptcy Court***") presiding over the bankruptcy of the Company commenced through chapter 11 cases ("***Chapter 11 Cases***") under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "***Bankruptcy Code***").

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE ENTRY INTO DEFINITIVE DOCUMENTATION ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING.  THE TRANSACTIONS CONTEMPLATED BY THIS TERM SHEET ARE SUBJECT TO NEGOTIATION AND EXECUTION OF DEFINITIVE DOCUMENTATION, WHICH SHALL EACH BE IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET.**

**THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY.  IT SHALL NOT BE USED AS EVIDENCE IN ANY LITIGATION, CONTESTED MATTER, OR ADVERSARY PROCEEDING, AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE RULES UNDER FEDERAL AND STATE LAW.  THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY.**

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in **Annex I** hereto.

| Material Terms of the Restructuring | |
|---|---|
| **Company and Proposed Filing Entities** | "***Company***" means, collectively, VER Technologies HoldCo, LLC ("***VER***") together with all of its direct and indirect subsidiaries. |
| | The following direct and indirect subsidiaries of VER shall be debtors and debtors in possession in the Chapter 11 Cases: CPV Europe Investments LLC; FAAST Leasing California, LLC; Full Throttle Films, LLC; Maxwell Bay Holdings LLC; Revolution Display, LLC; VER Finco, LLC; VER Technologies LLC; and VER Technologies MidCo LLC (the foregoing entities together with VER, the "***Debtors***"). |
| | FAAST Equipment Leasing Limited, VER Flex Solutions, LLC, VER GmbH, VER Holland B.V., and Verrents UK Limited (collectively, the "***Non-Debtor Obligors***") shall not be Debtors. |
| **Restructuring Support Agreement** | This Term Sheet will be attached to, and form a part of, a restructuring support agreement (the "***Restructuring Support Agreement***") among the Company, the Prepetition Term Loan Lenders holding at least 66 2/3% of the Prepetition Term Loan Claims, the DIP Lenders, the Prepetition Term Loan Agent, the DIP Agent, Production Resource Group Inc. ("***PRG***"), Catterton, and any other parties thereto (collectively, the "***Parties***"). |
| | Prior to the commencement of the Chapter 11 Cases, the Parties shall execute the Restructuring Support Agreement, which will be in form and substance consistent with this Term Sheet.  The Restructuring Support Agreement may contain additional covenants, restrictions, and remedies, and shall govern this document in the event of any conflict. |
| **Implementation** | The Company will effectuate the Restructuring through a prearranged in-court chapter 11 filing.  The Chapter 11 Cases shall be funded with cash on hand and proceeds from the DIP Facilities. |
| | Distributions under the Plan shall be funded with consideration from the New First Lien Loan, the New Second Lien Term Loan, and equity interests in Reorganized VER, which, pursuant to the Merger (as defined below), will be exchanged for additional consideration, as set forth herein. |
| | The Parties will negotiate, in good faith, all other definitive documents reasonably required to consummate the Restructuring (the "***Definitive Documents***"). |
| **ABL DIP Facility** | The Company shall obtain a commitment from the ABL DIP Lenders to fund the ABL DIP Facility, which shall be senior to all other obligations of the Company, except the Carve-Out and permitted prior liens. |
| | The commitment letter and terms of the ABL DIP Facility shall be reasonably acceptable to the DIP Lenders, the Requisite Consenting Prepetition Term Loan Lenders, PRG and the Debtors, and shall be consistent in all respects with the ABL DIP Facility Term Sheet annexed hereto as **Annex III** (the "***ABL DIP Facility Term Sheet***"). |

| | |
|---|---|
| **Term DIP Facility and Cash Collateral Consent** | The Company shall obtain a commitment from the Term DIP Lenders to fund the Term DIP Facility, which shall be senior to all other obligations of the Company, except the Prepetition ABL Facility, ABL DIP Facility, the Prepetition ABL Adequate Protection Liens, the Carve-Out (as defined herein), and permitted prior liens. |
| | The terms of the Term DIP Facility shall be reasonably acceptable to the Term DIP Lenders, the Requisite Consenting Prepetition Term Loan Lenders, PRG and the Debtors, and shall be consistent in all respects with the credit agreement annexed hereto as **Annex II** (the "***Term DIP Credit Agreement***"), including the Carve-Out (as defined therein). |
| | The Prepetition Term Loan Lenders party hereto consent to the Debtors' use of such parties' cash collateral, including the Carve-Out (as defined and set forth in **Annex II**) on the terms set forth in the Term DIP Credit Agreement. |
| **Effective Date Merger** | As shall be provided in the Restructuring Support Agreement, on or before the Effective Date, (i) PRG Holdings LLC ("***PRG Holdings***"), the immediate parent of PRG, will create PRG II LLC ("***PRG II***"), and (ii) PRG II will create a wholly owned limited liability company subsidiary ("***MergeCo***"). On the Effective Date, PRG Holdings will contribute 100% of the equity in PRG to PRG II and, in consideration of such contribution, be issued preferred units and common units in PRG II representing the post-closing proportionate ownership of PRG II set forth below. |
| | The Restructuring Support Agreement shall provide for the merger of Reorganized VER and MergeCo (the "***Merger***"), to be implemented as part of the Plan, with Reorganized VER being the surviving entity of the Merger and becoming a wholly owned subsidiary of PRG II. In consideration of the Merger, the stockholders in Reorganized VER (which shall be the Prepetition Term Loan Lenders (or their designated affiliates), consistent with the distributions contemplated by the Plan), will be issued, upon the consummation of the Merger, preferred units and common units in PRG II representing the post-closing proportionate ownership of PRG II set forth below. |
| | After giving effect to the Merger, (i) PRG Holdings will own 72% of the preferred units in PRG II and 80% of the common units in PRG II, and (ii) the Prepetition Term Loan Lenders (or their designated affiliates) will collectively own 28% of the preferred units in PRG II and 20% of the common units in PRG II. |
| | Simultaneous with the consummation of the Merger, PRG II will contribute 100% of the equity in Reorganized VER to PRG, and thereupon (i) Reorganized VER will become a wholly owned subsidiary of PRG and (ii) PRG shall enter into the New First Lien Term Loan and the New Second Lien Term Loan. |
| **Forbearance, Waiver and Injunction** | Unless and until the Restructuring Support Agreement is terminated (subject to any cure period in the Restructuring Support Agreement and except in the event that the Restructuring Support Agreement automatically terminates after |

the Restructuring is consummated), the Prepetition Term Loan Lenders party hereto shall agree to cause the Prepetition Term Loan Agent to waive any and all rights and remedies against the Non-Debtor Obligors arising under the Prepetition Term Loan Facility, including but not limited to any such rights and remedies as the result of events of default thereunder arising in connection with the filing of the Chapter 11 Cases (the "***Term Loan Forbearance***").  The Term Loan Forbearance will terminate as to any Non-Debtor Obligor if there is a successful challenge to any security interest in favor of the Prepetition Term Loan Lenders in any equity interest in the Non-Debtor Obligor.

The Term Loan Forbearance shall be effective upon the execution of the Restructuring Support Agreement.  On the Effective Date, once the Prepetition Term Loan Lenders receive the treatment to which they are entitled under the Plan, they shall permanently and irrevocably waive all claims against the Non-Debtor Obligors relating to the Prepetition Term Loan.

| **Plan Treatment** |
|---|

| | |
|---|---|
| **Administrative Expense and Priority Claims** | Unless otherwise agreed to by the holder of an allowed administrative claim or priority claim against the Debtors, each such holder shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim, payment in full in cash on the Effective Date or otherwise in the ordinary course of business to the extent not yet due and owing on the Effective Date. |
| **ABL DIP Claims** | Unless otherwise agreed to by the holder of an allowed ABL DIP Claim against the Debtors, on or as soon as is reasonably practicable after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each allowed ABL DIP Claim, each holder of an allowed Prepetition ABL DIP Claim shall receive payment in full in cash. |
| **Term DIP Facility Claims** | On or as soon as is reasonably practicable after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each allowed Term DIP Facility Claim, each holder of an allowed Term DIP Facility Claim shall receive payment in full in cash or such other treatment as may be agreed by a Bankruptcy Majority of the holders of Term DIP Facility Claims. |
| **Prepetition ABL Claims** | Unless otherwise agreed to by the holder of an allowed Prepetition ABL Claim against the Debtors, on or as soon as is reasonably practicable after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each allowed Prepetition ABL Claim, to the extent such claim has not been paid in full with the proceeds of the ABL DIP Facility, each holder of an allowed Prepetition ABL Claim shall receive payment in full in cash.   Any indemnification obligations owed by the Debtors or the Reorganized Debtors to the Prepetition ABL Lenders |

3

| | |
|---|---|
| | under any instrument that includes but is not limited to the DIP Order, the ABL DIP Facility, and the ABL DIP Credit Agreement shall survive the Effective Date. |
| **Additional First Out Prepetition Term Loan Claims** | On or as soon as is reasonably practicable after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each allowed Additional First Out Prepetition Term Loan Claim, each holder of an allowed Additional First Out Prepetition Term Loan Claim, to the extent such Claim has not been paid in full with the proceeds of the Term DIP Facility, shall receive payment in full in cash or such other treatment as may be agreed by a Bankruptcy Majority of the holders of Additional First Out Prepetition Term Loan Claims. |
| **Prepetition Term Loan Claims** | Except to the extent that a holder of an allowed Prepetition Term Loan Claim agrees to less favorable treatment, on or as soon as is reasonably practicable after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each allowed Prepetition Term Loan Claim, each holder thereof (or a designated affiliate) shall receive its pro rata share 28% of the preferred units in PRG II and 20% of the common units in PRG II. |
| **Other Secured Claims** | Except to the extent that a holder of an allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each allowed Other Secured Claim, each holder thereof will receive: (a) payment in full in cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) reinstatement of such Claim; or (d) other treatment rendering such claim unimpaired. |
| **General Unsecured Claims** | Except to the extent that a holder of a General Unsecured Claim agrees to less favorable treatment, on or as soon as is reasonably practicable after the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed General Unsecured Claim, each holder thereof shall receive consideration in an amount to be agreed to by the Debtors, the Requisite Consenting Prepetition Term Loan Lenders, and PRG. |
| **Intercompany Claims** | Each Intercompany Claim shall be, at the option of the Debtors, the Requisite Consenting Prepetition Term Loan Lenders, and PRG, either: (i) reinstated; or (ii) canceled and released without any distribution on account of such claims. |
| **Intercompany Interests** | All Intercompany Interests shall be reinstated for administrative convenience or cancelled as determined by the Debtors, the Requisite Consenting Prepetition Term Loan Lenders, and PRG. |

| | |
|---|---|
| **Interests in VER** | On the Effective Date, all Interests in VER shall be cancelled without any distribution on account of such Interests. |
| **Section 510(b) Claims** | Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each holder of such Claims will not receive any distribution on account of such Claim. |
| **Assumed Contracts** | The Debtors will assume those executory contracts and leases required by the Requisite Consenting Prepetition Term Lenders and PRG to be assumed in connection with the Plan, and all other executory contracts shall be rejected. <br><br> If requested by PRG and the Requisite Consenting Prepetition Term Loan Lenders, the Debtors will file a motion to extend the deadline to assume or reject real property leases to 210 days after the Petition Date. |

| **Post Effective Date Financing** | |
|---|---|
| **New First Lien Loan** | On the Effective Date, Production Resource Group, L.L.C. ("**PRG LLC**") and, upon the consummation of the Merger, which shall be deemed to occur contemporaneously therewith, VER Technologies, LLC shall receive net cash proceeds under a new first lien credit agreement (the "**New First Lien Loan**") arranged by Ally Bank ("**Ally**") guaranteed on a secured basis by PRG and each of its domestic subsidiaries. <br><br> The New First Lien Loan shall be secured by a first priority lien on and security interest in all or substantially all of the assets and properties of PRG and its domestic subsidiaries, subject to certain customary permitted liens. <br><br> The terms and amount of the New First Lien Loan shall be as set forth in a binding commitment letter (with term sheet) from the New First Lien Lenders. |
| **New Second Lien Term Loan** | On the Effective Date, PRG L.L.C. and, upon the consummation of the Merger, which shall be deemed to occur contemporaneously therewith, VER Technologies, LLC shall issue debt (the "**New Second Lien Term Loan**") to the PRG Term Lenders guaranteed on a secured basis by PRG's domestic subsidiaries in the principal amount of at least $435 million. <br><br> The New Second Lien Term Loan may be secured by a lien on and security interest in all or substantially all of the assets and properties of PRG and its domestic subsidiaries, subject to certain customary permitted liens and similar in breadth and scope to the New First Lien Loan. The lien securing the New Second Lien Term Loan may be second in priority only to the lien securing the New First Lien Loan. The New Second Lien Term Loan may be entitled to the same guaranties and other credit enhancements from subsidiaries and/or parent entities as are afforded to the New First Lien Loan. <br><br> The New Second Lien Term Loan shall have a maturity date of six years after the Effective Date. The New Second Lien Term Loan shall accrue interest at the rate of LIBOR + 9.00% (subject to adjustment in certain circumstances). <br><br> Other terms of the New Second Lien Term Loan shall be substantially the same |

| | as the terms applicable to the term loans under the New First Lien Loans, with customary and appropriate adjustments (including customary and appropriate cushions to the covenant levels, basket sizes and thresholds) to reflect the second lien nature of the New Second Lien Term Loans, with such further customary and appropriate changes as may be agreed upon by PRG, the Requisite Consenting Prepetition Term Loan Lenders and the PRG Term Lenders to reflect the Restructuring. |
|---|---|
| | A binding commitment letter (with term sheet) (the "New Second Lien Commitment Papers") with respect to the New Second Lien Term Loan shall be delivered simultaneously with the execution of the Restructuring Support Agreement. |
| **Treatment of PRG Term Debt** | The requisite PRG Term Lenders shall provide any consents necessary to permit PRG to consummate the Merger; *provided* that such consents are consistent with the New Second Lien Commitment Papers. Upon the Effective Date, the PRG Term Debt shall be satisfied in full or in part, including all prepayment premiums, in exchange for the New Second Lien Term Loan Indebtedness in the amount and on the terms set forth above and in the New Second Lien Commitment Papers. |

**General Provisions**

| **Cancellation of Notes, Interests, Instruments, Certificates and other Documents** | Unless otherwise provided herein, on the Effective Date, all notes, instruments, certificates, and any other documents evidencing Claims or Interests will be cancelled, and the obligations of the Company thereunder or in any way related thereto will be deemed satisfied in full and discharged except, without limitation, any indemnification obligations owed by the Debtors or the Reorganized Debtors to the Prepetition ABL Lenders under any instrument that includes but is not limited to the DIP Order, the ABL DIP Facility, and the ABL DIP Credit Agreement, which shall survive the Effective Date. |
|---|---|
| **Released Parties** | "***Released Party***" means, collectively, in each case in its capacity as such: (a) the Debtors, (b) the Reorganized Debtors, (c) the Prepetition ABL Agent, (d) the Prepetition Term Loan Agent, (e) the Prepetition ABL Lenders and each of the "Prepetition Secured Parties" as defined in the DIP Order, (f) the Prepetition Term Loan Lenders, (g) Catterton, (h) the DIP Agents, (i) the DIP Lenders, (j) holders of Interests, (k) PRG, (l) PRG II, (m) PRG Holdings, (n) MergeCo, and (o) for each of the foregoing entities in clauses (a) through (n), such entity's current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, principals, equity holders, (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided that* any holder of a Claim or Interest that elects to opt |

| | |
|---|---|
| | out of granting releases by timely objecting to the Plan's third-party release provisions shall not be a "Released Party." |
| **Releasing Parties** | "***Releasing Parties***" means, collectively: (a) the Debtors, (b) the Reorganized Debtors, (c) the Prepetition ABL Agent, (d) the Prepetition Term Loan Agent, (e) the Prepetition ABL Lenders and each of the "Prepetition Secured Parties" as defined in the DIP Order, (f) the Prepetition Term Loan Lenders, (g) Catterton, (h) the DIP Agents, (i) the DIP Lenders, (j) holders of Interests, (k) all holders of Claims or Interests that vote to accept or are deemed to accept the Plan, (l) all holders of Claims or Interests that vote to reject the Plan or do not vote to accept or reject the Plan but, in either case, do not affirmatively elect to "opt out" of being a releasing party by timely objecting to the Plan's third-party release provisions, (m) all holders of Claims or Interests that are deemed to reject the Plan that do not affirmatively elect to "opt out" of being a releasing party by timely objecting to the Plan's third-party release provisions, (n) PRG, (o) PRG II, (p) PRG Holdings, (q) MergeCo, and (r) with respect to each of the Debtors, the Reorganized Debtors, and for each of the foregoing entities in clauses (a) through (q), such entity's current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, principals, equity holders, (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, restructuring advisors, and other professionals. |
| **Company Releases** | As of the Effective Date, each Released Party will be deemed forever released, waived, and discharged by each and all of the Debtors, the Reorganized Debtors, and their estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their estates, as applicable, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereinafter arising, in law, at equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the estates or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim against, or interest in, a Debtor or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the |

| | |
|---|---|
| | subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (other than any Intercompany Claims that have been reinstated as contemplated above), the Restructuring, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the disclosure statement, the ABL DIP Credit Agreement, the Term DIP Credit Agreement, the Plan, or any other restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the disclosure statement, the ABL DIP Credit Agreement, the Term DIP Credit Agreement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided that* any right to enforce the Plan and confirmation order is not so released. |
| **Releases by Holders of Claims and Interests** | As of the Effective Date, to the fullest extent permissible under applicable law, each of the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Debtor, Reorganized Debtor and Released Party from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereinafter arising, in law, at equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their estates, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (other than any Intercompany Claims that have been reinstated as provided above and other than intercompany transactions among PRG and its subsidiaries), entry into the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, a disclosure statement, the ABL DIP Credit Agreement, the Term DIP Credit Agreement, the Plan, or any restructuring transaction, contract, instrument, release, or other agreement, instrument, or other document created or entered into in connection with the Restructuring Support Agreement, the disclosure statement, the ABL DIP Credit Agreement, the Term DIP Credit Agreement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation, the pursuit of |

| | |
|---|---|
| | consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct, or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or entity under the Plan, or any document, instrument, or agreement executed to implement the Plan. |
| **Exculpation and Injunction** | The Plan and Confirmation Order shall provide customary exculpation and injunction provisions. |
| **Milestones** | The Restructuring shall be implemented in accordance with the following milestones: |
| | (i)   The Debtors shall commence their chapter 11 cases no later than April 5, 2018; |
| | (ii)   The proposed Plan and related disclosure statement shall be filed within 25 days after the filing date of the chapter 11 cases (the "***Petition Date***"); |
| | (iii)   The Debtors shall file their schedules of assets and liabilities and statement of financial affairs no later than 25 days after the Petition Date; |
| | (iv)   The bar date for the filing of non-governmental prepetition claims shall occur no later than 55 days after the Petition Date; |
| | (v)   The Debtors shall obtain an order approving the adequacy of the disclosure statement no later than 60 days after the Petition Date; |
| | (vi)   The Debtors shall obtain entry by the Bankruptcy Court of an order confirming the Plan of Reorganization no later than 100 days after the Petition Date; and |
| | (vii)   The Debtors shall cause the Effective Date of the Plan of Reorganization to occur no later than 115 days after the Petition Date. |
| **Conditions Precedent to Effective Date** | The occurrence of the Effective Date shall be subject to the satisfaction of certain conditions precedent, including, without limitation, the following: |
| | (i)   Entry of an order by the Bankruptcy Court, in form and substance reasonably satisfactory to the Debtors, the Term DIP Agent, the Requisite Consenting Prepetition Term Loan Lenders and PRG confirming the Plan, which order is final (unless such requirement is waived by the Requisite Consenting Prepetition Term Loan Lenders and PRG) and not subject to any stay pending appeal. |
| | (ii)   All allowed professional fee claims approved by the Bankruptcy Court |

and all Professional Fees (as set forth in the Professional Fees section below) shall have been paid in full or amounts sufficient to pay such allowed professional fee claims shall have been adequately reserved for; subject to any agreed upon fee cap.

(iii)    The final versions of the Definitive Documents shall be consistent with this Term Sheet in all material respects (and to the extent any terms thereof are not specified in this Term Sheet or the Restructuring Support Agreement, reasonably acceptable to the Debtors, Catterton, the Requisite Consenting Prepetition Term Loan Lenders, and PRG) and shall be executed by all necessary parties thereto; provided however, that (A) the Debtors shall only have consent rights to those documents to which the Debtors are a party or have an interest, and the Debtors shall have consultation rights with regard to those documents the Debtors are required to file with the Court; and (B) Catterton shall only have consent rights over those documents to which they are a party and only with respect to terms in those documents that materially affect their treatment pursuant to this Term Sheet.

(iv)    The final version of any plan supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the plan, shall be consistent with this Term Sheet in all material respects (and to the extent any terms thereof are not specified in this Term Sheet or the Restructuring Support Agreement, reasonably acceptable to the Debtors, Catterton, the Requisite Consenting Prepetition Term Loan Lenders, and PRG); provided however, that (A) the Debtors shall only have consent rights to those documents to which the Debtors are a party or have an interest, and the Debtors shall have consultation rights with regard to those documents the Debtors are required to file with the Court; and (B) Catterton shall only have consent rights over those documents to which they are a party and only with respect to terms in those documents that materially affect their treatment pursuant to this Term Sheet.

(v)    All requisite governmental authorities and third parties shall have approved or consented to the Restructuring (including the Merger), to the extent required.

| | |
|---|---|
| **Covenants** | The Debtors shall adhere to the covenants regarding operation of the Debtors' business and access to be provided to PRG and the Prepetition Term Loan Lenders that are set forth in the Restructuring Support Agreement ("Covenants"). |
| **Fiduciary Duties** | If any Company entity or any Company entity's board of directors, board of managers, directors, managers, officers, members, or other similar governing body or fiduciary, determines, upon the advice of counsel, that taking any action, or refraining from taking any action would reasonably be expected to be a breach of its or their fiduciary obligations under applicable law, the Debtors may elect not to proceed with the transactions contemplated hereby. |

| | |
|---|---|
| **Indemnification** | During the pendency of the Restructuring, the Company shall honor any indemnification obligations in place as of the commencement of the Restructuring, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts ("***Legacy Indemnification Obligations***"), for the Company's current and former directors and the officers. The Legacy Indemnification Obligations shall remain in full force and effect for all acts and circumstances giving rise to a claim occurring prior to the Effective Date. To the extent that an act or circumstance giving rise to a claim occurs on and after the Effective Date, the Legacy Indemnification Obligations shall not control, and officers and directors shall receive solely the indemnification that PRG provides to its officers and directors as in existence on the Effective Date.<br><br>Notwithstanding anything else in this Term Sheet or the RSA to the contrary, neither PRG, PRG II, nor any affiliate of PRG shall be assuming or shall be deemed to have assumed, nor shall PRG, PRG II, or an affiliate of PRG be deemed to indemnify or have any obligation to indemnify any person with respect to any claims against the Company, or the Company's current and former officers and directors, arising from or related to (i) any current or former employee of the Company, or the characterization of any individual or entity providing or claiming to have provided services to the Company for compensation, or (ii) any claims for remuneration for work done on behalf of the Company from any party. |
| **Tax Issues** | The Restructuring and related transactions shall, subject to the terms and conditions of the Restructuring Support Agreement, be structured to achieve a tax-efficient structure, in a manner acceptable to the Company, the Requisite Consenting Prepetition Term Loan Lenders, and PRG. |
| **Review of Bankruptcy Pleadings** | The Debtors shall deliver copies of all pleadings to be filed in the bankruptcy court to Morgan Lewis as counsel for certain of the Prepetition Term Loan Lenders and counsel to PRG no less than three business days prior to the date that Debtors' counsel intends to file such pleading; *provided*, that the Debtors shall deliver copies of all material replies or other material pleadings that are required to be filed on less than seven business days' notice to counsel for the Prepetition Term Loan Lenders and PRG as soon as reasonably practicable before such pleadings are filed. |
| **Professional Fees** | Upon entry of the Interim DIP Order, the Debtors shall pay or reimburse (in cash) all reasonable and documented fees and out-of-pocket expenses of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, to the extent required to be paid under the Term Loan Agreement with funds made available under the DIP Facilities to the extent funds are not otherwise available to the Debtors.<br><br>Reimbursement of the postpetition fees and expenses of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders shall be made through |

| | |
|---|---|
| | monthly adequate protection payments in the bankruptcy (which payments shall be provided for in any Interim and Final Orders approving the DIP Loan), with any fees not paid through adequate protection to be paid in cash upon the Effective Date.<br><br>Upon the Effective Date all reasonable and documented fees and out-of-pocket expenses of PRG shall be paid in cash. |
| **PRG Work Fee** | In the event the Restructuring Support Agreement is terminated, the Debtors shall pay or reimburse PRG for certain fees and expenses in accordance with the following and in accordance with the language in any order approving debtor-in-possession financing:<br><br>1. If at the time of such termination, PRG is in default of its obligations under the Restructuring Support Agreement, there shall be no payment or reimbursement of any portion of the PRG Work Fee (as defined below);<br><br>2. If at the time of such termination, the Requisite Consenting Prepetition Term Loan Lenders are in default of their obligations under the Restructuring Support Agreement, the Debtors shall pay or reimburse PRG for the entire amount of the PRG Work Fee at the time of such termination; and<br><br>3. If at the time of such termination, (i) neither the Requisite Consenting Prepetition Term Loan Lenders nor PRG are in default of their obligations under the Restructuring Support Agreement, or (ii) both the Requisite Consenting Prepetition Term Loan Lenders and PRG are in default of their obligations under the Restructuring Support Agreement, the Debtors shall pay or reimburse PRG for one-half (1/2) of the PRG Work Fee at the time of such termination.<br><br>"***PRG Work Fee***" shall mean the sum of (i) all fees payable to Ally under the Fee Letter, as in effect on the RSA Effective Date, between Ally and PRG LLC in respect of the New First Lien Loan and accrued through the date of such termination; (ii) all reasonable fees and expenses of counsel to Ally accrued through the date of such termination and required to be paid by PRG LLC under the terms of the commitment letter with Ally in respect of the New First Lien Loan, (iii) all reasonable fees and expenses of counsel to Franklin Square Holdings, L.P. ("***FS***") accrued through the date of such termination and required to be paid by PRG LLC under the terms of the commitment letter with FS in respect of the New Second Lien Term Loan, and (iv) all reasonable fees and expenses of Morrison Cohen LLP and Greenberg Traurig, LLP, counsel to PRG, in respect potential transactions relating to the VER and its subsidiaries, accrued through the date of such termination. |
| **Jurisdiction** | The Bankruptcy Proceedings shall be filed in the District of Delaware. |
| **Documentation** | The Parties shall negotiate the Definitive Documents in good faith. Any and all documentation necessary to effectuate the Restructuring, including the |

| | |
|---|---|
| | Definitive Documents, shall be in form and substance consistent with this Term Sheet and the Restructuring Support Agreement and otherwise reasonably satisfactory to those Parties who are party to such documentation or otherwise have consent rights specified in this Term Sheet or the Restructuring Support Agreement. |
| **Reservation of Rights** | Nothing herein is an admission of any kind. If the Restructuring is not consummated for any reason, all parties reserve any and all of their respective rights. |
| **Governing Law** | The governing law for all applicable documentation shall be New York law. |
| **Management Incentive Plan** | After the Effective Date members of the management team of the Company and PRG and their subsidiaries may be entitled to participate in an equity or other similar incentive program (the "Management Incentive Plan"). |
| **Key Employee Incentive Plan and Key Employee Retention Plan** | The Debtors may file motions seeking approval of a key employee incentive plan, (the "KEIP") and a key employee retention plan (the "KERP"), which shall be subject to review and approval in all respects by PRG and the Requisite Consenting Prepetition Term Loan Lenders. |

## Annex I

### Definitions

"*$2.5 Million Catterton Promissory Notes*" means that certain Subordinated Promissory Note in the aggregate principal amount of up to $2,500,000, dated as of March 9, 2017, as amended, supplemented, or modified from time to time, among certain of the Debtors and Catterton.

"*$5 Million Catterton Promissory Notes*" means that certain Subordinated Promissory Note in the aggregate principal amount of up to $5,000,000, dated as of February 9, 2017, as amended, supplemented, or modified from time to time, among certain of the Debtors and Catterton.

"*ABL DIP Credit Agreement*" means that certain senior secured super-priority priming debtor-in-possession credit agreement by and among certain entities of the Company, as borrowers and/or guarantors, Bank of America, N.A. as administrative agent and collateral agent ("*ABL DIP Agent*"), and the lenders party thereto, including all agreements, notes, instruments, and any other document delivered pursuant thereto or in connection therewith (in each case as amended, modified, or supplemented from time to time), which shall be in form and substance substantially similar to the ABL DIP Facility Term Sheet annexed as **Annex III** hereto and which shall be approved by the Bankruptcy Court pursuant to the DIP Order.

"*ABL DIP Facility*" means that certain debtor-in-possession asset-based credit facility, available pursuant to the terms and conditions of the ABL DIP Credit Agreement on terms and conditions substantially similar to those set forth on **Annex III** hereto.

"*ABL DIP Facility Claim*" means any Claim arising under the ABL DIP Credit Agreement.

"*Additional First Out Prepetition Term Loan*" means, collectively, those certain loans provided under the Eighth Amendment to the Prepetition Term Loan Agreement, dated as of February 8, 2018 between certain entities of the Company, the Prepetition Term Loan Agent, and certain of the Prepetition Term Loan Lenders.

"*Additional First Out Prepetition Term Loan Claim*" means any Claim held by the Additional First Out Prepetition Term Loan Lenders that is derived from or based upon the Additional First Out Prepetition Term Loan Facility.

"*Additional First Out Prepetition Term Loan Facility*" means that certain facility provided through the Eighth Amendment to the Prepetition Term Loan Agreement dated as of February 8, 2018 providing for up $5,000,000 in initial first out loans and up to $10,000,000 in additional first out loans between certain entities of the Company, the Prepetition Term Loan Agent, and certain of the Prepetition Term Loan Lenders.

"*Additional First Out Prepetition Term Loan Lenders*" means those certain lenders under the Prepetition Term Loan Agreement that provide, or have provided, the Additional First Out Prepetition Term Loan.

"**Bankruptcy Majority**" with respect to any class of claims means the holders of more than two-thirds in amount and one-half in number of such claims.

"*Catterton*" means, collectively, the Catterton Funds and Catterton Manager.

"*Catterton Claims*" means any Claim derived from or based upon any indebtedness, equity interest, unpaid management fees or other obligations of any Debtor to Catterton.

"*Catterton Funds*" means, collectively, Catterton Partners VII, L.P., Catterton Partners VII Offshore, L.P., Catterton Partners VII Special Purpose, L.P. and each of their respective affiliates each, to the extent applicable, whether acting as a lender to, equity holder in or manager of any of the Debtors.

"*Catterton Manager*" means, collectively, L Catterton Management Limited and its affiliates.

"*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor or a Debtor's estate.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"*DIP Agents*" means, together, the ABL DIP Agent and the Term DIP Agent.

"*DIP Facilities*" means, together, the ABL DIP Facility and the Term DIP Facility.

"*DIP Lenders*" means, collectively, the lenders under the ABL DIP Facility and the Term DIP Facility.

"*DIP Order*" means, collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Company to enter into the ABL DIP Credit Agreement and the Term DIP Credit Agreement, which shall contain terms consistent in all respects with the ABL DIP Facility Term Sheet, the Term DIP Credit Agreement and otherwise in form and substance reasonably acceptable to the Company, the Requisite Consenting Term Loan Lenders and the DIP Lenders.

"*Effective Date*" means the date that is the first business day after the date the Court confirms the Plan on which (a) the conditions to the occurrence of the Effective Date under the Plan have been satisfied or waived pursuant to the terms thereof, (b) no stay of the order confirming the Plan is in effect, and (c) the Debtors declare the Plan effective.

"*General Unsecured Claim*" means a general unsecured claim against the Company, including any claims by Catterton in respect of indebtedness or management fees and expenses, any claim on account of the New FTF Promissory Note, the Promissory Notes Claims,  and any Prepetition Term Loan Deficiency Claim.

"*Intercompany Claim*" means any Claim held by a Debtor or an affiliate of a Debtor against another Debtor arising before the Petition Date.

"*Intercompany Interest*" means, other than an Interest in VER, an Interest in one Debtor held by another Debtor or non-Debtor subsidiary or Affiliate.

"*Interest*" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

"*MergeCo*" means that new entity formed by PRG II to consummate the Merger.

"*New First Lien Lenders*" means Ally Bank.

"*New FTF Promissory Note*" means that certain Unsecured Subordinated Promissory Note in an aggregate principal amount of up to $30,000,000, dated as of December 11, 2014, as amended, supplemented, or modified from time to time, among certain of the Debtors and the lenders thereunder.

"*Other Secured Claim*" Any secured Claim against any of the Debtors which is senior in priority to the Prepetition Term Loan Claims as of the Petition Date or *pari passu* with any secured Prepetition Term Loan Claims.

"*Prepetition ABL Adequate Protection Liens*" means the security interests in and liens on the collateral under the DIP Facility for the benefit of the Prepetition ABL Lenders, the Prepetition ABL Agent and other secured creditors (as defined in the Prepetition ABL Documents).

2

"*Prepetition ABL Agent*" means Bank of America, N.A., in its capacity as administrative agent and collateral agent under the Prepetition ABL Facility.

"*Prepetition ABL Agreement*" means that certain Credit Agreement, dated as of December 11, 2014, as amended, supplemented, or modified from time to time, among the certain entities of the Company, the Prepetition ABL Agent, and the Prepetition ABL Lenders.

"*Prepetition ABL Claim*" means any Claim derived from, based upon, or secured by the Prepetition ABL Documents, which Claims shall be deemed Allowed Claims.

"*Prepetition ABL Documents*" means the Prepetition ABL Agreement and any other agreements or documents executed in connection with or related thereto.

"*Prepetition ABL Facility*" means that certain prepetition senior secured asset-based revolving credit facility dated as of December 11, 2014 in the aggregate principal amount of up to $300,000,000 at any time outstanding among certain entities of the Company, the Non-Debtor Obligors, the Prepetition ABL Agent, and the Prepetition ABL Lenders.

"*Prepetition ABL Lenders*" means the Prepetition ABL Agent and the other lenders from time to time party to the Prepetition ABL Facility.

"*Prepetition Term Loan Agent*" means Wilmington Trust, National Association, and its predecessors thereto prior to the Petition Date, each in its capacity as administrative agent and collateral agent under the Prepetition Term Loan Facility.

"*Prepetition Term Loan Agreement*" means that certain Credit Agreement, dated as of December 11, 2014, as amended, supplemented, or modified from time to time, among certain entities of the Company, the Prepetition Term Loan Agent, and the Prepetition Term Loan Lenders.

"*Prepetition Term Loan Claim*" means any Claim held by the Prepetition Term Loan Agent or the Prepetition Term Loan Lenders that is derived from or based upon the Prepetition Term Loan Facility other than an Additional First Out Prepetition Term Loan Claim.

"*Prepetition Term Loan Deficiency Claim*" means the unsecured portion of any Prepetition Term Loan Claim held by a Prepetition Term Loan Lender that is derived from or based upon the Prepetition Term Loan Facility.

"*Prepetition Term Loan Facility*" means that certain prepetition senior secured term loan credit facility dated as of December 11, 2014 in the original aggregate principal amount of up to $400,000,000 at any time outstanding between the certain entities of the Company, the Prepetition Term Loan Agent, and the Prepetition Term Loan Lenders.

"*Prepetition Term Loan Lenders*" means the banks, financial institutions, and other lenders party to the Prepetition Term Loan Facility from time to time.

"**PRG Term Debt**" means the debt evidenced by the PRG 2L Loan and the PRG 3L Loan.

"**PRG Term Lenders**" means the PRG 2L Lenders and the PRG 3L Lenders.

"**PRG 2L Lenders**" means the lenders party to the PRG 2L Loan.

"**PRG 2L Loan**" means the loan evidenced by that certain second lien credit agreement dated as of May 1, 2017 (as amended, restated, supplemented or otherwise modified from time to time) between PRG, certain subsidiaries of PRG and the PRG 2L Lenders.

"**PRG 3L Lenders**" means the lenders party to the PRG 3L Loan.

"***PRG 3L Loan***" means the loan evidenced by that certain third lien credit agreement dated as of July 23, 2014 (as amended, restated, supplemented or otherwise modified from time to time) by and between PRG, certain subsidiaries of PRG and the PRG 3L Lenders.

"***Promissory Notes Claims***" means any Claim derived from, based upon, or secured by the New FTF Promissory Notes, the $2.5 Million Catterton Promissory Notes and the $5 Million Catterton Promissory Notes.

"***Reorganized Debtors***" means the Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

"***Reorganized VER***" means VER from and after the Effective Date.

"***Requisite Consenting Prepetition Term Loan Lenders***" means a majority of the Prepetition Term Loan Lenders party to the Restructuring Support Agreement.

"***Section 510(b) Claims***" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

"***Term DIP Credit Agreement***" means that certain senior secured super-priority priming debtor-in-possession credit agreement by and among certain entities of the Company, as borrowers and/or guarantors, Wilmington Trust, N.A., as administrative agent and collateral agent ("***Term DIP Agent***"), and the lenders party thereto, including all agreements, notes, instruments, and any other document delivered pursuant thereto or in connection therewith (in each case as amended, modified, or supplemented from time to time), in substantially the form annexed as **Annex II** hereto and which shall be approved by the Bankruptcy Court pursuant to the DIP Order.

"***Term DIP Facility***" means that certain debtor-in-possession financing facility, available pursuant to the terms and conditions of the Term DIP Credit Agreement on terms and conditions substantially similar to those set forth on **Annex II** hereto.

"***Term DIP Facility Claim***" means any Claim arising under the Term DIP Credit Agreement.

"***Term DIP Lenders***" means any other holders of Term DIP Facility Claims.

**<u>Annex II</u>**

**Term DIP Credit Agreement**

**MORGAN LEWIS**
**DRAFT 4/5/2018**

PRIMING SECOND LIEN, SUPER-PRIORITY, DEBTOR-IN-POSSESSION CREDIT
AGREEMENT

among

VER TECHNOLOGIES HOLDCO LLC,
as Holdings

VER TECHNOLOGIES LLC,
as Lead Borrower

Each of the other Borrowers party hereto

VARIOUS LENDERS,

and

WILMINGTON TRUST, NATIONAL ASSOCIATION
as ADMINISTRATIVE AGENT and COLLATERAL AGENT

Dated as of April [__], 2018

# TABLE OF CONTENTS

**Page**

SECTION 1.    DEFINITIONS AND ACCOUNTING TERMS .................................. 3

    1.01.    Defined Terms ................................................................. 3
    1.02.    Terms Generally ............................................................ 30
    1.03.    Exchange Rates; Currency Equivalent ............................ 30
    1.04.    Interpretation (Quebec) ................................................. 30
    1.05.    Permitted Liens .............................................................. 31

SECTION 2.    AMOUNT AND TERMS OF CREDIT ........................................ 31

    2.01.    Loans ............................................................................. 31
    2.02.    Borrowings, Withdrawals .............................................. 32
    2.03.    Evidence of Debt; Repayment of Loans ......................... 33
    2.04.    Fees ............................................................................... 34
    2.05.    Interest on Loans ........................................................... 34
    2.06.    Prepayments of Loans .................................................... 35
    2.07.    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ......................... 35
    2.08.    Super-Priority Nature of Obligations and Collateral Agent's Liens ................... 37
    2.09.    Lead Borrower ............................................................... 37
    2.10.    Special Provisions Regarding Repayment of Loans ......................................... 37

SECTION 3.    YIELD PROTECTION, ILLEGALITY AND REPLACEMENT OF LENDERS ............................................................. 37

    3.01.    Increased Costs, Illegality, etc ...................................... 37
    3.02.    Compensation ............................................................... 39
    3.03.    Change of Lending Office .............................................. 40
    3.04.    Replacement of Lenders ................................................ 40
    3.05.    Inability to Determine Rates .......................................... 41

SECTION 4.    ADMINISTRATIVE AGENT'S ADVISORS .................................. 41

SECTION 5.    TAXES ............................................................................... 41

    5.01.    Net Payments ................................................................. 41

SECTION 6.    CONDITIONS PRECEDENT TO EFFECTIVENESS ................... 44

    6.01.    Loan Agreement; Credit Documents .............................. 44
    6.02.    Officer's Certificate ...................................................... 44
    6.03.    Opinions of Counsel ...................................................... 44
    6.04.    Intercreditor Agreement ................................................ 44
    6.05.    Corporate Documents; Proceedings, etc ........................ 45
    6.06.    Initial Availability ......................................................... 45
    6.07.    Projections; Approved Budget ....................................... 45
    6.08.    Bankruptcy Matters ....................................................... 45
    6.09.    Roll-Up Loans ............................................................... 45
    6.10.    Trustee Matters .............................................................. 45

DB3/ 201858782.15

# TABLE OF CONTENTS
(continued)

Page

6.11.   No Material Adverse Effect .............................................................. 45
6.12.   Restructuring Support Agreement ..................................................... 46
6.13.   Cash Collateral ................................................................................. 46
6.14.   ABL Exit Financing Commitments ................................................... 46
6.15.   Exit Financing Commitments ........................................................... 46
6.16.   Litigation ......................................................................................... 46
6.17.   Reserved ........................................................................................... 46
6.18.   Lien Searches .................................................................................... 46
6.19.   Fees, etc ............................................................................................ 46
6.20.   Representation and Warranties ......................................................... 47
6.21.   Patriot Act ........................................................................................ 47
6.22.   Borrowing Notice ............................................................................. 47
6.23.   [ABL Credit Facility ........................................................................ 47
6.24.   Reserved ........................................................................................... 47
6.25.   No Default ........................................................................................ 47
6.26.   Closing Date ..................................................................................... 47
6.27.   Consents and Approvals ................................................................... 47
6.28.   Security, Perfection .......................................................................... 47

SECTION 7.     CONDITIONS PRECEDENT TO FULL AVAILABILITY ............. 48

7.01.   Borrowing Notice ............................................................................. 48
7.02.   Approved Budget .............................................................................. 48
7.03.   Representation and Warranties ......................................................... 48
7.04.   No Default ........................................................................................ 48
7.05.   Rights of Secured Creditors ............................................................. 48
7.06.   Order ................................................................................................. 48
7.07.   Compliance With Approved Budget ................................................. 48
7.08.   Fees, etc ............................................................................................ 48

SECTION 8.     REPRESENTATIONS, WARRANTIES AND AGREEMENTS ..... 48

8.01.   Organizational Status ....................................................................... 49
8.02.   Power and Authority; Enforceability ............................................... 49
8.03.   No Violation ..................................................................................... 49
8.04.   Approvals ......................................................................................... 49
8.05.   Financial Statements; Financial Condition ...................................... 50
8.06.   Litigation ......................................................................................... 50
8.07.   True and Complete Disclosure ......................................................... 50
8.08.   Use of Proceeds; Margin Regulations .............................................. 51
8.09.   Tax Returns and Payments ............................................................... 51
8.10.   ERISA ............................................................................................... 52
8.11.   The Security Documents ................................................................... 52
8.12.   Properties ......................................................................................... 53
8.13.   Capitalization ................................................................................... 53

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 8.14. | Subsidiaries | 53 |
| 8.15. | Compliance with Statutes, OFAC Rules and Regulations; Patriot Act; FCPA | 53 |
| 8.16. | Investment Company Act | 54 |
| 8.17. | [Reserved] | 54 |
| 8.18. | Environmental Matters | 54 |
| 8.19. | Labor Relations | 54 |
| 8.20. | Intellectual Property | 55 |
| 8.21. | Legal Names; Type of Organization (and Whether a Registered Organization); Jurisdiction of Organization; etc. | 55 |
| 8.22. | Chapter 11 Cases | 55 |
| 8.23. | Foreign Employees of U.S. Persons | 55 |

SECTION 9.    AFFIRMATIVE COVENANTS ............................................................ 55

| | | |
|---|---|---|
| 9.01. | Information Covenants | 56 |
| 9.02. | Books, Records and Inspections | 57 |
| 9.03. | Maintenance of Property; Insurance | 58 |
| 9.04. | Existence; Franchises | 59 |
| 9.05. | Compliance with Statutes, etc | 59 |
| 9.06. | Compliance with Environmental Laws | 59 |
| 9.07. | ERISA | 60 |
| 9.08. | End of Fiscal Years; Fiscal Quarters | 60 |
| 9.09. | Performance of Obligations | 60 |
| 9.10. | Payment of Taxes | 60 |
| 9.11. | Use of Proceeds | 60 |
| 9.12. | Additional Security; Further Assurances | 60 |
| 9.13. | Post-Closing Actions | 62 |
| 9.14. | Weekly Status Update Call | 62 |
| 9.15. | Approved Budget | 62 |
| 9.16. | Deposit Accounts | 63 |
| 9.17. | Debtor-In-Possession Obligations | 63 |
| 9.18. | Required Milestones | 63 |
| 9.19. | Restructuring Support Agreement | 64 |
| 9.20. | Adequate Protection Interest Accrual | 64 |
| 9.21. | First Day Orders | 64 |

SECTION 10.    NEGATIVE COVENANTS ................................................................ 64

| | | |
|---|---|---|
| 10.01. | Liens | 64 |
| 10.02. | Consolidation, Merger, or Sale of Assets, etc | 68 |
| 10.03. | Dividends | 70 |
| 10.04. | Indebtedness | 71 |
| 10.05. | Advances, Investments and Loans | 72 |
| 10.06. | Transactions with Affiliates | 74 |

# TABLE OF CONTENTS
(continued)

Page

10.07. Limitations on Modification of Pre-Petition Credit Documents, Organizational Documents, etc ................................................ 75
10.08. Limitation on Certain Restrictions on Subsidiaries ............................ 75
10.09. Business ................................................................................ 76
10.10. Negative Pledges ..................................................................... 77
10.11. Foreign Employees of U.S. Persons ............................................. 77
10.12. Rental Equipment Leases ........................................................... 78
10.13. Prepayment of Other Debt .......................................................... 78
10.14. Reclamation Claims .................................................................. 78
10.15. Insolvency Proceeding Claims ..................................................... 78
10.16. Bankruptcy Actions .................................................................. 78
10.17. Right of Subrogation ................................................................ 78
10.18. Restructuring Matters ............................................................... 78
10.19. Restructuring Officer ............................................................... 81
10.20. Sale-Leaseback Transactions ...................................................... 82

SECTION 11.    EVENTS OF DEFAULT ................................................. 82

11.01. Events of Default .................................................................... 82
11.02. Remedies ............................................................................... 88
11.03. Application of Funds ................................................................ 89

SECTION 12.    THE ADMINISTRATIVE AGENT ................................... 90

12.01. Appointment and Authorization ................................................... 90
12.02. Delegation of Duties ................................................................ 91
12.03. Liability of Agents ................................................................... 91
12.04. Reliance by the Agents .............................................................. 93
12.05. Notice of Default ..................................................................... 94
12.06. Credit Decision; Disclosure of Information by the Agents ................... 94
12.07. Indemnification of the Agents ..................................................... 95
12.08. Administrative Agent in Its Individual Capacity ............................... 95
12.09. Successor Administrative Agent ................................................... 95
12.10. Administrative Agent May File Proofs of Claim ............................... 96
12.11. Collateral and Guaranty Matters .................................................. 97
12.12. Administrative Agent and the Collateral Agent ................................ 97
12.13. Withholding Taxes .................................................................... 98
12.14. Quebec Liens (Hypothecs) .......................................................... 98
12.15. German Security Agreement ........................................................ 99

SECTION 13.    MISCELLANEOUS ..................................................... 99

13.01. Payment of Expenses, etc .......................................................... 99
13.02. Right of Setoff ...................................................................... 103
13.03. Notices ............................................................................... 103
13.04. Benefit of Agreement; Assignments; Participations, etc .................... 104

# TABLE OF CONTENTS
(continued)

Page

13.05. No Waiver; Remedies Cumulative ...................................................... 106
13.06. Parallel Debt ................................................................................... 107
13.07. Calculations; Computations .............................................................. 108
13.08. GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL; ETC .................................................... 108
13.09. Counterparts .................................................................................... 110
13.10. INTERCREDITOR AGREEMENT ................................................. 110
13.11. Headings Descriptive ....................................................................... 111
13.12. Amendment or Waiver; etc ............................................................... 111
13.13. Survival ........................................................................................... 112
13.14. Domicile of Loans ........................................................................... 112
13.15. Register ........................................................................................... 113
13.16. Confidentiality ................................................................................ 113
13.17. USA Patriot Act Notice ................................................................... 114
13.18. Special Provisions Regarding Pledges of Equity Interests in Persons Not Organized in Qualified Jurisdictions ............................................... 115
13.19. Waiver of Sovereign Immunity ........................................................ 115
13.20. Absence of Fiduciary Relationship ................................................... 115
13.21. Electronic Signatures ....................................................................... 115
13.22. Judgment Currency .......................................................................... 116

SECTION 14.    CREDIT PARTY GUARANTY .................................................. 116

14.01. The Guaranty ................................................................................... 116
14.02. Bankruptcy ...................................................................................... 117
14.03. Nature of Liability ........................................................................... 117
14.04. Independent Obligation .................................................................... 117
14.05. Authorization ................................................................................... 118
14.06. Reliance ........................................................................................... 118
14.07. Subordination ................................................................................... 119
14.08. Waiver .............................................................................................. 119
14.09. Maximum Liability .......................................................................... 120
14.10. Payments .......................................................................................... 120
14.11. Information ....................................................................................... 120
14.12. Order ................................................................................................ 120

## TABLE OF CONTENTS
(continued)

**Page**

SCHEDULE 2.01          Commitments
SCHEDULE 8.12          Real Property
SCHEDULE 8.14          Subsidiaries
SCHEDULE 8.18          Environmental Matters
SCHEDULE 8.19          Labor Matters
SCHEDULE 8.21          Legal Names; Types of Organization (and Whether a Registered
                       Organization); Jurisdiction of Organization, etc.
SCHEDULE 9.13          Post-Closing Actions
SCHEDULE 9.16          Deposit Accounts
SCHEDULE 10.01(iii)    Existing Liens
SCHEDULE 10.04(iv)     Existing Indebtedness
SCHEDULE 10.05(iii)    Existing Investments
SCHEDULE 10.12         Rental Equipment Leases
EXHIBIT A              Form of Notice of Borrowing
EXHIBIT B              Form of Term Note
EXHIBIT C              Form of U.S. Tax Compliance Certificate
EXHIBIT D              Approved Budget
EXHIBIT E              Form of Assignment and Assumption Agreement
EXHIBIT F              Form of Withdrawal Notice
EXHIBIT G              Interim Order

THIS PRIMING SECOND LIEN, SUPER-PRIORITY, DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of April [__], 2018 (this "Agreement"), is by and among VER TECHNOLOGIES HOLDCO LLC, a Delaware limited liability company ("Holdings"), VER TECHNOLOGIES LLC, a Delaware limited liability company, as the Lead Borrower (the "Lead Borrower"), each of the Domestic Subsidiaries of Lead Borrower party hereto as Borrowers (as hereinafter defined), the Lenders party hereto from time to time, and WILMINGTON TRUST, NATIONAL ASSOCIATION, as the Administrative Agent (in such capacity the "Administrative Agent") and Collateral Agent (in such capacity, the "Collateral Agent").  All capitalized terms used herein and defined in Section 1 are used herein as therein defined.

W I T N E S S E T H:

WHEREAS, on April [__], 2018 (the "Petition Date"), (a) Holdings, (b) VER Technologies Midco LLC, a Delaware limited liability company ("MidCo"), (c) the Lead Borrower, (d) FAAST Leasing California, LLC, a California limited liability company ("FAAST"), (e) Revolution Display, LLC, a Delaware limited liability company ("Revolution"), (f) Full Throttle Films, LLC, a Delaware limited liability company ("Full Throttle"), (g) VER Finco, LLC, a Delaware limited liability company ("Finco"), (h) CPV Europe Investments LLC, a Delaware limited liability company ("CPV"), and (i) Maxwell Bay Holdings LLC, a Delaware limited liability company ("Maxwell Bay Holdings") (the Persons specified in the foregoing clauses (a) through (i), collectively, the "Debtors" and each individually, a "Debtor"), commenced Chapter 11 Case Nos. [_____] through [_____], as administratively consolidated at Chapter 11 Case No. [_____] (collectively, the "Cases" and each individually, a "Case") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, certain of the Lenders provided financing to the Borrowers pursuant to that certain Credit Agreement, dated as of December 11, 2014 (as amended, amended and restated, restated, supplemented or otherwise modified through the Petition Date, the "Pre-Petition Term Loan Agreement"), by and among, inter alia, MidCo, the Lead Borrower, FAAST, Revolution, Full Throttle, VER Flex Solutions, LLC, a Delaware limited liability company, Finco, CPV, and Maxwell Bay Holdings, as borrowers (the foregoing, collectively, the "Pre-Petition Borrowers"), FAAST Equipment Leasing, Limited, an Irish private company limited by shares, VER GmbH, a German *Gesellschaft mit beschränkter Haftung*, VER Holland B.V., a Dutch *Besloten Vennootschap met beperkte aansprakelijkheid*, and VERRENTS UK Limited, a United Kingdom limited company, as guarantors (the foregoing, collectively, the "Pre-Petition Guarantors"), the lenders from time to time party thereto (collectively, the "Pre-Petition Term Lenders"), and Wilmington Trust, National Association, as administrative agent and collateral agent (in such capacities, collectively, the "Pre-Petition Term Agent");

WHEREAS, prior to the Petition Date, certain of the Pre-Petition Term Lenders (such Pre-Petition Term Lenders, collectively, the "Pre-Petition First Out Lenders") provided additional financing to the Borrowers in the form of First Out Loans (as defined in the Pre-Petition Term Loan Agreement, hereinafter the "Pre-Petition First Out Loans") pursuant to the Pre-Petition Term Loan Agreement, which Pre-Petition First Out Loans provided the Pre-Petition Borrowers and Pre-Petition Guarantors with bridge financing to allow the Pre-Petition Borrowers and Pre-Petition Guarantors to pursue an orderly restructuring of their businesses;

WHEREAS, prior to the Petition Date, the Pre-Petition ABL Lenders (as defined below) provided financing to the Pre-Petition Borrowers pursuant to that certain Credit Agreement, dated as of December 11, 2014, among, inter alia, the Pre-Petition Borrowers, the lenders party thereto (the "Pre-Petition ABL Lenders"), and Bank of America, N.A., as the Pre-Petition ABL Agent (as amended, amended and restated, restated, supplemented or otherwise modified through the Petition Date, the "Pre-Petition ABL Credit Agreement");

WHEREAS, on the Petition Date, the Pre-Petition Term Lenders under the Pre-Petition Term Loan Agreement were owed (a) $424,239,750.00 constituting the outstanding principal balance of Existing Term Loans (as defined in the Pre-Petition Term Loan Agreement, hereinafter the "Pre-Petition Term Loans"), plus interest, fees, costs and expenses related thereto, (b) $14,654,113.99 constituting the outstanding principal balance of Pre-Petition First Out Loans, plus interest, fees, costs and expenses related thereto, and (c) all other Obligations (as defined in the Pre-Petition Term Loan Agreement, including, without limitation, the amounts described in clauses (a) and (b) above, hereinafter the "Pre-Petition Term Obligations") under the Pre-Petition Term Loan Agreement;

WHEREAS, the Pre-Petition Term Obligations are secured by a security interest in substantially all of the assets of the Pre-Petition Borrowers and the Pre-Petition Guarantors as more fully set forth in the Pre-Petition Term Loan Credit Documents and such security interest is perfected, and has priority over other security interests (except for the Pre-Petition ABL Obligations and the ABL Obligations), as described in the Pre-Petition Term Loan Credit Documents and the Pre-Petition Intercreditor Agreement;

WHEREAS, the Borrowers have requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make available to the Borrowers, a priming second lien, super-priority, debtor-in-possession credit facility in an aggregate principal amount of up to $64,700,000 for the purposes further described herein, consisting of (a) delayed draw term loans in an aggregate principal amount not to exceed $50,000,000 and (b) term loans in an aggregate amount equal to the outstanding principal amount of the Pre-Petition First Out Loans (plus interest thereon and any unpaid fees, costs and expenses in respect thereof) outstanding as of the Closing Date of all Pre-Petition Term Lenders that are Lenders hereunder (collectively, the "Roll-Up Amount");[1]

WHEREAS, the Borrowers have requested, and, upon the terms set forth in this Agreement, the ABL Lenders have agreed to make available to the Borrowers a superpriority

---

[1] **NTD**: Assumes all such Lenders commit to provide new loans on at least a dollar-for-dollar basis with such Lenders' Pre-Petition First Out Loans.

senior secured debtor-in-possession asset-based revolving credit facility in an aggregate principal amount of up to $300,000,000, which will be used to repay in full the Pre-Petition ABL Credit Agreement and for the purposes further described in that certain Superpriority Senior Debtor-in-Possession Credit Agreement, dated on or about the Closing Date (as amended, restated, amended and restated, supplemented, or otherwise modified in accordance with the terms and limitations of the Intercreditor Agreement and the Order, the "ABL Credit Agreement"), by and among the Borrowers, the lenders party thereto (the "ABL Lenders"), and Bank of America, N.A., as administrative agent and collateral agent (the "ABL Agent");

WHEREAS, each Borrower and each Guarantor have agreed to secure all of their Obligations under the Credit Documents by granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of their existing and after-acquired property (subject to the limitations contained in the Credit Documents and the Orders);

WHEREAS, each Borrowers' and each Guarantors' business is a mutual and collective enterprise and the Borrowers and the Guarantors believe that the loans made to the Borrowers under this Agreement will enhance the aggregate borrowing powers of the Borrowers and facilitate the administration of the Cases and their loan relationship with the Lenders, all to the mutual advantage of the Borrowers and Guarantors;

WHEREAS, each Borrower and each Guarantor acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans to the Borrowers as provided in this Agreement; and

WHEREAS, the Lenders' willingness to make loans to the Borrowers as more fully set forth in this Agreement and the other Credit Documents, is done solely as an accommodation to the Borrowers and the Guarantors and at the Borrowers' and the Guarantors' request and in furtherance of the Borrowers' and the Guarantors' mutual and collective enterprise.

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged (these recitals being an integral part of this Agreement), the parties hereto hereby agree as follows:

Section 1.    Definitions and Accounting Terms.

1.01.    Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"ABL Agent" shall have the meaning provided in the recitals hereto.

"ABL Credit Agreement" shall have the meaning provided in the recitals hereto.

"ABL Credit Documents" shall mean the Credit Documents (or any corresponding term) as defined in the ABL Credit Agreement, as the same may be as amended, restated, amended and restated, supplemented, or otherwise modified in accordance with the terms and limitations of the Intercreditor Agreement and the Order.

"ABL Lenders" shall have the meaning provided in the recitals hereto.

"ABL Obligations" shall have the meaning assigned to the term "Obligations" in the ABL Credit Agreement.

"Adequate Protection Liens" shall have the meaning assigned to the term "Adequate Protection Liens" in the Interim Order (or the Final Order, when applicable).

"Adequate Protection Superpriority Claims" shall have the meaning assigned to the term "Adequate Protection Superpriority Claims" in the Interim Order (or the Final Order, when applicable).

"Additional Security Documents" shall have the meaning provided in Section 9.12(a).

"Adjustment Date" shall mean (a) May [__], 2018[2] and (b) the [__]th day of each calendar month thereafter.

"Administrative Agent" shall mean Wilmington Trust, National Association, in its capacity as Administrative Agent for the Lenders hereunder, and shall include any successor to the Administrative Agent appointed pursuant to Section 12.09.

"Administrative Agent Fees" shall have the meaning provided in Section 2.04(a).

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; provided, however, that neither the Administrative Agent nor any Lender (nor any Affiliate thereof) shall be considered an Affiliate of any Credit Party or any Subsidiary thereof as a result of this Agreement or any Security Document (or the enforcement thereof), or any document evidencing any equity subscription by GSO in a Parent Company or the extensions of credit hereunder or its actions in connection therewith. For the purposes of this Agreement, GSO on the one hand, and funds managed, advised or sub-advised by GSO or its Affiliates on the other hand, shall be Affiliates of each other.

"Agents" shall mean the Administrative Agent, the Collateral Agent, and any other agent with respect to the Credit Documents.

"Agent Fee Letter" shall mean the letter agreement dated as of the Closing Date between the Administrative Agent and the Lead Borrower, as modified, supplemented, amended, or restated (including any amendment and restatement thereof).

"Agent's Advisors" shall have the meaning provided in Section 4.

---

[2] **NTD**: To be one month after the Closing Date.

"Agent-Related Persons" shall mean the Administrative Agent, the Collateral Agent, their respective affiliates and the officers, directors, employees, agents and attorneys-in-fact of the Administrative Agent, the Collateral Agent, and their respective affiliates.

"Agreement" shall mean this Priming Second Lien, Super-Priority, Debtor-In-Possession Credit Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"Agreement Currency" shall have the meaning provided in Section 13.22.

"Anti-Terrorism Laws" shall mean any laws relating to terrorism or money laundering in any jurisdiction, including the Patriot Act.

"Applicable Margin" shall mean 13.25%.

"Applicable Jurisdiction" shall mean the United States, Canada, England and Wales, or any country that was a Participating Member State as of April 30, 2004.

"Approved Budget" shall mean the budget prepared by the Borrowers in the form of Exhibit D and as further described in Section 9.15, which shall (a) depict all sources and uses of cash by the Borrowers for the then-succeeding 13 calendar weeks (including, but not limited to, (i) projected cash receipts (including from asset sales), (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of any Credit Party's professionals and advisors), Capital Expenditures, and any other fees and expenses relating to the Credit Documents), (iii) projected net cash flow and (iv) the anticipated uses of all Loans under this Agreement), and (b) initially be furnished to the Administrative Agent and the Lenders on the Closing Date, and shall be in form and substance reasonably satisfactory to the Required Lenders and, as to the initial Approved Budget, the Administrative Agent, as the same shall be updated on a bi-weekly basis (without revising amounts therein in prior periods) as provided in Section 9.15, or amended from time to time with the approval of the Required Lenders in their sole and absolute discretion.

"Approved Budget Variance Report" shall mean a current report that (a) details the actual amount by line item of the net cash flows, total cash receipts, and total disbursements (including, but not limited to, Capital Expenditures) for the prior week for each line item included in the Approved Budget (on a weekly and cumulative basis); (b) compares such net cash flows, total cash receipts, and total disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each line item set forth in the Approved Budget for such period; and (c) provides an explanation for all variances, on a line-item and cumulative basis, between budgeted amounts and actual amounts. Each Approved Budget Variance Report (i) will be certified (x) as true and correct by a Responsible Officer of the Lead Borrower and (y) as complying with the requirements of Section 9.15(b), and (ii) shall certify that no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto. The Approved Budget Variance Report shall be in a form and shall contain supporting information satisfactory to the Required Lenders in their sole discretion.

"Assignment and Assumption Agreement" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit E (appropriately completed) or such other form as shall be acceptable to the Administrative Agent.

"Attorney" shall have the meaning provided in Section 12.15.

"Automatic Stay" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"Bank Product" shall mean any of the following products, services or facilities extended to any Borrower or any of Holdings' Subsidiaries: (a) Cash Management Services; (b) products under Swap Contracts; (c) commercial credit card and merchant card services; and (d) other banking products or services, including, but not limited to, p-cards, purchase cards and commercial cards, as may be requested by any Borrower.

"Bank Product Debt" shall mean Indebtedness and other obligations of a Borrower or any of Holdings' Subsidiaries relating to Bank Products.

"Bankruptcy Code" shall mean Title 11 of the United States Code (11 U.S.C. Section 101 et seq.) as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court" shall have the meaning provided in the recitals hereto.

"Borrowers" shall mean, collectively, (i) the Lead Borrower, (ii) FAAST, (iii) Revolution, (iv) Full Throttle, (v) Finco, (vi) CPV, and (vii) Maxwell Bay Holdings.

"Business Day" shall mean (i) for all purposes other than as covered by clause (ii) below, any day except Saturday, Sunday and any day which shall be in New York City a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, LIBOR Rate Loans, any day which is a Business Day described in clause (i) above and which is also a day for trading by and between banks in the New York or London interbank Eurodollar market.

"Canadian Collateral" shall mean all the "Collateral" (or equivalent term) as defined in each Canadian Security Agreement and all other property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Canadian Security Agreement, and all other property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document governed by the laws of Canada (or any political subdivision thereof).

"Canadian Dollars" shall mean the lawful currency of Canada.

"Canadian Employee Benefits Legislation" shall mean the Pension Benefits Act (Ontario), and any Canadian federal, provincial or local counterparts or equivalents.

"Canadian Security Agreement" shall mean the Canadian Security Agreement described on Schedule 9.13, by and among the Collateral Agent and the applicable Credit Parties, and in form and substance satisfactory to the Collateral Agent and the Required Lenders, and to the extent that a Credit Party has a place of business, registered office or tangible property in the province of Quebec, such term shall include each deed of hypothec and all related documents as may be applicable.

"Capital Expenditures" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with U.S. GAAP and, without duplication, the amount of Capital Expenditures incurred by such Person; provided that Capital Expenditures shall not include (i) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for such existing equipment being traded in at such time, (ii) expenditures made in leasehold improvements, to the extent reimbursed by the landlord, (iii) expenditures to the extent that they are actually paid for by a third party (excluding any Credit Party or any of its Restricted Subsidiaries) and for which no Credit Party or any of its Restricted Subsidiaries has provided or is required to provide or incur, directly or indirectly, any consideration or monetary obligation to such third party or any other Person (whether before, during or after such period) and (iv) property, plant and equipment taken in settlement of accounts.

"Capitalized Lease Obligations" shall mean, with respect to any Person, all rental obligations of such Person to the extent such obligations, under U.S. GAAP in effect on the date hereof, are required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with U.S. GAAP; provided that all obligations of any Person that are or would be characterized as operating lease obligations in accordance with U.S. GAAP immediately prior to the Closing Date (whether or not such operating lease obligations were in effect on such date) shall continue to be accounted for as operating lease obligations (and not as Capitalized Lease Obligations) for purposes of this Agreement regardless of any change in U.S. GAAP following the date that would otherwise require such obligations to be recharacterized as Capitalized Lease Obligations.

"Carve-Out" shall have the meaning provided for the term "Carve-Out" in the Order.

"Cases" shall have the meaning provided in the recitals hereto.

"Cash Equivalents" shall mean:

(i)    U.S. Dollars, Canadian Dollars, pounds sterling, euros, the national currency of any Participating Member State or, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(ii)    readily marketable direct obligations of any member of the European Economic Area, Switzerland, or Japan, or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of such country, and, at

the time of acquisition thereof, having a credit rating of at least Aa3 (or the equivalent grade) by Moody's or AA by S&P;

(iii)    marketable general obligations issued by any state of the United States, any province of Canada, or any political subdivision thereof or any instrumentality thereof that are guaranteed by the full faith and credit of such state or province, and, at the time of acquisition thereof, having a credit rating of at least Aa3 (or the equivalent grade) by Moody's or AA by S&P;

(iv)    securities or any other evidence of Indebtedness or readily marketable direct obligations issued or directly and fully guaranteed or insured by the United States government or the Canadian government or any agency or instrumentality of the United States or Canadian government (provided that the full faith and credit of the United States or Canada is pledged in support of those securities), in such case having maturities of not more than twelve months from the date of acquisition;

(v)    certificates of deposit and eurodollar time deposits with maturities of twelve months or less from the date of acquisition, bankers' acceptances with maturities not exceeding twelve months and overnight bank deposits, in each case, with any Lender party to this Agreement or any commercial bank or trust company having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's;

(vi)    repurchase obligations with a term of not more than thirty days for underlying securities of the types described in clauses (iv) and (v) above entered into with any financial institution meeting the qualifications specified in clause (v) above;

(vii)    commercial paper having one of the two highest ratings obtainable from Moody's or S&P and, in each case, maturing within twelve (12) months after the date of acquisition; and

(viii)    money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (i) through (vii) of this definition.

"Cash Management Services" shall mean any services provided from time to time to any Borrower or any of Holdings' Subsidiaries in connection with operating, collections, payroll, trust, or other depository or disbursement accounts, including automated clearinghouse, e-payable, electronic funds transfer, wire transfer, controlled disbursement, overdraft, depository, information reporting, lockbox and stop payment services.

"Cash Management Order" shall mean the order of the Bankruptcy Court entered in the Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto or any "second day" order, in form and substance satisfactory to the Administrative Agent and the Required Lenders, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Term Loan Agreement and the ABL Credit Agreement) and establishes the Collateral Account or such other arrangements as shall be acceptable to the Required Lenders.

"Catterton" shall mean Catterton Partners VII, L.P., Catterton Partners VII Special Purpose, L.P., Catterton Partners VII Offshore, L.P., Catterton Management Company L.L.C., each, to the extent applicable, as holders of the Catterton Claims (as defined in the Restructuring Support Agreement) and holders of Equity Interests in the Credit Parties.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same has been amended and may hereafter be amended from time to time, 42 U.S.C. § 9601 et seq.

"CFC" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change of Control" shall mean, at any time and for any reason whatsoever, (a) the Sponsor and Sponsor Affiliates shall fail to have, directly or indirectly, beneficial ownership (within the meaning of Rule 13d-3 of the Securities Exchange Act) in the aggregate of at least 50.1% on a fully diluted basis of voting interests in Holdings' Equity Interests, (b) Holdings shall fail to directly or indirectly own 100% on a fully diluted basis of MidCo's Equity Interests, (c) MidCo shall fail to directly or indirectly own 100% on a fully diluted basis of the Lead Borrower's Equity Interests, (d) the Lead Borrower shall fail to own, directly or indirectly, the percentage of the Equity Interests of each Restricted Subsidiary owned by it on the Closing Date, or (e) a "change of control" or similar event shall occur as provided in any of the ABL Credit Documents, the Pre-Petition Credit Documents or any other debt instrument of a Credit Party with an aggregate principal amount in excess of the Threshold Amount.

"Chapter 11 Plan" means a plan of reorganization under Chapter 11 of the Bankruptcy Code.

"Closing Date" shall mean April [__], 2018.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall mean all the "Collateral" (or equivalent term) as defined in each Security Agreement, including, without limitation, the Canadian Collateral, the English Collateral, the German Collateral, the Netherlands Collateral, the U.S. Collateral and all other property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Agreement and/or the Order, and all other property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document and/or the Order, including, without limitation, all Pledge Agreement Collateral.

"Collateral Account" shall mean a segregated cash collateral account in which the proceeds of all Loans made hereunder shall be held solely for the benefit of the Administrative Agent and the Lenders until requested by the Borrowers to be disbursed for use in accordance with Section 8.08 and in a manner consistent with the Approved Budget.

"Collateral Agent" shall mean Wilmington Trust, National Association, in its capacity as Collateral Agent for the Lenders hereunder, and its capacity as security trustee under

the English Security Agreement, German Security Agreement, and Netherlands Security Agreement and shall include any successor to the Collateral Agent appointed pursuant to <u>Section 12.09</u>.

"<u>Committee</u>" shall mean an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

"<u>Commitment</u>" shall mean, with respect to each Lender, its commitment to make New Money Loans hereunder, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on <u>Schedule 2.01</u> to the Agreement or in the Assignment and Assumption Agreement pursuant to which such Lender became a Lender under this Agreement.

"<u>Contingent Obligation</u>" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness ("<u>primary obligations</u>") of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including, without limitation, any such obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; <u>provided</u>, <u>however</u>, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"<u>Contract</u>" shall mean any legally binding agreement or contract (including any loan or credit agreement, note, bond, mortgage, indenture, lease, sublease, license, sublicense or purchase order).

"<u>Corresponding Debt</u>" shall have the meaning provided in <u>Section 13.06</u>.

"<u>Credit Documents</u>" shall mean this Agreement and each Note, the Agent Fee Letter, the Fee Letter, each Security Document, all Approved Budgets, all Approved Budget Variance Reports, the Intercreditor Agreement, and each other document, certificate or other instrument executed in connection therewith.

"<u>Credit Event</u>" shall mean the making of any Loan.

"<u>Credit Parties</u>" shall mean Holdings, each Borrower, and each Guarantor.

"Credit Party Guaranty" shall mean the guaranty of each Credit Party pursuant to Section 14.

"Debtors" shall have the meaning provided in the recitals hereto.

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Default Rate" shall have the meaning provided in Section 2.05(b).

"Deposit Account" shall have the meaning assigned thereto in Article 9 of the UCC and include, with respect to any bank account located outside of the United States, any bank account with a deposit function.

"Designated Jurisdiction" shall mean a country or territory that is the subject of a Sanction.

"Disposition" or "Dispose" shall mean the sale, transfer, license, lease or other disposition of any property by any Credit Party or Subsidiary thereof (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, but excluding any Involuntary Disposition.

"Distribution" means, with respect to any indebtedness, obligation or security, (a) any payment or distribution by any Person of cash, securities or other property, by set-off or otherwise, on account of such indebtedness, obligation or security, or (b) any redemption, purchase or other acquisition of such indebtedness, obligation or security by any Person.

"Dividend" shall mean, with respect to any Person, that such Person has paid a dividend, distribution or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than common equity of such Person) or cash to its stockholders, partners or members as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any shares of any class of its capital stock or any partnership or membership interests outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes.

"Dodd-Frank and Basel III" shall have the meaning provided in Section 3.01(d).

"Dollar Equivalent" shall mean, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any other currency, the equivalent amount thereof in Dollars as determined by the Administrative Agent at such time on the basis of the Spot Rate for the purchase of Dollars with such alternative currency.

"Domestic Subsidiary" shall mean any Subsidiary organized under the laws of the United States, any state thereof or the District of Columbia.

"Effective Date" shall have the meaning provided in the Restructuring Support Agreement.

"Eligible Transferee" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act) (other than a natural person) but in any event excluding the Sponsor, Holdings, each Borrower and their respective Subsidiaries and Affiliates.

"English Collateral" shall mean all the "Collateral" and "Charged Assets" (or equivalent term) as defined in each English Security Agreement and all other property (whether real, personal or otherwise) with respect to which any security interests or Liens have been granted (or purported to be granted) pursuant to any English Security Agreement, and all other property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document governed by the laws of England and Wales (or any political subdivision thereof).

"English Security Agreement" shall mean (i) the debenture described on Schedule 9.13, by and among the Collateral Agent and the applicable Credit Parties, and in form and substance satisfactory to the Collateral Agent and the Required Lenders, including all schedules, annexures and subparts thereto, and (ii) any other pledge agreement, mortgage, debenture, security agreement or other agreement entered into  pursuant to the terms of the Credit Documents that is governed by the laws of England and Wales (or any subdivision thereof), securing the Obligations and entered into pursuant to the terms of this Agreement or any other Credit Document.

"Environmental Claims" shall mean all investigations, suits, proceedings, written demands, written claims, written notices of violation,  or other written orders or directives relating to the Credit Parties and arising under any Environmental Law, (a) in connection with any actual or alleged violation of any applicable Environmental Law,  (b) in connection with any contamination by or exposure to any Hazardous Material, or (c) in connection with an alleged injury or threat of injury to human health, safety or the environment from any Hazardous Material.

"Environmental Law" shall mean any legally-binding federal, state, provincial, municipal, local or foreign statute, law (including common law), rule, regulation, ordinance, code, judicial or administrative order, consent decree or judgment, in each case relating to pollution or protection of the environment or, to the extent regarding Hazardous Materials, public health, including, without limitation, all those relating to the generation, handling, transportation, treatment, storage, disposal, distribution, labeling,  discharge, release, threatened release, control, or cleanup of any Hazardous Materials, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos or polychlorinated biphenyls.

"Equity Interests" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any preferred stock, any limited or general

partnership interest and any limited liability company or unlimited liability company membership interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and, unless the context indicates otherwise, the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA as in effect at the date of this Agreement and any successor Section thereof.

"ERISA Affiliate" shall mean each trade or business which together with a Credit Party is deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code and, solely with respect to Section 412 of the Code, Sections 414(b), (c), (m) or (o) of the Code.

"ERISA Event" shall mean (a) a Reportable Event with respect to a Plan; (b) withdrawal of a Credit Party or ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) complete or partial withdrawal by a Credit Party or ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 of ERISA, or the institution of proceedings by the PBGC to terminate a Plan; (e) determination that any Plan is considered an at-risk plan or a plan in critical or endangered status under the Code or ERISA; (f) an event or condition that constitutes grounds under Section 4042 of ERISA for termination of, or appointment of a trustee to administer, any Plan; (g) imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Credit Party or ERISA Affiliate; or (h) failure by a Credit Party or ERISA Affiliate to meet all applicable requirements under the Code and ERISA rules regarding minimum required contributions (including installment payments) set forth in Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA in respect of a Plan, or to make a required contribution to a Multiemployer Plan.

"Event of Default" shall have the meaning provided in Section 11.01.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Credit Party under any Credit Document (each, a "Recipient"), (a) Taxes imposed on (or measured by) its net income (however denominated), franchise Taxes, and any other similar Tax, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) imposed as a result of any other present or former connection between it and the jurisdiction imposing such Tax (other than a connection arising solely from such Administrative Agent, Lender or other Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document), (b) any branch profits Taxes under Section 884(a) of the Code, or

any similar Tax, imposed by any jurisdiction described in clause (a) above, (c) in the case of a Lender (other than an assignee pursuant to a request by the Lead Borrower under Section 3.04), any withholding Tax (including backup withholding tax) that is imposed on amounts payable to such Lender pursuant to a law in effect at the time such Lender becomes a party to this Agreement (or designates a new Lending Office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from a Credit Party with respect to such Tax pursuant to Section 5.01, (d) any Tax that is attributable to such recipient's failure to comply with Section 5.01(b) or Section 5.01(c), and (e) any U.S. federal withholding Taxes imposed under FATCA and (f) U.S. federal backup withholding Taxes pursuant to Code Section 3406.

"Exit Financing Commitments" shall have the meaning provided in Section 6.15.

"Extraordinary Expenses" shall mean all reasonable and documented out-of-pocket costs, expenses or advances that the Administrative Agent or the Collateral Agent may incur during the occurrence and continuance of a Default or Event of Default, or during the pendency of a Proceeding of any Credit Party, including those relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, manufacture, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against the Administrative Agent, the Collateral Agent, any Lender, any Credit Party, any representative of creditors of a Credit Party or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of the Agents' Liens with respect to any Collateral), Credit Documents or Obligations, including any lender liability or any other claims; (c) the exercise, protection or enforcement of any rights or remedies of the Administrative Agent or the Collateral Agent in, or the monitoring of, any Proceeding; (d) settlement or satisfaction of any taxes, charges or Liens with respect to any Collateral; (e) any enforcement action; or (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Credit Documents or Obligations. Such costs, expenses and advances include transfer fees, taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, legal fees, financial advisor fees, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, accountants' fees, environmental study fees, wages and salaries paid to employees of any Credit Party or independent contractors in liquidating any Collateral, and travel expenses.

"FATCA" shall mean Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder or official interpretations thereof, and any agreements entered into pursuant to Section 1471(b) of the Code.

"FCPA" shall have the meaning provided in Section 8.15(c).

"Federal Funds Rate" shall mean (a) the weighted average of interest rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on the applicable Business Day (or on the preceding Business Day, if the applicable day is not a Business Day), as published by the Federal Reserve Bank of New York on the next Business Day; or (b) if no such rate is published on the next Business Day, the

average of the quotations for the day for such transactions as determined by the Administrative Agent.

"Fee Letter" shall mean that certain Fee Letter, dated as of the Closing Date, by and between Holdings and GSO, and acknowledged by the Administrative Agent, as modified, supplemented, amended, or restated (including any amendment and restatement thereof).

"Fees" shall mean all amounts payable pursuant to or referred to in Section 2.04.

"Final Order" shall mean, collectively, the order of the Bankruptcy Court entered in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to the Administrative Agent and the Required Lenders, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless the Required Lenders waive such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Required Lenders, which, among other matters but not by way of limitation, authorizes the Credit Parties to continue to use cash collateral of the ABL Agent and the Pre-Petition ABL Agent and to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Credit Documents, as the case may be, and provides for the super-priority of the Agents' and the Lenders' claims.

"Final Order Entry Date" shall mean the date upon which the Final Order is entered by the Bankruptcy Court.

"Foreign Plan" shall mean any employee benefit plan or arrangement (a) maintained or contributed to by any Credit Party that is not subject to the laws of the United States; or (b) mandated by a government other than the United States for employees of any Credit Party.

"Foreign Subsidiaries" shall mean each Subsidiary of Holdings that is not a Domestic Subsidiary.

"German Collateral" shall mean all the "Collateral" (or equivalent term) as defined in each German Security Agreement and all other property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any German Security Agreement, and all other property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document governed by the laws of Germany.

"German Security Agreement" shall mean the German security transfer agreement described on Schedule 9.13, by and among the Collateral Agent and the applicable Credit Parties, and in form and substance satisfactory to the Collateral Agent and the Required Lenders.

"Governmental Authority" shall mean the government of the United States of America, Canada, any other nation or any political subdivision thereof, whether state, provincial, municipal or local, and any agency, authority, instrumentality, regulatory body, court, central

bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"GSO" means GSO Capital Partners LP, a Delaware limited partnership and/or certain clients, funds or accounts managed, advised or sub-advised by GSO Capital Partners LP or its Affiliates, as the context may require.

"Guaranteed Creditors" shall mean and include each of the Administrative Agent, the Collateral Agent and the Lenders.

"Guaranteed Obligations" shall mean, in the case of each Credit Party (and excluding, in each case, Obligations of such Credit Party), the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the unpaid principal and interest on each Note issued by, and all Loans made to each Borrower under this Agreement, together with all the other obligations (including obligations which, but for the Automatic Stay, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding, or which would have accrued but for such bankruptcy, insolvency, receivership or similar proceeding, at the rate provided for herein, whether or not such interest is an allowed or allowable claim in any such proceeding) thereon) of each Borrower to the Lenders, the Administrative Agent and the Collateral Agent now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document (other than the Intercreditor Agreement) to which each Borrower is a party and the due performance and compliance by the Borrowers with all the terms, conditions and agreements contained in this Agreement and in each such other Credit Document (other than the Intercreditor Agreement).

"Guaranteed Party" shall mean, with respect to any Credit Party, any other Credit Party.

"Guarantor" shall mean Holdings, MidCo, and any other Credit Party, or any other Person that becomes a guarantor of the Guaranteed Obligations under Section 14 hereof.

"Hazardous Materials" shall mean (a) petroleum, radioactive materials, asbestos, polychlorinated biphenyls, and radon gas; and (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," "pollutants," "pollutant or contaminant," or words of similar import, under any applicable Environmental Law due to their hazardous or toxic characteristics.

"Holdings" shall have the meaning provided in the preamble hereto.

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness (including principal, interest, fees and charges) of such Person (A) for borrowed money or (B) for the deferred purchase price of property or services, (ii) the maximum amount available to be drawn under all letters of credit, bankers' acceptances and similar obligations issued for the account of such Person and all unpaid drawings in respect of such letters of credit, bankers' acceptances and similar obligations, (iii) all Indebtedness of the types described in

clause (i), (ii), (iv), (v), (vi) or (vii) of this definition secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such Indebtedness, such Indebtedness shall be deemed to be in an amount equal to the lesser of (x) the aggregate unpaid amount of Indebtedness secured by such Lien and (y) the fair market value of the property to which such Lien relates as determined in good faith by such Person), (iv) the aggregate amount of all Capitalized Lease Obligations of such Person, (v) all Contingent Obligations of such Person, (vi) all obligations under any Swap Contracts and any Bank Product Debt or under any similar type of agreement and (vii) all Off-Balance Sheet Liabilities of such Person.  Notwithstanding the foregoing, Indebtedness shall not include (a) trade payables and accrued expenses incurred by any Person in accordance with customary practices and in the ordinary course of business of such Person or (b) earn-outs and other contingent payments in respect of acquisitions except to the extent that the liability on account of any such earn-outs or contingent payment becomes fixed and is required by U.S. GAAP to be reflected as a liability on the consolidated balance sheet of Holdings, the Lead Borrower and any Restricted Subsidiary.

"Indemnified Liabilities" shall have the meaning provided in Section 13.01(b).

"Indemnified Person" shall have the meaning provided in Section 13.01(b).

"Indemnified Taxes" shall mean all Taxes other than (i) Excluded Taxes and (ii) Other Taxes.

"Initial Availability" shall mean $33,000,000 or if less, the amount approved pursuant to an order of the Bankruptcy Court.

"Intellectual Property" shall have the meaning provided in Section 8.20.

"Intellectual Property Security Agreements" shall mean, collectively, (i) that certain Trademark Security Agreement dated as of the Closing Date by and among Revolution, Full Throttle, and the Collateral Agent, (ii) that certain Patent Security Agreement dated as of the Closing Date by and between Revolution and the Collateral Agent, and (iii) that certain Copyright Security Agreement dated as of the Closing Date by and between Revolution and the Collateral Agent.

"Intercreditor Agreement" shall mean that certain DIP Intercreditor Agreement, dated on or about the Closing Date, by and among the Agents and the ABL Agent (as same may be amended or modified from time to time in accordance with the terms thereof and the Order).

"Interest Determination Date" shall mean, with respect to any LIBOR Rate Loan, the second Business Day prior to the commencement of any Interest Period relating to such LIBOR Rate Loan.

"Interest Expense" shall mean, for any Person, the aggregate consolidated interest expense (net of interest income) of such Person and its Restricted Subsidiaries for such period, in respect of Indebtedness determined on a consolidated basis in accordance with U.S. GAAP, including amortization or original issue discount on any Indebtedness and amortization of all fees payable in connection with the incurrence of such Indebtedness, including, without

limitation, the interest portion of any deferred payment obligation and the interest component of any Capitalized Lease Obligations, and, to the extent not included in such interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities.

"Interest Period" shall mean as to each Loan, (a) the period commencing on the Closing Date and ending on, but not including, the first Adjustment Date following the Closing Date and (b) each subsequent one-month period from and including one Adjustment Date to, but not including, the next Adjustment Date; provided, that:

(i)       if any Interest Period that would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(ii)      any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(iii)     no Interest Period shall extend beyond the Maturity Date.

Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"Interim Order" shall mean the order of the Bankruptcy Court entered in the Cases after an interim hearing in form and substance satisfactory to the Administrative Agent and the Required Lenders, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Required Lenders, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrowers and Guarantors to continue to use cash collateral of the ABL Agent and the Pre-Petition ABL Agent and execute and perform under the terms of this Agreement and the other Credit Documents.

"Interim Order Entry Date" shall mean the date upon which the Bankruptcy Court enters the Interim Order.

"Inventory" shall mean all "inventory," as such term is defined in the UCC, wherever located, in which any Person now or hereafter has rights.

"Investments" shall have the meaning provided in Section 10.05.

"Involuntary Disposition" shall mean any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any property of any Credit Party or any Subsidiary thereof.

"Joint Venture" shall mean any Person other than an individual or a Subsidiary of Holdings (i) in which the Lead Borrower or any Restricted Subsidiary holds or acquires an

ownership interest (by way of ownership of Equity Interests or other evidence of ownership) and (ii) which is engaged in a business permitted by Section 10.09.

"KEIP" shall mean any key employee incentive plan of Holdings acceptable to the Required Lenders.

"KERP" shall mean any key employee retention plan of Holdings acceptable to the Required Lenders.

"Lead Borrower" shall have the meaning provided in the preamble hereto.

"Lender" shall mean each financial institution listed on Schedule 2.01, as well as any Person that becomes a "Lender" hereunder pursuant to Section 3.04 or 13.04(b), including any Lending Office of the foregoing.

"Lending Office" shall mean the office (including any domestic or foreign Affiliate or branch) designated as such by a Lender by notice to Administrative Agent and Lead Borrower.

"LIBOR Rate" shall mean, for each Interest Period, the per annum rate of interest (rounded up, if necessary, to the nearest 1/8th of 1%) determined by the Administrative Agent at approximately 11:00 a.m. (London time) two Business Days prior to commencement of such Interest Period, equal to (a) the London Interbank Offered Rate, or comparable or successor rate approved by the Administrative Agent, as published on the applicable Bloomberg screen page (or other commercially available source designated by the Administrative Agent from time to time) for a term of one month; or (b) if the rate described in clause (a) is unavailable for any reason, the interest rate at which Dollar deposits in the approximate amount of the Loan would be offered by Bank of America's London branch to major banks in the London interbank Eurodollar market (and in each case, if any such rate is below zero, the LIBOR Rate shall be deemed to be zero).  Notwithstanding the foregoing, in no event shall the LIBOR Rate for any Interest Period be less than 1.50% per annum with respect to the Loans and any other Obligations for which interest is calculated by reference to the LIBOR Rate.

"LIBOR Rate Loan" shall mean each Loan issued hereunder.

"Lien" shall mean any mortgage, charge, pledge, security interest, hypothec, collateral assignment, security deposit arrangement, encumbrance, deemed, constructive or statutory trust, security conveyance, lien (statutory or other) or arrangement to provide any preference or priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, and any financing lease having substantially the same effect as any of the foregoing).

"Loans" shall mean advances made to or at the instructions of a Borrower pursuant to Section 2 hereof, including, without limitation, the New Money Loans and the Roll-Up Loans, as the context requires.

"Location" of any Person shall mean such Person's "location" as determined pursuant to Section 9-307 of the UCC or, if applicable Section 7 (or similar provision) of the PPSA.

"Management Incentive Plan" shall mean any equity or other similar incentive program of Holdings (any direct or indirect parent thereof) or any of its Restricted Subsidiaries acceptable to the Required Lenders.

"Margin Stock" shall have the meaning provided in Regulation U.

"Material Adverse Effect" shall mean (i) a material adverse effect on the assets, business, operations, liabilities or financial condition of Holdings and the Restricted Subsidiaries taken as a whole or (ii) a material adverse effect (x) on the material rights or remedies of the Lenders or the Administrative Agent hereunder or under any other Credit Document or (y) on the ability of the Credit Parties, taken as a whole, to perform their payment obligations to the Lenders or the Administrative Agent hereunder or under any other Credit Document.

"Maturity Date" shall mean the earlier of (i) one hundred and fifteen (115) days from the Petition Date, (ii) the effective date of any Chapter 11 Plan of any Debtor that is confirmed pursuant to an order entered by the Bankruptcy Court, (iii) the earlier of (x) the date that is forty (40) days after the Petition Date if the Final Order Entry Date shall not have occurred by such date and (y) the date of revocation of the Interim Order or the Final Order, as applicable, (iv) the date of a consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code, (v) the date that the Bankruptcy Court (A) orders the conversion of any Case from one under Chapter 11 of the Bankruptcy Code to one under Chapter 7 of the Bankruptcy Code, (B) orders the dismissal of any Case, or (C) appoints a receiver, interim receiver, receiver and manager or similar official over all or any substantial portion of the assets of any Debtor, or the appointment of an examiner in any of the Cases with enlarged powers to operate or manage the financial affairs, the business, or reorganization of the Credit Parties, (vi) the date that the Loans are have been accelerated or the Commitments terminated, including, without limitation, as a result of an Event of Default pursuant to Section 11.01, and (vii) the stated maturity date or earlier termination date (whether by acceleration or otherwise) of the ABL Credit Agreement.

"Moody's" shall mean Moody's Investors Service, Inc.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA under which a Credit Party or an ERISA Affiliate has any obligation or liability.

"New Money Loans" shall have the meaning provided in Section 2.01(a)

"Note" shall mean each promissory note substantially in the form of Exhibit B hereto.

"Notice of Borrowing" shall mean a notice substantially in the form of Exhibit A hereto.

"Notice Office" shall mean the office of the Administrative Agent located at Rodney Square North, 1100 North Market Street, Wilmington, DE 19890, Attention: VER Technologies Administrator; or such other offices or persons as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"Netherlands Collateral" shall mean all the "Collateral" (or equivalent term) as defined in each Netherlands Security Agreement and all other property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Netherlands Security Agreement, and all other property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document governed by the laws of The Netherlands (or any political subdivision thereof).

"Netherlands Security Agreement" shall mean the omnibus deed of pledge described on Schedule 9.13, by and among the Collateral Agent and the applicable Credit Parties, in form and substance satisfactory to the Collateral Agent and the Required Lenders.

"Obligations" shall mean all now existing or hereafter arising debts, obligations, covenants, and duties of payment or performance of every kind, matured or unmatured, direct or contingent, owing, arising, due, or payable to any Lender, Agent or Indemnified Person by any Credit Party arising out of this Agreement or any other Credit Document (other than the Intercreditor Agreement), including, without limitation, all obligations to repay principal or interest (including any interest accruing during the pendency of any bankruptcy, insolvency, receivership or similar proceeding, or which would have accrued but for such bankruptcy, insolvency, receivership or similar proceeding, at the rate provided for herein, regardless of whether allowed or allowable in such proceeding) on the Loans, and to pay interest, fees, costs, charges, expenses, professional fees, and all sums chargeable to the Borrowers or any other Credit Party or for which any Borrower or any other Credit Party is liable as indemnitor under the Credit Documents, whether or not evidenced by any note or other instrument (including fees accruing during the pendency of any bankruptcy, insolvency, receivership or similar proceeding, regardless of whether allowed or allowable in such proceeding).

"OFAC" shall have the meaning provided in Section 8.15(b).

"Off-Balance Sheet Liabilities" of any Person shall mean (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability of such Person under any Sale-Leaseback Transactions that do not create a liability on the balance sheet of such Person, (iii) any obligation under a Synthetic Lease or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"Order" shall mean, as applicable and as the context may require, the Interim Order or the Final Order.

"Other Taxes" shall mean any and all present or future stamp, court or documentary, intangible, recording, filing or property Taxes or similar Taxes arising from any

payment made under, from the execution, delivery, registration, performance or enforcement of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document except any such Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.04) that are imposed as a result of any present or former connection between the relevant Recipient and the jurisdiction imposing such Tax (other than a connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan).

"Outstanding Amount" shall mean, with respect to Loans on any date, the amount of the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"Over-Allocation Event" shall have the meaning provided in Section 2.02(c).

"Parallel Debt" shall have the meaning provided in Section 13.06.

"Parent Company" shall mean any direct or indirect parent company of Holdings (other than non-corporate investment funds that are Sponsor Affiliates).

"Participant Register" shall have the meaning provided in Section 13.04(a).

"Participating Member State" shall mean the member states of the European Communities that adopt or have adopted the euro as their lawful currency in accordance with the legislation of the European Union relating to European Monetary Union.

"Patriot Act" shall have the meaning provided in Section 13.17.

"Payment Office" shall mean, the office of the Administrative Agent located at Rodney Square North, 1100 North Market Street, Wilmington, DE 19890.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA.

"Permitted Liens" shall have the meaning provided in Section 10.01.

"Person" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Petition Date" shall have the meaning provided in the recitals hereto.

"Plan" shall mean any pension plan as defined in Section 3(2) of ERISA, other than a Foreign Plan or a Multiemployer Plan, which is maintained or contributed to (or to which there is an obligation to contribute) by a Credit Party or, solely with respect to a pension plan subject to Title IV of ERISA,  an ERISA Affiliate or with respect to which a Credit Party or,

solely with respect to a pension plan subject to Title IV of ERISA, an ERISA Affiliate has (or could reasonably be expected to have) any liability.

"Pledge Agreement" shall mean that certain Pledge Agreement, dated as of the Closing Date, by and among the Borrowers and the Collateral Agent, in form and substance satisfactory to the Administrative Agent and the Required Lenders.

"Pledge Agreement Collateral" shall mean all of the "Collateral" (or equivalent term) as defined in the Pledge Agreement and all other Equity Interests or other property similar to that pledged (or purported to have been pledged) pursuant to the Pledge Agreement and which is pledged (or purported to be pledged) pursuant to one or more Additional Security Documents.

"Pledgee" shall have the meaning provided in the Pledge Agreement.

"Post-Petition" shall mean the time period commencing immediately upon the filing of the Cases.

"PPSA" shall mean the Personal Property Security Act (Ontario) and the regulations thereunder; provided, however, if validity, perfection and effect of perfection and non-perfection of the Collateral Agent's Lien on any applicable Collateral are governed by the personal property security laws of any Canadian jurisdiction other than Ontario, PPSA shall mean those personal property security laws (including the Civil Code of Quebec) in such other jurisdiction for the purposes of the provisions hereof relating to such validity, perfection and effect of perfection and non-perfection and for the definitions related to such provisions, as from time to time in effect.

"Pre-Petition" shall mean the time period ending immediately prior to the filing of the Cases.

"Pre-Petition ABL Agent" shall, collectively, have the meaning assigned to the terms "Administrative Agent" and "Collateral Agent" in the Pre-Petition ABL Credit Agreement.

"Pre-Petition ABL Credit Agreement" shall have the meaning provided in the recitals hereto.

"Pre-Petition ABL Credit Documents" shall have the meaning assigned to the term "Credit Documents" (or any corresponding term) in the Pre-Petition ABL Credit Agreement, as the same have been amended, supplemented, waived, otherwise modified, extended, renewed, refinanced or replaced from time to time, in each case, in accordance with the terms and limitations of the Pre-Petition Intercreditor Agreement.

"Pre-Petition ABL Lenders" shall have the meaning provided in the recitals hereto.

"Pre-Petition ABL Obligations" shall have the meaning assigned to the term "Obligations" in the Pre-Petition ABL Credit Agreement.

"<u>Pre-Petition Agents</u>" shall mean each of the Pre-Petition Term Agent and/or the Pre-Petition ABL Agent.

"<u>Pre-Petition Borrowers</u>" shall have the meaning provided in the recitals hereto.

"<u>Pre-Petition Closing Date</u>" shall mean December 11, 2014.

"<u>Pre-Petition Credit Documents</u>" shall mean the Pre-Petition Term Loan Credit Documents and the Pre-Petition ABL Credit Documents.

"<u>Pre-Petition First Out Lenders</u>" shall have the meaning provided in the recitals hereto.

"<u>Pre-Petition First Out Loans</u>" shall have the meaning provided in the recitals hereto.

"<u>Pre-Petition Guarantors</u>" shall have the meaning provided in the recitals hereto.

"<u>Pre-Petition Intercreditor Agreement</u>" shall mean that certain Intercreditor Agreement, dated as of the Pre-Petition Closing Date, by and among, inter alia, the Pre-Petition Term Agent, the Pre-Petition ABL Agent, and each additional representative party thereto from time to time for purposes thereof for holders of one or more classes of Indebtedness (as same may be amended or modified from time to time prior to the Petition Date in accordance with the terms thereof).

"<u>Pre-Petition Lenders</u>" shall mean each of the Pre-Petition Term Lenders and/or the Pre-Petition ABL Lenders.

"<u>Pre-Petition Obligations</u>" shall mean the Pre-Petition Term Obligations and the Pre-Petition ABL Obligations.

"<u>Pre-Petition Term Agent</u>" shall have the meaning provided in the recitals hereto.

"<u>Pre-Petition Term Lenders</u>" shall have the meaning provided in the recitals hereto.

"<u>Pre-Petition Term Loan Agreement</u>" shall have the meaning provided in the recitals hereto.

"<u>Pre-Petition Term Loan Credit Documents</u>" shall mean the "Credit Documents" as defined in the Pre-Petition Term Loan Agreement.

"<u>Pre-Petition Term Loans</u>" shall have the meaning provided in the recitals hereto.

"<u>Pre-Petition Term Obligations</u>" shall have the meaning provided in the recitals hereto.

"<u>PRG</u>" shall mean Production Resources Group, L.L.C.

"Proceeding" shall mean any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, dissolution, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, dissolution, or other winding up of a Person.

"Projections" shall mean a pro forma projection model for the five (5) year period following the Petition Date projecting the financial performance of the reorganized Debtors, in form satisfactory to the Required Lenders and which shall contain such information as the Required Lenders may request.

"Pro Rata Share" shall mean, with respect to each Lender at any time (and calculated with respect to any amount, as the context may require), a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of such Lender's Loans at such time and the denominator of which is the aggregate Outstanding Amount of all Loans at such time. The initial Pro Rata Shares of each Lender are set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption Agreement pursuant to which such Lender becomes a party hereto, as applicable.

"Real Property" of any Person shall mean, collectively, the right, title and interest of such Person (including any leasehold, mineral or other estate) in and to any and all land, improvements and fixtures owned, leased or operated by such Person, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"Recovery Event" shall mean the receipt by the Lead Borrower or any Restricted Subsidiaries of any cash insurance proceeds or condemnation awards payable (i) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of the Lead Borrower or any Restricted Subsidiaries (but not by reason of any loss of revenues or interruption of business or operations caused thereby) and (ii) under any policy of insurance required to be maintained under Section 9.03, in each case to the extent such proceeds or awards do not constitute reimbursement or compensation for amounts previously paid by the Lead Borrower or any Restricted Subsidiaries in respect of any such event.

"Register" shall have the meaning provided in Section 13.15.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Release" shall mean disposing, discharging, releasing, injecting, spilling, pumping, leaking, leaching, dumping, emitting, emptying, pouring, or seeping of Hazardous Materials into, through or upon the environment.

"Remedies Notice Period" shall have the meaning provided in Section 11.02.

"Rental Equipment" shall mean Inventory which is of a type offered for lease in the ordinary course of business of the Borrowers.

"Replaced Lender" shall have the meaning provided in Section 3.04.

"Replacement Lender" shall have the meaning provided in Section 3.04.

"Reportable Event" shall mean, with respect to any Plan, any event set forth in Section 4043(c) of ERISA, other than an event for which the 30-day notice period has been waived.

"Required Lenders" shall mean Lenders, the sum of whose outstanding principal of Loans as of any date of determination represents greater than 50% of the sum of all outstanding Loans of all the Lenders at such time.

"Required Milestones" shall have the meaning provided in Section 9.18.

"Requirement of Law" shall mean, with respect to any Person, (i) the charter, articles or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person and (ii) any statute, law, treaty, rule, regulation, order, decree, writ, official administrative pronouncement, injunction or determination of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" shall mean, with respect to any Person, its chief executive officer, president, chief financial officer or any vice president, managing director, treasurer, controller, secretary, assistant secretary, or other officer of such Person having substantially the same authority and responsibility; provided that, with respect to compliance with financial covenants, "Responsible Officer" shall mean the chief financial officer, treasurer or controller of the Lead Borrower, or any other officer of the Lead Borrower having substantially the same authority and responsibility.

"Restricted Subsidiary" shall mean each Subsidiary of Holdings. The Borrowers and the other Credit Parties shall at all times constitute Restricted Subsidiaries.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of April [__], 2018, by and among, *inter alia*, a majority of the Pre-Petition

Term Lenders holding at least 66 2/3% of the Pre-Petition Term Obligations, the Lenders, the Administrative Agent, the Pre-Petition Term Agent, Catterton, and PRG.

"<u>Returns</u>" shall have the meaning provided in <u>Section 8.09</u>.

"<u>Roll-Up Loans</u>" shall have the meaning provided in <u>Section 2.01(b)</u>.

"<u>Roll-Up Amount</u>" shall have the meaning provided in the recitals hereto.

"<u>S&P</u>" shall mean Standard & Poor's Ratings Services, a division of the McGraw Hill Company, Inc., and any successor owner of such division.

"<u>Sale-Leaseback Transaction</u>" shall mean any arrangements with any Person providing for the leasing by the Lead Borrower or any Restricted Subsidiaries of real or personal property which has been or is to be sold or transferred by the Lead Borrower or such Restricted Subsidiary to such Person or to any other Person to whom funds have been or are to be advanced by such Person in connection therewith.

"<u>Sanction</u>" shall mean any sanction administered or enforced by the U.S. Government (including OFAC), the Government of Canada, the Netherlands, Germany, the United Nations Security Council, the European Union or Her Majesty's Treasury or any other applicable sanctions authority.

"<u>Secured Creditors</u>" shall mean, collectively, the Administrative Agent, the Collateral Agent, each other Agent, and the Lenders.

"<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"<u>Securities Exchange Act</u>" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"<u>Security Agreement</u>" shall mean each Canadian Security Agreement, each English Security Agreement, each German Security Agreement, each Netherlands Security Agreement, and/or each U.S. Security Agreement, as the context may require, and (ii) each joinder or other supplemental security agreement executed in connection herewith.

"<u>Security Document</u>" shall mean and include the Security Agreement, the Pledge Agreement, each Intellectual Property Security Agreement, and, after the execution and delivery thereof, each Additional Security Document.

"<u>Sponsor</u>" shall mean Catterton Management Company, L.L.C.

"<u>Sponsor Affiliate</u>" shall mean the collective reference to any entities (other than a portfolio company) controlled directly or indirectly by the Sponsor.

"<u>Sponsor Agreement</u>" shall mean that certain Management Services Agreement dated as of December 11, 2014 between the Lead Borrower and the Sponsor.

"Spot Rate" means the exchange rate, as determined by the Administrative Agent, that is applicable to conversion of one currency into another currency, which is (a) the exchange rate reported by Bloomberg (or other commercially available source designated by the Administrative Agent) as of the end of the preceding business day in the financial market for the first currency; or (b) if such report is unavailable for any reason, the spot rate for the purchase of the first currency with the second currency as in effect during the preceding business day in Bank of America's principal foreign exchange trading office for the first currency.

"Subsidiary" shall mean, as to any Person, (i) any corporation, more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency), which is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, unlimited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% Equity Interest at the time.

"Successor Case" shall mean, with respect to the Cases, any subsequent proceedings under Chapter 7 of the Bankruptcy Code.

"Swap Contract" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Synthetic Lease" shall mean a lease transaction under which the parties intend that (i) the lease will be treated as an "operating lease" by the lessee and (ii) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, fees, assessments, liabilities or withholdings imposed by any Governmental Authority, including any interest, penalties and additions to tax with respect thereto.

"Termination Declaration" shall have the meaning provided in Section 11.02.

"Threshold Amount" shall mean $1,000,000.

"UCC" shall mean the Uniform Commercial Code in effect in the State of New York from time to time; provided, however, that, at any time, if by reason of mandatory provisions of law, the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York governs, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions relating to such perfection or priority and for purposes of definitions relating to such provisions.

"United States" and "U.S." shall each mean the United States of America.

"Unused Fee" shall have the meaning provided in 2.04(b).

"U.S. Collateral" shall mean all the "Collateral" (or equivalent term) as defined in each U.S. Security Agreement and all other property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any U.S. Security Agreement, and all other property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document governed by the laws of the United States (or any state thereof), including, without limitation, and all Pledge Agreement Collateral.

"U.S. Dollars" or "Dollars" and the sign "$" shall each mean freely transferable lawful money (expressed in dollars) of the United States.

"U.S. GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time; provided that determinations made pursuant to this Agreement in accordance with U.S. GAAP are subject (to the extent provided therein) to Section 13.07(a).

"U.S. Security Agreement" shall mean that certain Security Agreement, dated as of the date hereof, by and among Holdings, the Lead Borrower, the other Credit Parties party thereto as grantors, and the Collateral Agent, in form and substance satisfactory to the Administrative Agent and the Required Lenders.

"U.S. Tax Compliance Certificate" shall have the meaning provided in Section 5.01(c).

"U.S. Trustee" shall mean the United States Trustee for Region 3.

"Wholly-Owned Restricted Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Restricted Subsidiary of such Person.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person owns 100% of the Equity Interests at such time (other than, in the case of a Foreign Subsidiary with respect to preceding clauses (i) or (ii), director's qualifying shares and/or other nominal

amounts of shares required to be held by Persons other than the Lead Borrower and any Restricted Subsidiary under applicable law).

"<u>Withdrawal Notice</u>" means a notice delivered by the Lead Borrower to the Administrative Agent and the Required Lenders in substantially the form of <u>Exhibit F</u>, requesting a withdrawal of funds from the Collateral Account.

1.02.   <u>Terms Generally</u>.   The definitions in <u>Section 1.01</u> shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  The words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement unless the context shall otherwise require.  All references herein to Articles, Sections, paragraphs, clauses, subclauses, Exhibits and Schedules shall be deemed references to Articles, Sections, paragraphs, clauses and subclauses of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Unless otherwise expressly provided herein, (a) all references to documents, instruments and other agreements (including the Credit Documents and organizational documents) shall be deemed to include all subsequent amendments, restatements, amendments and restatements, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendments and restatements, supplements and other modifications are not prohibited by any Credit Document and (b) references to any law, statute, rule or regulation shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.03.   <u>Exchange Rates; Currency Equivalent</u>.   All references in the Credit Documents to Loans and Obligations and other amounts shall be denominated in Dollars, unless expressly provided otherwise.  The Dollar Equivalent of any amounts denominated or reported under a Credit Document in a currency other than Dollars shall be determined by the Administrative Agent on a daily basis, based on the current Spot Rate.  The Lead Borrower shall report value to the Administrative Agent in the currency invoiced by the applicable Borrower or shown in the Borrowers' financial records, and unless expressly provided otherwise, shall deliver financial statements and calculate financial covenants in Dollars.

1.04.   <u>Interpretation (Quebec)</u>.   For purposes of any Collateral located in the Province of Quebec or charged by any deed of hypothec (or any other Credit Document) and for all other purposes pursuant to which the interpretation or construction of a Credit Document may be subject to the laws of the Province of Quebec or a court or tribunal exercising jurisdiction in the Province of Quebec, (a) "personal property" shall be deemed to include "movable property," (b) "real property" shall be deemed to include "immovable property," (c) "tangible property" shall be deemed to include "corporeal property," (d) "intangible property" shall be deemed to include "incorporeal property," (e) "security interest," "mortgage" and "lien" shall be deemed to

include a "hypothec," "prior claim" and a "resolutory clause," (f) all references to filing, registering or recording under the UCC or the PPSA shall be deemed to include publication under the Civil Code of Quebec, (g) all references to "perfection" of or "perfected" Liens shall be deemed to include a reference to an "opposable" or "set up" Liens as against third parties, (h) any "right of offset," "right of setoff" or similar expression shall be deemed to include a "right of compensation," (i) "goods" shall be deemed to include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall be deemed to include a "mandatary," (k) "construction liens" shall be deemed to include "legal hypothecs," (l) "joint and several" shall be deemed to include "solidary," (m) "gross negligence or willful misconduct" shall be deemed to be "intentional or gross fault," (n) "beneficial ownership" shall be deemed to include "ownership on behalf of another as mandatary," (o) "easement" shall be deemed to include "servitude," (p) "priority" shall be deemed to include "prior claim," (q) "survey" shall be deemed to include "certificate of location and plan," (r) "fee simple title" shall be deemed to include "absolute ownership" and (s) "ground lease" shall be deemed to include "emphyteutic lease."  The parties hereto confirm that it is their wish that this Agreement and any other document executed in connection with the transactions contemplated herein be drawn up in the English language only (except if another language is required under any applicable law) and that all other documents contemplated thereunder or relating thereto, including notices, may also be drawn up in the English language only.  *Les parties aux présentes confirment que c'est leur volonté que cette convention et les autres documents de crédit soient rédigés en langue anglaise seulement et que tous les documents, y compris tous avis, envisagés par cette convention et les autres documents peuvent être rédigés en langue anglaise seulement (sauf si une autre langue est requise en vertu d'une loi applicable).*

1.05.  <u>Permitted Liens</u>.  Any reference in any of the Credit Documents to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created by any of the Credit Documents to any Permitted Lien.

Section 2.  <u>Amount and Terms of Credit</u>.

2.01.  <u>Loans.</u>

(a)  <u>Term Loans</u>.  Subject to the terms and conditions set forth herein, including, without limitation, compliance with the Approved Budget as set forth in <u>Section 9.15</u>, each Lender severally agrees to make Loans from time to time to the Borrowers in Dollars in an aggregate principal amount not to exceed such Lender's Commitment (collectively, the "<u>New Money Loans</u>"); <u>provided</u> that (i) the aggregate principal amount of all New Money Loans shall not exceed the aggregate Commitments and (ii) prior to the satisfaction of each of the conditions set forth in <u>Section 7</u>, the aggregate amount of all New Money Loans shall not exceed the Initial Availability.  Once repaid, whether such repayment is voluntary or required, the New Money Loans may not be reborrowed.

(b)  <u>Roll-Up Loans</u>.  Subject to the terms and conditions set forth herein, each Lender holding Pre-Petition First Out Loans severally agrees to make a single loan to the Borrowers on the Closing Date in an aggregate principal amount equal to such Lender's Pre-Petition First Out Loans, together with all interest, fees, expenses and other sums constituting

Pre-Petition Term Obligations payable in respect thereof under the Pre-Petition Term Loan Agreement (collectively, the "Roll-Up Loans"); provided that the aggregate principal amount of the Roll-Up Loans shall not exceed the Roll-Up Amount.

2.02.   Borrowings, Withdrawals.

(a)   Borrowing Procedure.   Subject to the terms and conditions hereof, the Lead Borrower may request to borrow New Money Loans in an aggregate amount not to exceed the Commitments by delivering to the Administrative Agent a Notice of Borrowing. Each such Notice of Borrowing must be received by the Administrative Agent and the Lenders not later than 11:00 a.m. three (3) Business Days prior to the requested date of such Loans, or, in the case of a request to borrow Loans on the Closing Date, not later than one Business Day prior to the Closing Date, and shall specify the Dollar amount of the Loans being requested on such date. The Administrative Agent shall promptly notify each Lender of its proportionate share of such Loans and the requested date of such Loans.  On the borrowing date specified in such Notice of Borrowing, each Lender shall make its share of the Borrowing available at the Notice Office no later than 2:00 p.m., in immediately available funds.  The Administrative Agent shall make all funds received in respect of such Loans available to the Borrowers, subject to the provisions of clause (b) below, in like funds as received by the Administrative Agent by crediting the Collateral Account with the amount of such funds.

(b)   Requests for Withdrawals.   No later than 12:00 noon (New York time) on Wednesday of each week or at such other time as may be agreed to by the Required Lenders and the Administrative Agent in their reasonable discretion, the Lead Borrower shall deliver to the Administrative Agent and the Lenders a Withdrawal Notice in form and substance reasonably satisfactory to the Required Lenders and consistent with the Approved Budget. Upon the receipt of a Withdrawal Notice and written confirmation (which may be by e-mail) from the Required Lenders that such Withdrawal Notice is in form and substance reasonably satisfactory to the Required Lenders, the Administrative Agent shall transfer funds from the Collateral Account in an aggregate principal amount equal to the amount specified in such Withdrawal Notice to the account of the Borrowers specified in such Withdrawal Notice to fund expenses of the following week; provided that (i) immediately prior to making such withdrawal, no Event of Default shall have occurred and be continuing at such time or would result from such withdrawal, (ii) funds withdrawn shall be used solely to pay amounts in accordance with the Approved Budget within permitted variances as set forth in Section 9.15(b) and (iii) all representations and warranties made by any Credit Party herein and in any other Credit Document shall be true and correct in all material respects (except for any representation or warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language, which shall be true and correct) as of the date of such Withdrawal Notice (except for any representation or warranty which expressly refers to an earlier date, which shall be true and correct as of such date).  Each Withdrawal Notice shall contain a certification by the Borrower that the withdrawal request pursuant thereto complies, and the application of the funds so withdrawn will comply, with the terms of this Agreement in all respects, and the Administrative Agent shall be entitled to conclusively rely on such certification, absent manifest error.

(c)   Administration of Collateral Account.   If at any time after receipt of funds from the Collateral Account, Borrowers shall determine that (i) Borrowers no longer intend to

consummate any proposed use of funds in accordance with the Approved Budget for the applicable week or (ii) the funds received by Borrowers exceed the actual cost of any such proposed use (each an "Over-Allocation Event"), then immediately following such Over-Allocation Event, Borrowers shall transfer the amount of funds not used in accordance with the proposed use of funds from the applicable Borrower's account to the Collateral Account. For the avoidance of doubt, none of the Credit Parties shall be permitted to withdraw, transfer, or disburse any funds from the Collateral Account.

2.03.    Evidence of Debt; Repayment of Loans.

(a)    Each Borrower, jointly and severally, hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of the Loans of such Lender on the Maturity Date, subject to Section 2.10. Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Credit Documents, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

(b)    Any confirmation order entered in the Cases shall not discharge or otherwise affect in any way any of the joint and several obligations of the Debtors to the Agents and the Lenders under this Agreement and the other Credit Documents, other than after the payment in full and in cash, subject to Section 2.10, to the Lenders of all obligations under this Agreement and the other Credit Documents on or before the Maturity Date.

(c)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.  The Lead Borrower shall be entitled to review records of such accounts with prior reasonable notice during normal business hours.

(d)    The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the currency thereof and the Interest Period applicable thereto; (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender.  The Lead Borrower shall be entitled to review records of such accounts with prior reasonable notice during normal business hours.

(e)    The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be prima facie evidence of the existence and amounts of the obligations therein recorded absent manifest error; provided that the failure of any Lender or the

Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrowers to repay the Loans in accordance with their terms.

(f)     Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Lead Borrower, as applicable, shall promptly prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) substantially in the form of Exhibit B.

2.04.   Fees.

(a)     Agent Fees.  The Borrowers, jointly and severally, agree to pay to the Administrative Agent, for its own account, the fees set forth in the Agent Fee Letter or such other fees payable in the amounts and at the times separately agreed upon between the Lead Borrower and the Administrative Agent (the "Administrative Agent Fees").  The Borrowers, jointly and severally, agree to pay the fees set forth in the Fee Letter to the parties entitled to the fees thereunder.

(b)     Unused Fees.  The Borrowers, jointly and severally, agree to pay to the Administrative Agent, for the account of each Lender, on each Adjustment Date, an unused fee in an amount equal to 0.50% multiplied by the amount by which the Commitments exceed the average daily balance of New Money Loans since the immediately preceding Adjustment Date (or the Closing Date, if there is no preceding Adjustment Date) (the "Unused Fee"), which Unused Fee shall be paid in kind by adding the amount of such Unused Fee to the outstanding principal balance of the Loans.

(c)     All fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent and, except in the case of Administrative Agent Fees and the fees set forth in the Fee Letter will be distributed, if and as appropriate, among the applicable Lenders. Once paid, none of the fees shall be refundable under any circumstances.

2.05.   Interest on Loans.

(a)     Subject to the provisions of Section 2.05(b), the Loans shall bear interest at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for such Loans plus the Applicable Margin in effect from time to time.

(b)     Upon the occurrence of any Event of Default and without further notice, motion or application to, or hearing before, or order from, the Bankruptcy Court, the Administrative Agent may (or, at the direction of Required Lenders, shall) determine that all outstanding Obligations hereunder shall bear interest, after as well as before any judgment, at a rate per annum equal to 2.00% plus the rate otherwise applicable to such Obligations (the "Default Rate"). All such interest shall be due and payable upon demand.

(c)     Accrued interest on each Loan shall be payable in arrears on each Adjustment Date and shall be paid in kind by adding the amount of such interest to the outstanding principal balance of the Loans (with effect as of such Adjustment Date) rather than paid in cash to the Administrative Agent on the applicable Adjustment Date, commencing with the first Adjustment Date after the Closing Date, for such Loan.

(d)    All interest hereunder shall be computed on the basis of a year of 365 days, except that interest computed by reference to the LIBOR Rate and all fees shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

2.06.    <u>Prepayments of Loans</u>.    The Lead Borrower may request to prepay the Loans made hereunder by delivering a written notice to the Administrative Agent and the Required Lenders not later than 1:00 p.m., New York City time, five (5) Business Days prior to the requested date of such prepayment, which request the Required Lenders may approve or deny in their sole discretion; <u>provided</u>, that, such approval or denial shall be provided to the Administrative Agent at least one (1) Business Day prior to any such proposed prepayment. Each such notice shall specify the requested prepayment date and the requested principal amount of the Loans or portion thereof to be prepaid.  If approved by the Required Lenders, such notice shall be irrevocable except with the written consent of the Required Lenders with notice thereof to the Administrative Agent. The Borrowers shall reimburse each Lender, pursuant to <u>Section 3.02</u>, for any funding losses incurred in connection with any prepayment or revocation thereof within five (5) Business Days after receiving written demand therefor.

2.07.    <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>.

(a)    Each Borrower shall make each payment required to be made by it hereunder or under any other Credit Document (whether of principal, interest or fees, or amounts payable under <u>Sections 3.01</u>, <u>3.02</u> and <u>5.01</u> or otherwise) at or before the time expressly required hereunder or under such other Credit Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff or counterclaim.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder with respect to principal and interest on Loans shall be made to the Administrative Agent at the Payment Office, for the ratable account of the respective Lenders to which such payment is owed, in Dollars and in immediately available funds. Without limiting the generality of the foregoing, the Administrative Agent may require that any payments due under this Agreement be made in the United States.  If, for any reason, any amount is payable hereunder in a currency other than Dollars, and any Borrower is prohibited by any law from making any required payment hereunder in such other currencies, such Borrower shall make such payment in Dollars in the Dollar Equivalent of the payment amount in such other currencies.  Any amounts received after the required time on any date may, in the reasonable discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All payments shall be made in Dollars to the Administrative Agent at the Payment Office for the ratable accounts of the Lenders, except (a) as otherwise expressly provided herein and (b) that payments pursuant to <u>Sections 3.01</u>, <u>3.02</u>, <u>5.01</u> and <u>13.01</u> shall be made to the Administrative Agent for the benefit of the Persons entitled thereto and payments pursuant to other Credit Documents shall be made to the Administrative Agent for the benefit of the Persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment under any Credit Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied in the manner as provided in Section 11.03 hereof, as applicable, ratably among the parties entitled thereto.

(c)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other applicable Lenders to the extent necessary so that the benefit of all such payments shall be shared by the applicable Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Lead Borrower or Affiliate thereof or any Subsidiary of Holdings (as to which the provisions of this paragraph shall apply). Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Credit Parties rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of a Credit Party in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Lead Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the applicable Lenders hereunder that such Borrower will not make such payment, the Administrative Agent may assume that such Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, but shall not be obligated to, distribute to the Lenders, as the case may be, the amount due.  In such event, if such Borrower has not in fact made such payment, then each of the Lenders, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.08(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

2.08.   <u>Super-Priority Nature of Obligations and Collateral Agent's Liens</u>.   The priority of the Collateral Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Interim Order or the Final Order, as applicable.

2.09.   <u>Lead Borrower</u>.   Each Borrower hereby designates the Lead Borrower as its representative and agent for all purposes under the Credit Documents, including designation of interest rates, delivery or receipt of communications, preparation and delivery of financial reports, receipt and payment of Obligations, requests for waivers, amendments or other accommodations, actions under the Credit Documents (including in respect of compliance with covenants), and all other dealings with the Administrative Agent or any Lender.  The Lead Borrower hereby accepts such appointment.  The Administrative Agent and the Lenders shall be entitled to rely upon, and shall be fully protected in relying upon, any notice or communication (including any Notice of Borrowing) delivered by the Lead Borrower on behalf of any Borrower.  The Administrative Agent and the Lenders may give any notice or communication with a Borrower hereunder to the Lead Borrower on behalf of such Borrower.   Each of the Administrative Agent and the Lenders shall have the right, in its discretion, to deal exclusively with the Lead Borrower for any or all purposes under the Credit Documents.  Each Borrower agrees that any notice, election, communication, representation, agreement or undertaking made on its behalf by the Lead Borrower shall be binding upon and enforceable against it.

2.10.   <u>Special Provisions Regarding Repayment of Loans</u>.   Upon the vote of the requisite bankruptcy majority of Lenders to accept a Chapter 11 Plan in the Cases in accordance with Section 1126 of the Bankruptcy Code, the Chapter 11 Plan may require that the Loans be refinanced or otherwise replaced with other securities or financial instruments (i) with a present value equal to the accrued principal and interest due in respect of the Loans as of the effective date of such Chapter 11 Plan, (ii) a maturity not exceeding the earliest maturity date applicable to any Pre-Petition Term Obligations and (iii) subject to affirmative and negative covenants, events of default and other terms for such applicable securities or instruments as shall be agreed upon or as proposed in a Chapter 11 Plan which shall be confirmed by the Bankruptcy Court; <u>provided</u> that (x) the relative position of the Lien of the Pre-Petition Term Lenders in respect of the Roll-Up Loans is maintained and (y) any such securities or instruments shall be guaranteed to the same extent and with the same priority as the Obligations hereunder are guaranteed by the Credit Party Guaranty made in connection with this Agreement.

Section 3.   <u>Yield Protection, Illegality and Replacement of Lenders</u>.

3.01.   <u>Increased Costs, Illegality, etc.</u>

(a)      In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clause (i) below, may be made only by the Administrative Agent):

(i)      on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement affecting the interbank Eurodollar market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBOR Rate;

(ii)     at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any LIBOR Rate Loan because of any change since the Closing Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the official interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, official guideline or request, such as, but not limited to:  (A) any additional Tax imposed on any Lender (except Indemnified Taxes or Other Taxes indemnified under <u>Section 5.01</u>, or any Excluded Tax) or (B) a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the LIBOR Rate; or

(iii)     at any time, that the making or continuance of any LIBOR Rate Loan has been made (x) unlawful by any law or governmental rule, regulation or order, (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law) or (z) impracticable as a result of a contingency occurring after the Closing Date which materially and adversely affects the interbank Eurodollar market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice in writing to the Lead Borrower and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders).     Thereafter (x) in the case of clauses (i) and (iii) above, the Lead Borrower shall, upon demand from such Lender, convert all LIBOR Rate Loans of such Lender to Loans accruing interest at the Federal Funds Rate plus the Applicable Margin plus 1.00% per annum, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans, (y) in the case of clause (ii) above, each Borrower, jointly and severally, agrees to pay to such Lender, upon such Lender's written request therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice setting forth the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, shall be submitted to the Lead Borrower by such Lender and shall, absent manifest error, be final and conclusive and binding on all the parties hereto), (z) in the case of clause (iii) above, the Borrowers shall take the action specified in <u>Section 3.01(b)</u> as promptly as possible and, in any event, within the time period required by law.

(b)     At any time that any LIBOR Rate Loan is affected by the circumstances described in <u>Section 3.01(a)(ii)</u>, the Lead Borrower may, and in the case of a LIBOR Rate Loan affected by the circumstances described in <u>Section 3.01(a)(iii)</u>, the Lead Borrower shall, on its own behalf or on behalf of the relevant Borrower cancel such Loans by giving the Administrative Agent written notice on the same date that the Lead Borrower was notified by the affected Lender or the Administrative Agent pursuant to <u>Section 3.01(a)(ii)</u>; provided that if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this <u>Section 3.01(b)</u>.

(c)      If any Lender determines that after the Closing Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy or liquidity, or any change in interpretation or administration thereof by any Governmental Authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitments or Loans hereunder or its obligations hereunder, then each Borrower, jointly and severally, agrees to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital.  In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, provided that such Lender's determination of compensation owing under this Section 3.01(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto.  Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 3.01(c), will give prompt written notice thereof to the Lead Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts.

(d)      Notwithstanding anything in this Agreement to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III ((x) and (y) collectively referred to as "Dodd-Frank and Basel III"), shall be deemed to be a change after the Closing Date in a Requirement of Law or government rule, regulation or order, regardless of the date enacted, adopted, issued or implemented (including for purposes of this Section 3.01).

(e)      Each Lender shall use its reasonable commercial efforts to notify the Borrowers if it reasonably believes that it may require compensation from the Borrowers under Section 3.01; provided that failure or delay on the part of any Lender to demand compensation pursuant to Section 3.01 shall not constitute a waiver of such Lender's right to demand such compensation; and provided further that the Borrowers shall not be obligated to pay any such amount which arose more than 270 days prior to the date of such demand or is attributable to periods more than 270 days prior to the date of such demand except where the change after the Closing Date in a Requirement of Law in question had retroactive effect extending prior to such times.

3.02.   Compensation.    Each Borrower, jointly and severally, agrees to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation and the calculation of the amount of such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its LIBOR Rate Loans but excluding loss of anticipated profits) which such Lender may sustain:  (i) if any prepayment or repayment (including any prepayment or repayments made pursuant to Section 2.06 or as a result of an acceleration of the

Loans pursuant to <u>Section 11.02</u>) occurs on a date which is not the last day of an Interest Period with respect thereto; or (ii) as a consequence of (x) any other default by any Borrower to repay its LIBOR Rate Loans when required by the terms of this Agreement or any Note held by such Lender or (y) any election made pursuant to <u>Section 3.01(b)</u>.

3.03.    <u>Change of Lending Office</u>.  Each Lender agrees that on the occurrence of any event giving rise to the operation of <u>Section 3.01(a)(ii)</u> or <u>(iii)</u>, <u>Section 3.01(c)</u> or <u>Section 5.01</u> with respect to such Lender, it will, if requested by the Lead Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another Lending Office for any Loans affected by such event, provided that such designation is made on such terms that such Lender and its Lending Office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section.  Nothing in this <u>Section 3.03</u> shall affect or postpone any of the obligations of the Borrowers or the right of any Lender provided in <u>Sections 3.01</u> and <u>5.01</u>.

3.04.    <u>Replacement of Lenders</u>.  (x) Upon the occurrence of an event giving rise to the operation of <u>Section 3.01(a)(ii)</u> or <u>(iii)</u>, <u>Section 3.01(c)</u> or <u>Section 5.01</u> with respect to such Lender or (y) in the case of a refusal by a Lender to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement which have been approved by the Required Lenders as (and to the extent) provided in <u>Section 13.12(b)</u>, the Lead Borrower shall have the right, if no Event of Default then exists (or, in the case of preceding clause (z), will exist immediately after giving effect to such replacement), to replace such Lender (the "<u>Replaced Lender</u>") with one or more other Eligible Transferees (collectively, the "<u>Replacement Lender</u>") and each of whom shall be required to be reasonably acceptable to the Required Lenders (to the extent the Required Lenders' consent would be required for an assignment to such Replacement Lender pursuant to <u>Section 13.04</u>); <u>provided</u> that (i) at the time of any replacement pursuant to this <u>Section 3.04</u>, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to <u>Section 13.04(b)</u> and with all fees payable pursuant to said <u>Section 13.04(b)</u> to be paid by the Replacement Lender and/or the Replaced Lender (as may be agreed to at such time by and among the Lead Borrower, the Replacement Lender and the Replaced Lender) pursuant to which the Replacement Lender shall acquire all of the Commitments and outstanding Loans of, the Replaced Lender and, in connection therewith, shall pay to (x) the Replaced Lender in respect thereof an amount equal to the sum of (I) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the respective Replaced Lender and (II) an amount equal to all accrued, but theretofore unpaid, fees owing to the Replaced Lender pursuant to <u>Section 2.04</u> and (ii) all obligations of each Borrower due and owing to the Replaced Lender at such time (other than those specifically described in clause (i) above in respect of which the assignment purchase price has been, or is concurrently being, paid) shall be paid in full to such Replaced Lender concurrently with such replacement.  Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this <u>Section 3.04</u>, the Administrative Agent shall be entitled (but not obligated) and authorized to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this <u>Section 3.04</u> and <u>Section 13.04</u>.  Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (i) and (ii) above, recordation of the assignment on the Register pursuant to <u>Section 13.15</u> and, if so requested by the Replacement Lender, delivery to the

Replacement Lender of the appropriate Note or Notes executed by the applicable Borrower, (x) the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 3.01, 3.02, 5.01, 12.07, 12.13 and 13.01), which shall survive as to such Replaced Lender.  In connection with any replacement of Lenders pursuant to, and as contemplated by, this Section 3.04, each Borrower hereby irrevocably authorizes Holdings to take all necessary action, in the name of such Borrower, as described above in this Section 3.04 in order to effect the replacement of the respective Lender or Lenders in accordance with the preceding provisions of this Section 3.04.

3.05.    Inability to Determine Rates.  If the Administrative Agent determines in good faith that for any reason (a) Dollars deposits are not being offered to, as regards to LIBOR Rate, banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Loan, (b) adequate and reasonable means do not exist for determining the LIBOR Rate for any requested Interest Period, or (c) that the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify each Lender and the Lead Borrower.  Thereafter, the obligation of the Lenders to make or maintain LIBOR Rate Loans shall be suspended, and such Loans shall instead be converted to a rate accruing interest at the Federal Funds Rate plus the Applicable Margin plus 1.00% per annum.

Section 4.    Administrative Agent's Advisors.  The Administrative Agent, on behalf of itself and the Lenders, shall be entitled to retain (at the direction of the Required Lenders) (either directly or through counsel) any financial advisor, auditor or any other consultant the Required Lenders may deem necessary (collectively, the "Agent's Advisors") to provide advice, analysis and reporting for the benefit of the Administrative Agent and the Lenders.  The Credit Parties and their advisors shall grant access to, and cooperate in all respects with, the Administrative Agent, the Lenders, the Agent's Advisors and any other representatives of the foregoing and provide all information that such parties may reasonably request in a timely manner.  The Borrowers shall promptly pay upon demand all fees and expenses of each Agent's Advisors, and all such fees and expenses shall constitute Obligations and be secured by the Collateral.  The Credit Parties further acknowledge and agree that each Agent's Advisor and each of their Related Parties shall constitute an Indemnitee for purposes of Section 12.07 hereof.

Section 5.    Taxes.

5.01.    Net Payments.

(a)    All payments made by or on account of any Credit Party under any Credit Document shall be made free and clear of, and without deduction or withholding for, any Taxes, except as required by applicable law.  If any Taxes are required to be withheld or deducted from such payments, then the Credit Parties jointly and severally agree that (i) to the extent such deduction or withholding is on account of an Indemnified Tax or Other Tax, the sum payable hereunder shall be increased as necessary so that after making all required deductions or withholding (including deduction or withholdings applicable to additional sums payable under this Section 5.01), the Administrative Agent or Lender (as the case may be) receives an amount

equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent will make such deductions or withholdings, and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.  In addition, the Credit Parties shall timely pay any Other Taxes imposed on them to the relevant Governmental Authority in accordance with applicable law.   The Credit Parties will furnish to the Administrative Agent within 45 days after the date the payment by any of them of any Indemnified Taxes or Other Taxes is due pursuant to applicable law certified copies of Tax receipts evidencing such payment by the applicable Credit Party.  The Credit Parties jointly and severally agree to indemnify and hold harmless the Administrative Agent and each Lender, and reimburse the Administrative Agent and each Lender, within 10 days of written request therefor, for the amount of any Indemnified Taxes paid by the Administrative Agent or such Lender or required to be withheld or deducted in respect of any payment to the Administrative Agent or such Lender under any Credit Document, and any Other Taxes (including any Indemnified Taxes and Other Taxes imposed on or attributable to amounts payable under this Section 5.01), and any reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered by such Administrative Agent or Lender (or by the Administrative Agent on behalf of a Lender) shall be conclusive absent manifest error.

(b)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Lead Borrower and the Administrative Agent, at the time or times reasonably requested by the Lead Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Lead Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or a reduce rate of, withholding Tax.   In addition, each Lender shall deliver to the Lead Borrower and the Administrative Agent, at the time or times reasonably requested by the Lead Borrower or the Administrative Agent, such other documentation prescribed by applicable law or reasonably requested by the Lead Borrower or the Administrative Agent as will enable the Lead Borrower or the Administrative Agent to determine whether such Lender is subject to backup withholding or information reporting requirements.  Each Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documents required below in Section 5.01(c)) expired, obsolete or inaccurate in any respect, deliver promptly to the Lead Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Lead Borrower or the Administrative Agent) or promptly notify the Lead Borrower and the Administrative Agent in writing of its inability to do so.

(c)    Without limiting the generality of the foregoing, (x) each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall, to the extent legally entitled to do so, deliver to the Lead Borrower and the Administrative Agent on or prior to the date on which it becomes a party to this Agreement, (i) two accurate and complete original signed copies of (A) Internal Revenue Service Form W-8BEN or Form W-8BEN-E (or successor form) claiming eligibility for benefits of an income tax treaty to which the United States is a party or (B) Internal Revenue Service Form W-8ECI (or successor form) or (ii)

in the case of a Lender claiming exemption from U.S. federal withholding Tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," a certificate substantially in the form of Exhibit C (any such certificate, a "U.S. Tax Compliance Certificate") and two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E (or successor form); (iii) to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two accurate and complete original signed copies of Internal Revenue Service Form W-8IMY (or successor form) of the Lender, accompanied by Form W-8ECI, Form W-8BEN, Form W-8BEN-E, U.S. Tax Compliance Certificate, Form W-8IMY, and/or any other required information (or successor or other applicable form) from each beneficial owner that would be required under this Section 5.01(c) if such beneficial owner were a Lender (provided that, if the Lender is a partnership for U.S. federal income Tax purposes and one or more direct or indirect partners are claiming the portfolio interest exemption, the U.S. Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)); or (iv) two accurate and complete original signed copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, U.S. federal withholding Tax on any payments to such Lender under the Credit Documents; and (y) each Lender that is a United States person, as defined in Section 7701(a)(30) of the Code, shall, to the extent legally entitled to do so, deliver to the Lead Borrower and the Administrative Agent, on or prior to the date on which it becomes a party to this Agreement, two accurate and complete original signed copies of Internal Revenue Service Form W-9, or any successor form, certifying that such Lender is exempt from United States back-up withholding.  If any payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Lead Borrower and the Administrative Agent, at the time or times reasonably requested by the Lead Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Administrative Agent as may be necessary for the Lead Borrower or the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA and to determine, if necessary, the amount to deduct and withhold from such payment.  Solely for purposes of this Section 5.01(c), "FATCA" shall include any amendment made to FATCA after the Closing Date. The Administrative Agent shall comply with this Section 5.01(c) as if it were a Lender.

(d)    Notwithstanding any other provision of this Section 5.01, a Lender shall not be required to deliver any documentation or form (other than such documentation set forth in Section 5.01(c)(x)(i), 5.01(c)(x)(ii), 5.01(c)(x)(iii), 5.01(c)(y) or the penultimate sentence of Section 5.01(c) if such Lender reasonably believes delivery of such documentation or form would subject it to any material unreimbursed cost or expense or would materially prejudice its legal or commercial position.

(e)    If the Administrative Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Credit Parties or with respect to which a Credit Party has paid additional amounts pursuant to Section 5.01(a), it shall pay to the relevant

Credit Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Credit Party under Section 5.01(a) with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including any Taxes) of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the relevant Credit Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Credit Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 5.01(e), in no event will the Administrative Agent or any Lender be required to pay any amount to any Credit Party pursuant to this Section 5.01(e) to the extent that such payment would place the Administrative Agent or such Lender in a less favorable position (on a net after-Tax basis) than such party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.  Nothing in this Section 5.01(e) shall be construed to obligate the Administrative Agent or any Lender to disclose its Tax returns or any other information regarding its Tax affairs or computations to any Person or otherwise to arrange its Tax affairs in any manner other than as it determines in its sole discretion.

Section 6.    Conditions Precedent to Effectiveness.    The effectiveness of this Agreement, and the obligations of the Lenders to fund any Loans on the Closing Date, including the Roll-Up Loans, and the other obligations of the parties hereto, shall be subject to the prior satisfaction of the following conditions unless waived by the Lenders and the Administrative Agent, as applicable:

6.01.    Loan Agreement; Credit Documents.    On or prior to the Closing Date, each Credit Party, the Administrative Agent and each of the Lenders on the date hereof shall have signed a counterpart of this Agreement and each other Credit Document required to be delivered on the Closing Date (whether the same or different counterparts) and shall have delivered (by electronic transmission or otherwise) the same to the Administrative Agent, and all such Credit Documents shall be in form and substance satisfactory to the Administrative Agent and the Lenders.

6.02.    Officer's Certificate.    The Administrative Agent and GSO shall have received a certificate, dated the Closing Date and signed on behalf of the Lead Borrower (and not in any individual capacity) by a Responsible Officer of the Lead Borrower, certifying on behalf of the Lead Borrower that all of the conditions in Sections 6.20 and 6.25 have been satisfied on such date.

6.03.    Opinions of Counsel.    On the Closing Date, the Administrative Agent and the Required Lenders shall have received from Kirkland & Ellis LLP, an opinion addressed to the Administrative Agent and each of the Lenders and dated the Closing Date in form and substance reasonably satisfactory to the Required Lenders.

6.04.    Intercreditor Agreement.    On the Closing Date, the Intercreditor Agreement shall have been duly executed by parties thereto.

6.05.  Corporate Documents; Proceedings, etc.

(a)  The Administrative Agent and GSO shall have received a certificate from each Credit Party, dated the Closing Date, signed by the Secretary or any Assistant Secretary of such Credit Party, and attested to by a Responsible Officer of such Credit Party, in customary form, together with copies of the certificate or articles of incorporation and by-laws (or equivalent organizational documents), as applicable, of such Credit Party and the resolutions of such Credit Party referred to in such certificate, and each of the foregoing shall be in form and substance reasonably satisfactory to the Required Lenders.

(b)  The Administrative Agent and GSO shall have received good standing certificates and bring down facsimiles, if any, for the Credit Parties which the Administrative Agent or GSO reasonably may have requested, certified by proper governmental authorities from each jurisdiction in which such Credit Party is organized.

6.06.  Initial Availability.  The aggregate amount of New Money Loans borrowed on the Closing Date, if any, shall not exceed the Initial Availability.

6.07.  Projections; Approved Budget.  The Administrative Agent and the Lenders shall have received the Projections and the initial Approved Budget.

6.08.  Bankruptcy Matters.  (a) The Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to the Administrative Agent and the Required Lenders, the Interim Order by no later than two (2) Business Days after the Petition Date, and the Interim Order shall not have been reversed, modified, amended, stayed or vacated without the Required Lenders' prior written consent or subject to any motion for reversal, modification, amendment, appeal, leave to appeal, or stay; (b) the Borrowers shall be in compliance with the Interim Order; (c) the Credit Parties shall have taken all steps reasonably necessary to comply with the Cash Management Order; (d) the Required Lenders shall have received drafts of the "first day" pleadings for the Cases, in each case, in form and substance reasonably satisfactory to the Required Lenders, not later than a reasonable time in advance of the Petition Date for the Administrative Agent's and the applicable Lenders' counsel to review and analyze the same; and (e) all motions, orders (including the "first day" orders) and other documents to be filed with and submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the Required Lenders, and the Bankruptcy Court shall have approved and entered all "first day" orders, including the Cash Management Order.

6.09.  Roll-Up Loans.  The Pre-Petition First Out Loans shall be refinanced in full with the proceeds of the Roll-Up Loans substantially contemporaneously with the effectiveness of this Agreement.

6.10.  Trustee Matters.  No trustee, examiner or other official of the type described in Section 11.01(l)(ix)(A) shall have been appointed.

6.11.  No Material Adverse Effect.  No Material Adverse Effect, other than by virtue of the commencement of, or preparations with regard to, the Cases, shall have occurred.

6.12.  <u>Restructuring Support Agreement</u>.  The Lenders shall have received a fully executed Restructuring Support Agreement, which shall be in form and substance satisfactory in all respects to the Required Lenders.

6.13.  <u>Cash Collateral</u>.  The ABL Agent, the requisite ABL Lenders, the Pre-Petition ABL Agent, and the requisite Pre-Petition ABL Lenders shall have consented to the Credit Parties' use of cash collateral, including the Carve Out, on terms consistent with the Restructuring Support Agreement and otherwise in form and substance satisfactory to the Required Lenders and with the Required Lenders agreement with the ABL Agent on case controls.

6.14.  <u>ABL Exit Financing Commitments</u>.  The Lead Borrower or affiliates thereof shall have received binding commitments in respect of a committed exit financing from the ABL Agent that is in form and substance acceptable to the Required Lenders.

6.15.  <u>Exit Financing Commitments</u>.  PRG or affiliates thereof shall have received Effective Date Debt Financing Commitments (as defined in the Restructuring Support Agreement, herein, the "<u>Exit Financing Commitments</u>") and such commitments, and the terms and provisions in respect of such financing arrangements (including, for the avoidance of doubt, the aggregate principal amount of such financing arrangements and any flex provisions in respect thereof), shall be reasonably satisfactory to the Required Lenders, shall not have been terminated, and shall remain in full force and effect; and no lender in respect of the Exit Financing Commitments shall have terminated, repudiated or denied any portion of its commitments or obligations thereunder.

6.16.  <u>Litigation</u>.  No litigation shall have been commenced, other than the Cases, which could reasonably be expected to have a material adverse impact on any Credit Party, or its business, or its ability to perform any material obligation to repay the Loans, the Pre-Petition Obligations, or the ABL Obligations, or which challenges the validity, legality, enforceability of this Agreement or the rights and powers of any Agent or any Lender hereunder.

6.17.  <u>Reserved</u>.

6.18.  <u>Lien Searches</u>.  The Administrative Agent and GSO shall have received, in respect of each Credit Party, certified copies, each of a recent date, of requests for information or copies (Form UCC 1), or equivalent reports as of a recent date, listing all effective financing statements under the UCC, and other filings and/or registrations that name Holdings, any Borrower or any other Credit Party as debtor, together with copies of such other financing statements that name Holdings, any Borrower or any other Credit Party as debtor (none of which shall cover any of the Collateral except to the extent evidencing Permitted Liens).

6.19.  <u>Fees, etc.</u>  On the Closing Date, the Lead Borrower shall have paid to the Administrative Agent and all other parties entitled thereto (a) all fees required to be paid pursuant to the Agent Fee Letter, (b) all fees required to be paid pursuant to the Fee Letter, and (c) all reasonable and documented out-of-pocket fees and expenses of the Administrative Agent and the Lenders (including reasonable attorneys' fees and expenses) in connection with the

preparation, negotiation and execution of this Agreement to the extent invoiced at least one Business Day prior to the Closing Date.

6.20.    <u>Representation and Warranties</u>.  All representations and warranties made by any Credit Party herein and in any other Credit Document shall be true and correct in all material respects on the Closing Date (in each case, any representation or warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on the Closing Date).

6.21.    <u>Patriot Act</u>.  The Lead Borrower and each other Credit Party shall have provided to the Administrative Agent and the Lenders the documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, in each case, at least five Business Days prior to the Closing Date.

6.22.    <u>Borrowing Notice</u>.  No later than the Closing Date, the Administrative Agent and the Lenders shall have received a Notice of Borrowing meeting the requirements of <u>Section 2.02</u>.

6.23.    [<u>ABL Credit Facility</u>.  The ABL Credit Documents shall have been duly executed and delivered by each party thereto and shall be in form and substance satisfactory to the Lenders.][3]

6.24.    <u>Reserved</u>.

6.25.    <u>No Default</u>.  No Default or Event of Default shall then exist.

6.26.    <u>Closing Date</u>.  The Closing Date shall have occurred on or prior to the date that is two (2) days after the Interim Order Entry Date.

6.27.    <u>Consents and Approvals</u>.  The Borrower shall have obtained all filings, licenses, permits, consents, approvals, authorizations, qualifications or orders of any Governmental Authority and other third parties, domestic or foreign, necessary (including to avoid a conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of this Agreement, and the entry into and performance of the obligations under the other Credit Documents.

6.28.    <u>Security,    Perfection</u>.    All    certificates,    agreements,    registers, acknowledgements, consents or instruments as may be necessary, appropriate or desirable, and all filings, recordations, registrations or other actions required with respect thereto, to perfect the Liens created by the Security Documents shall have been received and/or taken or shall be in an agreed and proper form to be taken concurrent with the occurrence of the Closing Date, as applicable.

---

[3] NTD: To be revised to refer to commitment letter and term sheet if ABL Credit Agreement is not finalized in time for closing.

Section 7.    <u>Conditions Precedent to Full Availability</u>.    The availability of the aggregate amount of the Commitments in excess of the Initial Availability, and the obligations of the Lenders to fund any Loans in excess of the Initial Availability, shall be subject to the prior satisfaction of the following conditions unless waived by the Required Lenders:

7.01.    <u>Borrowing Notice</u>. At least three Business Days prior to such Credit Event, the Administrative Agent (or its counsel) shall have received a Notice of Borrowing meeting the requirements of <u>Section 2.02</u>.

7.02.    <u>Approved Budget</u>.  The Administrative Agent shall have received the most recent Approved Budget and Approved Budget Variance Report due prior to such Credit Event.

7.03.    <u>Representation and Warranties</u>.  All representations and warranties made by any Credit Party herein and in any other Credit Document shall be true and correct in all material respects (except for any representation or warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language, which shall be true and correct) on the date of such Credit Event (except for any representation or warranty which expressly refers to an earlier date, which shall be true and correct as of such date).

7.04.    <u>No Default</u>.  Both before and after giving effect to such Credit Event, no Default or Event of Default shall then exist.

7.05.    <u>Rights of Secured Creditors</u>.    Other than those resulting from the commencement of the Cases, there shall have been no adverse change in the ability of the any Secured Creditor to enforce its rights under this Agreement or any other Credit Document.

7.06.    <u>Order</u>.  The Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to the Administrative Agent and the Required Lenders, the Final Order, which Final Order shall have been entered by no later than thirty (30) days following the Interim Order Entry Date, and shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders, and the Final Order shall not have been vacated, stayed, reversed, modified, or amended without the Required Lenders' consent and shall otherwise be in full force and effect.

7.07.    <u>Compliance With Approved Budget</u>.  The Credit Parties shall be in compliance with the requirements of <u>Section 9.15(b)</u>.

7.08.    <u>Fees, etc.</u>  On the date of such Credit Event, the Lead Borrower shall have paid to the Administrative Agent and all other parties entitled thereto all expenses (including reasonable attorneys' fees and expenses) due and payable by the Lead Borrower to the Administrative Agent and the Lenders on or prior to such date, to the extent invoiced at least one Business Day prior to the date of such Credit Event.

Section 8.    <u>Representations, Warranties and Agreements</u>.  In order to induce the Lenders to enter into this Agreement and to make the Loans, each of Holdings, each Borrower and each other Credit Party, as applicable, make the following representations, warranties and agreements, in each case after giving effect to the execution and delivery of the Credit Documents and the consummation of the transactions contemplated thereby.

8.01.   <u>Organizational Status</u>.  Each of Holdings, the Borrowers and each of their Restricted Subsidiaries (i) is duly organized, validly existing and (to the extent applicable) in good standing under the laws of the jurisdiction of its organization, (ii) has the requisite power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is, to the extent such concepts are applicable under the laws of the relevant jurisdiction, duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to be so qualified which, individually and in the aggregate, have not had, and would not reasonably be expected to have, a Material Adverse Effect.

8.02.   <u>Power and Authority; Enforceability</u>.   Each Credit Party, subject to the entry of the Interim or Final Order, as applicable, has the requisite power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary action to authorize the execution, delivery and performance by it of each of such Credit Documents.  Upon entry by the Bankruptcy Court of the Interim Order or the Final Order, as applicable, each Credit Party has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

8.03.   <u>No Violation</u>.   Neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof subject to the entry of the Interim Order or Final Order, as applicable, (i) will contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or governmental instrumentality, (ii) will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the property or assets of any Credit Party or any of its respective Restricted Subsidiaries pursuant to the terms of, any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party or any of its Restricted Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject (except, in the case of preceding clauses (i) and (ii), other than in the case of any contravention, breach, default and/or conflict, that would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect) or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Credit Party or any of its respective Restricted Subsidiaries.

8.04.   <u>Approvals</u>.  Except to the extent the failure to obtain or make the same would not reasonably be expected to have a Material Adverse Effect, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for (x) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date and (y) filings which are necessary to

perfect the security interests and Liens created under the Security Documents), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to be obtained or made by, or on behalf of, any Credit Party to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party in connection with, the execution, delivery and performance of any Credit Document.

8.05.    Financial Statements; Financial Condition.

(a)    The most recent financial statements delivered pursuant to the Pre-Petition Credit Documents present fairly in all material respects the combined financial position of the Credit Parties at the dates of such balance sheets and the combined results of the operations of the Credit Parties for the periods covered thereby.

(b)    After giving effect to the execution and delivery of the Credit Documents and the other transactions contemplated thereby, there shall be no Material Adverse Effect, and there shall be no change, event or occurrence that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(c)    The Projections have been prepared in good faith and are based on assumptions that were believed by the Credit Parties to be reasonable at the time made and at the time delivered to the Lenders.

8.06.    Litigation.  Except for the Cases, there are no actions, suits or proceedings pending or, to the knowledge of any Credit Party, threatened in writing that either individually or in the aggregate, have had, or would reasonably be expected to have, a Material Adverse Effect.

8.07.    True and Complete Disclosure.

(a)    All information (taken as a whole) furnished by or on behalf of any Credit Party in writing to the Administrative Agent or any Lender (including, without limitation, all such written information contained in the Credit Documents) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein does not, and all other such written information (taken as a whole) hereafter furnished by or on behalf of any Credit Party in writing to the Administrative Agent or any Lender will not, on the date as of which such written information is dated or certified, contain any material misstatement of fact or omit to state any material fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such written information was provided.

(b)    Notwithstanding anything to the contrary in the foregoing clause (a) of this Section 8.07, none of the Credit Parties makes any representation, warranty or covenant with respect to any information consisting of statements, estimates, forecasts and projections (including the Projections) regarding the future performance of the Lead Borrower or any of Holdings' Subsidiaries, or regarding the future condition of the industries in which they operate other than that such information has been (and in the case of such information furnished after the Closing Date, will be) prepared in good faith based upon assumptions believed to be reasonable at the time of preparation thereof.

8.08.    Use of Proceeds; Margin Regulations.

(a)    All proceeds of the Loans incurred on or after the Closing Date will be used by the Borrowers (a) with respect to proceeds of the Roll-Up Loans, exclusively to repay the Pre-Petition First Out Loans, (b) with respect to proceeds of New Money Loans, (i) to pay costs and expenses related to the consummation of the transactions contemplated hereby, including professional fees in connection with the Cases, approved by the Bankruptcy Court in a manner consistent with this Agreement, (ii) to pay any adequate protection payments to the Pre-Petition Lenders on terms consistent with this Agreement, (iii) to provide working capital for the Debtors, and (iv) for other general corporate purposes. The Borrowers shall not be permitted to use the proceeds of the Loans in contravention of the provisions of the Bankruptcy Code or the Order, including any restrictions or limitations on the use of proceeds contained therein.

(b)    No part of any Credit Event (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Loan hereunder nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

(c)    No part of any proceeds of the Loan will be used, directly or indirectly, nor lent, contributed or otherwise made available to any Subsidiary, joint venture partner or other Person, (i) to fund any activities of or business with any Person, or in any Designated Jurisdiction, that, at the time of such Loan, is the subject of any Sanction; or (ii) in any manner that would result in a violation of a Sanction by any Person (including any Secured Creditor or other individual or entity participating in a transaction).

8.09.    Tax Returns and Payments.  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, (i) each Credit Party and each of Holdings' Subsidiaries has timely filed or caused to be timely filed with the appropriate taxing authority all Tax returns, statements, forms and reports for taxes (the "Returns") required to be filed by, or with respect to the income, properties or operations of, any Credit Party and/or any of Holdings' Subsidiaries, (ii) the Returns accurately reflect liability for Taxes of each Credit Party and each of Holdings' Subsidiaries for the periods covered thereby, (iii) each Credit Party and each of Holdings' Subsidiaries have paid all Taxes payable by them, other than those that are being contested in good faith by appropriate proceedings and fully provided for as a reserve on the financial statements of each Credit Party and each of Holdings' Subsidiaries in accordance with U.S. GAAP and (iv) there is no material action, suit, proceeding, investigation, audit or claim now pending or, to the best knowledge of each Credit Party and each of Holdings' Subsidiaries, threatened in writing by any authority regarding any Taxes relating to any Credit Party or any of Holdings' Subsidiaries. As of the Closing Date, neither any Credit Party nor any of Holdings' Subsidiaries has entered into an agreement or waiver that is still in effect or been requested in writing to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of material Taxes by any Credit Party or any of Holdings' Subsidiaries.

8.10.  ERISA.

(a)    Except as would not reasonably be expected to have a Material Adverse Effect, no ERISA Event has occurred or is reasonably expected to occur.  Except as would not have a Material Adverse Effect, each Plan is in material compliance in form and operation with its terms and with the applicable provisions of ERISA, the Code and other applicable law. Except as would not reasonably be expected to have a Material Adverse Effect, each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service or is in the form of a prototype document that is the subject of a favorable opinion letter.  Except as would not have a Material Adverse Effect: (i) no Credit Party or ERISA Affiliate has engaged in a transaction that would be subject to Section 4069 or 4212(c) of ERISA; and (ii) no Plan subject to Title IV of ERISA has been terminated by its plan administrator or the PBGC, and no fact or circumstance exists that could reasonably be expected to cause the PBGC to institute proceedings to terminate a Plan.

(b)    Except as would not have a Material Adverse Effect, with respect to any Foreign Plan: (i) all employer and employee contributions required by law or by the terms of the Foreign Plan to have been made by a Credit Party have been made, or, if applicable, accrued, in accordance with normal accounting practices; and (ii) it has been registered if required to have been registered by a Credit Party and has been maintained in good standing with applicable regulatory authorities.

(c)    The Credit Parties and each ERISA Affiliate have made all contributions to each Plan and Multiemployer Plan required by law to be made by them within the applicable time limits, except where any failure to make such contributions would not have a Material Adverse Effect.

8.11.  The Security Documents.

(a)    Subject to the entry of the Orders, the provisions of the Security Agreement are effective to create in favor of the Collateral Agent for the benefit of the Secured Creditors legal, valid and enforceable security interests and Liens (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law)) in and on all right, title and interest of the Credit Parties in the Collateral specified therein in which a security interest or Lien can be created under applicable law, subject to no other Liens other than Permitted Liens.

(b)    Subject to the entry of the Orders, the provisions of the Pledge Agreement are effective to create in favor of the Collateral Agent for the benefit of the Secured Creditors a legal, valid and enforceable security interest (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law) in all right, title and interest of the Credit Parties in the Pledge Agreement Collateral (as described in the Pledge Agreement), subject to no other Liens other than Permitted Liens.

8.12.    Properties.  All Real Property owned by any Credit Party as of the Closing Date, and the nature of the interest therein, is set forth in Schedule 8.12.  Each Credit Party and each of Holdings' Subsidiaries has good and marketable title or valid leasehold interest in the case of Real Property (unless the failure to have such good and marketable title or valid leasehold interest could not reasonably be expected to result in a Material Adverse Effect), and good and valid title in the case of tangible personal property, to all material tangible properties owned by it, including all material property reflected in the most recent historical balance sheets referred to in Section 8.05(a) (except as sold or otherwise disposed of since the date of such balance sheet in the ordinary course of business or as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.

8.13.    Capitalization.  All outstanding shares of capital stock of the Credit Parties have been duly and validly issued and are fully paid and non-assessable (except as such rights may arise under mandatory provisions of applicable statutory law that may not be waived) and are owned directly by, in the case of any Borrower, Holdings or another Borrower, or, in the case of any other Credit Party, another Credit Party.  None of the Borrowers or any Restricted Subsidiary that is a Credit Party has outstanding any capital stock or other securities convertible into or exchangeable for their capital stock or any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, their capital stock.

8.14.    Subsidiaries.  On and as of the Closing Date, Holdings has no Subsidiaries other than those Subsidiaries listed on Schedule 8.14.  Schedule 8.14 correctly sets forth, as of the Closing Date, the percentage ownership (direct and indirect) of Holdings in each class of capital stock of each of its Subsidiaries and also identifies the direct owner thereof.

8.15.    Compliance with Statutes, OFAC Rules and Regulations; Patriot Act; FCPA.

(a)    Each of the Credit Parties and their Subsidiaries is in compliance with all applicable statutes, regulations and orders of (including any laws relating to embargoed persons or Anti-Terrorism Laws), and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property, except such noncompliance as, individually and in the aggregate, have not had, and would not reasonably be expected to have, a Material Adverse Effect. None of the Credit Parties nor their Subsidiaries or, to the knowledge of any Credit Party or any of their Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is or is owned or controlled by any individual or entity that is currently the subject or target of any Sanction or is located, organized or resident in a Designated Jurisdiction.

(b)    None of the Credit Parties nor their Subsidiaries is in violation of any of the foreign assets control regulations of the Office of Foreign Assets Control ("OFAC") of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or of the Government of Canada or any enabling legislation or executive order relating to any of the foregoing, and none of the Credit Parties or any Subsidiary or any Affiliate thereof is in violation

of and shall not violate any of the country or list based economic and trade sanctions administered and enforced by OFAC.

(c)     The Credit Parties and their Subsidiaries are in compliance in all material respects with the Foreign Corrupt Practices Act, 15 U.S.C.§§ 78dd-1, et seq. ("FCPA"), and any foreign counterpart thereto applicable to such Credit Party or such Subsidiary.  To the knowledge of the Credit Parties, no Credit Party or any Subsidiary has made a payment, offering, or promise to pay, or authorized the payment of, money or anything of value (a) in order to assist in obtaining or retaining business for or with, or directing business to, any foreign official, foreign political party, party official or candidate for foreign political office, (b) to a foreign official, foreign political party or party official or any candidate for foreign political office, and (c) with the intent to induce the recipient to misuse his or her official position to direct business wrongfully to any Credit Party or any Subsidiary or to any other Person, in violation of FCPA.

8.16.     Investment Company Act.  No Credit Party is an "investment company" within the meaning of the Investment Company Act of 1940, as amended, required to be registered as such.

8.17.     [Reserved].

8.18.     Environmental Matters.  Except as set forth in Schedule 8.18 or as has not, individually or in the aggregate, had and would not reasonably be expected to have a Material Adverse Effect:

(a)     Each Credit Party and each Restricted Subsidiary is in compliance with all applicable Environmental Laws and the requirements of any permits required under such Environmental Laws for their current operations.  There are no pending or, to the knowledge of any Credit Party, threatened Environmental Claims against any Credit Party or any Restricted Subsidiary or with respect to their operations at any Real Property currently owned, leased or operated by any Credit Party or any Restricted Subsidiary;

(b)     Hazardous Materials have not been generated, used, treated or stored on, or transported to or from, or Released on or from, or at any Real Property owned, leased or operated by any Credit Party or any Restricted Subsidiary where such generation, use, treatment, storage, transportation or Release (i) has violated or would be reasonably expected to violate any applicable Environmental Law, (ii) would reasonably be expected to give rise to an Environmental Claim against any Credit Party or any Restricted Subsidiary or (iii) would reasonably be expected to give rise to liability under any applicable Environmental Law; and

(c)     No Credit Party nor any Restricted Subsidiary has, with respect to its operations or Real Property, any liability with respect to any Release, environmental contamination by hazardous materials or otherwise arising under Environmental Laws, and there are no facts, circumstances or conditions that are reasonably likely to result in any such liability in the future.

8.19.     Labor Relations.  Except as set forth in Schedule 8.19 and except to the extent the same has not, either individually or in the aggregate, had and would not reasonably be expected to have a Material Adverse Effect, (a) there are no strikes, lockouts, slowdowns or

other labor disputes pending against any Credit Party or any Restricted Subsidiaries or, to the knowledge of each Credit Party, threatened against any Credit Party or any Restricted Subsidiaries, (b) to the knowledge of each Credit Party, there are no questions concerning union representation with respect to any Credit Party or any Restricted Subsidiaries, (c) the hours worked by and payments made to employees of any Credit Party or any Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, provincial, municipal, local, or foreign law dealing with such matters and (d) to the knowledge of each Credit Party, no wage and hour department investigation has been made of any Credit Party or any Restricted Subsidiaries.

8.20.    <u>Intellectual Property</u>.    Each Credit Party and each other Restricted Subsidiary owns or has the right to use all the patents, trademarks, domain names, service marks, trade names, copyrights, inventions, trade secrets, formulas, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases) (collectively, "<u>Intellectual Property</u>"), necessary for the present conduct of its respective business, without any known conflict with the Intellectual Property rights of others, except for such failures to own or have the right to use and/or conflicts as have not had, and would not reasonably be expected to have, a Material Adverse Effect.

8.21.    <u>Legal Names; Type of Organization (and Whether a Registered Organization); Jurisdiction of Organization; etc</u>.    Schedule 8.21 contains for each Credit Party, as of the Closing Date, (i) the exact legal name of such Credit Party, (ii) the type of organization of such Credit Party, (iii) whether or not such Credit Party is a registered organization, (iv) the jurisdiction of organization or incorporation of such Credit Party, (v) such Credit Party's Location, (vi) the organizational identification or company registration number (if any) of such Credit Party and (vii) each trade name used (or previously used) by each Credit Party.    To the extent that such Credit Party does not have an organizational identification number on the Closing Date and later obtains one, such Credit Party shall promptly thereafter notify the Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Collateral Agent to the extent necessary to maintain the security interest of the Collateral Agent in the Collateral intended to be granted pursuant to the Security Documents fully perfected and in full force and effect.

8.22.    <u>Chapter 11 Cases</u>.    The Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (i) the motion seeking approval of the Credit Documents, the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) following the entry of the Interim Order, the hearing for the entry of the Final Order.

8.23.    <u>Foreign Employees of U.S. Persons</u>. No Borrower has any employee (or employees) whose location of employment is in (i) the United Kingdom, Germany or The Netherlands, such that a permanent establishment of such Borrower is created in such country under the laws thereof, or (ii) Canada, in each case unless the Administrative Agent has received notice thereof.

Section 9.    <u>Affirmative Covenants</u>.    The Credit Parties and each other Restricted Subsidiary hereby covenants and agrees that on and after the Closing Date and so long as any

Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than any indemnification obligations arising hereunder which are not then due and payable), shall remain outstanding:

9.01.   Information Covenants.   The Lead Borrower will furnish to the Administrative Agent for distribution to each Lender:

(a)   Monthly Financial Statements. Within 25 days (or, in the case of comparable monthly financial information required to be delivered pursuant to the ABL Credit Agreement, within such shorter time period as may be required by the ABL Credit Agreement) after the last day of each fiscal month, the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such calendar month and the related consolidated statements of income and cash flows for such calendar month and for the elapsed portion of the fiscal year ended with the last day of such calendar month, in each case setting forth comparative figures for the corresponding calendar month in the prior fiscal year and comparable forecasted figures for such calendar month based on the corresponding figures in the most recently delivered Approved Budget, all of which shall be certified by the chief financial officer of Holdings that they fairly present in all material respects in accordance with U.S. GAAP the financial condition of Holdings and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes.

(b)   Notice of Default, Litigation and Material Adverse Effect.  Promptly after any Responsible Officer of Holdings or any of its Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes a Default or an Event of Default or any default or event of default under any Pre-Petition Credit Document or any other debt instrument in excess of the Threshold Amount (except for defaults occasioned by the filing of the Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Credit Party from complying or permits any Credit Party not to comply), (ii) any litigation or governmental investigation or proceeding pending against Holdings or any of its Subsidiaries (x) which, either individually or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect or (y) with respect to any Credit Document, or (iii) any other event, change or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect.

(c)   Other Reports and Filings.  As soon as practicable (and in any case, no later than two (2) Business Days) in advance of filing with the Bankruptcy Court or delivering to the Committee appointed in a Case, if any, or to the U.S. Trustee, as the case may be, the Final Order, all other material proposed orders and pleadings related to (i) the Cases (all of which must be in form and substance satisfactory to the Required Lenders), (ii) the Pre-Petition Term Loan Agreement and this Agreement and the credit facilities contemplated thereby, and/or any Chapter 11 Plan and/or any disclosure statement related thereto (all of which must be in form and substance satisfactory to the Required Lenders), and (iii) substantially simultaneously with the filing with the Bankruptcy Court or delivering to the Committee appointed in any Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of any Credit Party or its Subsidiaries or the Cases that may be filed with the Bankruptcy Court or delivered to the Committee appointed in any Case, if any, or to the U.S. Trustee.  In addition, the Debtors shall

give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given specified in the Interim Order or Final Order, as applicable.

(d)     Environmental Matters.  Promptly after any officer of any Credit Party or any Subsidiary of Holdings obtains actual knowledge thereof, notice of one or more of the following environmental matters to the extent that such environmental matters, either individually or when aggregated with all other such environmental matters, would reasonably be expected to have a Material Adverse Effect:

(i)     any pending or threatened Environmental Claim against any Credit Party or any Subsidiary of Holdings or any Real Property owned, leased or operated by any Credit Party or any Subsidiary of Holdings;

(ii)     any environmental condition or contamination by Hazardous Materials on any Real Property owned, leased or operated by any Credit Party or any Subsidiary of Holdings;

(iii)     the taking of any removal or remedial action in response to the actual or alleged contamination by any Hazardous Material on any Real Property owned, leased or operated by any Credit Party or any of Holdings' Subsidiaries as required by any Environmental Law or any governmental or other administrative agency pursuant thereto; and

(iv)     the receipt of written notice by any Credit Party or any Subsidiary of Holdings from any government or governmental agency under, or pursuant to, CERCLA or other Environmental Law which identifies any Credit Party or any Subsidiary of Holdings as potentially responsible parties for remediation costs, or which otherwise notify any Credit Party or any Subsidiary of Holdings of potential liability under CERCLA or other Environmental Law, due to contamination by any Hazardous Material on any Real Property owned, leased or operated by any Credit Party or any of Holdings' Subsidiaries.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and such Credit Party's or such Subsidiary's response thereto.

(e)     Notices to Holders of Other Indebtedness.  Contemporaneously with the sending or filing thereof, the Lead Borrower will provide to the Administrative Agent for distribution to each of the Lenders, any notices provided to, or received from, holders of (I) Indebtedness pursuant to the ABL Credit Documents, (II) Indebtedness pursuant to the Pre-Petition Credit Documents or (III) other Indebtedness with a principal amount in excess of the Threshold Amount.

(f)     Other Information.   From time to time, such other information or documents (financial or otherwise) with respect to Holdings or any of its Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

9.02.   Books, Records and Inspections.

(a)    Each Credit Party and each Restricted Subsidiary will keep proper books of record and accounts in which full, true and correct entries in conformity with U.S. GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities.

(b)    The Credit Parties will permit the Administrative Agent and/or GSO, subject to reasonable advance notice to, and reasonable coordination with, the Lead Borrower and during normal business hours, to visit and inspect the properties of any Credit Party, at the Borrowers' expense as provided in clause (c) below, inspect, audit and make extracts from any Credit Party's corporate, financial or operating records, and discuss with its officers, employees, agents, advisors and independent accountants (subject to such accountants' customary policies and procedures) such Credit Party's business, financial condition, assets and results of operations (it being understood that a representative of the Lead Borrower is allowed to be present in any discussions with officers, employees, agent, advisors and independent accountants).  The Credit Parties acknowledge that all inspections and Reports are prepared by the Administrative Agent and Lenders for their purposes, and the Credit Parties shall not be entitled to rely upon them.

(c)    Reimburse the Administrative Agent and/or GSO for all reasonable out-of-pocket costs and expenses (other than any legal fees or costs and expenses covered under Section 13.01) of the Administrative Agent in connection with examinations of any Credit Party's books and records or any other financial or Collateral matters as the Administrative Agent or GSO deems appropriate.

9.03.    Maintenance of Property; Insurance.

(a)    Each Credit Party and each Restricted Subsidiary will (i) keep all tangible property necessary to the business of such Credit Party and such Restricted Subsidiary in good working order and condition, ordinary wear and tear, casualty and condemnation excepted, (ii) maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as such Credit Party and such Restricted Subsidiary, and (iii) furnish to the Administrative Agent, upon its request therefor, full information as to the insurance carried.  The provisions of this Section 9.03 shall be deemed supplemental to, but not duplicative of, the provisions of any Security Documents that require the maintenance of insurance.

(b)    Each Credit Party and each Restricted Subsidiary will at all times keep its property insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance (and any other insurance maintained by the Lead Borrower and/or such Restricted Subsidiaries) (i) shall be endorsed to the Collateral Agent's reasonable satisfaction for the benefit of the Collateral Agent (including, without limitation, containing a loss payable clause or endorsement that names the Collateral Agent, on behalf of the Secured Creditors, as the lender loss payee), (ii) if agreed by the insurer (which agreement the applicable Credit Parties shall use commercially reasonable efforts to obtain), shall state that such insurance policies shall not be canceled without at least 30 days' prior written notice thereof (or, with respect to non-payment of premiums, 10 days' prior written notice) by the respective insurer to the Collateral Agent; provided that the requirements of this Section 9.03(b) shall not

apply to (x) insurance policies covering (1) directors and officers, fiduciary or other professional liability, (2) employment practices liability, (3) workers compensation liability, (4) automobile and aviation liability, (5) health, medical, dental and life insurance, and (6) such other insurance policies and programs as the Collateral Agent may approve; and (y) self-insurance programs and (iii) shall be deposited with the Collateral Agent.

(c)    If any Credit Party or any Restricted Subsidiary shall fail to maintain insurance in accordance with this Section 9.03, or any Credit Party or any Restricted Subsidiary shall fail to so endorse and deposit all policies or certificates with respect thereto, after any applicable grace period, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Credit Parties jointly and severally agree to reimburse the Administrative Agent for all reasonable costs and expenses of procuring such insurance.

9.04.    Existence; Franchises.  Each Credit Party and any Restricted Subsidiary will do all things necessary to preserve and keep in full force and effect its existence and, in the case of each Credit Party and such Restricted Subsidiaries, its and their rights, franchises, licenses, permits, and Intellectual Property, in each case to the extent material; provided, however, that nothing in this Section 9.04 shall prevent (i) sales of assets and other transactions by such Credit Parties or such Restricted Subsidiaries in accordance with Section 10.02, (ii) the abandonment by the Credit Parties or such Restricted Subsidiaries of any rights, franchises, licenses, permits, or Intellectual Property that the Lead Borrower reasonably determines are no longer material to the operations of the Lead Borrower and such Restricted Subsidiaries taken as a whole or (iii) the withdrawal by the Lead Borrower or such Restricted Subsidiaries of its qualification as a foreign corporation, partnership, limited liability company or unlimited liability company, as the case may be, in any jurisdiction if such withdrawal would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

9.05.    Compliance with Statutes, etc.  Each Credit Party and any Subsidiary will comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to ERISA, Canadian Employee Benefits Legislation, if applicable, OFAC, FCPA, embargoed persons and Anti-Terrorism Laws), except such noncompliance as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

9.06.    Compliance with Environmental Laws.  Each Credit Party and any Restricted Subsidiary will comply with all Environmental Laws and permits applicable to, or required by, the ownership, lease or use of Real Property now or hereafter owned, leased or operated by a Credit Party or any Restricted Subsidiary, except such noncompliance as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, no Credit Party nor any Restricted Subsidiary will generate, use, treat, store, Release or permit the generation, use, treatment, storage, or Release of Hazardous Materials on any Real Property now or hereafter owned, leased or operated by the any Credit Party or any Restricted Subsidiary, or transport or permit the transportation of Hazardous Materials to or from any such Real Property.

9.07.  <u>ERISA</u>.  As soon as reasonably practicable and, in any event, within ten (10) Business Days after a Responsible Officer of the Lead Borrower knows of the occurrence of an ERISA Event that would or could reasonably be expected to result in a Material Adverse Effect,  the Lead Borrower will deliver to the Administrative Agent a certificate setting forth a reasonable level of detail as to such occurrence and the action, if any, that the Lead Borrower, a Credit Party or an ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given or filed by the Lead Borrower or such Credit Party to or with the PBGC or any other Governmental Authority, and any notices received by the Lead Borrower or such Credit Party from the PBGC or any other Governmental Authority with respect thereto.

9.08.  <u>End of Fiscal Years; Fiscal Quarters</u>.  Each Credit Party and each Restricted Subsidiary will maintain (i) fiscal years to end on December 31 of each year and (ii) fiscal quarters to end on March 31, June 30 and September 30 of each year.

9.09.  <u>Performance of Obligations</u>.  Each Credit Party and any Restricted Subsidiary will perform all of its Post-Petition or other obligations required by the Order of the Bankruptcy Court under the terms of each agreement, contract or instrument by which it is bound (in each case other than those representing Indebtedness), except such non-performances as, individually and in the aggregate, have not had, and would not reasonably be expected to have, a Material Adverse Effect.

9.10.  <u>Payment of Taxes</u>.  Except as such non-performance as individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect, each Credit Party and each Restricted Subsidiary, subject to the Order, will pay and discharge all Taxes imposed after the Petition Date upon it or upon its income or profits or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all material lawful claims incurred after the Petition Date which, if unpaid, might become a Lien or charge upon any properties of any Credit Party or any Restricted Subsidiary not otherwise permitted under <u>Section 10.01(i)</u>; <u>provided</u> that no Credit Party nor any Restricted Subsidiary shall be required to pay any such Tax which is being contested in good faith and by appropriate proceedings if it has maintained adequate reserves with respect thereto in accordance with U.S. GAAP; <u>provided</u>, <u>further</u>, that to the extent the Lead Borrower is a pass-through entity or otherwise is a member of a consolidated, combined, unitary or similar group for Tax purposes, the relevant Taxes may be paid by a Parent Company of the Lead Borrower rather than by the Lead Borrower and/or a Restricted Subsidiary.

9.11.  <u>Use of Proceeds</u>.  Each Borrower will use the proceeds of the Loans only as provided in <u>Section 8.08</u>.

9.12.  <u>Additional Security; Further Assurances</u>.

(a)    Each Credit Party and each Domestic Subsidiary of Holdings will grant to the Collateral Agent for the benefit of the Secured Creditors security interests in such assets and properties of the Lead Borrower and such Domestic Subsidiaries as are not covered by the original Security Documents and as may be reasonably requested from time to time by the Administrative Agent, the Collateral Agent or the Required Lenders (collectively, as may be amended, modified or supplemented from time to time, the "<u>Additional Security Documents</u>").

All such security interests shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders and shall constitute, upon taking all necessary perfection (or the equivalent under applicable law, including the laws of each of the United States, Canada, England, Wales, Germany or The Netherlands, or any political subdivision of the foregoing) action (which the Credit Parties agree to promptly take) valid and enforceable perfected (or the equivalent under applicable law, including the United States, Canada, England, Wales, Germany or The Netherlands, or any political subdivision of the foregoing) security interests (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law)), superior to and prior to the rights of all third Persons and subject to no other Liens except for Permitted Liens.  The Additional Security Documents or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect (subject to exceptions as are reasonably acceptable to the Required Lenders) the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Security Documents and all Taxes, fees and other charges payable in connection therewith shall be paid in full.

(b)     In the event that any Person becomes a Domestic Subsidiary after the Closing Date, the applicable Credit Party that is the parent of such Domestic Subsidiary shall promptly cause such new Domestic Subsidiary (i) to execute a joinder agreement to this Agreement in form and substance satisfactory to the Required Lenders to join as a Guarantor, (ii) cause such new Subsidiary to take all actions necessary or advisable in the opinion of the Required Lenders to cause the Lien created by the applicable Security Documents to be duly perfected to the extent required by such agreement in accordance with all applicable Requirements of Law, and (iii) deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Lenders, of counsel to the Credit Parties reasonably acceptable to the Required Lenders as to such matters set forth in this Section 9.12(b) as the Required Lenders may reasonably request.

(c)     Each Credit Party and each Domestic Subsidiary will, at the expense of the Lead Borrower, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent, promptly, upon the reasonable request of the Administrative Agent or the Collateral Agent, at Lead Borrower's expense, any document or instrument supplemental to or confirmatory of the Security Documents, including opinions of counsel, or otherwise deemed by the Administrative Agent or the Collateral Agent reasonably necessary for the continued validity, perfection (or the equivalent with respect to the laws of Canada, England, Wales, Germany or The Netherlands or any political subdivision of any of the foregoing) and priority of the Liens on the Collateral covered thereby subject to no other Liens except for Permitted Liens or as otherwise permitted by the applicable Security Document.

(d)     To the extent that any Foreign Subsidiary at any time has possession or control of any tangible property or assets owned by another Credit Party, such Foreign Subsidiary shall hold such property or asset as security trustee, in trust for the benefit of such other Credit Party.

9.13.    Post-Closing Actions.  Each Credit Party and each Restricted Subsidiary agrees that it will complete each of the actions described on Schedule 9.13 as soon as commercially reasonable and by no later than the dates set forth in Schedule 9.13 with respect to such action (or such later date as the Required Lenders may agree). The Agents shall be notified by the Required Lenders or a representative thereof upon completion of any such action described on Schedule 9.13 and of any extension of any date set forth in such Schedule relating to the completion of any of the actions described therein.

9.14.    Weekly Status Update Call.    On Wednesday of each week, the Restructuring Officer, and such Responsible Officers of the Credit Parties as the Required Lenders may request, shall use commercially reasonable efforts to have a status update call with the Administrative Agent and the Lenders (except to the extent that the Administrative Agent or any of the Lenders declines to participate in any such call), in which the Restructuring Officer and such Responsible Officers on such call shall discuss the current financial condition of the Debtors, the status of the Cases, and provide such other information as the Required Lenders may request.

9.15.    Approved Budget.

(a)    The use of Loans by the Credit Parties under this Agreement and the other Credit Documents and the use of cash collateral shall be limited in accordance with the Approved Budget (subject to variances permitted under Section 9.15(b)). The Approved Budget shall be updated by the Borrowers on a bi-weekly basis on the Friday following the close of the previously measured 14-day period, and each such update shall be approved in writing by, and shall be in form and substance reasonably satisfactory to, the Required Lenders, and no such update shall be effective as an Approved Budget until so approved and once so approved shall be deemed an Approved Budget. Each updated Approved Budget shall be accompanied by a report of actual cash receipts and disbursements (in the same form as the Approved Budget for ease of comparison), which report shall also be in form and substance satisfactory to the Required Lenders.

(b)    The Borrowers shall not permit (i) for the first two weeks of the Approved Budget (a) total operating disbursements to exceed by more than 20.0% of the aggregate amount budgeted for such two-week test period on a cumulative basis or (b) total receipts to be less than 20.0% of the amount budgeted for such two-week test period on a cumulative basis, and (ii) if required, for the second two weeks of the Approved Budget (a) total operating disbursements to exceed by more than 15.0% of the aggregate amount budgeted for such two-week test period on a cumulative basis or (b) total receipts to be less than 15.0% the budgeted amount for such two-week test period on a cumulative basis. If a new Approved Budget has not been approved by the Required Lenders following the first four-week period encompassed by the Approved Budget (that is, beginning with the Approved Budget Variance Report delivered on the Friday following the fifth week of the Approved Budget), variances shall be tested weekly relative to the four-week period ending the Friday immediately prior to the delivery of an Approved Budget Variance Report. For each such rolling, four-week period of the Approved Budget, the Borrowers shall not permit (a) total operating disbursements to exceed by more than 10% of the aggregate amount budgeted for such rolling, four-week test period on a cumulative basis or (b)

total receipts to be less than 10% of the budgeted amount for such rolling, four-week test period on a cumulative basis.

(c)     The Administrative Agent and the Lenders (i) may assume that the Credit Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) subject to the Carve-Out, shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders are estimates only, and the Credit Parties remain obligated to pay any and all Obligations in accordance with the terms of the Credit Documents and the applicable Order regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget shall constitute an amendment or other modification of any Credit Document or any of the covenants set forth therein.

9.16.   Deposit Accounts.   Schedule 9.16 sets forth all Deposit Accounts (other than Excluded Deposit Accounts) maintained by the Credit Parties, as of the Closing Date. Each Credit Party shall be the sole account holder of each Deposit Account and shall not allow any other Person (other than the Collateral Agent, the ABL Agent and the applicable depositary bank) to have control over, or a perfected Lien (subject to Permitted Liens) on, a Deposit Account or any deposits therein.  None of the Credit Parties shall open or close any Deposit Account without the prior written consent of the Required Lenders.

9.17.   Debtor-In-Possession Obligations.  Each of the Credit Parties will comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Cases, the Bankruptcy Code, the Bankruptcy Rules, the Order and any other order of the Bankruptcy Court.

9.18.   Required Milestones.  Each of the Credit Parties will comply with each of the following covenants (the "Required Milestones"):

(a)     No later than twenty-five (25) days after the Petition Date (or such later date to which the Required Lenders consent in writing in their sole discretion), the Debtors shall have filed with the Bankruptcy Court (i) the Chapter 11 Plan contemplated by the Restructuring Support Agreement together with (ii) their schedules of assets and liabilities and statement of financial affairs related thereto, each in form and substance satisfactory to the Required Lenders in all respects.

(b)     No later than fifty-five (55) days after the Petition Date (or such later date to which the Required Lenders consent in writing in their sole discretion), the bar date for the filing of non-governmental prepetition claims shall have occurred.

(c)     No later than sixty (60) days after the Petition Date (or such later date to which the Required Lenders consent in writing in their sole discretion), the Credit Parties shall obtain an order of the Bankruptcy Court approving the adequacy of the disclosure statement filed pursuant to clause (a)(ii), above, with only such changes thereto as have been approved by the Required Lenders in writing.

(d)    No later than one hundred (100) days after the Petition Date (or such later date to which the Required Lenders consent in writing in their sole discretion), the Chapter 11 Plan filed pursuant to clause (a)(i), above, shall have been confirmed by an order of the Bankruptcy Court, with only such changes thereto as have been approved by the Required Lenders in writing.

(e)    No later than one hundred fifteen (115) days after the Petition Date (or such later date to which the Required Lenders consent in writing in their sole discretion), the effective date of the Chapter 11 Plan filed pursuant to clause (a)(i), above, shall have occurred.

9.19.    <u>Restructuring Support Agreement</u>.  Each of the Credit Parties will comply with all of their obligations under the Restructuring Support Agreement.

9.20.    <u>Adequate Protection Interest Accrual</u>.  Adequate protection in an aggregate amount equal to the interest on the outstanding principal amount of the Pre-Petition Term Loans (after giving effect to the transactions contemplated hereby) shall continue to accrue for the benefit of the Pre-Petition Term Lenders at the rate specified therefor in the Pre-Petition Term Loan Agreement.

9.21.    <u>First Day Orders</u>.  The Credit Parties shall cause all proposed "first day orders" submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects.

Section 10.    <u>Negative Covenants</u>.  The Lead Borrower and any Restricted Subsidiary (and Holdings in the case of such provisions below as are explicitly applicable to it (including as a Credit Party)) hereby covenant and agree that on and after the Closing Date and so long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than any indemnification obligations arising hereunder which are not then due and payable and shall remain unpaid or unsatisfied):

10.01.  <u>Liens</u>.  Each of the Lead Borrower and any Restricted Subsidiary will not create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of the Lead Borrower or any Restricted Subsidiary, whether now owned or hereafter acquired, or sell accounts receivable with recourse to the Lead Borrower or any Restricted Subsidiary); <u>provided</u> that the provisions of this <u>Section 10.01</u> shall not prevent the creation, incurrence, assumption or existence of, or any filing in respect of, the following (Liens described below are herein referred to as "<u>Permitted Liens</u>"):

(i)    Liens for Taxes, assessments or governmental charges or levies not overdue or Liens for Taxes being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with U.S. GAAP (or, for Foreign Subsidiaries, in conformity with generally accepted accounting principles that are applicable in their respective jurisdiction of organization);

(ii)    Liens in respect of property or assets of the Lead Borrower or any Restricted Subsidiary imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, contractors', materialmen's and mechanics' liens and other similar

Liens arising in the ordinary course of business, and which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets, subject to any such Lien for which adequate reserves have been established in accordance with U.S. GAAP;

(iii)    Liens in existence on the Closing Date which are listed, and the property subject thereto described, in Schedule 10.01(iii), plus modifications, renewals, replacements, refinancings and extensions of such Liens, provided that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension, plus accrued and unpaid interest and cash fees and expenses (including premium) incurred in connection with such renewal, replacement or extension and (y) any such renewal, replacement or extension does not encumber any additional assets or properties of the Lead Borrower or any Restricted Subsidiary (other than after-acquired property that is affixed or incorporated into the property encumbered by such Lien on the Closing Date and the proceeds and products thereof) unless such Lien is permitted under the other provisions of this Section 10.01;

(iv)    (x) Liens created pursuant to the Credit Documents, (y) Liens securing Indebtedness and obligations in respect of the ABL Credit Documents and the Pre-Petition Credit Documents, and (z) Liens securing the Adequate Protection Liens and Adequate Protection Superpriority Liens;

(v)    Leases, subleases, licenses or sublicenses (including licenses or sublicenses of Intellectual Property) granted to other Persons not materially interfering with the conduct of the business of the Lead Borrower or any Restricted Subsidiary;

(vi)    survey exceptions, ground leases, easements, rights-of-way, servitudes, sewers, electric lines, drains, telegraph and telephone and cable television lines, gas and oil pipelines, and other similar purposes, or restrictions (including zoning restrictions and building codes), encroachments, protrusions and other similar charges or encumbrances and title deficiencies, which do not materially interfere with the conduct of the business of the Lead Borrower or any Restricted Subsidiary or the value, use and occupancy thereof;

(vii)    Liens arising from precautionary UCC, PPSA or other similar financing statement filings regarding operating leases or consignments entered into in the ordinary course of business and filed prior to the Petition Date;

(viii)    statutory and common law landlords' liens under leases of real property to which the Lead Borrower or any Restricted Subsidiary is a party;

(ix)    Liens (other than Liens imposed under ERISA, or, if applicable, Canadian Employee Benefits Legislation) incurred in the ordinary course of business and in accordance with the Approved Budget in connection with workers' compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, leases and contracts in the ordinary course of business, statutory

obligations, surety, stay, customs or appeal bonds, performance bonds and other obligations of a like nature (including (i) those to secure health, safety and environmental obligations and (ii) those required or requested by any Governmental Authority other than letters of credit) incurred in the ordinary course of business;

(x)    any interest or title of a lessor, sublessor, licensee, sublicensee, licensor or sublicensor under any lease, sublease, license or sublicense agreement (including software and other technology licenses) in the ordinary course of business, in each case entered into prior to the Petition Date in accordance with the Pre-Petition Term Loan Credit Documents;

(xi)    Liens on property subject to Sale-Leaseback Transactions to the extent such Sale-Leaseback Transactions were consummated prior to the Petition Date;

(xii)    any encumbrances or restrictions (including, without limitation, put and call agreements) with respect to the Equity Interests of any Joint Venture expressly permitted by the terms of this Agreement arising prior to the Closing Date and pursuant to the agreement evidencing such Joint Venture;

(xiii)    Liens on Collateral in favor of any Credit Party securing intercompany Indebtedness permitted by Section 10.04; provided that any Liens securing Indebtedness that is required to be subordinated pursuant to Section 10.04 shall be subordinated to the Liens created pursuant to the Security Documents;

(xiv)    Liens on specific items of inventory or other goods (and proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods, and pledges or deposits in the ordinary course of business;

(xv)    Liens on insurance policies and the proceeds thereof (whether accrued or not) and rights or claims against an insurer, in each case securing insurance premium financings permitted under Section 10.04(v);

(xvi)    Liens that may arise on inventory or equipment of the Lead Borrower or any Restricted Subsidiary in the ordinary course of business as a result of such inventory or equipment being located on premises owned by Persons other than the Lead Borrower and any Restricted Subsidiary;

(xvii)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business and provided that any such payments are not overdue by more than thirty (30) days or are being properly contested;

(xviii)    Liens (x) of a collection bank arising under Section 4-210 of the UCC or under similar provision of other applicable law on items in the course of collection, (y) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and (z) in favor of a banking or other financial

institution arising as a matter of law or under customary general terms and conditions encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(xix)    Liens not otherwise permitted under this Section, to the extent attaching to properties and assets with an aggregate fair market value not in excess of, and securing liabilities not in excess of, $100,000 in the aggregate at any time outstanding and on a junior basis to the Obligations;

(xx)    Liens that are contractual rights of set-off (x) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the incurrence or issuance of Indebtedness, (y) relating to pooled deposit or sweep accounts of the Lead Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Lead Borrower or any Restricted Subsidiary or (z) relating to purchase orders and other agreements entered into with customers of the Lead Borrower or any Restricted Subsidiary in the ordinary course of business;

(xxi)    cash deposits with respect to the ABL Credit Agreement and the Pre-Petition ABL Credit Agreement, to the extent permitted by Section 10.07;

(xxii)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Lead Borrower or any Restricted Subsidiary in the ordinary course of business;

(xxiii) Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xxiv) (x) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business of the Lead Borrower and the Restricted Subsidiaries complies, and (y) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Lead Borrower or any Restricted Subsidiary;

(xxv)    deposits made in the ordinary course of business to secure liability to insurance carriers to the extent such Liens encumber only the unearned portion of the insurance premiums financed thereby;

(xxvi)    receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxvii)    adequate protection Liens granted by the Bankruptcy Court in favor of the Pre-Petition Agents and Pre-Petition Lenders, in each case, pursuant to the Order;

(xxviii) so long as no Default has occurred and is continuing at the time of granting such Liens, Liens on cash deposits in an aggregate amount not to exceed $5,000,000 securing any Swap Contracts permitted under the ABL Credit Agreement or Pre-Petition ABL Credit Agreement and entered into prior to the Petition Date; and

(xxix) pledges and deposits given to a public utility or to any municipalities or Governmental Authorities or other public authority when required by the utility, municipality or Governmental Authorities or other public authority in connection with the supply of services or utilities to the Credit Parties.

In connection with the granting of Liens of the type described in this Section 10.01 by the Lead Borrower and any Restricted Subsidiary, the Administrative Agent and the Collateral Agent shall, and shall be authorized to, take any actions deemed appropriate by it in connection therewith (including, without limitation, by executing appropriate lien releases or lien subordination agreements in favor of the holder or holders of such Liens, in either case solely with respect to the item or items of equipment or other assets subject to such Liens).

10.02.  Consolidation, Merger, or Sale of Assets, etc.  Each of the Credit Parties and any Restricted Subsidiary will not wind up, liquidate or dissolve its affairs or enter into any partnership, joint venture, or transaction of merger, amalgamation or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets, or enter into any sale-leaseback transactions of any Person, except that:

(i)      the Credit Parties and their Restricted Subsidiaries may dispose of cash and Cash Equivalents in the ordinary course of business and as may be permitted by the Bankruptcy Court;

(ii)     each of the Lead Borrower and any Restricted Subsidiary may lease (as lessee) or license (as licensee) real or personal property (so long as any such lease or license does not create a Capitalized Lease Obligation);

(iii)    each of the Lead Borrower and any Restricted Subsidiary may grant non-exclusive licenses, non-exclusive sublicenses, leases or subleases to other Persons not materially interfering with the conduct of the business of the Lead Borrower or any Restricted Subsidiary, including of Intellectual Property in the ordinary course of business;

(iv)     each of the Lead Borrower and any Restricted Subsidiary may make sales of inventory and goods held for sale in the ordinary course of business and may lease (as lessor) any rental fleet assets in the ordinary course of business;

(v)      each of the Lead Borrower and any Restricted Subsidiary may sell or otherwise dispose of outdated, obsolete, or worn out property, in each case, in the ordinary course of business and in an aggregate amount not to exceed $2,000,000 in any fiscal year;

(vi)    in order to effect a sale, transfer or disposition otherwise permitted by this Section 10.02, any Restricted Subsidiary may be merged, amalgamated or consolidated with or into another Person, or may be dissolved or liquidated;

(vii)    each of the Lead Borrower and any Restricted Subsidiary may make transfers of property subject to casualty or condemnation proceedings upon the occurrence of the related Recovery Event;

(viii)    each of the Lead Borrower and any Restricted Subsidiary may abandon Intellectual Property rights in the ordinary course of business, which in the reasonable good faith determination of the Lead Borrower or a Restricted Subsidiary are not material to the conduct of the business of the Lead Borrower and any Restricted Subsidiary taken as a whole;

(ix)    each of the Lead Borrower and any Restricted Subsidiary may make dispositions resulting from foreclosures by third parties on properties of the Lead Borrower or any Restricted Subsidiary and acquisitions by the Lead Borrower or any Restricted Subsidiary resulting from foreclosures by such Persons or properties of third parties;

(x)    each of the Lead Borrower and any Restricted Subsidiary may terminate leases and subleases;

(xi)    each of the Lead Borrower and any Restricted Subsidiary may use cash and Cash Equivalents to make payments that are otherwise permitted hereunder;

(xii)    each of the Lead Borrower or any Restricted Subsidiary may sell or otherwise dispose of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such sale or disposition are promptly applied to the purchase price of such replacement property;

(xiii)    sales, dispositions or contributions of property (A) between Credit Parties (other than Holdings), (B) between Restricted Subsidiaries (other than Credit Parties), or (C) by Restricted Subsidiaries that are not Credit Parties to the Credit Parties (other than Holdings) (provided that, in the case of (A), (B), or (C) hereof (1) the portion (if any) of any such sale, disposition or contribution of property made for less than fair market value and (2) any noncash consideration received in exchange for any such sale, disposition or contribution of property, shall in each case constitute an Investment in such Restricted Subsidiary);

(xiv)    dispositions of Investments (including Equity Interests) in Joint Ventures to the extent required prior to the Petition Date by, or made pursuant to customary buy/sell arrangements made prior to the Petition Date between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(xv)    transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that

has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(xvi)    any disposition of any asset between or among the Restricted Subsidiaries as a substantially concurrent interim disposition in connection with a disposition otherwise permitted pursuant to this Section 10.02; and

(xvii)   dispositions permitted by Section 10.03.

To the extent the Required Lenders waive the provisions of this Section 10.02 with respect to the sale of any Collateral, or any Collateral is sold or otherwise transferred as permitted but this Section 10.02 (other than to the Lead Borrower or any other Credit Party), such Collateral shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent and the Collateral Agent shall, and shall be authorized to, take any actions deemed appropriate in order to effect the foregoing.

10.03.   Dividends.  Each of the Lead Borrower and any Restricted Subsidiary will not pay any Dividends with respect to the Lead Borrower or any Restricted Subsidiary, except that:

(i)     any Restricted Subsidiary may pay Dividends or return capital or make distributions not otherwise prohibited hereby and other similar payments with regard to its Equity Interests to the Lead Borrower or to other Restricted Subsidiaries which directly or indirectly own equity therein;

(ii)    to the extent approved by the Bankruptcy Court and in accordance with the Approved Budget, the Lead Borrower or any Restricted Subsidiary may pay cash dividends or other payments to, or make loans or advances to, Holdings, any Parent Company or the equity interest holders thereof in amounts required for any Parent Company or the equity interest holders thereof to pay, in each case without duplication:

(A)     franchise and similar Taxes (and other fees and expenses) required to maintain their corporate existence to the extent such Taxes, fees and expenses are reasonably attributable to the ownership or operations of the Lead Borrower and any Restricted Subsidiary;

(B)     for any taxable period for which the Lead Borrower or such Restricted Subsidiary is treated as a partnership or disregarded entity for U.S. federal and/or applicable state, local or foreign income tax purposes, amounts so that Holdings or any Parent Company (i) may pay any income, franchise or other Taxes payable by it in respect of its ownership of Holdings, Lead Borrower, or such Restricted Subsidiary, as applicable, and (ii) without duplication, may make the Tax distributions required by its operating agreement, excluding in each case, any Tax or required Tax distribution determined by reference to the income or activities of any Person other than  the Subsidiaries of Holdings; and

(C)    general corporate operating and overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties) of any Parent Company to the extent such costs and expenses are reasonably attributable to the ownership or operations of the Lead Borrower and any Restricted Subsidiary; and

(iii)    reasonable and customary indemnities to directors, officers and employees of any Parent Company in the ordinary course of business, to the extent reasonably attributable to the ownership or operation of the Lead Borrower and any Restricted Subsidiary.

10.04. <u>Indebtedness</u>.    The Lead Borrower will not, and will not permit any Restricted Subsidiary to, contract, create, incur, assume or suffer to exist any Indebtedness, except:

(i)    Indebtedness incurred pursuant to (A) this Agreement, (B) the ABL Credit Documents, and (C) to the extent incurred prior to the Petition Date, the Pre-Petition Credit Documents;

(ii)    Indebtedness under Swap Contracts entered into prior to the Closing Date and with respect to other Indebtedness permitted under this <u>Section 10.04</u> so long as the entering into of such Swap Contracts are bona fide hedging activities and are not for speculative purposes;

(iii)    intercompany Indebtedness among the Lead Borrower and any Restricted Subsidiary to the extent permitted by <u>Section 10.05(v)</u>;

(iv)    Indebtedness outstanding on the Closing Date and listed on <u>Schedule 10.04(iv)</u>;

(v)    Indebtedness incurred in the ordinary course of business to finance insurance premiums or take-or-pay obligations contained in supply arrangements;

(vi)    Indebtedness incurred in the ordinary course of business in respect of netting services, overdraft protections, employee credit card programs, automatic clearinghouse arrangements and other similar services in connection with cash management and deposit accounts and Indebtedness in connection with the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, including, in each case, Bank Product Debt;

(vii)    Contingent Obligations for customs, stay, performance, bid, appeal, judgment, replevin and similar bonds and suretyship arrangements, and completion guarantees and other obligations of a like nature, all in the ordinary course of business;

(viii)    Contingent Obligations to insurers required in connection with worker's compensation and other insurance coverage incurred in the ordinary course of business;

(ix)    guarantees made by the Lead Borrower or any Restricted Subsidiary of Indebtedness of the Lead Borrower or any such Restricted Subsidiary permitted to be outstanding under this Section 10.04; provided that such guarantees are permitted by Section 10.05;

(x)    customary Contingent Obligations in connection with sales, other dispositions and leases permitted under Section 10.02 (but not in respect of Indebtedness for borrowed money or Capitalized Lease Obligations) including indemnification obligations with respect to leases, and guarantees of collectability in respect of accounts receivable or notes receivable for up to face value;

(xi)    to the extent the Bankruptcy Court has entered an order approving the incurrence thereof, guarantees of Indebtedness of directors, officers and employees of the Lead Borrower or any Restricted Subsidiary in respect of expenses of such Persons in connection with relocations and other ordinary course of business purposes;

(xii)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds, provided that such Indebtedness is extinguished within two (2) Business Days of its incurrence;

(xiii)    (x) severance, pension and health and welfare retirement benefits or the equivalent thereof to current and former employees of the Lead Borrower or any Restricted Subsidiary incurred in the ordinary course of business and (y) Indebtedness representing deferred compensation or stock-based compensation to employees of the Lead Borrower and the Restricted Subsidiaries;

(xiv)    (x) guarantees made by the Lead Borrower or any Restricted Subsidiary of obligations (not constituting debt for borrowed money) of the Lead Borrower or any Restricted Subsidiary owing to vendors, suppliers and other third parties incurred in the ordinary course of business and (y) Indebtedness of any Credit Party (other than Holdings) as an account party in respect of trade letters of credit issued in the ordinary course of business;

(xv)    Indebtedness arising out of Sale-Leaseback Transactions permitted by Section 10.01(xviii) and consummated prior to the Petition Date;

(xvi)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxx) above.

10.05.    Advances, Investments and Loans.  Each of the Lead Borrower and any Restricted Subsidiary will not, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or hold any cash or Cash Equivalents (each of the foregoing, an "Investment" and, collectively, "Investments" and with the value of each

Investment being measured at the time made and without giving effect to subsequent changes in value or any write-ups, write-downs or write-offs thereof but giving effect to any cash return or cash distributions received by the Lead Borrower and any Restricted Subsidiary with respect thereto), except that the following shall be permitted:

(i)    the Lead Borrower and any Restricted Subsidiary may acquire and hold accounts receivable owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Lead Borrower or such Restricted Subsidiary;

(ii)    the Lead Borrower and any Restricted Subsidiary may acquire and hold cash and Cash Equivalents;

(iii)    the Lead Borrower and any Restricted Subsidiary may hold the Investments held by them on the Closing Date and described on Schedule 10.05(iii), and any modification, replacement, renewal or extension thereof that does not increase the principal amount thereof unless any additional Investments made with respect thereto are permitted under the other provisions of this Section 10.05;

(iv)    the Lead Borrower and any Restricted Subsidiary may acquire and hold Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers, and Investments received in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(v)    (a)    the Lead Borrower and any Restricted Subsidiary may make intercompany loans to and other investments in Credit Parties (other than Holdings, unless otherwise permitted by Section 10.03) and (b) any Restricted Subsidiary that is not a Credit Party may make intercompany loans to, and other investments in, any other Restricted Subsidiary that is also not a Credit Party;

(vi)    to the extent the Bankruptcy Court has entered an order approving the incurrence thereof, loans and advances by the Lead Borrower and any Restricted Subsidiary to officers, directors and employees of the Lead Borrower and any Restricted Subsidiary in connection with relocations and other ordinary course of business purposes (including travel and entertainment expenses) shall be permitted;

(vii)    advances of payroll payments to employees of the Lead Borrower and any Restricted Subsidiary in the ordinary course of business and consistent with the Approved Budget;

(viii)    to the extent approved by the Bankruptcy Court, extensions of trade credit may be made in the ordinary course of business (including advances made to distributors consistent with past practice), Investments received in satisfaction or partial satisfaction of previously extended trade credit from financially troubled account debtors, Investments consisting of prepayments to suppliers made in the ordinary course of business and loans or advances made to distributors in the ordinary course of business;

(ix)    to the extent approved by the Bankruptcy Court, Investments in the nature of pledges or deposits with respect to leases or utilities provided to third parties in the ordinary course of business;

(x)    Investments in the ordinary course of business consisting of UCC Article 3 or similar endorsements for collection or deposit;

(xi)    to the extent occurring prior to the Petition Date and to the extent approved by the Bankruptcy Court, the licensing, sublicensing or contribution of intellectual property rights pursuant to arrangements with Persons other than the Lead Borrower and the Restricted Subsidiaries in the ordinary course of business for fair market value, as determined by the Lead Borrower or such Restricted Subsidiary, as the case may be, in good faith; and

(xii)    to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials and equipment in the ordinary course of business.

10.06. <u>Transactions with Affiliates</u>.    Each of the Lead Borrower and any Restricted Subsidiary will not enter into any transaction or series of related transactions with any Affiliate of the Lead Borrower or any of Holdings' Subsidiaries, other than on terms and conditions not less favorable to the Lead Borrower or such Restricted Subsidiary as would reasonably be obtained by the Lead Borrower or such Restricted Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except:

(i)    Dividends may be paid to the extent provided in <u>Section 10.03</u>;

(ii)    to the extent the Bankruptcy Court has entered an order approving the payment thereof, customary fees and indemnification (including the reimbursement of out-of-pocket expenses) may be paid to directors of Holdings, the Lead Borrower and any Restricted Subsidiary (and, to the extent directly attributable to the operations of the Lead Borrower and the other Restricted Subsidiaries, to any other Parent Company); <u>provided</u>, <u>that</u>, no fees (other than reimbursements for reasonable out-of-pocket expenses) may be paid to any such director appointed by Sponsor;

(iii)    to the extent the Bankruptcy Court has entered an order approving the entry into or making thereof, the Lead Borrower and any Restricted Subsidiary may enter into, and may make payments under, employment agreements, employee benefits plans, stock option plans, indemnification provisions, stay bonuses, severance and other similar compensatory arrangements with officers, employees and directors of Holdings, the Lead Borrower and any Restricted Subsidiary in the ordinary course of business;

(iv)    to the extent not otherwise prohibited by this Agreement, transactions between or among the Lead Borrower and any other Restricted Subsidiary shall be permitted (including equity issuances);

(v)    transactions between the Lead Borrower and any Person that is an Affiliate of the Lead Borrower solely due to the fact that a director of such Person is also a director of the Lead Borrower or any Parent Company shall be permitted; <u>provided</u>,

_however_, that such director abstains from voting as a director of the Lead Borrower or such Parent Company, as the case may be, on any matter involving such other Person; and

(vi)    the Lead Borrower and any Restricted Subsidiary may make modifications to Indebtedness permitted by Section 10.07(a).

Notwithstanding anything to the contrary contained above in this Section 10.06, in no event shall the Lead Borrower or any Restricted Subsidiary pay any management, consulting or similar fee to the Sponsor.

10.07.  Limitations on Modification of Pre-Petition Credit Documents, Organizational Documents, etc.  Each of the Lead Borrower and any Restricted Subsidiary will not:

(a)    amend or modify, or permit the amendment or modification of any provision of, (w) the Pre-Petition Credit Documents or the ABL Credit Documents, except to the extent permitted by the Pre-Petition Intercreditor Agreement, the Intercreditor Agreement, or the Order, as applicable, (x) the Restructuring Support Agreement, or (y) any Indebtedness with a principal amount in excess of the Threshold Amount; or

(b)    except as contemplated by the Restructuring Support Agreement and approved by the Bankruptcy Court, amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent organizational documents), as applicable, or any agreement entered into by it with respect to its Equity Interests, or enter into any new agreement with respect to its Equity Interests.

10.08.  Limitation on Certain Restrictions on Subsidiaries.  Each of the Lead Borrower and any Restricted Subsidiary will not, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any such Restricted Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Lead Borrower or any Restricted Subsidiary, or pay any Indebtedness owed to the Lead Borrower or any Restricted Subsidiary, (b) make loans or advances to the Lead Borrower or any Restricted Subsidiary or (c) transfer any of its properties or assets to the Lead Borrower or any Restricted Subsidiary, except for such encumbrances or restrictions existing under or by reason of:

(i)    applicable law;

(ii)    this Agreement and the other Credit Documents;

(iii)    the Pre-Petition Credit Documents;

(iv)    customary provisions restricting subletting or assignment of any lease governing any leasehold interest of the Lead Borrower or any Restricted Subsidiary;

(v)    customary provisions restricting assignment of any licensing agreement (in which the Lead Borrower or any Restricted Subsidiary is the licensee) or other contract, lease or sublease entered into by the Lead Borrower or any Restricted Subsidiary in the ordinary course of business;

(vi)    encumbrances or restrictions on cash or other deposits or net worth imposed by customers under agreements entered into in the ordinary course of business;

(vii)    restrictions on the transfer of any asset subject to a Lien permitted by Section 10.01;

(viii)    restrictions and conditions imposed by the terms of the documentation governing any Indebtedness of a Restricted Subsidiary of the Lead Borrower that is not a Credit Party, which Indebtedness is permitted by Section 10.04;

(ix)    customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 10.05 and applicable solely to such joint venture; and

(x)    negative pledges and restrictions on Liens in favor of any holder of Indebtedness for borrowed money permitted under Section 10.04 but only if such negative pledge or restriction expressly permits Liens for the benefit of the Administrative Agent and/or the Collateral Agent and the secured parties with respect to the credit facilities established hereunder and the Obligations under the Credit Documents on a senior basis and without a requirement that such holders of such Indebtedness be secured by such Liens securing the Obligations under the Credit Documents equally and ratably or on a junior basis.

10.09.  Business.

(a)    The Lead Borrower will not permit at any time the business activities taken as a whole conducted by the Lead Borrower and any Restricted Subsidiary to be materially different from the business activities taken as a whole conducted by the Lead Borrower and any Restricted Subsidiary on the Closing Date.

(b)    The Credit Parties will not change their (i) accounting policies or reporting practices, except as required by U.S. GAAP, or (ii) fiscal year.

(c)    Holdings will not engage in any business other than its ownership of the capital stock of, and the management of, the Lead Borrower and Holdings' other Subsidiaries and activities incidental thereto; provided that Holdings may engage in those activities that are incidental to (i) the maintenance of its corporate existence in compliance with applicable law, (ii) legal, tax and accounting matters in connection with any of the foregoing or following activities, (iii) the entering into, and performing its obligations under, this Agreement, the Credit Documents, the ABL Credit Agreement, the ABL Credit Documents, the Pre-Petition Credit Documents, and the Sponsor Agreement (as in effect on the Closing Date), (iv) the issuance, sale or repurchase of its Equity Interests in accordance with the Restructuring Support Agreement, (v) the filing of registration statements, and compliance with applicable reporting and other

obligations, under federal, state or other securities laws, (vi) the performance of obligations under and compliance with its certificate of incorporation and by-laws, or any applicable law, ordinance, regulation, rule, order, judgment, decree or permit, including, without limitation, as a result of or in connection with the activities of Holdings' Subsidiaries, (x) the incurrence and payment of its operating and business expenses and any taxes for which it may be liable (including reimbursement to Affiliates for such expenses paid on its behalf), in each case in accordance with the Approved Budget, and (xi) the making of loans to or other Investments in, or incurrence of Indebtedness from, the Borrowers as and to the extent permitted by this Agreement.

10.10. <u>Negative Pledges</u>.    Each of the Lead Borrower and any Restricted Subsidiary shall not agree or covenant with any Person to restrict in any way its ability to grant any Lien on its assets in favor of the Lenders, except that this <u>Section 10.10</u> shall not apply to:

(i)    any covenants contained in this Agreement, the ABL Credit Agreement, or any other Credit Documents or that exist on the Closing Date;

(ii)    covenants contained in the Pre-Petition Credit Documents as in effect on the Closing Date;

(iii)    customary provisions in leases, subleases, licenses or sublicenses and other contracts restricting the right of assignment thereof;

(iv)    customary provisions in joint venture agreements and other similar agreements applicable to joint ventures;

(v)    restrictions imposed by law;

(vi)    licenses or contracts which, by the terms of such licenses and contracts, prohibit the granting of Liens on the rights contained therein;

(vii)    restrictions on cash (or Permitted Investments) or other deposits imposed by customers under contracts entered into in the ordinary course of business; and

(viii)    customary net worth provisions contained in real property leases entered into by the Credit Parties, so long as the Lead Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Credit Parties to meet their ongoing obligations.

10.11. <u>Foreign Employees of U.S. Persons</u>.    No Borrower shall have any employee (or employees) whose location of employment is in (i) the United Kingdom, Germany or The Netherlands (or any other country in which Eligible Rental Equipment (as defined in the ABL Credit Agreement) is permitted to be returned pursuant to the terms of the ABL Credit Agreement), such that a permanent establishment of such Borrower is created in such country under the laws thereof, or (ii) Canada, in each case unless the Administrative Agent has received notice thereof.

10.12.  <u>Rental Equipment Leases</u>.  Following the Petition Date, each of the Lead Borrower and each Restricted Subsidiary will not create, incur, assume or suffer to exist any operating lease or capital lease with respect to Rental Equipment other than those existing on the Closing Date and set forth on <u>Schedule 10.12</u>.

10.13.  <u>Prepayment of Other Debt</u>.  Other than pursuant to an order of the Bankruptcy Court (including the Order) and in accordance with the Approved Budget, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity, other than (a) the Obligations, (b) the Pre-Petition First Out Loans for the purpose of refinancing such Pre-Petition First Out Loans pursuant to the "roll-up" in accordance with the terms of this Agreement and the Order, and (c) any payments in respect of accrued payroll and related expenses as of the Petition Date in accordance with the Approved Budget.

10.14.  <u>Reclamation Claims</u>.  Without the prior written consent of the Required Lenders, enter into any agreement to return any of the Collateral to any of its creditors for application against any Pre-Petition Obligations, Pre-Petition trade payables or other Pre-Petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Obligations, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise.

10.15.  <u>Insolvency Proceeding Claims</u>.  Incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claims of the Administrative Agent and the Lenders against the Debtors, except for the ABL Obligations, the Pre-Petition ABL Obligations, and as set forth in the applicable Order.

10.16.  <u>Bankruptcy Actions</u>.  Seek, consent to, or permit to, exist, without the prior written consent of the Required Lenders, any order granting authority to take any action that is prohibited by the terms of this Agreement or the other Credit Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Credit Documents.

10.17.  <u>Right of Subrogation</u>.  Assert any right of subrogation or contribution against any Credit Party or Subsidiary.

10.18.  <u>Restructuring Matters.</u>  Notwithstanding anything contained herein to the contrary, each of the Lead Borrower and each Restricted Subsidiary will not:

(a)     amend or modify, or file a pleading seeking authority to amend or modify, the Credit Documents in a manner that is materially inconsistent with the Restructuring Support Agreement;

(b)     subject to applicable law and the limitations set forth in Section 10(b) of the Restructuring Support Agreement, solicit or induce from any Person any proposal, offer, bid, term sheet, or discussion with respect to a new money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange,

business combination, or similar transaction involving any of the Debtors or the Indebtedness, Equity Interests, or other interests in any of the Debtors that is an alternative to the transactions set forth in the Restructuring Support Agreement other than an alternate, standalone plan supported by the Debtors and the Supporting Term Loan Lenders (as defined in the Restructuring Support Agreement);

(c)    notwithstanding any other provision herein to the contrary, take any of the following actions with respect to the Credit Parties' business:

(i)    make or commit to make any Capital Expenditure with respect to the Credit Parties' business other than as contemplated by the Approved Budget as in effect on the Effective Date, or as modified from time to time in accordance with the Restructuring Support Agreement, or fail to make any Capital Expenditures in line with such Approved Budget other than any variances therefrom that do not, in the aggregate, exceed 5% of such aggregate budgeted amount from and after the Effective Date for the duration of the Cases;

(ii)    other than as contemplated by the Approved Budget, enter into sales agreements or any Contract for or relating to the Credit Parties' business with annual payments in excess of $250,000;

(iii)    other than as contemplated by the Approved Budget, sell or otherwise dispose of any assets, other than dispositions of Inventory and obsolete or damaged assets or assets that have low utilization in the ordinary course of business (including assets disposed of through the "used asset sale" program) that do not exceed $500,000 in the aggregate;

(iv)    grant or voluntarily create any Lien other than (w) adequate protection liens of the Pre-Petition ABL Lenders, (x) adequate protection liens of the Pre-Petition Term Agent or the Pre-Petition Term Lenders, (y) Liens of any Lender or any Agent, or (z) Liens that may arise by operation of law or that will be discharged prior to the Effective Date or otherwise by operation of the Order confirming a Chapter 11 Plan;

(v)    other than in the ordinary course of business, (x) grant any licenses or other rights to or under any Intellectual Property of the Credit Parties, which, for the avoidance of doubt, does not include the grant of an exclusive license therefor or (y) acquire, abandon, permit to lapse, or otherwise dispose of any material Intellectual Property;

(vi)    except in accordance with the Approved Budget, any Bankruptcy Court approved KEIP, or KERP, applicable law or existing written agreements, (t) grant to any employee any increase in salary, a bonus, or other compensation or benefits in excess of $10,000 or grant or announce any incentive equity or equity-based awards, (u) grant to any employee any increase in severance or termination pay, (v) enter into any employment, bonus, retirement, consulting, severance, or termination agreement with any employee or increase employee (1099 or W-2) costs, in each case in excess of $100,000, (w) hire any new employee who will earn an annual salary in excess of $100,000, (x)

establish, adopt, enter into or amend in any respect or increase benefits under any benefit plan, (y) accelerate any rights or benefits under any benefit plan or (z) agree to pay to any employee any pension, retirement allowance, or other employee benefit not required by any existing benefit plan as in effect on the date hereof;

(vii)    terminate, amend, modify, reject, or permit to lapse or expire, or otherwise waive any rights under, any VER Leased Real Property or any VER Material Contract (each as defined in the Restructuring Support Agreement), or enter into any Material Contract;

(viii)    other than any critical vendor payment authorized through the Credit Parties' "first day" motions not to exceed $200,000, waive, release, assign, settle, or compromise any material claim, litigation, or arbitration relating to the Credit Parties' business (other than claims related to sales, use and VAT taxes) in excess of $200,000 individually or $1,000,000 in the aggregate, to the extent that such waiver, release, assignment, settlement, or compromise (x) imposes any binding obligation or restriction, whether contingent or realized, on the business, or (y) waives or releases any material rights or claims;

(ix)    except in accordance with the Approved Budget, any KEIP or KERP agreement approved by the Bankruptcy Court, applicable law or existing written agreements, institute any new grant pursuant to an existing, or increase (including any increase in coverage) any existing, profit-sharing, bonus, incentive, deferred compensation, severance, insurance, pension, retirement, medical, hospital, disability, welfare, or other benefit or compensation plan, program, policy, contract, agreement, or arrangement with respect to current or former directors, officers, or employees of the Credit Parties;

(x)    (x) amend or waive any performance or vesting criteria or (y) accelerate vesting or exercisability of any compensation payable or benefits to become payable or provided to any current or former director, officer, or employee of the Credit Parties;

(xi)    as described on Debtors' Disclosure Schedule 6(b)(10) to the Restructuring Support Agreement, make loans, advances or payments to, or forgive any loans advances or amounts owed by or make or relinquish any guarantees for the benefit of, or investments with, any member of senior management, director, holder of Equity Interests or Affiliates of any Credit Party or any subsidiary, any entity in which such person owns any beneficial interests, or any members of such person's immediate family, or any Affiliates of such person;

(xii)    recognize any union or other labor organization or enter into any collective bargaining or similar Contracts with respect to any current or former employees of the Credit Parties;

(xiii)    except in accordance with any Bankruptcy Court approved KEIP, KERP, or Management Incentive Plan that is consistent with the Restructuring Support Agreement, grant or make any equity awards that may be settled in Equity Interests or

any other securities of the Credit Parties' business, or the value of which is linked directly or indirectly, in whole or in part, to the price or value of any Equity Interests or other securities of the Credit Parties' business;

(xiv)   other than as contemplated in the Approved Budget, implement or announce any material employee layoffs that would be reasonably likely to implicate the Worker Adjustment Retraining and Notification Act of 1988, as amended, or any similar legal requirement;

(xv)   other than as expressly permitted by the Restructuring Support Agreement or the Credit Documents, set aside, make or pay any dividend or other distribution in respect of the Equity Interests of the Credit Parties, or repurchase, redeem or otherwise acquire any outstanding shares of the Equity Interests in the Credit Parties or make any payment to Catterton or its Affiliates;

(xvi)   except pursuant to, or as permitted by, this Agreement, or except in the ordinary course of business in the case of trade or similar obligations, incur any Indebtedness (including any borrowings with the non-Credit Parties), enter into any material guarantee, indemnity, or other agreement to secure any obligation of a third party;

(xvii)   other than as contemplated by the Approved Budget, close any facilities, or conduct any liquidation, auction, or similar sale;

(xviii) (v) make, change, or rescind any material tax election (unless required by law) or change its fiscal year or financial or tax accounting methods, policies, or practices (unless required by law), or settle any material tax action (other than claims related to sales, use and VAT Taxes) , claim, or liability with respect to taxes, (w) prepare and file or cause to be prepared and filed any tax return in a manner inconsistent with past practice (unless required by law), (x) amend any tax return, (y) surrender any claim for a refund of taxes, or (z) consent to (except to the extent specifically requested in writing by a tax authority) or request any extension or waiver of the limitation period applicable to any tax claim;

(xix)   make any change in any method of accounting or accounting policies other than such changes as are required by U.S. GAAP;

(xx)   make any change in the nature, scope or operations of the Credit Parties' business that would be adverse to the Credit Parties' business in any material respect, including by designing, developing, marketing, manufacturing, selling or distributing any products of the Credit Parties' business not otherwise included in the Credit Parties' business prior to the Effective Date;

(xxi)   materially alter the terms of the Credit Parties' business by providing discounts outside of the ordinary course of business or historical practice such that such products or services are provided at a price below their respective variable cost;

(xxii)  suspend or revoke the Restructuring (as defined in the Restructuring Support Agreement); or

(xxiii)  authorize, or commit or agree to take, any of the foregoing actions.

10.19.  <u>Restructuring Officer</u>.  The Borrowers shall not at any time terminate the engagement of the chief restructuring officer or strategic planning officer (the "<u>Restructuring Officer</u>") retained by Borrowers prior to the Closing Date to assist with restructuring the Borrowers' business and analyzing strategic alternatives without the consent of GSO, unless the Restructuring Officer is <u>replaced</u> concurrently with a replacement chief restructuring officer satisfactory to GSO in its sole discretion pursuant to an employment agreement in scope and on terms and conditions satisfactory to GSO.  It is understood that the Restructuring Officer shall be retained by and at the sole cost and expense of the Borrowers and solely on behalf of the Credit Parties at all times.

10.20.  <u>Sale-Leaseback Transactions</u>.    Each of the Lead Borrower and any Restricted Subsidiary will not, following the Petition Date, engage in any Sale-Leaseback Transactions.

Section 11. <u>Events of Default</u>.

11.01.  <u>Events of Default</u>.    Subject to the Order and the terms thereof, but notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion, hearing before, or order of the Bankruptcy Court or any notice to any Credit Party, the occurrence of any of the following specified events shall constitute an "<u>Event of Default</u>" unless otherwise consented to by the Required Lenders, and subject to the Remedies Notice Period:

(a)  <u>Payments</u>.  Any Borrower shall (i) default in the payment when due of any principal of any Loan or any Note or (ii) default, and such default shall continue unremedied for three (3) or more Business Days, in the payment when due of any interest on any Loan or any Note, or any Fees or any other amounts owing hereunder or under any other Credit Document; or

(b)  <u>Representations, etc</u>.  Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate delivered to the Administrative Agent or any Lender pursuant hereto or thereto (including, without limitation, any Approved Budget, Approved Budget Variance Report or Withdrawal Notice) shall prove to be untrue in any material respect on the date as of which made or deemed made; or

(c)  <u>Covenants</u>.  Holdings, the Lead Borrower or any Restricted Subsidiary shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in any of <u>Sections</u>, <u>9.01</u>, <u>9.02(b)</u>, <u>9.04</u>, <u>9.08</u>, <u>9.11</u>, <u>9.12</u>, <u>9.13</u>, <u>9.14</u>, <u>9.15</u>, <u>9.16</u>, <u>9.17</u>, <u>9.18</u> or <u>Section 10</u>, or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or in any other Credit Document (other than those set forth in <u>Sections 11.01(a)</u> and <u>11.01(c)(i)</u>)), and such default shall continue unremedied for a period of fifteen (15) days after written notice thereof to the defaulting party by the Administrative Agent or the Required Lenders; or

(d)    <u>Default Under Other Agreements</u>. Other than as a result of the Cases, (i) Holdings, the Lead Borrower or any Restricted Subsidiary shall default in the payment of principal, interest and other amounts payable in respect of any Indebtedness (other than the Obligations) upon the acceleration of final maturity thereof, or upon final maturity thereof, or (ii) any Indebtedness (other than the Obligations) of Holdings, the Lead Borrower or any Restricted Subsidiary shall be declared to be (or shall become) due and payable, or required to be prepaid other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, provided that (A) it shall not be a Default or an Event of Default under this <u>Section 11.01(d)</u> unless the aggregate principal amount of any Indebtedness as described in preceding clauses (i) or (ii) is at least equal to the Threshold Amount and (B) the preceding clause (ii) shall not apply to Indebtedness that becomes due as a result of a voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is otherwise permitted hereunder; or

(e)    <u>ABL Credit Agreement</u>.  The ABL Lenders cease to fund loans or make other credit extensions under the ABL Credit Agreement or any Default or Event of Default (as defined in the ABL Credit Documents) under the ABL Credit Documents shall occur and be continuing; or

(f)    <u>ERISA</u>.  (a) An ERISA Event has occurred with respect to a Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in a Material Adverse Effect or (b) a Credit Party or any ERISA Affiliate fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan and a Material Adverse Effect would result; or

(g)    <u>Collateral; Invalidity of Credit Documents</u>.  (i) Any Credit Document, or any material provision of any Credit Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder, ceases to be in full force and effect; or any Credit Party contests (or supports any other Person in contesting) that any Credit Document or any provision thereof is not the legal, valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its terms; or any Credit Party denies that it has any or further liability or obligation under any Credit Document, or purports to revoke or rescind any Credit Document; (ii) any challenge by or on behalf of any Credit Party, receiver, trustee, custodian, conservator, monitor, liquidator, rehabilitator, administrator, administrative receiver or similar officer for any Credit Party or for all or any part of its property to the validity of any Credit Document or the applicability or enforceability of any Credit Document strictly in accordance with the subject Credit Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Credit Document or any payment made pursuant thereto, (iii) the Order or any Security Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected or recorded Lien on and security interest in any portion of the Collateral purported to be covered thereby, or such Lien or other security interest shall cease to have the status and priority provided in the Order (other than pursuant to the terms thereof); or (iv) any of the Security Documents shall for any reason cease to be in full force and effect, shall cease to create a valid and perfected (or the equivalent under applicable law with respect to the Collateral located outside of the United States) or recorded Lien on and security interest in any portion of the Collateral purported to be covered thereby, or shall cease to give the Collateral Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby, superior to and

prior to the rights of all other obligations of the Credit Parties (except (x) the obligations of the Credit Parties under the ABL Credit Documents, (y) the obligations of the Credit Parties the Pre-Petition ABL Credit Documents, and (z) "DIP Permitted Prior Liens" (as defined in the Interim Order or Final Order, as applicable), and subject to no other Liens (except as permitted by Section 10.01); or

(h)    Guaranties.  Any Credit Party Guaranty or any provision thereof shall cease to be in full force or effect as to any Credit Party, or any Guarantor or any Person acting for or on behalf of such Credit Party shall deny or disaffirm such Credit Party's obligations under the Credit Party Guaranty to which it is a party or any Guarantor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Credit Party Guaranty to which it is a party; or

(i)    Judgments.  One or more judgments or decrees shall be entered against Holdings, the Lead Borrower or any Restricted Subsidiary involving in the aggregate for Holdings, the Lead Borrower and any Restricted Subsidiary a liability or liabilities (i) in excess of the Threshold Amount (calculated without including any amounts fully covered by a reputable and solvent insurance company with respect to judgments for the payment of money), (ii) that would reasonably be expected to have, a Material Adverse Effect or (iii) that would operate to divest any one or more of the Credit Parties of any material assets or property; unless, in the case of clauses (i) through (iii), such judgments or decrees are subject to the Automatic Stay; or

(j)    Change of Control.  A Change of Control shall occur; or

(i)    Disruption of Business.  The Debtors shall be enjoined from carrying on any material portion of their business or there shall occur a material disruption of the business operations of the Debtors, in each case as conducted prior to the Petition Date; or

(k)    Material Damage or Loss.  There shall occur any material damage to, or loss of, any assets material to the operation of business of the Debtors or in the aggregate in excess of $5,000,000; or

(l)    Chapter 11 Cases.  The occurrence of any of the following in the Cases:

(i)    the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any of the Credit Parties or any Subsidiary (or any direct or indirect parent of any Credit Party), or any Person claiming by or through any Credit Party or any Subsidiary, in the Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Liens upon or affecting any Collateral; (C) except as provided in the Interim Order or Final Order or permitted hereunder, as the case may be, to use cash collateral of the Administrative Agent and the other Secured Parties or any of ABL Agent, ABL Lenders, the Pre-Petition Agents or Pre-Petition Lenders under Section 363(c) of the Bankruptcy Code; or (D) materially adverse to (x) the Administrative Agent and Lenders or their rights and remedies hereunder, under any other Credit Documents, or their

interest in the Collateral, or (y) the Pre-Petition Term Agent and Pre-Petition Term Lenders or their rights under the Pre-Petition Term Loan Agreement or the other Pre-Petition Term Loan Credit Documents or their interest in the Collateral (as defined in the Pre-Petition Term Loan Agreement), in each case, other than as provided in the Order; or

(ii)    (A) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by a Credit Party that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement and the Pre-Petition Term Obligations, in each such instance, to which the Required Lenders do not consent, or any of the Credit Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order, (B) the entry of any order terminating any Credit Party's exclusive right to file a plan of reorganization (or the same shall be requested unless actively contested by the Credit Parties), or (C) the expiration of any Credit Party's exclusive right to file a plan of reorganization; or

(iii)    the entry of an order in any of the Cases confirming a plan of reorganization, without the consent of the Required Lenders, that does not contain a provision for termination of the Commitments and indefeasible repayment in full in cash of all of the Obligations under this Agreement and the Pre-Petition Term Obligations, except as set forth in Section 2.10, on or before the effective date of such plan or plans; or

(iv)    (A) the filing of a motion by a Credit Party for reconsideration with respect to the Interim Order, the Final Order or the Cash Management Order, or (B) any Credit Party or any Subsidiary shall breach or otherwise fail to comply with the Interim Order, the Final Order or the Cash Management Order; or

(v)    the Final Order Entry Date shall not have occurred within forty (40) days after the Petition Date; or

(vi)    any Credit Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Pre-Petition Obligations, Pre-Petition claim, or other Indebtedness or payables that is junior in interest or right to the Liens and mortgages securing the "Collateral" (as defined in the Pre-Petition ABL Credit Agreement) other than payments (A) required by the Bankruptcy Code, (B) permitted under this Agreement, or (C) to the extent authorized or required by one or more "first day" orders or the Order (or other orders in form and substance satisfactory to the Required Lenders), in each case, consistent with the Approved Budget; or

(vii)    the payment of, or application for authority to pay, any material Pre-Petition claim without the Required Lenders' prior written consent unless in accordance with the Approved Budget or as contemplated by the Order; or

(viii)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender or any of

the Collateral or against the Pre-Petition Term Agent, any Pre-Petition Lender or any Collateral (as defined in the Pre-Petition Term Loan Agreement); or

(ix)   (A) the appointment of an interim or permanent trustee in any of the Cases or the appointment of a receiver, interim receiver, or similar official over all or any substantial portion of the assets of any Debtor, or the appointment of an examiner in any of the Cases with enlarged powers to operate or manage the financial affairs, the business, or reorganization of the Credit Parties; or (B) the sale without the Required Lenders' consent of all or substantially all of the Debtors' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Cases or otherwise that does not result in payment in full in cash of all of the Obligations under this Agreement and all Pre-Petition Term Obligations, except as set forth in Section 2.10, at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable, or any of the Credit Parties or any of their Subsidiaries (or any of their direct or indirect parents), shall file, propose, support, or fail to contest in good faith such a sale or the entry of an order in connection therewith; or

(x)   the dismissal of any Case, or the conversion of any Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Credit Party shall file a motion or other pleading seeking the dismissal of the Cases under Section 1112 of the Bankruptcy Code or otherwise or the conversion of the Cases to Chapter 7 of the Bankruptcy Code; or

(xi)   any Credit Party shall file a motion seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the Automatic Stay (A) to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on (including the granting of a deed in lieu of foreclosure and the like) any Collateral having a value in excess of $1,000,000, (B) approving any settlement or other stipulation not approved by the Required Lenders with any secured creditor of any Credit Party providing for payments as adequate protection or otherwise to such secured creditor, or (C) to permit other actions not permitted hereunder that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole); or

(xii)   the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against either the Administrative Agent or any Lender or the Pre-Petition Term Agent or any Pre-Petition Lender by a Credit Party and, as to any suit or action brought by any Person other than a Credit Party or a Subsidiary of a Credit Party, officer or employee of a Credit Party, the continuation thereof without dismissal for sixty (60) days after service thereof on either the Administrative Agent or such Lender or the Pre-Petition Term Agent or any Pre-Petition Lender, that asserts or seeks by or on behalf of a Credit Party, any state of federal environmental protection or health and safety agency, any official committee in any Case or any other party in interest in any of the Cases, a claim or any legal or equitable remedy that would (x) have the effect of invalidating, subordinating or challenging any or all of the Obligations or Liens of the Administrative Agent or any Lender under the Credit Documents or the Pre-Petition Term Obligations or Liens of the Pre-Petition Term Agent or Pre-Petition Term Lenders under the Pre-Petition Term Loan Credit Documents to any other claim, or (y)

have a material adverse effect on the rights and remedies of the Administrative Agent or any Lender or the Pre-Petition Term Agent or any Pre-Petition Lender under any Credit Document or the Pre-Petition Term Agent or Pre-Petition Term Lenders under the Pre-Petition Term Loan Credit Documents or the collectability of all or any portion of the Obligations or the Pre-Petition Term Obligations; or

(xiii)   the entry of an order (A) in the Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Credit Documents or the Pre-Petition Term Obligations owing under the Pre-Petition Term Loan Credit Documents or (B) in the Cases or by any other court of competent jurisdiction materially adversely impacting the rights and interests of any Agent or Lender granted hereunder or under the Order; or

(xiv)   (A) other than the Carve-Out or in respect of the Pre-Petition Term Loan Credit Documents, the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of this Agreement and the other Credit Documents, or as otherwise permitted under the Credit Documents or permitted under the Order, entitled to superpriority administrative expense claim status in any Case pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Administrative Agent and the Secured Parties under this Agreement and the other Credit Documents, or (B) other than the Carve-Out, there shall arise or be granted by the Bankruptcy Court (x) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code or (y) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Credit Documents or in the Order then in effect (but only in the event specifically consented to by the Required Lenders); or

(xv)   (A) the Order shall cease to be in full force and effect or shall cease to create a valid and perfected Lien on the Collateral as contemplated therein or to be in full force and effect, or (B) the Order, the Cash Management Order or any other order of the Bankruptcy Court with respect to the Cases that materially affects this Agreement shall have been reversed or materially modified, amended, supplemented, stayed, vacated; or

(xvi)   if the Final Order does not include a waiver, in form and substance satisfactory to the Required Lenders, of (A) the right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code and (B) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Pre-Petition Term Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Credit Party after the Petition Date; or

(xvii)   an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Credit Parties, including, without limitation, at the request of the ABL Agent, the ABL Lenders, the Pre-Petition ABL Agent, or the Pre-Petition ABL Lenders; or

(xviii) except to the extent described in <u>Section 2.10</u>, an order materially adversely impacting the rights and interests of the Agents and the Lenders or resulting in material impairment of the assets of the Debtors or the Collateral, as determined by the Agents and the Required Lenders, as applicable, in their reasonable discretion, shall have been entered or granted (or requested, unless actively opposed by the Debtors) by the Bankruptcy Court or any other court of competent jurisdiction; or

(xix) any Credit Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations or the Pre-Petition Term Agent or the Pre-Petition Term Lenders with respect to the Pre-Petition Term Obligations, or without the consent of the Administrative Agent, the filing of any motion by the Credit Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any Pre-Petition Agent or Pre-Petition Lender that is inconsistent with the Order; or

(xx) the entry of any order by the Bankruptcy Court granting, or the filing by any Credit Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Order and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's consent or to obtain any financing under Section 364 of the Bankruptcy Code, in each case, other than as permitted by the Credit Documents or the Order; or

(xxi) an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Cases and such order shall not be reversed or vacated within ten (10) days; or

(xxii) without the Administrative Agent's consent, any Credit Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (A) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral (as defined in the Order), whether senior, equal or subordinate to the Administrative Agent's and Lenders' liens and security interests other than as permitted hereunder; or (B) to modify or affect in any material respect any of the rights of the Administrative Agent or the Lenders under the Order, the Credit Documents, and related documents by any plan of reorganization confirmed in the Cases or subsequent order entered in the Cases; or

(xxiii) any Credit Party or any Subsidiary thereof shall file any pleading in support of any matter prohibited by this <u>Section 11.01(l)</u> or any other Person shall do so and such application is not contested in good faith by the Credit Parties and the relief requested is granted in an order that is not stayed pending appeal; or

(xxiv) there shall occur any breach or other failure to comply with the Order; or

(m) <u>Liquidation</u>. The commencement of any winding up or liquidation proceeding affecting the Debtors under any applicable law; or

(n)    Restructuring Support Agreement.  (i) Any event occurs (in any case, that is not waived or cured in accordance with the terms of the Restructuring Support Agreement), the effect of which event is to cause the Restructuring Support Agreement to terminate or (ii) the Restructuring Support Agreement is terminated for any reason.

11.02.  Remedies.  The Debtors' access to Loans and use of cash collateral shall terminate upon five (5) Business Days following the delivery of a written notice (any such notice, a "Termination Declaration") by the Agent, with a copy to Kirkland & Ellis LLP, the United States Trustee, and lead counsel to the Committee (any such five-business-day period of time, the "Remedies Notice Period"), of the occurrence of an Event of Default unless such occurrence is cured by the Debtors or waived by the Agent or the Required Lenders prior to the expiration of the Remedies Notice Period with respect thereto.  Upon and after delivery of the Termination Declaration, the Debtors and each of the Agent and Lenders consent to a hearing on an expedited basis solely to consider whether an Event of Default has occurred.  If an Event of Default has occurred then without further order of the Bankruptcy Court, the Automatic Stay shall be vacated and modified to the extent necessary to permit the Agents, upon the written request of the Required Lenders, to exercise, upon delivery of a Carve Out Trigger Notice (as defined in the Carve-Out), and subject to the Carve-Out, the intercreditor provisions set forth in the Order, and the Intercreditor Agreement, all rights and remedies provided for in any of the Credit Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable) without prejudice to the rights of the Agents, any Lender or the holder of any Note to enforce its claims against any Credit Party:

(a)    declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party;

(b)    terminate the Debtors' use of any cash collateral;

(c)    terminate the Debtors' ability to request withdrawals from the Collateral Account;

(d)    immediately set-off any and all amounts in accounts maintained by the Debtors with the Collateral Agent against the Obligations;

(e)    enforce, as Collateral Agent, all of the Liens and security interests created pursuant to the Security Documents, including, without limitation, disposition of the Collateral for application towards the Obligations owed by the Debtors;

(f)    take any other actions or exercise any other rights or remedies against the Debtors permitted under the Orders, the Credit Documents or applicable law to effect the repayment of the Obligations owed by the Debtors; and

(g)    enforce each Credit Party Guaranty.

11.03.  <u>Application of Funds</u>.  Subject to the intercreditor provisions of the Order and the Intercreditor Agreement, any amounts received on account of the Obligations and any proceeds of Collateral received by the Agents shall be applied in the following order:

<u>First</u>, (i) to the payment of all reasonable costs and out-of-pocket expenses, fees, commissions and taxes in connection with any sale, collection or other realization upon the Collateral including, without limitation, compensation to the Administrative Agent, the Collateral Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent or Collateral Agent in connection therewith and (ii) to the payment of all other fees, expenses, liabilities, indemnities or other amounts due and payable to the Agents pursuant to this Agreement (including, without limitation, <u>Sections 12.07</u> and <u>13.01</u> hereof) or any other Credit Document;

<u>Second</u>, to interest then due and payable on the Loans and any other amounts due with respect to the Loans pursuant to <u>Sections 3.01</u>, <u>3.02</u> and <u>5.01</u>, ratably (in accordance with the respective outstanding principal amounts thereof);

<u>Third</u>, to the principal balance of the Loans, ratably (in accordance with the respective outstanding principal amounts thereof);

<u>Fourth</u>, to all other Obligations *pro rata*; and

<u>Fifth</u>, the balance, if any, to the Person lawfully entitled thereto (including the applicable Credit Party or its successors or assigns).

In the event that any such proceeds are insufficient to pay in full the items described in clauses <u>First</u> through <u>Fifth</u> of this <u>Section 11.03</u>, the Credit Parties shall remain liable for any deficiency.

Section 12.  <u>The Administrative Agent</u>.

12.01.  <u>Appointment and Authorization</u>.

(a)    Each Lender hereby irrevocably designates and appoints Wilmington Trust, National Association as Administrative Agent and Collateral Agent for such Lender each to act as specified herein and in the other Credit Documents.  Each Lender hereby irrevocably authorizes the Administrative Agent and the Collateral Agent to take such action on its behalf under the provisions of this Agreement and each other Credit Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Credit Document, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Credit Document, the Administrative Agent and the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein.  None of the Agents (other than the Administrative Agent and the Collateral Agent) shall have any rights, powers, obligations, liabilities, responsibilities or duties under this Agreement or any of the other Credit Documents, except in its capacity, as applicable, as a Lender.  Notwithstanding anything to the contrary set forth in any Credit Document and notwithstanding that any Agent may be named as the "security

trustee' under any document, the Agents shall not have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Agents. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Credit Documents with reference to the Agents is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)     Each of the Lenders hereby further authorizes the Administrative Agent to enter into the Intercreditor Agreement on behalf of such Lender. Without limiting the generality of the foregoing, each of the Lenders hereby authorizes and directs the Administrative Agent to bind each Lender to the actions required by such Lender under the terms of the Intercreditor Agreement. The Administrative Agent shall take such actions with respect to the amendments to the Intercreditor Agreement or any amendments thereto as instructed in writing by the Required Lenders.

(c)     The provisions of this Article (other than Sections 12.09 and 12.11) are solely for the benefit of the Agents and the Lenders, and the Borrowers shall not have rights as a third party beneficiary of any of such provisions.

12.02.  Delegation of Duties. The Administrative Agent and the Collateral Agent may execute any of their duties under this Agreement or any other Credit Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties. The Administrative Agent and the Collateral Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects, except to the extent a court of competent jurisdiction determines in a final nonappealable judgment that the Administrative Agent or the Collateral Agent acted with gross negligence or willful misconduct in the selection of such agent or attorney.

12.03.  Liability of Agents.

(a)     No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by it under or in connection with this Agreement or any other Credit Document or the transactions contemplated hereby (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent-Related Person shall believe in good faith shall be necessary, under the circumstances as provided in Section 11) or (ii) in the absence of its own gross negligence or willful misconduct as determined in a final nonappealable judgment by a court of competent jurisdiction in connection with its duties expressly set forth herein, (b) be responsible in any manner to any Lender or participant for any recital, statement, representation or warranty made by any Credit Party or any officer thereof, contained herein or in any other Credit Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Credit Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this

Agreement or any other Credit Document, or for any failure of any Credit Party or any other party to any Credit Document to perform its obligations hereunder or thereunder, (c) have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that such Agent-Related Person is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents), provided that each of the Administrative Agent and the Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose such Administrative Agent or Collateral Agent to liability or that is contrary to any Credit Document or applicable law, or (d) except as expressly set forth in the Credit Documents, have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to any Credit Party that is communicated to or obtained by any Agent-Related Person in any capacity.   No Agent-Related Person shall be under any obligation to any Lender or participant to ascertain or to inquire as to the observance or performance of any of the agreements or covenants contained in, or conditions (including the conditions set forth in Article VI) of, this Agreement or any other Credit Document other than to confirm receipt of items expressly required to be delivered to such Agent, or to inspect the properties, books or records of any Credit Party or any Affiliate thereof.

(b)    If the Administrative Agent shall request instructions from the Lenders with respect to any act or action (including failure to act), consent, designation, specification, requirement or approval, notice, request or other communication from, or other direction given or action to or to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent in connection with this Agreement or any Credit Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received written instructions, advice or concurrence from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in any other Credit Document); and the Administrative Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, the Lenders shall not have any right of action whatsoever against the Administrative Agent as a result of its acting or refraining from acting hereunder in either case in accordance with the instructions of the Required Lenders. This provision is intended solely for the benefit of the Administrative Agent and its successors and permitted assigns and is not intended and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

(c)    Neither the Administrative Agent nor the Collateral Agent shall be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

(d)    Neither the Administrative Agent nor the Collateral Agent shall not be responsible or liable for (i) the environmental condition or any contamination of any property

secured by any mortgage or deed of trust or for any diminution in value of any such property as a result of any contamination of the property by any Hazardous Material, or (ii) any claims by or on behalf of the Borrower or Lenders or any other person or entity arising from contamination of the property by any Hazardous Material, and shall have no duty or obligation to assess the environmental condition of any such property or with respect to compliance of any such property under state or federal laws pertaining to the transport, storage, treatment or disposal of Hazardous Materials or regulations, permits or licenses issued under such laws.

(e)      Neither the Administrative Agent nor the Collateral Agent shall be under any obligation to effect or maintain insurance or to renew any policies of insurance or to inquire as to the sufficiency of any policies of insurance carried by the Credit Parties, or to report, or make or file claims or proof of loss for, any loss or damage insured against or that may occur, or to keep itself informed or advised as to the payment of any taxes or assessments, or to require any such payment to be made.

(f)      Neither the Administrative Agent nor the Collateral Agent shall be obligated to acquire possession of or take any action with respect to any property secured by a mortgage or deed of trust, if as a result of such action, the Administrative Agent or Collateral Agent would be considered to hold title to, to be a "mortgagee in possession of", or to be an "owner" or "operator" of such property within the meaning of the CERCLA unless the Administrative Agent has previously determined, based upon a report prepared by a person who regularly conducts environmental audits, that (i) the such property is in compliance with applicable Environmental Laws or, if not, that it has determined that adequate indemnity or other security has been provided to it by the Lenders and (ii) there are not circumstances present at such property relating to the use, management or disposal of any Hazardous Materials for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any federal, state or local law or regulation or that if any such materials are present for which such action could be required, that it has determined that adequate indemnity or other security has been provided to it by the Lenders. Notwithstanding the foregoing, before taking any such action, the Administrative Agent and Collateral Agent may require that a satisfactory indemnity bond or environmental impairment insurance be furnished to it for the payment or reimbursement of all expenses to which it may be put and to protect it against all liability resulting from any claims, judgments, damages, losses, fees, penalties or expenses which may result from such action.

12.04.   <u>Reliance by the Agents</u>.

(a)      Each of the Administrative Agent and the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons. Each of the Administrative Agent and the Collateral Agent shall be entitled to rely upon advice and statements of legal counsel (including counsel to any Credit Party), independent accountants and other experts selected by such Administrative Agent or Collateral Agent and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  Each of the Administrative Agent and

the Collateral Agent shall be fully justified in failing or refusing to take any action under any Credit Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Each of the Administrative Agent and the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Credit Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b)    For purposes of determining compliance with the conditions specified in Section 6, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the Closing Date specifying its objection thereto.

12.05.  Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, or Event of Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Lead Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The Administrative Agent will notify the Lenders of its receipt of any such notice.  The Administrative Agent shall take such action with respect to such Default or Event of Default as may be directed by the Required Lenders in accordance with Section 11.01; provided, however, that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the interest of the Lenders.

12.06.  Credit Decision; Disclosure of Information by the Agents.  Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Credit Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to the Agents that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Credit Parties and their respective Subsidiaries, and all applicable bank or other regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrowers and the other Credit Parties hereunder.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to

make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrowers and the other Credit Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Credit Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

12.07.  Indemnification of the Agents.    Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent (and its officers, directors, employees, agents and attorneys in fact which are acting on behalf of such Agent) (to the extent not reimbursed by or on behalf of any Credit Party and without limiting the obligation of any Credit Party to do so), pro rata, and hold harmless each Agent (and its officers, directors, employees, agents and attorneys in fact which are acting on behalf of such Agent) from and against any and all Indemnified Liabilities incurred by it; provided, however, that no Lender shall be liable for the payment to any Agent (and its officers, directors, employees, agents and attorneys in fact which are acting on behalf of such Agent) of any portion of such Indemnified Liabilities to the extent determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Agent's (and its officers, directors, employees, agents and attorneys in fact which are acting on behalf such Agent) own gross negligence or willful misconduct; provided, however, that no action taken in accordance with the directions of the Required Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section.  Without limitation of the foregoing, each Lender shall reimburse each Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including, without limitation, the reasonable fees and disbursements of counsel) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrowers.  The undertaking in this Section shall survive termination of the Loans, the payment of all other Obligations and the resignation or removal of the Agents.

12.08.  Administrative Agent in Its Individual Capacity.    Wilmington Trust, National Association and its Affiliates may make loans to, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Credit Parties and their respective Affiliates as though Wilmington Trust, National Association was not the Administrative Agent hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, Wilmington Trust, National Association or its Affiliates may receive information regarding any Credit Party or its Affiliates (including information that may be subject to confidentiality obligations in favor of such Credit Party or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them.  With respect to its Loans, Wilmington Trust, National Association shall have the same rights and

powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not an Administrative Agent, and the terms "Lender" and "Lenders" include Wilmington Trust, National Association in its individual capacity.

12.09. <u>Successor Administrative Agent</u>.

(a)     The Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders.   If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor administrative agent for the Lenders. If no successor administrative agent is appointed prior to the effective date of the resignation of the Administrative Agent, the Administrative Agent may appoint a successor administrative agent from among the Lenders; <u>provided</u> that any such successor administrative agent shall be either a domestic office of a commercial bank organized under the laws of the United States or any State thereof, or a United States branch of a bank that is organized under the laws of another jurisdiction, in either case which has a combined capital and surplus of at least $500,000,000.   Upon the acceptance of its appointment as successor administrative agent hereunder, the Person acting as such successor administrative agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent" shall mean such successor administrative agent and the retiring Administrative Agent's appointment, powers and duties as Administrative Agent shall be terminated.   After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this <u>Section 12</u> and <u>Section 13.01</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.   If no successor administrative agent has accepted appointment as Administrative Agent by the date which is 30 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.

(b)     The Required Lenders may at any time by written notice thereof to the Administrative Agent and the Lead Borrower remove the Administrative Agent and appoint a successor.   Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents.   After the removal hereunder and under the other Credit Documents by the retiring Administrative Agent, the provisions of this <u>Section 12</u> and <u>Section 13.01</u> inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.

(c)     Notwithstanding the foregoing, a retiring Administrative Agent shall continue in its obligations to hold collateral security on behalf of the Secured Creditors until such time as a successor Administrative Agent is appointed.   Upon the appointment of such successor Administrative Agent, the retiring Administrative Agent shall deliver all Collateral then in its possession to such successor Agent, and assist such successor Agent in transferring, amending or otherwise updating any public filings made to perfect or otherwise make public the security interests and Liens of the Agents and the other holders of the Obligations.

12.10. <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Agents and their respective agents and counsel and all other amounts due the Lenders and the Agents under <u>Sections 2.04</u> and <u>13.01</u> or any other provision of the Credit Documents) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agents any amounts due for the reasonable compensation, expenses, disbursements and advances of such Agent and its agents and counsel, and any other amounts due the Agents under <u>Sections 2.04</u> and <u>13.01</u> or any other provision of the Credit Documents.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

12.11. <u>Collateral and Guaranty Matters</u>.  The Lenders irrevocably authorize the Administrative Agent and the Collateral Agent, as applicable,

(i)    to release any Lien on any property granted to or held by the Collateral Agent under any Credit Document (A) upon payment in full of all Obligations (other than contingent indemnification obligations and expense reimbursement obligations not yet due and payable), and (B) that is sold or to be sold to a Person that is not a Credit Party as part of or in connection with any sale permitted hereunder or (C) subject to <u>Section 13.12</u>, if approved, authorized or ratified in writing by the Required Lenders; and

(ii)    to release any Guarantor from its obligations under the Credit Party Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Administrative Agent or the Collateral Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's or the Collateral Agent's, as applicable, authority to release or subordinate its interest in particular types or items of property,

or to release any Guarantor from its obligations under the Credit Party Guaranty pursuant to this Section 12.11.

12.12.  Administrative Agent and the Collateral Agent.  The Administrative Agent shall also act as the "collateral agent" under the Credit Documents, and each of the Lenders (in its capacity as a Lender) hereby irrevocably appoint and authorize the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this capacity, the Administrative Agent, as "collateral agent" and any agent, employee or attorney-in-fact appointed by the "collateral agent" pursuant to Section 12.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the "collateral agent", shall be entitled to the benefits of all provisions of this Section 12 and Section 13 as though such agent, employee or attorney-in-fact were the "collateral agent" under the Credit Documents, as if set forth in full herein with respect thereto.

12.13.  Withholding Taxes.  To the extent required by any applicable laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender under any Credit Document an amount equivalent to any applicable withholding Tax.  Without limiting or expanding the provisions of Section 5.01, each Lender shall severally indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all (a) Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so) (b) any Taxes attributable to such Lender's failure to maintain a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Credit Document against any amount due the Administrative Agent under this Section 12.13.  The agreements in this Section 12.13 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.  For the avoidance of doubt, for purposes of this Section 12.13, the term "Lender" shall include any Lender.

12.14.  Quebec Liens (Hypothecs).  Without limiting the powers of the Collateral Agent, for the purposes of holding any hypothec granted to the Attorney (as defined below) pursuant to the laws of the Province of Quebec to secure payment of any bond, debenture or similar title of indebtedness issued by any Credit Party, each of the Secured Creditors hereby irrevocably appoints and authorizes the Collateral Agent and, to the extent necessary, ratifies the appointment and authorization of the Collateral Agent, to act as the person holding the power of attorney (i.e., "fondé de pouvoir") of the creditors as contemplated under Article 2692 of the

Civil Code of Quebec (in such capacity, the "Attorney"), and to enter into, to take and to hold on their behalf, and for their benefit, any hypothec, and to exercise such powers and duties that are conferred upon the Attorney under any related deed of hypothec.  Moreover, without prejudice to such appointment and authorization to act as the person holding the power of attorney as aforesaid, each of the Secured Creditors hereby irrevocably appoints and authorizes the Collateral Agent (in such capacity, the "Quebec Custodian") to act as agent and custodian for and on behalf of the Secured Creditors to hold and be the sole registered holder of any debenture which may be issued under any such deed of hypothec, the whole notwithstanding Section 32 of *An Act respecting the special powers of legal persons* (Quebec) or any other applicable law, and to execute all related documents. Each of the Attorney and the Quebec Custodian shall:  (a) have the sole and exclusive right and authority to exercise, except as may be otherwise specifically restricted by the terms hereof, all rights and remedies given to the Attorney and the Quebec Custodian (as applicable) pursuant to any such deed of hypothec, debenture, debenture pledge agreement and applicable laws, and (b) benefit from and be subject to all provisions hereof with respect to the Collateral Agent mutatis mutandis, including, without limitation, all such provisions with respect to the liability or responsibility to and indemnification by the Secured Creditors.  Any person who becomes a Secured Creditor shall, by its execution of an Assignment and Assumption Agreement, be deemed to have consented to and confirmed:  (i) the Attorney as the person holding the power of attorney as aforesaid and to have ratified, as of the date it becomes a Secured Creditor, all actions taken by the Attorney in such capacity, and (ii) the Quebec Custodian as the agent and custodian as aforesaid and to have ratified, as of the date it becomes a Secured Creditor, all actions taken by the Quebec Custodian in such capacity.  The substitution of the Collateral Agent pursuant to the provisions of this Section 12 also constitute the substitution of the Attorney and the Quebec Custodian.

12.15.  German Security Agreement.

(a)    The Collateral Agent shall hold and administer any Lien governed by German law which is security assigned or otherwise transferred under a non-accessory security right to it as trustee for the benefit of the Secured Creditors; and

(b)    Each Secured Creditor hereby authorizes the Collateral Agent (whether or not by or through employees or agents):

(i)    to exercise such rights, remedies, powers and discretions as are specifically delegated to or conferred upon the Collateral Agent under the German Security Agreements together with such powers and discretions as are reasonably incidental thereto; and

(ii)    to take such action on its behalf as may from time to time be authorized under or in accordance with the German Security Agreements.

(c)    Each of the Secured Creditors hereby exempt the Collateral Agent from any restrictions on representing several persons and self-dealing under any applicable law, in particular from the restrictions set out in § 181 of the German Civil Code, in each case to the extent legally possible to such Secured Creditor, to make use of any authorization granted under this Agreement (including in case of granting any sub-power of attorney) and to perform its duties and obligations as the Collateral Agent hereunder and under the German Security

Agreements. A Secured Creditor which is barred by its constitutional documents or by-laws from granting such exemption shall notify the Collateral Agent accordingly.

(d)    Each Secured Creditor hereby ratifies and approves all acts and declarations previously done by the Collateral Agent on such Secured Creditor's behalf.

Section 13.  Miscellaneous.

13.01.  Payment of Expenses, etc.

(a)    Generally.  The Credit Parties hereby jointly and severally agree to (i) pay all reasonable and documented out-of-pocket costs and expenses of the Agents, GSO, and the Lenders (including, without limitation, the reasonable fees and disbursements of Morgan, Lewis & Bockius LLP, Alston & Bird LLP, Richards, Layton & Finger, PA, and, if reasonably necessary, one local counsel in any relevant jurisdiction (or other reasonably necessary local or specialty counsel)) in connection with the preparation, execution and delivery of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein, the administration hereof and thereof and any amendment, waiver or consent relating hereto or thereto (whether or not effective), or in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings, (ii) pay all accounting, appraisal, consulting and other reasonable and documented fees, out-of-pocket costs and expenses incurred by it in connection with (a) negotiation and preparation of any Credit Documents, including any amendment or other modification thereof; (b) administration of and actions relating to any Collateral, Credit Documents, and transactions contemplated thereby, including any actions taken to perfect or maintain priority of the Collateral Agent's Liens on any Collateral, to maintain any insurance required hereunder or to verify Collateral; and (c) each inspection, audit or appraisal with respect to any Credit Party or Collateral, whether prepared by the Collateral Agent's personnel or a third party.  For the avoidance of doubt and subject to the limitations set forth above with respect to fees for outside counsel, the Borrowers shall reimburse the Agents, GSO and the Lenders for all reasonable and documented legal, accounting, appraisal, consulting, and other fees, costs and expenses incurred in connection with the negotiation, preparation and administration of the Credit Documents, the Interim Order, and the Final Order and incurred in connection with:

(i)    all Extraordinary Expenses;

(ii)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by any Agent, any Lender, the Borrower or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Credit Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case or proceeding commenced by or against any Borrower or any other Person that may be obligated to any Agent by virtue of the Credit Documents; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Loans during the

pendency of one or more Events of Default; provided that no Person shall be entitled to reimbursement under this Section 13.01(a) in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct (as determined by a final non-appealable judgment);

(iii)    any attempt to enforce or prosecute any rights or remedies of any Agent against any or all of the Credit Parties or any other Person that may be obligated to any Agent or any Lender by virtue of any of the Credit Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(iv)    any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(v)    the obtaining of approval of the Credit Documents by the Bankruptcy Court;

(vi)    the preparation and review of pleadings, documents and reports related to the Cases and any Successor Cases, attendance at meetings, court hearings or conferences related to the Cases and any Successor Cases, and general monitoring of the Cases and any Successor Cases;

(vii)    efforts of any Agent to (i) monitor the Loans or any of the other Obligations, (ii) evaluate, observe or assess any of the Credit Parties or their respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral;

(viii)    any lien searches or request for information listing financing statements or liens filed or searches conducted to confirm receipt and due filing of financing statements and security interests in all or a portion of the Collateral; and

(ix)    including, as to each item in this Section 13.01(a), all reasonable attorneys' fees of each Agent (subject to the limitations set forth above) and such Agent's other professional and service providers' fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all reasonable expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 13.01, all of which shall be payable, on demand, by the Borrowers to such Agent.    Without limiting the generality of the foregoing, such reasonable expenses, costs, charges and fees may include: reasonable fees, costs and expenses of accountants, sales consultants, financial advisors, any Agent's Advisor, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; air express charges; and reasonable expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.

(b)  <u>Indemnified Persons</u>.  The Credit Parties hereby jointly and severally agree to pay and hold each Agent and each Lender harmless from and against any and all Other Taxes with respect to the foregoing matters and save each Agent and each Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to such Agent or such Lender) to pay such Other Taxes and indemnify each Agent, GSO, each Lender, and their respective Affiliates and branches, and the officers, directors, employees, agents, and investment advisors of each of the foregoing (each, an "<u>Indemnified Person</u>") from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) (but excluding Taxes other than Taxes that represent liabilities, obligations, losses, damages, penalties, actions, costs, expenses and disbursements arising from a non-Tax claim) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any investigation, litigation or other proceeding (whether or not any Agent, GSO, or any Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party) related to the entering into and/or performance of this Agreement or any other Credit Document or the proceeds of any Loans hereunder or any other transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents, or (b) the actual or alleged presence of Hazardous Materials in the environment relating in any way to any Real Property owned, leased or operated, at any time, by the Lead Borrower or any Restricted Subsidiary; the generation, storage, transportation, handling, Release or threat of Release of Hazardous Materials by the Lead Borrower or any Subsidiaries at any location, whether or not owned, leased or operated by the Lead Borrower or any of Holdings' Subsidiaries; the non-compliance by the Lead Borrower or any Subsidiaries with any Environmental Law (including applicable permits thereunder) applicable to any Real Property; or any Environmental Claim asserted against the Lead Borrower, any Subsidiaries or relating in any way to any Real Property at any time owned, leased or operated by the Lead Borrower or any Subsidiaries, including, in each case, without limitation, the reasonable fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding but excluding in each case any losses, liabilities, claims, damages or expenses (i) to the extent incurred by reason of the gross negligence, bad faith or willful misconduct of the applicable Indemnified Person, any Affiliate or branch of such Indemnified Person or any of their respective directors, officers, employees, representatives, agents, Affiliates, trustees or investment advisors, (ii) to the extent incurred by reason of any material breach of the obligations of such Indemnified Person under this Agreement or the other Credit Documents (in the case of each preceding clauses (i) and (ii), as determined by a court of competent jurisdiction in a final and non-appealable decision) or (iii) that do not involve or arise from an act or omission by the Lead Borrower or Guarantors or any of their respective affiliates and is brought by an Indemnified Person (other than claims against any Agent or any Lead Arranger in its capacity as such or in its fulfilling such role) (collectively, the "<u>Indemnified Liabilities</u>").  To the extent that the undertaking to indemnify, pay or hold harmless any Agent, GSO or any Lender or other Indemnified Person set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Credit Parties shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

(c)    No Agent or any Indemnified Person shall be responsible or liable to any Credit Party or any other Person for (x) any determination made by it pursuant to this Agreement or any other Credit Document in the absence of gross negligence, bad faith or willful misconduct on the part of such Indemnified Person (in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment), (y) any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems or (z) any indirect, special, exemplary, incidental, punitive or consequential damages (including, without limitation, any loss of profits, business or anticipated savings) which may be alleged as a result of this Agreement or any other Credit Document or the financing contemplated hereby.

(d)    <u>Fees and Expenses as Obligations</u>.    All amounts reimbursable by the Borrowers under this <u>Section 13.01</u> and <u>Section 4</u> shall constitute Obligations secured by the Collateral and shall be payable on demand to the Borrowers therefor by the Administrative Agent, subject to the Order.

13.02.    <u>Right of Setoff</u>.  In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special, in whatever currency) (other than accounts used exclusively for payroll, payroll taxes, fiduciary and trust purposes, and employee benefits) and any other Indebtedness (in whatever currency) at any time held or owing by the Administrative Agent or such Lender (including, without limitation, by branches and agencies of the Administrative Agent or such Lender wherever located) to or for the credit or the account of the Lead Borrower or any Subsidiaries against and on account of the Obligations and liabilities of the Credit Parties to the Administrative Agent or such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to <u>Section 13.04(b)</u>, and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Administrative Agent or such Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

13.03.    <u>Notices</u>.

(a)    Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telegraphic, telex, telecopier or cable communication) and mailed, telegraphed, telexed, telecopied, cabled or delivered:  if to any Credit Party, c/o VER Technologies LLC, 757 W. California Ave., Building 4, Glendale, CA 91203, Attention:  Digby Davies, Telephone No.:  [(818) 956-6449]; Facsimile No.:  [(818) 956-6496], with a copy to (which shall not constitute notice) c/o Catterton Partners, 599 West Putnam Avenue, Greenwich, CT 06839, Attention: Matthew Leeds, Telephone No.: (203) 742-5168; Facsimile No.: (203) 629-4903, with a copy to (which shall not constitute notice) c/o Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attention: Jason Kanner, Telephone No.: (212) 446-4902, Facsimile No.: (212) 446-6460; if to any Lender,

at its address specified in writing to the Administrative Agent or as set forth in any Assignment and Assumption Agreement; if to the Administrative Agent, at its Notice Office, Telephone No. 302-636-5048, Telecopier No. 302-636-4145, with a copy to (which shall not constitute notice) c/o Alston & Bird LLP, Bank of America Plaza, 101 South Tryon Street, Suite 4000, Charlotte, NC 28280, Attention: Jason J. Solomon, Telephone No.: (704) 444-1295, Facsimile No.: (704) 444-1795, and with a copy to (which shall not constitute notice) c/o Morgan, Lewis & Bockius LLP; 101 Park Avenue, New York, NY 10178, Attention: Frederick Eisenbiegler, Esq., Telephone No.: (212) 309-6720, Facsimile No.: (212) 309-6001, or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Lead Borrower and the Administrative Agent.   All such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Administrative Agent and the Credit Parties shall not be effective until received by the Administrative Agent or the Lead Borrower, as the case may be.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  Each of the Administrative Agent, the Lead Borrower or Holdings may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

13.04.  Benefit of Agreement; Assignments; Participations, etc.

(a)    This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided however that no Borrower may assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of the Lenders and the Administrative Agent and, provided further that, although any Lender may transfer, assign or grant participation in its rights hereunder with the consent of the Required Lenders, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments hereunder except as provided in Sections 3.04 and 13.04(b)) and the transferee, assignee or participant, as the case may be, shall not constitute a "Lender" hereunder and, provided, further, that no Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post default increase in interest rate) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory repayment of the Loans shall not constitute a change in the terms of such participation), (ii) consent to the assignment or transfer

by any Borrower of any of its rights and obligations under this Agreement, (iii) modify any of the voting percentages set forth in <u>Section 13.12</u> or the underlying definitions, (iv) except as otherwise expressly provided in the Security Documents, release all or substantially all of the Collateral under all the Security Documents supporting the Loans in which such participant is participating or (v) except as otherwise provided in the Credit Documents, release all or substantially all of the value of the Credit Party Guaranty supporting the Loans in which such participant is participating.  In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto).  Each Borrower agrees that each participant shall be entitled to the benefits of <u>Sections 3.01</u> and <u>5.01</u> (subject to the limitations and requirements of such Sections and it being understood that the documentation required under <u>Section 5.01(b)</u> and <u>Section 5.01(c)</u> shall be delivered to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment; <u>provided, however</u>, that a participant shall not be entitled to receive any greater payment under <u>Section 3.01</u> or <u>Section 5.01</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant except to the extent such entitlement to a greater payment results from a change in any requirement described in clause (ii) of the definition of "Requirement of Law" after the sale of the participation takes place.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Lead Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and interest amounts) of each participant's interest in the Loans or other obligations under the Credit Documents (the "<u>Participant Register</u>"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loan, or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(b)     Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its Commitments and related outstanding Obligations hereunder to (i)(A) its parent company and/or any Affiliate of such Lender which is at least 50% owned by such Lender or its parent company or to accounts and clients of GSO or its Affiliates that are, in each case, managed, advised or sub-advised by GSO or its Affiliates, or (B) to one or more other Lenders or any Affiliate of any such other Lender which is at least 50% owned by such other Lender or its parent company (provided that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an Affiliate of such other Lender for the purposes of this subclause (x)(i)(B)) or (ii) in the case of any Lender that is a fund that invests in loans, any other fund that invests in loans and is managed or advised by the same investment advisor of any Lender or by an Affiliate of such investment advisor or (y) assign all or a portion of such Commitments and related outstanding Obligations hereunder to one or more Eligible Transferees (treating any fund that invests in loans and any other fund that

invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement (which Assignment and Assumption Agreement shall contain an acknowledgement and agreement by the respective assignee that, as a Lender, it shall be subject to, and bound by the terms of the Intercreditor Agreement), provided that (in the case of both (x) and (y) above) (i) at such time, Schedule 2.01 shall be deemed modified to reflect the Commitments of such new Lender and of the existing Lenders, (ii) upon the surrender of the relevant Notes by the assigning Lender (or, upon such assigning Lender's indemnifying the Borrowers for any lost Note pursuant to a customary indemnification agreement) new Notes will be issued, at the Borrowers' expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Notes to be in conformity with the requirements of Section 2.03 (with appropriate modifications) to the extent needed to reflect the revised Commitments and/or outstanding Loans, as the case may be, (iii) the consent of the Required Lenders and acknowledgment of the Administrative Agent shall be required in connection with any such assignment, (iv) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $3,500 and (v) no such transfer or assignment shall be effective until recorded by the Administrative Agent on the Register pursuant to Section 13.15.  To the extent of any assignment pursuant to this Section 13.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Loans.  At the time of each assignment pursuant to this Section 13.04(b) to a Person that is not already a Lender hereunder, such assignee shall provide to the Administrative Agent and the Borrowers such Tax forms as are required to be provided under clauses (b) and (c) of Section 5.01.  To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to Section 3.04 or this Section 13.04(b) would, at the time of such assignment, result in increased costs under Section 3.01 or 5.01 from those being charged by the assigning Lender prior to such assignment, then the Borrowers shall not be obligated to pay such increased costs (although the Borrowers, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c)    Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to secure obligations of such Lender, including without limitation, a pledge or assignment to secure obligations to a Federal Reserve Bank in support of borrowings made by such Lender from such Federal Reserve Bank and, with prior notification to the Administrative Agent (but without the consent of the Administrative Agent or the Borrowers), any Lender which is a fund may pledge all or any portion of its Loans and Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be.  No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

(d)    Each Lender acknowledges and agrees to comply with the provisions of Section 13.04 applicable to it as a Lender hereunder.

13.05. <u>No Waiver; Remedies Cumulative</u>.  No failure or delay on the part of the Administrative Agent, the Collateral Agent or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrowers or any other Credit Party and the Administrative Agent, the Collateral Agent or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent or any Lender would otherwise have.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent or any Lender to any other or further action in any circumstances without notice or demand.

13.06. <u>Parallel Debt</u>.

(a)    Each Credit Party hereby irrevocably and unconditionally undertakes (and to the extent necessary undertakes in advance) to pay to the Collateral Agent an amount equal to the aggregate amount due by such Credit Party to any Secured Creditor under this Agreement and any other Credit Document to which it is a party (each payment undertaking under this <u>Section 13.06</u> and the obligations and liabilities resulting therefrom being a "<u>Parallel Debt</u>").

(b)    Each Credit Party and the Collateral Agent agree and acknowledge that the obligations of each Credit Party under this <u>Section 13.06</u> are several, separate and independent  from, and shall not in any way limit or affect, the corresponding obligations of each Credit Party to any Secured Creditor under this Agreement or any other Credit Document to which it is a party (the "<u>Corresponding Debt</u>") nor shall the amounts for which each Credit Party is liable under this <u>Section 13.06</u> be limited or affected in any way by its Corresponding Debt, <u>provided</u> that:

(i)    the Parallel Debt shall be decreased to the extent that the Corresponding Debt has been irrevocably paid or discharged (other than, in each case, contingent obligations);

(ii)    the Corresponding Debt shall be decreased to the extent that the Parallel Debt has been irrevocably paid or discharged;

(iii)    the amount of each Parallel Debt shall at all times be equal to the amount of the relevant Corresponding Debt; and

(iv)    for the avoidance of doubt, each Parallel Debt will become due and payable at the same time and in the same amount when the relevant Corresponding Debt becomes due and payable.

(c)     Each Parallel Debt represents the own debt of each Credit Party, and no Parallel Debt constitutes any several and joint liability of any Credit Party, nor is any Parallel Debt subject to any debt owed by a collective ownership of any Credit Party.

(d)     The security granted, in each case, under the German Security Agreement and Netherlands Security Agreement with respect to the relevant Parallel Debt is granted to the Collateral Agent in its capacity as sole creditor of each Parallel Debt.

(e)     Without limiting or affecting the Collateral Agent's rights against any Credit Party (whether under this Agreement or any other Credit Document), each Credit Party acknowledges that:

(i)     nothing in this Agreement or any Credit Document shall impose any obligation on the Collateral Agent to advance any sum to any Credit Party; and

(ii)     for the purpose of any vote taken under any Credit Document, the Collateral Agent shall not be regarded as having any participation or commitment other than those which it has in its capacity as a Lender.

(f)     The parties hereto acknowledge and confirm that the provisions contained in this Section 13.06 shall not be interpreted so as to increase the maximum total amount of the Obligations.

(g)     Without limiting the generality of any provision of this Agreement, this Section 13.06 shall be binding on the successors and assigns of each Credit Party.

(h)     All monies received or recovered by the Collateral Agent pursuant to this Agreement and all amounts received or recovered by the Collateral Agent from or by the enforcement of any security granted to secure any Parallel Debt shall be applied in accordance with the terms of this Agreement.

(i)     Each Secured Creditor agrees to and acknowledges the existence and terms of the Parallel Debt contained in this Section 13.06.

(j)     In the event of a resignation of the Collateral Agent, or the appointment of a new Collateral Agent, the retiring Collateral Agent shall assign the Parallel Debt owed to it to the successor Collateral Agent.

13.07. Calculations; Computations.  The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with U.S. GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto). Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to Statement of Financial Accounting Standards 141R or ASC 805 (or any other financial accounting standard having a similar result or effect).

13.08. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL; ETC.</u>

(a)    THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN THE RELEVANT SECURITY DOCUMENT, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF, TO THE EXTENT THAT THE SAME ARE NOT MANDATORILY APPLICABLE BY STATUTE AND WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION). ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT (EXCEPT THAT, (X) IN THE CASE OF ANY SECURITY DOCUMENT, PROCEEDINGS MAY ALSO BE BROUGHT BY THE ADMINISTRATIVE AGENT OR COLLATERAL AGENT IN THE STATE IN WHICH THE COLLATERAL IS LOCATED OR ANY OTHER RELEVANT JURISDICTION AND (Y) IN THE CASE OF ANY BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDINGS WITH RESPECT TO ANY CREDIT PARTY, ACTIONS OR PROCEEDINGS RELATED TO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS MAY BE BROUGHT IN SUCH COURT HOLDING SUCH BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDINGS (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE BANKRUPTCY COURT)) MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, EACH OF THE PARTIES HERETO OR THERETO HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH PARTY HERETO HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER IT, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENTS BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER IT. EACH PARTY HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, SUCH PARTY, AS THE CASE MAY BE, AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY OTHER SUCH PARTY IN ANY OTHER JURISDICTION.

(b)    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

(d)    If any action, litigation or proceeding relating to any Obligations or Credit Documents is filed in a court sitting in or applying the laws of California, the court shall, and is hereby directed to, make a general reference pursuant to Cal. Civ. Proc. Code §638 to a referee (who shall be an active or retired judge) to hear and determine all issues in such case (whether fact or law) and to report a statement of decision.  Nothing in this Section shall limit any right of any Secured Creditor to exercise self-help remedies, such as setoff, foreclosure or sale of any Collateral, or to obtain provisional or ancillary remedies from a court of competent jurisdiction before, during or after any judicial reference.  The exercise of a remedy does not waive the right of any party to resort to judicial reference.  At Administrative Agent's or Collateral Agent's option, foreclosure under a mortgage or deed of trust may be accomplished either by exercise of power of sale thereunder or by judicial foreclosure.

13.09.  <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with the Lead Borrower and the Administrative Agent.

13.10.  <u>INTERCREDITOR AGREEMENT</u>.

(a)    EACH LENDER PARTY HERETO UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT IT (AND EACH OF ITS SUCCESSORS AND ASSIGNS) AND EACH OTHER LENDER (AND EACH OF THEIR SUCCESSORS AND ASSIGNS) SHALL BE BOUND BY THE INTERCREDITOR AGREEMENT, WHICH IN CERTAIN CIRCUMSTANCES MAY REQUIRE (AS MORE FULLY PROVIDED THEREIN) THE TAKING OF CERTAIN ACTIONS BY THE LENDERS, INCLUDING THE PURCHASE AND SALE OF PARTICIPATIONS BY VARIOUS LENDERS TO EACH OTHER IN ACCORDANCE WITH THE TERMS THEREOF.

(b)    THE PROVISIONS OF THIS <u>SECTION 13.10</u> ARE NOT INTENDED TO SUMMARIZE OR FULLY DESCRIBE THE PROVISIONS OF THE INTERCREDITOR AGREEMENT.    REFERENCE MUST BE MADE TO THE

INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF.  EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NO AGENT OR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE INTERCREDITOR AGREEMENT.  A COPY OF THE INTERCREDITOR AGREEMENT MAY BE OBTAINED FROM THE ADMINISTRATIVE AGENT.

(c)    THE INTERCREDITOR AGREEMENT IS AN AGREEMENT SOLELY AMONGST THE LENDERS (AND THEIR SUCCESSORS AND ASSIGNS) AND IS NOT AN AGREEMENT TO WHICH HOLDINGS OR ANY OF ITS SUBSIDIARIES IS PARTY.  AS MORE FULLY PROVIDED THEREIN, THE INTERCREDITOR AGREEMENT CAN ONLY BE AMENDED BY THE PARTIES THERETO IN ACCORDANCE WITH THE PROVISIONS THEREOF.

13.11.  Headings Descriptive.    The headings of the several Sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

13.12.  Amendment or Waiver; etc.

(a)    Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the Credit Parties party hereto or thereto, the Administrative Agent and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions) the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders), provided that no such change, waiver, discharge or termination shall (i) without the prior written consent of each Lender directly and adversely affected thereby, extend the final scheduled maturity of any Loan, or reduce the rate or extend the time of payment of interest or Fees thereon or reduce or forgive the principal amount thereof (it being understood that waivers or modifications of conditions precedent, Defaults or Events of Default shall not constitute a reduction or extension of the time of payment of interest or Fees thereon of any Lender), (ii) except as otherwise expressly provided in the Security Documents, release all or substantially all of the Collateral under all the Security Documents without the prior written consent of each Lender, (iii) except as otherwise provided in the Credit Documents, release all or substantially all of the value of the Credit Party Guaranty without the prior written consent of each Lender, (iv) amend, modify or waive any pro rata sharing provision of Section 2.07, the payment waterfall provisions of Section 11.03, or any provision of this Section 13.12(a) (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Loans on the Closing Date), in each case, without the prior written consent of each Lender directly and adversely affected thereby, (v) reduce the percentage specified in the definitions of Required Lenders, (vi) consent to the assignment or transfer by any Borrower of any of its rights and obligations under this Agreement without the consent of each Lender; provided further that no such change, waiver, discharge or termination shall (1) increase the

Loans of any Lender over the amount thereof then in effect without the consent of such Lender, or (2) without the consent of each Agent adversely affected thereby, amend, modify or waive any provision of <u>Section 12</u> or any other provision as same relates to the rights or obligations of such Agent.

(b)    If, in connection with any proposed change, waiver, discharge or termination of any of the provisions of this Agreement as contemplated by clauses (i) through (vi), inclusive, of the first proviso to <u>Section 13.12(a)</u>, the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Lead Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described in either clauses (A) or (B) below, to either (A) replace each such non-consenting Lender or Lenders with one or more Replacement Lenders pursuant to <u>Section 3.04</u> so long as at the time of such replacement, each such Replacement Lender consents to the proposed change, waiver, discharge or termination or (B) terminate such non-consenting Lender's Commitments and/or repay the outstanding Loans of such Lender in accordance with <u>Section 3.04</u>, <u>provided</u> that, unless the Commitments that are terminated, and Loans repaid, pursuant to the preceding clause (B) are immediately replaced in full at such time through the addition of new Lenders or the increase of outstanding Loans of existing Lenders (who in each case must specifically consent thereto), then in the case of any action pursuant to preceding clause (B) the Required Lenders (determined after giving effect to the proposed action) shall specifically consent thereto, <u>provided</u> <u>further</u> that in any event the Lead Borrower shall not have the right to replace a Lender, terminate its Commitments or repay its Loans solely as a result of the exercise of such Lender's rights (and the withholding of any required consent by such Lender) pursuant to the second proviso to <u>Section 13.12(a)</u>.

(c)    Without the consent of any other person, the applicable Credit Party or Parties and the Administrative Agent and/or Collateral Agent may (in its or their respective sole discretion, or shall, to the extent required by any Credit Document) enter into any amendment or waiver of any Credit Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Creditors, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Creditors, in any property or so that the security interests therein comply with applicable Requirements of Law.

(d)    Notwithstanding anything to the contrary herein, any fee letter may be amended, or rights and privileges thereunder waived, in a writing executed only by the parties thereto.

(e)    Further, notwithstanding anything to the contrary contained in this <u>Section 13.12</u>, if following the Closing Date, the Administrative Agent and any Credit Party shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Credit Documents, then the Administrative Agent and the Credit Parties shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Credit Documents if the same is not objected to in writing by the Required Lenders within ten (10) Business Days following receipt of notice thereof.

13.13.  Survival.  All indemnities set forth herein including, without limitation, in Sections 3.01, 3.02, 5.01, 12.07, 12.13, and 13.01 shall survive the execution, delivery and termination of this Agreement and the Notes, the making and repayment of the Obligations, and the resignation or removal of the Agents.

13.14.  Domicile of Loans.  Each Lender may transfer and carry the Loans at, to or for the account of any office, branch, Subsidiary or Affiliate of such Lender.  Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 13.14 would, at the time of such transfer, result in increased costs under Section 3.01 or 5.01 from those being charged by the respective Lender prior to such transfer, then the Borrowers shall not be obligated to pay such increased costs (although the Borrowers shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective transfer).

13.15.  Register.  The Borrowers hereby designate the Administrative Agent to serve as its agent, solely for purposes of this Section 13.15, to maintain a register (the "Register") on which it will record the Commitments from time to time of each of the Lenders (and principal amount (and related interest amount) of Loans and each repayment in respect of the principal amount of the Loans of each Lender.  Holdings, the Lead Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement (and the entries in the Register shall be conclusive for such purposes (absent manifest error)), notwithstanding notice to the contrary.  With respect to any Lender, the transfer of the Commitments of, and the principal (and interest) amounts of the Loans owing to it, such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Loans and  prior to such recordation all amounts owing to the transferor with respect to such Commitments and Loans shall remain owing to the transferor.  The registration of assignment or transfer of all or part of any Commitments and Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement and receipt by the Administrative Agent of the assignment fee pursuant to Section 13.04(b).  Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note (if any) evidencing such Loan, and thereupon one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

13.16.  Confidentiality.

(a)     Subject to the provisions of clause (b) of this Section 13.16, each Agent and Lender agrees that it will use its commercially reasonable efforts not to disclose without the prior consent of the Lead Borrower other than to its Affiliates, and to its and its Affiliates' employees, auditors, partners, directors, officers, agents, advisors or counsel, or to another Lender if such Lender or such Lender's holding or parent company in its sole discretion

determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section 13.16 to the same extent as such Lender (or language substantially similar to this Section 13.16(a)) any information with respect to the Lead Borrower or any Restricted Subsidiary which is now or in the future furnished pursuant to this Agreement or any other Credit Document, provided that any Lender or either Agent, as applicable, may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Section 13.16(a) by such Lender, (ii) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, or as required or requested by any governmental agency or representative thereof (including, without limitation, public disclosures by any Agent or Lender or any of their Affiliates required by the Securities and Exchange Commission or any other governmental or regulatory authority), (iii) as may be required or appropriate in respect to any applicable laws, summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) in the case of any Lender, to the Administrative Agent or the Collateral Agent, (vi) to any prospective or actual direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section 13.16 (or language substantially similar to this Section 13.16(a)), (vii) to any prospective or actual transferee, pledgee or participant in connection with any contemplated transfer, pledge or participation of any of the Notes or Commitments or any interest therein by such Lender provided that such prospective transferee, pledge or participant agrees to be bound by the confidentiality provisions contained in this Section 13.16 (or language substantially similar to this Section 13.16(a)); (viii), in connection with the exercise of any remedy hereunder or under any other Credit Documents or any suit, action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, (ix) any rating agency, (x) the CUSIP Service Bureau or other similar organization, (xi) otherwise with the consent of the Lead Borrower; (xi) to an investor or prospective investor in securities or interests issued by an any fund that is administered, advised or managed by any Lender or any Affiliate of any Lender that also agrees that such information shall be kept confidential and used solely for the purpose of evaluating an investment in such securities or interests issued by such fund, or (xii) in the case of either Agent, to any Lender; provided further that, to the extent permitted pursuant to any applicable law, order, regulation or ruling, and other than in connection with credit and other bank examinations conducted in the ordinary course with respect to such Lender, in the case of any disclosure pursuant to the foregoing clauses (ii), (iii) or (iv), such Lender will use its commercially reasonable efforts to notify the Lead Borrower in advance of such disclosure so as to afford the Lead Borrower the opportunity to protect the confidentiality of the information proposed to be so disclosed.

(b)     The Borrowers hereby acknowledge and agree that each Lender may share with any of its Affiliates and branches, and such Affiliates and branches may share with such Lender, any information related to Holdings, the Lead Borrower or any Subsidiary (including, without limitation, any non-public customer information regarding the creditworthiness of Holdings, the Lead Borrower and the Subsidiaries), provided such Persons shall be subject to the provisions of this Section 13.16 to the same extent as such Lender.

13.17.  <u>USA Patriot Act Notice</u>.  The Agents and each Lender hereby notifies Holdings and the Borrowers that pursuant to the requirements of the USA PATRIOT Act Title III of Pub. 107-56 (signed into law October 26, 2001 and amended on March 9, 2009) (the "<u>Patriot Act</u>") and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" policies, regulations, laws or rules and Anti-Terrorism Laws, it is required to obtain, verify, and record information that identifies each Credit Party, which information includes the name of each Credit Party and other information that will allow the Agent or such Lender to identify the Credit Party in accordance therewith, and each Credit Party agrees to provide such information from time to time to the Agents or any Lender.

13.18.  <u>Special Provisions Regarding Pledges of Equity Interests in Persons Not Organized in Qualified Jurisdictions</u>.  The parties hereto acknowledge and agree that the provisions of the various Security Documents executed and delivered by the Credit Parties require that, among other things, all Equity Interests in various Persons owned by the respective Credit Party be pledged, and, to the extent certificated, delivered for pledge, pursuant to the Security Documents (other than to the extent such Equity Interests constitute Excluded Collateral).  The parties hereto further acknowledge and agree that each Credit Party shall be required to take all actions under the laws of the jurisdiction in which such Credit Party is organized, or in which the Collateral is deemed located by applicable law, to create and perfect all security interests granted pursuant to the various Security Documents and to take all actions under the laws of, or applicable in, the United States, Canada, England, Wales, The Netherlands and Germany (or any political subdivision of any of the foregoing), as applicable, to create and perfect the security interests in the Equity Interests of any Person organized under the laws of said jurisdictions (to the extent said Equity Interests are owned by any Credit Party).

13.19.  <u>Waiver of Sovereign Immunity</u>.  Each of the Credit Parties, in respect of itself, its Subsidiaries, its process agents, and its properties and revenues, in each case of any kind, hereby irrevocably agrees that, to the extent that Holdings, the Borrowers, or any of their respective Subsidiaries or any of its properties has or may hereafter acquire any right of immunity, whether characterized as sovereign immunity or otherwise, from any legal proceedings, to enforce or collect upon the Loans or any Credit Document or any other liability or obligation of Holdings, the Borrowers, or any of their respective Subsidiaries related to or arising from the transactions contemplated by any of the Credit Documents, including, without limitation, immunity from service of process, immunity from jurisdiction or judgment of any court or tribunal, immunity from execution of a judgment, and immunity of any of its property from attachment prior to any entry of judgment, or from attachment in aid of execution upon a judgment, each Credit Party, for themselves and on behalf of their respective Subsidiaries, hereby expressly waive, to the fullest extent permissible under applicable law, any such immunity, and agree not to assert any such right or claim in any such proceeding.  Without limiting the generality of the foregoing, each Credit Party further agrees that the waivers set forth in this <u>Section 13.19</u> shall have the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976 of the United States and other applicable law and are intended to be irrevocable for purposes of such Act and such other applicable law.

13.20.  <u>Absence of Fiduciary Relationship</u>.  Notwithstanding any other provision of this Agreement or any provision of any other Credit Document, (i) no Lender or Agent shall, solely by reason of this Agreement or any other Credit Document, have any fiduciary, advisory

or agency relationship or duty in respect of any Lender or any other Person and (ii) Holdings and the Borrowers hereby waive, to the fullest extent permitted by law, any claims they may have against any Agent or Lender for breach of fiduciary duty or alleged breach of fiduciary duty.

13.21.  <u>Electronic Signatures</u>.  The words "execution," "signed," "signature," and words of like import in any Credit Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based record keeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

13.22.  <u>Judgment Currency</u>.  If, for purposes of obtaining judgment in any court, it is necessary to convert a sum from the currency provided under a Credit Document ("<u>Agreement Currency</u>") into another currency, the rate of exchange used shall be the Spot Rate for conversion into Dollars or, for conversion into another currency, the Spot Rate for the purchase of the Agreement Currency with such other currency through Bank of America's principal foreign exchange trading office for the other currency during such office's preceding Business Day. Notwithstanding any judgment in a currency ("<u>Judgment Currency</u>") other than the Agreement Currency, a Credit Party shall discharge its obligation in respect of any sum due under a Credit Document only if, on the Business Day following receipt by the Administrative Agent of payment in the Judgment Currency, the Administrative Agent can use the amount paid to purchase the sum originally due in the Agreement Currency.  If the purchased amount is less than the sum originally due, such Credit Party agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent and Lenders against such loss.  If the purchased amount is greater than the sum originally due, the Administrative Agent shall return the excess amount to such Credit Party (or to the Person legally entitled thereto).

Section 14.  <u>Credit Party Guaranty</u>.

14.01.  <u>The Guaranty</u>.  In order to induce the Agents and the Lenders to enter into this Agreement and to extend credit hereunder, each Credit Party hereby agrees with the Guaranteed Creditors as follows:  each Credit Party hereby unconditionally and irrevocably guarantees as primary obligor and not merely as surety the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of its Guaranteed Obligations to the Guaranteed Creditors.  If any or all of the Guaranteed Obligations of any Credit Party to the Guaranteed Creditors becomes due and payable hereunder, such Credit Party, unconditionally and irrevocably, promises to pay such indebtedness to the Administrative Agent and/or the other Guaranteed Creditors, on demand, together with any and all expenses which may be incurred by the Administrative Agent and the other Guaranteed Creditors in collecting any of the Guaranteed Obligations.  This Credit Party Guaranty is a guaranty of payment and not of collection.  This Credit Party Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. If claim is ever made upon any Guaranteed Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the

aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including any Guaranteed Party), then and in such event the respective Credit Party agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Credit Party, notwithstanding any revocation of this Credit Party Guaranty or any other instrument evidencing any liability of any Guaranteed Party, and each Credit Party shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

14.02.  Bankruptcy.    Additionally,  each  Credit  Party  unconditionally  and irrevocably guarantees the payment of any and all of its Guaranteed Obligations to the Guaranteed Creditors whether or not due or payable by any Guaranteed Party upon the occurrence of any of the events specified in Section 11.01(e) and irrevocably and unconditionally promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand, in the currency in which the obligation was originally denominated.

14.03.  Nature of Liability.    The liability of each Credit Party hereunder is primary, absolute and unconditional, exclusive and independent of any security for or other guaranty of the Guaranteed Obligations, whether executed by any other guarantor or by any other party, and each Credit Party understands and agrees, to the fullest extent permitted under law, that the liability of such Credit Party hereunder shall not be affected or impaired by (a) any direction as to application of payment by any Guaranteed Party or by any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Guaranteed Obligations, or (c) any payment on or in reduction of any such other guaranty or undertaking (other than payment in cash of the Guaranteed Obligations), or (d) any dissolution, termination or increase, decrease or change in personnel by any Guaranteed Party, or (e) any payment made to any Guaranteed Creditor on the Guaranteed Obligations which any such Guaranteed Creditor repays to any Guaranteed Party pursuant to court order in any bankruptcy, insolvency, receivership, reorganization, arrangement, moratorium, winding up or other debtor relief proceeding, and each Credit Party waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, or (f) any action or inaction by the Guaranteed Creditors as contemplated in Section 14.05, or (g) any invalidity, irregularity or enforceability of all or any part of the Guaranteed Obligations or of any security therefor, or (h) any change in the corporate existence, structure or ownership of any Credit Party or any other Person liable for any of the Guaranteed Obligations, or (i) any bankruptcy, insolvency, receivership, reorganization, arrangement, moratorium, winding up or other debtor relief proceeding affecting any Credit Party, or their assets or any resulting release or discharge of any obligation of any Credit Party, or (j) the existence of any claim, setoff or other rights which any Credit Party may have at any time against any other Credit Party, a Guaranteed Creditor, or any other Person, whether in connection herewith or in any unrelated transactions, or (k) any other circumstance which might otherwise constitute a defense available to, or a discharge of, a Credit Party in respect of the Guaranteed Obligations or a Credit Party in respect of this Credit Party Guaranty or the Guaranteed Obligations.

14.04.  Independent Obligation.    The obligations of each Credit Party hereunder are independent of the obligations of any other guarantor, any other party or any Guaranteed

Party, and a separate action or actions may be brought and prosecuted against any Credit Party whether or not action is brought against any other guarantor, any other party or any Guaranteed Party and whether or not any other guarantor, any other party or any Guaranteed Party be joined in any such action or actions. Each Credit Party waives, in its capacity as a guarantor, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by any Guaranteed Party or other circumstance which operates to toll any statute of limitations as to such Guaranteed Party shall operate to toll the statute of limitations as to the relevant Credit Party.

14.05. <u>Authorization</u>. To the fullest extent permitted under law, each Credit Party authorizes the Guaranteed Creditors without notice or demand, and without affecting or impairing its liability hereunder, from time to time to:

(a)    change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Credit Party Guaranty shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

(b)    take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(c)    exercise or refrain from exercising any rights against any Guaranteed Party, any other Credit Party or others or otherwise act or refrain from acting;

(d)    release or substitute any one or more endorsers, guarantors, any Guaranteed Party, other Credit Parties or other obligors;

(e)    settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of any Guaranteed Party to its creditors other than the Guaranteed Creditors;

(f)    apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of any Guaranteed Party to the Guaranteed Creditors regardless of what liability or liabilities of such Guaranteed Party remain unpaid;

(g)    consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document, or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any other Credit Document, or any of such other instruments or agreements; and/or

(h)    take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of such Credit Party from its liabilities under this Credit Party Guaranty.

14.06.  Reliance.  It is not necessary for any Guaranteed Creditor to inquire into the capacity or powers of any Guaranteed Party or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

14.07.  Subordination.    Any indebtedness of any Guaranteed Party now or hereafter owing to any Credit Party is hereby subordinated to the Guaranteed Obligations of such Guaranteed Party owing to the Guaranteed Creditors; and if the Administrative Agent so requests at a time when an Event of Default exists, all such indebtedness of such Guaranteed Party to such Credit Party shall be collected, enforced and received by such Credit Party for the benefit of the Guaranteed Creditors and be paid over to the Administrative Agent on behalf of the Guaranteed Creditors on account of the Guaranteed Obligations of such Guaranteed Party to the Guaranteed Creditors, but without affecting or impairing in any manner the liability of any Credit Party under the other provisions of this Credit Party Guaranty.  Without limiting the generality of the foregoing, each Credit Party hereby agrees with the Guaranteed Creditors that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this Credit Party Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Guaranteed Obligations have been irrevocably paid in full in cash.

14.08.  Waiver.

(a)    Each Credit Party waives any right (except as shall be required by applicable law and cannot be waived) to require any Guaranteed Creditor to (i) proceed against any Guaranteed Party, any other guarantor or any other party, (ii) proceed against or exhaust any security held from any Guaranteed Party, any other guarantor or any other party or (iii) pursue any other remedy in any Guaranteed Creditor's power whatsoever.  For purposes of the law of the province of Quebec, if applicable, each Credit Party waives, in its capacity as a guarantor, the benefits of division and discussion.  Each Credit Party waives any defense (except as shall be required by applicable statute and cannot be waived) based on or arising out of any defense of any Guaranteed Party, any other guarantor or any other party, other than payment of the Guaranteed Obligations to the extent of such payment, based on or arising out of the disability of any Guaranteed Party, any other Guarantor or any other party, or the validity, legality or unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any Guaranteed Party other than payment of the Guaranteed Obligations to the extent of such payment.  The Guaranteed Creditors may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent or any other Guaranteed Creditor by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Guaranteed Creditors may have against any Guaranteed Party or any other party, or any security, without affecting or impairing in any way the liability of any Credit Party hereunder except to the extent the Guaranteed Obligations have been paid.  Each Credit Party waives, to the fullest extent permitted under law, any defense arising out of any such election by the Guaranteed Creditors, even though such election operates

119

to impair or extinguish any right of reimbursement or subrogation or other right or remedy of such Credit Party against any Guaranteed Party or any other party or any security.

(b)     Each Credit Party waives, to the fullest extent permitted under law, all presentments, demands for performance, protests and notices, including, without limitation, notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Credit Party Guaranty, and notices of the existence, creation or incurring of new or additional Guaranteed Obligations.  Each Credit Party assumes all responsibility for being and keeping itself informed of each Guaranteed Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks which such Credit Party assumes and incurs hereunder, and agrees that neither the Administrative Agent nor any of the other Guaranteed Creditors shall have any duty to advise any Credit Party of information known to them regarding such circumstances or risks.

14.09.  Maximum Liability.  It is the desire and intent of each Credit Party and the Guaranteed Creditors that this Credit Party Guaranty shall be enforced against such Credit Party to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  If, however, and to the extent that, the obligations of any Credit Party under this Credit Party Guaranty shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable federal, state, provincial or foreign law relating to fraudulent conveyances or transfers), then the amount of such Credit Party's obligations under this Credit Party Guaranty shall be deemed to be reduced and such Credit Party shall pay the maximum amount of the Guaranteed Obligations which would be permissible under applicable law.

14.10.  Payments.   All payments made by a Credit Party pursuant to this Section 14 will be made without setoff, counterclaim or other defense, and shall be subject to the provisions of Sections 2.06.

14.11.  Information.  Each Credit Party assumes all responsibility for being and keeping itself informed of each applicable Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of non-payment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Credit Party assumes and incurs under this guarantee, and agrees that no Guaranteed Creditor shall have any duty to advise any Credit Party of information known to it regarding those circumstances or risks.

14.12.  Order.  In the event of any inconsistency between the terms and conditions of any of the Credit Documents and the Interim Order or the Final Order, whichever is in effect at the time of reference thereto, the provisions of the Interim Order or the Final Order, as the case may be, shall govern and control.

*     *     *

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**VER TECHNOLOGIES HOLDCO, LLC**

By: _____
Name:
Title:

**VER TECHNOLOGIES MIDCO, LLC**

By: _____
Name:
Title:

**VER TECHNOLOGIES, LLC**

By: _____
Name:
Title:

**REVOLUTION DISPLAY, LLC**

By: _____
Name:
Title:

**FULL THROTTLE FILMS, LLC**

By: _____
Name:
Title:

**VER FINCO, LLC**

By:  VER Technologies LLC
Its:  Sole Member

By: _____
Name:
Title:

*[Signature Page to Junior DIP Credit Agreement]*

**FAAST LEASING CALIFORNIA, LLC**

By:  VER Technologies LLC
Its:  Sole Member

By: _____
Name:
Title:


**CPV EUROPE INVESTMENTS, LLC**

By:  VER Technologies LLC
Its:  Sole Member

By: _____
Name:
Title:


**MAXWELL BAY HOLDINGS, LLC**

By: _____
Name:
Title:

*[Signature Page to Junior DIP Credit Agreement]*

**GSO COF II FACILITY (LUXEMBOURG) S.À.R.L.**, as a Lender

By: _____
Name:
Title: A Manager

By: _____
Name:
Title: B Manager

**GSO SPECIAL SITUATIONS MASTER FUND LP**, as a Lender

By: GSO Capital Partners LP, its investment advisor

By: _____
Name:
Title:

DB3/ 201858782.15

**GSO CACTUS CREDIT OPPORTUNITIES FUND LP**, as a Lender

By: GSO Cactus Credit Opportunities Associates LLC, its general partner

By: _____
Name:
Title:

*[Signature Page to Junior DIP Credit Agreement]*

**GSO AIGUILLE DES GRANDS MONTETS FUND II LP**, as a Lender

By: GSO Capital Partners LP as Attorney-in-Fact

By: _____
Name:
Title:

**GSO CHURCHILL PARTNERS LP**, as a Lender

By: GSO Capital Partners LP, its Investment Advisor

By: _____
Name:
Title:

**GSO    PALMETTO    OPPORTUNISTIC INVESTMENT PARTNERS LP**, as a Lender

By: GSO Capital Partners LP, as Investment Manager

By: _____
Name:
Title:

*[Signature Page to Junior DIP Credit Agreement]*

**STEAMBOAT CREDIT OPPORTUNITIES MASTER FUND LP**, as a Lender

By: GSO Capital Partners LP, its Investment Manager

By: _____
Name:

*[Signature Page to Junior DIP Credit Agreement]*

**GSO CREDIT-A PARTNERS LP**, as a Lender

By: GSO Capital Partners LP, its Investment Manager

By: _____
Name:
Title:

*[Signature Page to Junior DIP Credit Agreement]*

**GSO COASTLINE CREDIT PARTNERS LP**, as a Lender

By: GSO Capital Partners LP, its Investment Manager

By: _____
Name:
Title:

*[Signature Page to Junior DIP Credit Agreement]*

**CONSUMER PROGRAM ADMINISTRATORS INC.**, as a Lender

By: _____
Name:
Title:

*[Signature Page to Junior DIP Credit Agreement]*

**ABR REINSURANCE LTD**, as a Lender

By: _____
Name:
Title:

DB3/ 201858782.15

**IRVING LLC**, as a Lender

By:_____
Name:
Title:

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent and Collateral Agent

By: _____
Name:
Title:

## **Annex III**

## **ABL DIP Facility Term Sheet**

**VER Technologies LLC**
**$300 million Superpriority Senior Debtor-in-Possession ABL Revolver**
**Summary of Principal Terms and Conditions**

Set forth below is a summary of certain key terms for a proposed $300 million DIP ABL Facility (as defined below) to be made available to the Borrowers (as defined below).  Capitalized terms not otherwise defined herein shall have the same meanings as specified therefor in the commitment letter (the "*Commitment Letter*") to which this Summary of Principal Terms and Conditions is attached.  To the extent of an inconsistencies between this Summary of Principal Terms and Conditions and the Interim Order (as defined below), the Interim Order shall control.

| | |
|---|---|
| **Borrowers:** | (1) VER Technologies LLC, a Delaware limited liability company ("*VER*" or the "*Lead Borrower*"), and (2) the U.S. Subsidiary Borrowers as described under the Prepetition ABL Credit Agreement (as defined below) with the exception of VER Flex Solutions, LLC (collectively with the Lead Borrower, the "*Borrowers*" and each individually, a "*Borrower*"), each Borrower as a debtor and debtor-in-possession in cases (collectively, the "*Borrowers' Cases*" and each individually, a "*Borrower's Case*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") to be filed in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"). |
| **ABL Administrative Agent:** | Bank of America, N.A. |
| **ABL Collateral Agent:** | Bank of America, N.A. |
| **ABL Joint Lead Arrangers and Bookrunners:** | Merrill Lynch, Pierce, Fenner & Smith Incorporated, HSBC Bank USA, National Association and SunTrust Robinson Humphrey, Inc. |
| **ABL Lenders:** | The Prepetition ABL Lenders (as defined below) (the "*DIP ABL Lenders*"). |
| **Certain Prepetition Debt Facilities:** | ABL Facility:  A senior secured asset-based revolving credit facility (the "*Prepetition ABL Facility*") made available to the Borrowers pursuant to that certain Credit Agreement, dated as of December 11, 2014, by and among the Credit Parties party thereto from time to time, the lenders party thereto from time to time (the "*Prepetition ABL Lenders*"), Bank of America, N.A., as administrative agent and collateral agent for the Prepetition ABL Lenders (in such capacity, the "*Prepetition ABL Agent*") and the other parties thereto from time to time, as amended, restated, supplemented or otherwise modified prior to the date hereof (the "*Prepetition ABL Credit Agreement*"). |
| | Term Loan Facility:  A senior secured term loan credit facility (the "*Prepetition Term Facility*") made available to the borrowers party thereto pursuant to that certain Credit Agreement, dated as of December 11, 2014, by and among the credit parties party thereto from time to time, the lenders party thereto from time to time (the |

"*Prepetition Term Lenders*"), Wilmington Trust, National Association, as administrative agent and collateral agent for the Prepetition Term Lenders (in such capacity, the "*Prepetition Term Agent*") and the other parties thereto, as amended, restated, supplemented or otherwise modified prior to the date hereof (the "*Prepetition Term Credit Agreement*").

The Prepetition ABL Facility and the Prepetition Term Facility are collectively referred to herein as the "*Prepetition Facilities*."

**DIP ABL Facility:**    A superpriority senior secured debtor-in-possession asset-based revolving credit facility in an aggregate principal amount of $300 million (such facility, the "*DIP ABL Facility*" and the loans thereunder, the "*DIP ABL Loans*") to be made available to the Borrowers (subject in all cases to having Excess Availability (as defined below)) pursuant to that certain Superpriority Senior Debtor-in-Possession Credit Agreement, by and among the Credit Parties party thereto, the DIP ABL Lenders, Bank of America, N.A., as administrative agent  and collateral agent for the DIP ABL Lenders (in such capacity, the "*ABL Administrative Agent*") and the other parties thereto, as amended, restated, supplemented or otherwise modified (the "*DIP ABL Credit Agreement*"), which will be available both on the Closing Date (as defined below), as well as at all times thereafter prior to the Termination Date to the extent authorized by the DIP Financing Orders (as defined below) and subject to applicable conditions to borrowing under the DIP ABL Credit Agreement (as defined below).

**DIP Term Loan Facility:**    A superpriority junior secured debtor-in-possession multiple draw term loan credit facility in an aggregate principal amount of up to $64.7 million (the "*DIP Term Facility*"), pursuant to that certain Priming Second Lien, Super-Priority Debtor-in-Possession Credit Agreement, by and among the credit parties party thereto, the lenders party thereto (the "*DIP Term Lenders*"), Wilmington Trust, National Association, as administrative agent and collateral agent for the DIP Term Lenders (in such capacity, the "*DIP Term Agent*") and the other parties thereto, as amended, restated, supplemented or otherwise modified (the "*DIP Term Credit Agreement*"), and $33 million of the loans made under the DIP Term Facility will be available on the Closing Date and the remaining amount available under the DIP Term Facility will be available in one draw on a date following the entry of the Final Order, in each case to the extent authorized by the DIP Financing Orders and subject to applicable conditions to borrowing under the DIP Term Facility.

The DIP ABL Facility and the DIP Term Facility are collectively referred to herein as the "*DIP Facilities*."

**DIP Loan Documents:**    The DIP ABL Facility and the DIP Term Facility will be documented in separate credit agreements and secured pursuant to

2

separate collateral agreements. The DIP Facilities will be subject to a single intercreditor agreement (the "***DIP Intercreditor Agreement***") to be based upon the prepetition intercreditor agreement, with such changes as are mutually acceptable to the parties thereto (the Debtors' entry into which will be authorized by the DIP Financing Orders), which shall establish the priorities among the DIP Facilities with respect to the proceeds of the Collateral (as defined below) and govern the relative rights and certain other intercreditor issues as among the holders of the obligations under the DIP Facilities with respect to the Collateral (including a 150 day second lien standstill period). The DIP ABL Credit Agreement and other definitive documentation with respect to the DIP ABL Facility are referred to as the "***DIP ABL Loan Documents***".

**Swingline Loans:**

Bank of America, N.A. (in such capacity, the "***Swingline Lender***") may make available to any Borrower a swingline facility under which such Borrower may make short-term borrowings upon same-day notice of up to $30 million. Any such swingline borrowings will reduce Excess Availability under the DIP ABL Facility on a dollar-for-dollar basis.

**Use of Proceeds:**

The letters of credit and proceeds of DIP ABL Loans will be used by the Borrowers for operating, working capital and other general corporate purposes of the Borrowers and the Guarantors (as defined below), in each case consistent with and subject to the approved budget, including, (i) to refinance in full on the Closing Date the indebtedness outstanding under the Prepetition ABL Facility (and, to the extent not deemed issued under the DIP ABL Facility, to replace or backstop letters of credit outstanding thereunder), and (ii) to pay fees, costs and expenses incurred in connection with the transactions contemplated hereby and other administration costs incurred in connection with the Cases (as defined below).

**Availability:**

Borrowings may be made at any time on or after the Closing Date to, but excluding, the business day immediately preceding the Termination Date (as defined below); <u>provided</u> that the aggregate amount of the loans, unreimbursed letter of credit drawings and letters of credit outstanding under the DIP ABL Facility at any time shall not exceed an amount equal to the lesser of (a) the aggregate commitments under the DIP ABL Facility (the "***Aggregate Commitments***") minus Excess Carve Out Reserve (as defined below) and (b) the Borrowing Base (as defined below) in effect at such time (such lesser amount, the "***Line Cap***" and the amount by which the Line Cap at any time exceeds the aggregate amount of the loans, unreimbursed letter of credit drawings and letters of credit outstanding under the DIP ABL Facility at such time, "***Excess Availability***").

"***Excess Carve Out Reserve***" means, as of any day, the amount if any by which the Carve Out Reserve as of such day exceeds $9

3

million.

**Borrowing Base:**    The Borrowing Base (the "***Borrowing Base***") at any time shall equal the sum of the following as set forth in the most recently delivered Borrowing Base certificate:

(a)    the sum of:

    (i)    the book value of Eligible Accounts <u>multiplied by</u> 85%,

<u>plus</u>

    (ii)    the lesser of:

        (A)    the net book value of Eligible Rental Equipment <u>multiplied by</u> 100%, and

        (B)    the Net Recovery Cost Percentage of the net book value of Eligible Rental Equipment <u>multiplied</u> by 85%;

<u>plus</u>

    (iii)    100% of Qualified Cash;

<u>minus</u>

(b)    Reserves established from time to time by the ABL Administrative Agent in its Permitted Discretion.

For purposes hereof, capitalized terms used above and not otherwise defined herein have the meanings ascribed to them in the Prepetition ABL Credit Agreement; *provided*, that the term "Reserves" will be modified to (x) include the Carve Out Reserve (as defined below) and (y) make other changes customary for debtor-in-possession asset based revolving credit facilities. Eligibility standards will require that representations or warranties in the Credit Documents relating to any Account or rental equipment not be untrue in any material respect (in the case of any Account, to the extent such materiality relates to the amount owing on such Account).

"***Carve Out Reserve***" means the amount, determined each Friday, equal to the sum of (a) $1 million (which, for the avoidance of doubt, is the "Post-Carve Out Trigger Notice Cap" as defined in the Interim Order) *plus* (b) all other accrued and unpaid liabilities included in the Carve Out *plus* (c) the aggregate amount of legal fees budgeted for estate professional during the immediately following two-week period *minus* (d) the lesser of (x) the aggregate amount of invoiced and unpaid professional fees and expenses of estate professionals on such date and (y) $3 million, provided that

4

the Debtors certify to the ABL Administrative Agent that, as of such date, the Company has, and expects to have, sufficient liquidity to pay such invoices in full, *minus* (e) the amount, if any, on deposit in an escrow account established and funded by the Debtors for the sole purpose of paying allowed fees and expenses of estate professionals when such fees and expenses become due and payable, *provided* that the DIP Term Lenders may direct the Debtors to establish and fund such escrow account, provided further, that the amounts on deposit in the account described in this clause (e) shall not be considered for purposes of calculating the Credit Parties' liquidity for purposes of clause (T) under the heading "Conditions to Closing and clause (vii) under the heading "Events of Default". For the avoidance of doubt, success, transaction, back-end and similar fees shall not be included in the Carve Out Reserve until such fees become earned and payable.

**Interest Rates and Fees:**    As set forth on **Schedule I** hereto.

**Letters of Credit:**    Up to $50 million of the DIP ABL Facility shall be available to the Borrowers for the purpose of issuing letters of credit. Letters of credit under the DIP ABL Facility shall be issued by Bank of America, N.A. and/or other DIP ABL Lenders reasonably acceptable to the Lead Borrower and the ABL Administrative Agent who agree to issue letters of credit (each an "***Issuing Bank***"). Each letter of credit shall expire not later than one year after its date of issuance (or such longer period as may be agreed by the issuing lender and the applicable Borrower).  The Borrowers shall be required to cash collateralize the outstanding letter of credit exposure under the DIP ABL Facility beginning on the fifth (5th) business day prior to the Scheduled Termination Date in an amount equal to 105% of the face amount of such outstanding letters of credit.  In addition, if any Event of Default  shall occur and be continuing, on the business day that the Lead Borrower receives notice from the ABL Administrative Agent demanding cash collateral, the Lead Borrower shall be required to cash collateralize the outstanding letter of credit exposure under the DIP ABL Facility in an amount equal to 105% of the face amount of such outstanding letters of credit.  The face amount of any outstanding letter of credit (and, without duplication, any unpaid drawing in respect thereof) will reduce Excess Availability under the DIP ABL Facility on a dollar-for-dollar basis. Letters of credit outstanding under the Prepetition ABL Credit Agreement on the Closing Date and issued by an Issuing Bank shall be rolled into the DIP ABL Facility on the Closing Date and deemed issued thereunder.

**Closing Date:**    The date on which the DIP ABL Facility becomes effective and all terms and conditions set forth under "Conditions to Closing" below and in the DIP ABL Loan Documents are satisfied or waived (the "***Closing Date***").

**Final Maturity:**    The DIP ABL Facility will mature, and lending commitments

thereunder will terminate, on the date that is the earliest of: (a) 180 days after the Petition Date (the "***Scheduled Termination Date***"), (b) the earlier of (x) the date that is 40 days from entry of the Interim Order (as defined below) unless the Final Order (as defined below) has been entered and has become effective prior to the expiration of such period (or such later date as the ABL Administrative Agent may approve in writing in its sole and absolute discretion) and (y) the date of revocation of the Interim Order or the Final Order, as applicable, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of a plan of reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (d) the consummation of a sale of all or substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code, (e) the date the Bankruptcy Court orders the conversion of the Cases to a Chapter 7 liquidation or the dismissal of the Cases or the appointment of a trustee or examiner with expanded power in the Cases, (f) the acceleration of the DIP ABL Loans and the termination of the commitments with respect to the DIP ABL Facility in accordance with the DIP ABL Loan Documents and (g) the stated maturity date or earlier termination date (whether by acceleration or otherwise) of the DIP Term Facility (the earliest of such dates, the "***Termination Date***").

"***Final Order***" means a final, non-appealable order of the Bankruptcy Court authorizing the DIP ABL Facility and the DIP Term Facility in form and substance satisfactory to the ABL Administrative Agent in its sole and absolute discretion.

**Guarantees:** All obligations of the Borrowers (the "***DIP ABL Obligations***") under the DIP ABL Facility and under any interest rate protection or other swap or hedging arrangements or cash management arrangements (including, without limitation, purchase cards and commercial cards) entered into with a DIP ABL Lender, the ABL Administrative Agent or any affiliate of a DIP ABL Lender or the ABL Administrative Agent as of the Closing Date or at the time of entering into of such arrangements ("***DIP ABL Bank Product Arrangements***") shall be unconditionally guaranteed jointly and severally on a senior secured basis (the "***DIP ABL Guarantees***") by VER Technologies Holdco LLC, a Delaware limited liability company ("***Holdings***"), VER Technologies Midco LLC, a Delaware limited liability company ("***Midco***"), all U.S. subsidiaries of the Lead Borrower that currently are or are required to be guarantors under the Prepetition ABL Credit Agreement other than VER Flex Solutions LLC (subject to any adjustment to such requirements in the DIP ABL Credit Agreement) and under the Prepetition Term Credit Agreement (collectively with Holdings and Midco, the "***Guarantors***"), each of which Guarantors will be a debtor and a debtor-in-possession in proceedings (together with the Borrowers' Cases, the "***Cases***" and each individually, a "***Case***")

6

under chapter 11 of the Bankruptcy Code filed contemporaneously and jointly administered with the Borrowers' Cases.

The Borrowers and the Guarantors are referred to herein as "*Credit Parties*" and each, a "*Credit Party*", or "*Debtors*" and each, a "*Debtor*".

The date of commencement of the Cases is referred to herein as the "*Petition Date*".

**Security:**

The DIP ABL Obligations, the DIP ABL Guarantees, and the DIP ABL Bank Product Arrangements will, subject to the Carve-Out:

(a) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Case of such Credit Party (the "*DIP Superpriority Claims*"), which DIP Superpriority Claims in respect of the DIP ABL Facility shall have priority over any and all claims against the Debtors;

(b) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a valid, perfected, continuing, enforceable, nonavoidable first priority lien and security interest on the Collateral of each Credit Party that is not subject to valid, perfected and nonavoidable liens as of the Petition Date (or subject to perfection subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code), except that the DIP ABL Obligations, DIP ABL Guarantees, and the DIP ABL Bank Product Arrangements will not be secured by (i) the GSO Funding Account (as defined below), (ii) amounts in the GSO Funding Account, and (iii) rights of the Debtors under the DIP Term Facility (collectively, the "*GSO Funding Account Assets*");

(c) subject to the immediately following clause (d), pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a valid perfected, continuing, enforceable and nonavoidable junior lien and security interest on the Collateral of each Credit Party that is subject (x) to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition ABL Credit Agreement and the Prepetition Term Credit Agreement to be senior to the liens securing the Prepetition ABL Facility and the Prepetition Term Facility (respectively, the "*Prepetition ABL Liens*" and the "*Prepetition Term Liens*"), or (y) to valid and unavoidable liens in favor of third parties that were in existence and permitted under the Prepetition ABL Credit Agreement and the Prepetition Term Credit Agreement to be senior to the Prepetition ABL Liens and the Prepetition Term Liens immediately prior to the Petition Date and that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (in the cause of both clause (x) and clause (y) above, other than the existing liens that secure obligations of the applicable Credit Party under or governed by (i) the Prepetition ABL Credit Agreement or (ii) the Prepetition Term

7

Credit Agreement, which existing liens will be primed by the liens described in clause (d) below), subject as to priority to such liens in favor of such third parties (such liens, the "**_Permitted Prior Liens_**"); and

(d) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority priming lien and security interest on the Collateral, subject to the Permitted Prior Liens, of each Credit Party (such lien and security interest, the "**_Priming Liens_**") senior to any current and future liens granted on the Collateral to or for the benefit of any secured creditors under the Prepetition Facilities (including, without limitation, the liens that secure the DIP Term Facility (other than in respect of the GSO Funding Account Assets) and any adequate protection liens) (such liens and security interests collectively, the "**_Primed Liens_**").

For the avoidance of doubt, the Priming Liens shall be subject to priority to (and only to): (i) the Permitted Prior Liens and (ii) the Permitted Liens (which shall be defined in the DIP ABL Credit Agreement) that are not junior or subordinated to the Collateral (pursuant to any express agreement, applicable law, or otherwise).

All of the liens described above (the "**_DIP ABL Liens_**") shall be effective and perfected upon entry of the Interim Order.

"**_Collateral_**"  means substantially all assets of the Credit Parties, other than (x) specified excluded collateral, (y) claims and causes of action of the Debtors' estates under chapter 5 of the Bankruptcy Code ("**_Avoidance Actions_**") (but including, upon entry of the Final Order, proceeds of Avoidance Actions ("**_Avoidance Proceeds_**")) and (z) the GSO Funding Account Assets.

The following chart summarizes the lien priorities with respect to the Collateral:

**Lien Priorities in the Collateral**
Carve-Out
Permitted Prior Liens
DIP ABL Liens
ABL Adequate Protection Liens
Prepetition ABL Liens
DIP Term Liens
Term Adequate Protection Liens
Prepetition Term Liens

**Carve-Out:**    Paragraph 45 of the proposed form of Interim Order annexed hereto as Annex A is incorporated herein by reference.

**Credit Support:**    The ABL Administrative Agent shall retain the Fund L/C (as defined in the Prepetition ABL Credit Agreement) and will not draw on the Fund L/C until the earliest of (x) the second business day after the Petition Date, if an Interim Order acceptable to the

8

ABL Administrative Agent has not been entered by 11:59 p.m. (Eastern Daylight Time) on such date, (y) the occurrence of any Event of Default under the DIP ABL Facility or (z) the termination of the DIP ABL Facility.

**Adequate Protection:**

Until the indebtedness outstanding under the Prepetition ABL Facility is indefeasibly paid in full and discharged (it being understood and agreed that the repayment of the indebtedness under the Prepetition ABL Facility shall become indefeasible, and the obligations thereunder discharged, no earlier than the expiration of all applicable "challenge" periods) Prepetition ABL Lenders will receive as adequate protection from any diminution of value of their interests in the prepetition collateral as set forth below:

    i.    adequate protection liens and superpriority claims;

    ii.    payment of reasonable and documented fees and out-of-pocket expenses of the Prepetition ABL Agent and other secured creditors under the Prepetition ABL Facility (including an indemnity reserve in an amount to be agreed);

    iii.    payment of current cash payment of interest (in respect of any obligations under the Prepetition ABL Facility that are reinstated as a result of a challenge or otherwise);

    iv.    collateral maintenance requirements consistent with the Prepetition ABL Credit Agreement, including, without limitation, maintenance of insurance and compliance with security trustee requirements; and

    v.    compliance with information covenants, inspection rights, and collateral monitoring and reporting obligations set forth in the Prepetition ABL Credit Agreement; delivery of monthly financial statement reporting; delivery of all budget updates and all cash-flow, budget, and related variance reports contemporaneously with the delivery thereof to the DIP Term Agent and the DIP Term Lenders.

**Mandatory Prepayments:**

Consistent with the terms of the Prepetition ABL Credit Agreement; provided, however, that mandatory prepayments shall be subject to the terms of the DIP Financing Orders.

**Voluntary Prepayments and Reductions in Commitments:**

Consistent with the terms of the Prepetition ABL Credit Agreement; provided, however, that voluntary prepayments and reductions in commitments shall be subject to the terms of the DIP Financing Orders.

**Representations and Warranties:**

Consistent with the terms of the Prepetition ABL Credit Agreement and consisting of the following: organizational status; power and authority; enforceability; no violation; approvals; financial statements, financial condition and projections; litigation; true and complete disclosure; use of proceeds; margin regulations; tax returns and payments; ERISA; security documents; properties; capitalization; subsidiaries; compliance with statutes, OFAC,

9

Patriot Act and FCPA; investment company act; sanctions and anti-corruption laws; environmental matters; labor relations; intellectual property; legal names, types of organization, jurisdiction of organization; borrowing base certificate; senior debt;; foreign employees of U.S. Persons; and matters relating to the Cases consistent with the DIP Term Credit Agreement.

**Conditions to Closing:**   Conditions to closing shall consist solely of the following:

A. The DIP ABL Loan Documents (including the DIP Intercreditor Agreement and the Restructuring Support Agreement among the Debtors, Production Resource Group Inc. ("**PRG**"), certain Prepetition Term Lenders, and certain other parties thereto (the "**RSA**")) shall have been executed and delivered by each party thereto.

B. The Commitment Letter and the Fee Letter have been executed and is in full force and effect.

C. The Petition Date shall have occurred, and each Credit Party shall be a debtor and a debtor-in-possession. The cash management order and all other substantive "first day orders" shall be in form and substance satisfactory to the ABL Administrative Agent in its sole and absolute discretion, and all administrative "first day orders" entered at the time of commencement of the Cases shall be reasonably satisfactory to the ABL Administrative Agent.

D. The ABL Administrative Agent shall have received a signed copy of an order of the Bankruptcy Court in the form of the order attached hereto as Annex A, without modification or amendment in any manner except as expressly consented to in writing by the ABL Administrative Agent, which consent may be withheld in the ABL Administrative Agent's sole and absolute discretion, which order shall have been entered not later than two (2) business days following the Petition Date (or such later date as the ABL Administrative Agent may agree), authorizing and approving the making of the loans and the issuance of the letters of credit in the amounts consistent with those set forth in the "DIP ABL Facility" section above, the making of the loans in the amounts consistent with those set forth in the "DIP Term Loan Facility" section above, and the granting of the superpriority claims and liens and other liens referred to above under the heading "Security" (such order, the "**Interim Order**", and together with the Final Order, the "**DIP Financing Orders**"), which Interim Order shall not have been vacated, reversed or stayed in any respect, except as expressly permitted by the DIP ABL Loan

10

Documents.

E.  No trustee or examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code Section 1104 (other than a fee examiner) shall have been appointed, or any Credit Party shall have applied for, consented to, or acquiesced in, any such appointment, with respect to the Credit Parties or their respective properties.

F.  All reasonable and documented out-of-pocket costs, fees and expenses (including, without limitation, reasonable and documented legal fees and expenses of special, foreign and local counsels) set forth in the DIP ABL Loan Documents and the Fee Letter or otherwise required to be paid to the ABL Administrative Agent, the ABL Collateral Agent, the Lead Arrangers, the DIP ABL Lenders and Exit ABL Lenders on or before the Closing Date shall have been paid. All reasonable and documented fees, out-of-pocket disbursements and other charges of (i) Skadden, Arps, Slate, Meagher & Flom LLP and (ii) Perella Weinberg Partners (to the extent fully earned and payable under the terms of such firm's engagement letter (the "Perella Engagement Letter"); provided, however, that no "Transaction Fee" as described in the Perella Engagement Letter shall be deemed earned solely as a result of repayment of the Prepetition ABL Facility with the proceeds of the DIP ABL Facility), in each case, incurred on or prior to the Closing Date of the DIP ABL Facility shall have been paid.

G.  The ABL Administrative Agent and DIP ABL Lenders shall have received (i) unaudited consolidated balance sheet and related consolidated statements of income and cash flows for each month ended after January 31, 2018 that is not a fiscal quarter end, and ending at least 30 days prior to the Closing Date, (ii) unaudited consolidated balance sheet and related consolidated statements of income and cash flows for each fiscal quarter ended after the close of its September 30, 2017 fiscal quarter that is not a fiscal year end, and ending at least 45 days prior to the Closing Date, and (iii) if the Closing Date occurs on or after March 31, 2018, unaudited consolidated balance sheets and related consolidated statements of income and cash flows for the fiscal year ended 2017.

H.  The ABL Administrative Agent and the DIP ABL Lenders shall have received (i) a standalone projection

11

model for a five-year period following the date the Reorganization Plan becomes effective, including an income statement, cash-flow statement, and projected balance sheet; (ii) monthly projections for the 12 months after the Closing Date dated as of a date not more than three (3) business days prior to the Closing Date, (iii) a cash-flow forecast for the 13-week period ending after the Closing Date dated as of a date not more than three (3) business days prior to the Closing Date (the "*Initial Budget*"), and (iv) a Borrowing Base certificate dated as of the last day of the week ended immediately prior to the Closing Date, which Borrowing Base certificate shall be in form and substance satisfactory to the ABL Administrative Agent and the DIP ABL Lenders in their sole and absolute discretion (it being understood that a Borrowing Base certificate in a form consistent with the Borrowing Base certificates delivered under the Prepetition ABL Facility shall be deemed a satisfactory form).

I.    After giving effect to all credit extensions under the DIP ABL Facility, on the Closing Date, the Borrowers shall have Excess Availability of at least $0.

J.    The ABL Administrative Agent shall have received customary closing deliverables consistent with the Prepetition ABL Credit Agreement.

K.    Since February 28, 2018, there shall not have occurred or there shall not exist any event or condition (other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code by the Credit Parties and the commencement of the Cases) that, individually or in the aggregate, (i) has a material adverse effect on the assets, business, operations, liabilities or financial condition of the Lead Borrower and the restricted subsidiaries taken as a whole; or (ii) a material adverse effect (x) on the material rights or remedies of the DIP ABL Lenders or the ABL Administrative Agent under any DIP ABL Loan Document or (y) on the ability of the Credit Parties, taken as a whole, to perform their payment obligations to the DIP ABL Lenders or the ABL Administrative Agent under any DIP ABL Loan Document (such event, condition, circumstance or contingency, a "*Material Adverse Effect*").

L.    There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Credit Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than

12

the Cases or the consequences that would normally result from the commencement and continuation of the Cases) that could reasonably be expected to have a Material Adverse Effect.

M. Each DIP ABL Lender who has requested the same at least five (5) business days prior to the Closing Date shall have received "know your customer" and similar information at least three (3) days prior to the Closing Date.

N. The ABL Administrative Agent, for the benefit of the DIP ABL Lenders, shall have the valid and perfected liens on the Collateral of the Credit Parties contemplated by the "*Security*" section above pursuant to the DIP Financing Orders; provided that the requirements to perfect such liens as of the Closing Date shall be limited to the filing of uniform commercial code financing statements, delivery of certificated equity interests otherwise required to be pledged, and execution and delivery of intellectual property security agreements, in each case in suitable form for filing; it being understood that the Credit Parties shall use commercially reasonable efforts to take all other actions necessary to perfect the ABL Administrative Agent's liens on the Collateral on a post-closing basis.

O. The Prepetition ABL Facility shall have been repaid in full, and the ABL Administrative Agent shall have received reasonably satisfactory evidence of each of the foregoing.

P. The ABL Administrative Agent shall have received opinions of counsels to the Credit Parties in form and substance reasonably satisfactory to the ABL Administrative Agent.

Q. The DIP Term Facility shall have become effective substantially concurrently with the DIP ABL Facility.

R. The ABL Administrative Agent shall be satisfied in its sole and absolute discretion with cash dominion arrangements effective with respect to the DIP ABL Facility.

S. The total outstanding amount of the obligations under the Prepetition ABL Facility shall be replaced and refinanced in full with the proceeds under the DIP ABL Facility, including a roll-up of existing letters of credit and bank product obligations, and the ABL Administrative Agent shall have received reasonably

13

satisfactory evidence of each of the foregoing.

T.  After giving effect on a pro forma basis to the funding under the DIP ABL Facility, the sum of (without duplication) (a) unrestricted cash in accounts controlled by the ABL Administrative Agent plus (b) availability under the DIP ABL Facility plus (c) committed amounts immediately available under the DIP Term Facility plus (d) amounts in the GSO Funding Account is at least $10 million ($7.5 million during the five (5) business days following each payroll date).

U.  The Closing Date shall have occurred on or prior to two (2) business days after the entry of the Interim Order.

V.  The ABL Administrative Agent and the DIP ABL Lenders shall have received, in respect of each Credit Party, certified copies, each of a recent date, of requests for information or copies (Form UCC 1), or equivalent reports as of a recent date, listing all effective financing statements under the UCC, and other filings and/or registrations that name any Credit Party as debtor, together with copies of such other financing statements that name any Credit Party as debtor (none of which shall cover any of the Collateral except to the extent evidencing liens permitted under the DIP ABL Facility).

W.  The Borrowers shall have obtained all filings, licenses, permits, consents, approvals, authorizations, qualifications or orders of any governmental authority and other third parties, domestic or foreign, necessary (including to avoid a conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of the DIP ABL Loan Documents, and the entry into and performance of the obligations under the DIP ABL Loan Documents.

X.  There shall have been no adverse change in the ability of the any secured creditors to enforce its rights under the DIP ABL Credit Agreement or any other DIP ABL Loan Document.

Y.  The ABL Administrative Agent and the DIP ABL Lenders shall have received such other documents and information (financial or otherwise) as may be reasonably requested by the ABL Administrative Agent or the Required Lenders on or prior to the Closing Date.

Z.  Each of the representations and warranties of any Credit Party in the DIP ABL Loan Documents shall be true and

14

correct in all material respects on the Closing Date (in each case, any representation or warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects as of the Closing Date).

AA.    The Borrowers party thereto shall have complied with the terms of the Commitment Letter (including this DIP ABL Facility Term Sheet) and the Fee Letter.

**Conditions to All Borrowings:**    On the date of each extension of credit or issuance of a letter of credit under the DIP ABL Facility, (a) the representations and warranties in the DIP ABL Loan Documents shall be accurate in all material respects (without duplication of any materiality standard set forth in any such representation or warranty), (b) the absence of defaults or events of default at the time of, or resulting from, such funding or issuance, (c) delivery of borrowing notice, (d) Excess Availability on the proposed date of borrowing shall be adequate to cover the amount of such credit extensions, (e) the making of such credit extension shall not result in the aggregate outstandings under the DIP ABL Facility exceeding the amount authorized by the Interim Order or the Final Order, as applicable, and (f) the cash management order, Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed or stayed in any respect or, except as expressly permitted by the DIP ABL Loan Documents, modified or amended in any manner.

**Affirmative Covenants:**    Consistent with the terms of the Prepetition ABL Credit Agreement (with modifications of materiality thresholds, baskets and other exceptions appropriate) for a post-petition credit facility) consisting of the following: financial statements and other information; books, records and inspections; maintenance of property; insurance; maintenance of existence and franchises; use of proceeds; additional security and further assurances; security trustee for foreign subsidiaries; collateral monitoring and reporting; anti-corruption laws; 13-week cash flow forecasts and variance reports (as set forth under the caption "Reporting" below); and lender calls. The Borrower shall promptly (and in any event within two business days of becoming aware of the same) notify the ABL Administrative Agent of any PRG Plan Termination Event.

**Collateral Reporting and Monitoring Covenants:**    Consistent with the terms of the Prepetition ABL Credit Agreement; provided, however, that the Lead Borrower shall deliver a Borrowing Base certificate and related borrowing base reporting on a weekly basis, and facilitate a field exam and inventory appraisal on a monthly basis. The Borrowers shall be required to reimburse the expenses of all field exams and inventory appraisals requested by the ABL Administrative Agent. If an Event of Default exists, there shall be no limit on the number of field

15

exams and inventory appraisals for which Borrowers shall be obligated to reimburse the ABL Administrative Agent.

| | |
|---|---|
| **Negative Covenants:** | None. |
| **Financial Covenants:** | None. |

**Reporting:**

The Borrowers shall deliver to the ABL Administrative Agent and the DIP ABL Lenders all budget updates, cash-flow forecasts, budget-variance reports, and similar budget-related reporting contemporaneously with the delivery thereof to the DIP Term Agent and the DIP Term Lenders. The ABL Administrative Agent and the DIP ABL Lenders shall also be entitled to receive on a timely basis other customary information and documents, including approval rights with respect to borrowing base certificates and other collateral reports, to be set forth in the definitive DIP ABL Facility documentation.

**Cash Dominion:**

All accounts receivable of the Credit Parties shall be paid directly into blocked accounts under the control of the ABL Administrative Agent. All payments made to such blocked accounts or other funds received and collected by the ABL Administrative Agent or any DIP ABL Lender, whether in respect of the receivables, as proceeds of inventory or other Collateral or otherwise shall be treated as payments to the ABL Administrative Agent and the DIP ABL Lenders in respect of the outstanding obligations and therefore shall constitute the property of the ABL Administrative Agent and the DIP ABL Lenders to the extent of the then outstanding obligations, and the ABL Administrative Agent may disregard Borrowers' instructions with respect to the blocked accounts and exercise exclusive dominion and control over the blocked accounts and apply funds deposited therein. Notwithstanding the foregoing, the proceeds of the DIP Term Facility may be funded into a separate operating account of the Credit Parties (the "*GSO Funding Account*") rather than applied to pay down the DIP ABL Facility and direct proceeds of such account shall not be required to be paid into blocked accounts.

**Events of Default:**

Events of Default shall consist solely of the events set out below:

  i.   nonpayment of any principal upon maturity with no cure period;
 ii.   nonpayment of any over-advances when due with one (1) day cure period;
iii.   nonpayment of any interest or fees with two (2) business days cure period;
 iv.   nonpayment of any other amounts not covered in clauses (i), (ii) or (iii) above under the DIP ABL Loan Documents with five (5) business days cure period;
  v.   cross default to the DIP Term Facility outstanding more than four (4) business days (after expiration of any

16

applicable cure period under the DIP Term Facility), unless waived by the requisite parties under the DIP Term Facility in accordance with the DIP Term Credit Agreement prior to the end of such period;

vi.    the DIP Term Lenders cease to fund under the DIP Term Facility when required under the terms of the DIP Term Facility or the obligations under the DIP Term Facility are accelerated;

vii.    sum of (without duplication) (a) unrestricted cash in accounts controlled by the ABL Administrative Agent plus (b) availability under the DIP ABL Facility plus (c) committed amounts immediately available (other than the requirement to give a customary borrowing notice) under the DIP Term Facility plus (d) amounts in the GSO Funding Account is at any time (subject to a one day cure period) less than (x) $7.5 million during the five (5) business days following each payroll date and (y) $10 million at all other times;

viii.    failure to deliver borrowing base certificate or comply with any other reporting covenants (including, without limitation, (x) monthly financial statement reporting and (y) the delivery of all budget updates and all cash-flow, DIP Budget, and related variance reports contemporaneously with the delivery thereof to the DIP Term Agent) in each case, with a three (3) business day cure period;

ix.    any borrowing base certificate or other certificate or reporting information (including any certificate delivered pursuant to clause (k)) delivered to the Administrative Agent or any Lender pursuant to any Credit Document shall prove to be untrue in any material respect on the date as of which made or deemed made;

x.    bankruptcy related events of default, as follows:

    a.    certain bankruptcy orders, as follows:

        1.    the entry of an order dismissing any of the Cases or converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, or any filing by the Debtors of a motion or other pleading seeking entry of such an order;

        2.    a trustee or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code Section 1104 (other than a fee examiner) is appointed in the Cases, the Debtors apply for, consent to, or acquiesce in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment;

        3.    the entry of an order reducing or terminating the Debtors' exclusive periods to propose or solicit acceptances of a chapter 11 plan under section 1121 of the Bankruptcy Code;

        4.    the entry of an order staying, reversing or

17

vacating the Interim Order or the Final Order or modifying or amending the Interim Order or Final Order (as applicable) other than in form and substance satisfactory to the ABL Administrative Agent and the Required Lenders, or the filing by the Debtors of an application, motion or other pleading seeking entry of such an order;

5. the entry of an order in any of the Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to foreclose on, or exercise any other remedies against, any material assets of the Debtors in excess of an amount to be mutually agreed;

6. the entry of a final non-appealable order in the Cases charging any of the Collateral in an amount in excess of an amount to be agreed under Section 506(c) of the Bankruptcy Code against the DIP ABL Lenders or the Prepetition ABL Lenders or the commencement of other actions by the Debtors that challenge the rights and remedies of the ABL Administrative Agent, the ABL Collateral Agent or the DIP ABL Lenders under the DIP ABL Facility in any of the Cases or inconsistent with the DIP ABL Loan Documents;

7. without the consent of the ABL Administrative Agent and the Required Lenders, the entry of an order in any of the Cases (x) authorizing the Debtors to obtain financing under Section 364 of the Bankruptcy Code (other than the DIP Facilities), unless such financing would indefeasibly repay in full in cash all obligations under the DIP ABL Facility upon consummation thereof; (y) authorizing the Debtors to use cash collateral on a non-consensual basis; or (z) granting the Debtors relief from, or otherwise modifying, the terms described under the heading "Cash Dominion" above;

8. the filing or support of any pleading by any Debtor (or any direct or indirect parent thereof) seeking, or otherwise consenting to, any of the matters set forth in clauses (1) through (7) above;

b. the entry of the Interim Order shall not have occurred within 2 business days after the Petition Date;

c. the entry of the Final Order shall not have occurred within 40 days after the Petition Date;

d. an order of the Bankruptcy Court granting, other than

18

the Carve-Out or as otherwise permitted under the applicable DIP ABL Loan Documents, any claim entitled to superpriority administrative expense claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the ABL Administrative Agent and the DIP ABL Lenders under the DIP ABL Facility, or the filing by the Debtors of a motion or application seeking entry of such an order;

e. other than with respect to the Carve-Out, the liens in respect of the GSO Funding Account Assets, and the liens provided for in the DIP Facilities, the Debtors shall create or incur, or the Bankruptcy Court enters an order granting, any lien which is pari passu with or senior to any liens under the Prepetition Facilities, the adequate protection liens and adequate protection obligations granted under the DIP Financing Orders;

f. noncompliance by any Debtor or any of its Debtors' subsidiaries with (a) the provisions of (i) paragraph 13 ("Dominion Account"), (ii) paragraph 29(a) ("Protection of Rights of DIP Agents, the DIP Lenders and the Prepetition Secured Parties"), (iii) paragraph 31 ("Cash Collection"), (iv) paragraph 32 ("Maintenance of DIP Collateral") or (v) paragraph 33 ("Disposition of DIP Collateral") of the Interim Order, and any substantially similar provisions that are included in the Final Order; or (b) any material provision of the Cash Management Order that is applicable to the ABL Administrative Agent or DIP ABL Lenders; provided, however, that to the extent a breach of this provision would also constitute an Event of Default separately enumerated herein that is subject to a cure period, such cure period shall apply (it being agreed that, without limiting the generality of the foregoing proviso, a cure period of three (3) business days shall apply to a breach of clause (a)(ii) of this provision);

g. the Credit Parties or any of their subsidiaries (or any direct or indirect parent of any Credit Party), or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the ABL Administrative Agent, the ABL Collateral Agent or any of the DIP ABL Lenders regarding the DIP ABL Facility, unless such suit or other proceeding is in connection with the enforcement of the DIP ABL Loan Documents against

19

any of the ABL Administrative Agent, the ABL Collateral Agent or the DIP ABL Lenders;

h.    any Debtor proposes a chapter 11 plan in the Cases that is not an Acceptable Plan (defined below);

i.    unless a PRG Plan Termination Event has occurred before such date (and the Debtors have notified the ABL Administrative Agent thereof), the Debtors fail within fifty (50) days of the Petition Date (x) to file an Acceptable PRG Plan or (y) to receive commitments (which commitments are no more conditional than the existing financing commitments in effect on the Petition Date and attached as exhibits to the RSA) sufficient to fully finance such Acceptable PRG Plan;

j.    if a PRG Plan Termination Event has occurred, either (x) the Debtors fail within twenty (20) days of such PRG Plan Termination Event to file an Acceptable Path B Plan or (y) an Acceptable Path B Plan is not confirmed in the Cases before the earlier of (i) the one hundredth (100th) day after such PRG Plan Termination Event or (ii) the one hundred sixty fifth (165th) day after the Petition Date;

k.    an Acceptable Plan is not confirmed in the Cases within one hundred twenty-five (125) days of the Petition Date; provided, however, that such period shall be extended by an additional forty (40) days if the RSA remains in full force and effect with no modifications that are material and adverse to the interests of the DIP ABL Lenders that are not acceptable to the ABL Administrative Agent; provided that the ABL Administrative Agent shall have received a certificate of the chief financial officer or chief restructuring officer of the Lead Borrower to the effect that (i) financing commitments sufficient to fully finance an Acceptable PRG Plan remain in full force and effect, without amendment or modification that would delay or impose additional conditions on the financing necessary for the consummation of the transactions contemplated by the RSA and provide for all funds necessary to consummate the transactions contemplated by the RSA; and (ii) the Debtors have no reason to believe that any of the conditions to the financing contemplated by the commitment letters that are required to be satisfied by it or any other party to the applicable commitment letter will not be satisfied on a timely basis or that the financing contemplated by the commitment letters will not be available to the Debtors immediately prior to, or contemporaneously

20

with, the consummation of the transactions contemplated by the RSA;

l. any order shall be entered which dismisses any of the Cases;

m. unless otherwise approved by the ABL Administrative Agent, any order that approves a 363 sale which order (i) does not provide for termination of the unused commitments under the DIP ABL Facility and payment in full in cash of the Credit Parties' obligations under the DIP ABL Facility upon such dismissal or the consummation of such sale, as applicable, or (ii) includes any other provisions that are (x) material and adverse to the interests of the ABL Administrative Agent and/or the DIP ABL Lenders and (y) are not acceptable to the ABL Administrative Agent; or any of the Debtors or any of their subsidiaries (or any of their direct or indirect parents), shall file, propose, support, or fail to contest in good faith such a sale or the entry of such an order; and

n. a substantial portion of the operations of the Debtors are suspended, voluntarily or involuntarily, on a permanent basis, or for more than 5 business days on a temporary basis.

"*Acceptable Plan*" means (a) an Acceptable PRG Plan, (b) an Acceptable Path B Plan, or (c) any other chapter 11 plan of reorganization in the Cases that is acceptable to the ABL Administrative Agent and the DIP ABL Lenders in their sole and absolute discretion.

"*Acceptable Path B Plan*" means a chapter 11 plan of reorganization in the Cases that:

(a) Provides for the termination of the unused commitments under the DIP ABL Facility and the payment in full in cash and full discharge of the Borrowers' and Guarantors' obligations under the DIP ABL Facility at emergence;

(b) Provides for holders of claims arising under the DIP Term Loan Facility and the Prepetition Term Facility to receive no distributions other than (i) equity interests in the Reorganized Debtor and/or (ii) fully subordinated unsecured debt obligations, interest under which are payable in kind;

(c) Provides for holders of general unsecured claims to

21

receive no distributions other than (i) equity interests or warrants in the Reorganized Debtor; (ii) fully subordinated unsecured debt obligations, interest under which is payable in kind; and/or (iii) such other distributions as are reasonably acceptable to the ABL Administrative Agent;

(d)     Provides or includes (including as exhibits to a plan supplement or disclosure statement): (i) a standalone projection model for the five-year period commencing on the effective date of such plan; (ii) an income statement; (iii) cash-flow statements; and (iv) a projected balance sheet;

(e)     Provides for the payment in full in cash on the effective date thereof of all reasonable and documented fees and disbursements of the ABL Administrative Agent and the DIP ABL Lenders, including, without limitation, all reasonable and documented fees and expenses of Skadden, Arps, Slate, Meagher & Flom LLP and Perella Weinberg Partners, including the "Transaction Fee" as described in the Perella Engagement Letter;

(f)     Includes consensual debtor and third-party releases and exculpatory provisions for  the ABL Administrative Agent, the DIP ABL Lenders, the Prepetition ABL Agent, and the Prepetition ABL Lenders in form and substance satisfactory to the ABL Administrative Agent  and the DIP ABL Lenders (it being understood that the consensual debtor and third-party releases in the form reflected in the chapter 11 plan filed by Remington Outdoor Company, Inc. and its affiliated debtors in their chapter 11 cases on March 25, 2018 are satisfactory to the ABL Administrative Agent and the DIP ABL Lenders); and

(g)     Contains no other provisions that are not reasonably acceptable to the ABL Administrative Agent and the Required Lenders.

"*Acceptable PRG Plan*" means a chapter 11 plan of reorganization in the Cases that:

(a)     Is based on the Restructuring Term Sheet attached to the RSA;

(b)     Provides for the termination of the unused commitments under the DIP ABL Facility and the payment in full in cash and full discharge of the

22

Borrowers' and Guarantors' obligations under the DIP ABL Facility at emergence, including all reasonable and documented fees and disbursements of the ABL Administrative Agent and the DIP ABL Lenders, including, without limitation, all reasonable and documented fees and expenses of Skadden, Arps, Slate, Meagher & Flom LLP and Perella Weinberg Partners, including the "Transaction Fee" as described in the Perella Engagement Letter;

(c)    Includes consensual debtor and third-party releases and exculpatory provisions for the ABL Administrative Agent, the DIP ABL Lenders, the Prepetition ABL Agent, and the Prepetition ABL Lenders in form and substance satisfactory to the ABL Administrative Agent and the DIP ABL Lenders (it being understood that the consensual debtor and third-party releases in the form reflected in the chapter 11 plan filed by Remington Outdoor Company, Inc. and its affiliated debtors in their chapter 11 cases on March 25, 2018 are satisfactory to the ABL Administrative Agent and the DIP ABL Lenders); and

(d)    Includes no other provisions that are (x) material and adverse to the interests of the ABL Administrative Agent and/or the DIP ABL Lenders and (y) are not acceptable to the ABL Administrative Agent and the Required Lenders.

"***PRG Plan Termination Event***" means any termination of the RSA.

**Voting:**    Changes, waivers, discharges or terminations of the DIP ABL Credit Agreement will require the approval of the DIP ABL Lenders holding more than 50% of the aggregate amount of the loans and commitments under the DIP ABL Facility or if there are only two or three DIP ABL Lenders, such approval shall require at least two DIP ABL Lenders (the "***Required Lenders***"), subject to exceptions set forth below. Defaulting lenders shall not be included in the calculation of Required Lenders.

No such change, waiver, discharge or termination shall (i) without the prior written consent of each DIP ABL Lender (and Issuing Bank, if applicable) directly and adversely affected thereby, extend the final scheduled maturity of any commitment, or reduce the rate or extend the time of payment of interest (except as provided in the DIP ABL Credit Agreement) or fees thereon or reduce or forgive the principal amount thereof (it being understood that waivers or modifications of conditions precedent, defaults or events of default

23

shall not constitute a reduction or extension of the time of payment of interest or fees thereon of any DIP ABL Lender), (ii) except as otherwise expressly provided in the security documents, release all or substantially all of the Collateral under the security documents without the prior written consent of each DIP ABL Lender, (iii) except as otherwise provided in the DIP ABL Loan Documents, release all or substantially all of the value of the guaranty without the prior written consent of each DIP ABL Lender, (iv) amend, modify or waive any pro rata sharing provision, the payment waterfall provision, or any provision of the amendment provision (except for technical amendments with respect to additional extensions of credit pursuant to the DIP ABL Credit Agreement which afford the protections to such additional extensions of credit of the type provided to the commitments on the Closing Date), in each case, without the prior written consent of each DIP ABL Lender directly and adversely affected thereby, (v) reduce the percentage specified in the definitions of Required Lenders or Supermajority Lenders without the prior written consent of each DIP ABL Lender directly and adversely affected thereby (it being understood that, with the prior written consent of the Required Lenders or Supermajority Lenders, as applicable, additional extensions of credit pursuant to the DIP ABL Credit Agreement may be included in the determination of the Required Lenders or Supermajority Lenders, as applicable, on substantially the same basis as the extensions of commitments are included on the Closing Date), (vi) change the definition of the terms "Availability," or "Borrowing Base" or any component definition used in the DIP ABL Credit Agreement (including, without limitation, the definitions of "Eligible Accounts," "Eligible Rental Equipment," "Qualified Security Deposit" and "Qualified Cash") if, as a result thereof, the amounts available to be borrowed by the Borrowers would be increased, in each case, without the prior written consent of each DIP ABL Lender, (vii) increase the percentages set forth in the term "Borrowing Base" or add any new classes of eligible assets thereto, in each case, without the prior written consent of each DIP ABL Lender, or (viii) consent to the assignment or transfer by any Borrower of any of its rights and obligations under the DIP ABL Credit Agreement without the prior written consent of each DIP ABL Lender; provided, further, that no such change, waiver, discharge or termination shall (1) increase the commitments of any DIP ABL Lender over the amount thereof then in effect without the consent of such DIP ABL Lender (it being understood that waivers or modifications of conditions precedent, covenants, defaults or events of default or of a mandatory reduction in the Aggregate Commitments shall not constitute an increase of the commitment of any DIP ABL Lender, and that an increase in the available portion of any commitment of any DIP ABL Lender shall not constitute an increase of the commitment of such DIP ABL Lender), (2) without the consent of each agent adversely affected thereby, amend, modify or waive any agency provision or any other provision as same relates to the rights or obligations of such agent, (3) without

24

the consent of Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the ABL Collateral Agent, or (4) without the consent of an Issuing Bank or a Swingline Lender, amend, modify or waive any provision relating to the rights or obligations of the such Issuing Bank or such Swingline Lender.

"*Supermajority Lenders*" shall mean those non-defaulting DIP ABL Lenders which would constitute the Required Lenders as defined above, if the percentage "50%" contained therein were changed to "66-2/3%."

| | |
|---|---|
| **Cost and Yield Protection:** | Consistent with the terms of the Prepetition ABL Credit Agreement and such other terms customary for transactions of this type. |
| **Assignments and Participations:** | Consistent with the terms of the Prepetition ABL Credit Agreement and such other terms customary for transactions of this type. |
| **Expenses, Indemnification and Releases:** | Consistent with the terms of the Prepetition ABL Credit Agreement and such other terms customary for transactions of this type. |
| **Governing Law and Forum:** | New York and, to the extent applicable, the Bankruptcy Code. |
| **Counsel to the ABL Administrative Agent:** | Skadden, Arps, Slate, Meagher & Flom LLP |

**SCHEDULE I**

| | |
|---|---|
| **Interest Rates:** | The applicable margin shall be 3.25% per annum for the Base Rate loans and 4.25% per annum for the LIBOR rate loans. |
| | All swingline loans will be Base Rate loans. |
| | The Lead Borrower may elect interest period of 1 month for LIBOR rate loans. |
| | Base Rate shall have the definition in the Prepetition ABL Credit Agreement. |
| **Letter of Credit Fee:** | Consistent with the terms of the Prepetition ABL Credit Agreement and such other terms as the ABL Administrative Agent deems appropriate. |
| **Commitment Fees:** | The Borrowers shall pay a commitment fee of 0.50% per annum on the average daily unused portion of the DIP ABL Facility, payable on the first day of each fiscal quarter in arrears. |
| | Such fees shall be distributed to the DIP ABL Lenders (other than the Swingline Lender in its capacity as such) pro rata in accordance with the amount of each such DIP ABL Lender's DIP ABL Facility commitment, with exceptions for defaulting DIP ABL Lenders. |
| **Default Rate:** | Applicable interest rate plus two percent (2%) per annum with respect to the principal amount of all of the loans, letters of credit and other DIP ABL Obligations outstanding upon the existence of any Event of Default (whether or not acceleration or demand for payment has been made), and including, to the extent permitted by applicable law, all past due interest. |

1

**Annex A**

**Form of Interim Order**

**[see attached]**

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VER TECHNOLOGIES HOLDCO LLC., *et al.*,[1] | ) | Case No. __-_____ (___) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**INTERIM ORDER (I) AUTHORIZING POSTPETITION FINANCING, (II)
AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY,
(VI) APPROVING EXIT FACILITY COMMITMENT LETTERS AND RELATED FEES,
(VII) SCHEDULING A FINAL HEARING, AND (VIII) GRANTING RELATED RELIEF**

Upon the motion, dated April 5, 2018 (the "DIP Motion") of VER Technologies HoldCo

LLC and certain of its debtor affiliates (collectively, the "Borrowers") and each of their affiliated

debtors, each as a debtor and debtor in possession (collectively, the "Debtors") in the above-

captioned Chapter 11 cases (collectively, the "Cases"), seeking entry of an order (this "Interim

Order") pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e),

and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002,

4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), *inter alia*:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: VER Technologies HoldCo, LLC (7239); CPV Europe Investments LLC (2533); FAAST Leasing California, LLC (7857); Full Throttle Films, LLC (0487); Maxwell Bay Holdings LLC (3433); Revolution Display, LLC (6711); VER Finco, LLC (5625); VER Technologies LLC (7501); and VER Technologies MidCo LLC (7482). The location of the Debtors' service address is: 757 West California Avenue, Building 4, Glendale, California 91203.

(i)        authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis (the "DIP ABL Facility"), and for each of the Debtors other than the Borrowers (the "Guarantors") to guaranty the Borrowers' obligations in connection with the DIP ABL Facility, on a superpriority basis consisting of a senior secured superpriority revolving credit facility in the aggregate principal amount of up to $300 million (the "DIP ABL Loans"), pursuant to the terms and conditions of the term sheet entitled VER Technologies LLC $300 Million Superpriority Senior Debtor-in-Possession ABL Revolver Summary of Principal Terms and Conditions (the "DIP ABL Term Sheet"), substantially in the form of **Exhibit B**, attached to the DIP Motion, and any definitive credit documents with respect to the DIP ABL Facility that contain terms consistent in all respects with, and not in contradiction of, those forth in the DIP ABL Term Sheet (as the same may be amended, restated, supplemented, or otherwise modified from time to time, to the extent permitted by this Interim Order, and together with the DIP ABL Term Sheet, the "DIP ABL Agreement"), by and among the Borrowers, the Guarantors, Bank of America, N.A., as administrative agent and collateral agent (in such capacities, the "DIP ABL Agent"), for and on behalf of itself and the other lenders party thereto from time to time (collectively, including the DIP ABL Agent, the "DIP ABL Lenders");

(ii)        authorizing the Debtors to execute and deliver the DIP ABL Agreement, the other Credit Documents (as defined in the DIP ABL Agreement) and any other agreements and documents related thereto, including, without limitation the ABL Fee Letter, the ABL Commitment Letter and their respective attachments (collectively with the DIP ABL Agreement and the Credit Documents, the "DIP ABL Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP ABL Documents;

(iii)    authorizing the Debtors, upon entry of this Interim Order and in consideration for the DIP ABL Lenders' and DIP ABL Agent's commitments under the ABL Commitment Letter, to immediately use proceeds of the DIP ABL Facility and Cash Collateral (as defined below) to, simultaneously with the initial draw under the DIP ABL Facility, refinance and discharge the Prepetition ABL Facility (as defined below) in full, including interest and fees through the date of repayment, and immediately deem any such letters of credit issued under the Prepetition ABL Credit Agreement to be issued under the DIP ABL Agreement;

(iv)    granting the DIP ABL Facility and all obligations owing thereunder and under the DIP ABL Documents to the DIP ABL Agent, the DIP ABL Lenders and/or the other Secured Creditors (as defined in the DIP ABL Agreement) (collectively, and together with the DIP ABL Agent and the DIP ABL Lenders, the "DIP ABL Secured Parties") and all other "Obligations" as described in the DIP ABL Agreement (collectively, the "DIP ABL Obligations") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases (as defined herein);

(v)    authorizing the Debtors to obtain secured postpetition financing (the "DIP Term Facility," and together with the DIP ABL Facility, the "DIP Facilities"), and for the Guarantors to guaranty the Borrowers' obligations in connection with the DIP Term Facility, on a superpriority basis consisting of priming second lien secured superpriority delayed-draw term loans (the "DIP Term Loans") in the aggregate principal amount of the sum of (a) up to $50,000,000 of new money delayed-draw term loans and (b) up to $14,700,000 in respect of any DIP Term Lender's (as defined below) outstanding First Out Loans (as defined in the Prepetition Term Loan Facility (as defined below)) on a dollar-for-dollar basis with such DIP Term Lender's commitment to provide DIP Term Loans, pursuant to the terms and conditions of that certain

Priming Second Lien, Super-Priority Debtor-in-Possession Credit Agreement, (as the same may be amended, restated, supplemented, or otherwise modified from time to time, to the extent permitted by this Interim Order, the "DIP Term Agreement," and together with the DIP ABL Agreement, the "DIP Agreements"), by and among the Borrowers, the Guarantors, Wilmington Trust, National Association, as administrative agent and collateral agent (in such capacities, the "DIP Term Agent," and together with the DIP ABL Agent, the "DIP Agents"), for and on behalf of itself and the lenders party thereto from time to time (the "DIP Term Lenders," and together with the DIP ABL Lenders, the "DIP Lenders"), substantially in the form of **Exhibit C**, attached to the DIP Motion;[2]

(vi)    authorizing the Debtors to execute and deliver the DIP Term Agreement, the other Credit Documents (as defined in the DIP Term Agreement) and any other agreements and documents related thereto (collectively with the DIP Term Agreement and the Credit Documents, the "DIP Term Documents," and together with the DIP ABL Documents, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(vii)    granting the DIP Term Facility and all obligations owing thereunder and under the DIP Term Documents to the DIP Term Agent, DIP Term Lenders and/or the other Secured Creditors (as defined in the DIP Term Agreement) (collectively, and together with the DIP Term Agent and the DIP Term Lenders, the "DIP Term Secured Parties" and, together with the DIP ABL Secured Parties, the "DIP Secured Parties") and all other "Obligations" as described in the DIP Term Agreement (collectively, the "DIP Term Obligations," and together with the DIP ABL

---

[2] The First Out Loans shall be fully rolled, on a dollar-for-dollar basis with such First Out Lender's commitment to provide DIP Term Loans, on the date hereof into the DIP Term Facility and shall constitute DIP Obligations hereunder.

Obligations, the "<u>DIP Obligations</u>") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases;

(viii)    granting to the DIP Agents, for the benefit of themselves and the DIP Lenders, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth herein;

(ix)    authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, continuing commitment fees, closing fees, audit fees, appraisal fees, monitoring fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agents' and the DIP Lenders' attorneys, advisors, accountants and other consultants, all as provided in, and in accordance with, the DIP Documents;

(x)    authorizing the Debtors to use the proceeds of the DIP Facilities in accordance with the Budget (as defined below);

(xi)    authorizing the Debtors to use the Prepetition Collateral (as defined herein), (including, solely for the purposes set forth herein, the Cash Collateral (as defined below)) of the Prepetition Secured Parties under the Prepetition Secured Debt Documents (each as defined herein), and providing adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the Prepetition Collateral (as defined herein), including the Cash Collateral (as defined below);

(xii)    subject to entry of the Final Order (as defined below), authorizing the Debtors to waive and be prohibited from asserting any surcharge claim, under section 506(c) of the

Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Secured Parties (as defined below) or the Prepetition Secured Parties upon the DIP Collateral or the Prepetition Collateral (as applicable);

(xiii)    providing that the DIP Parties and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable);

(xiv)    subject to entry of the Final Order (as defined below), authorizing the Prepetition Secured Parties to be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and for the "equities of the case" exception under section 552(b) to not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral;

(xv)    authorizing VER Technologies LLC to (a) enter into (1) that certain Commitment Letter (the "ABL Commitment Letter") dated as of April 5, 2018, among VER Technologies LLC, Bank of America, and the other lenders party thereto with respect to (A) the DIP ABL Facility and (B) a $300 million senior secured asset-based revolving credit facility to be provided by Bank of America and the other Prepetition ABL Lenders (as defined below) and DIP ABL Lenders upon the effective date of a chapter 11 plan for the Debtors and (2) that certain Fee Letter (the "ABL Fee Letter") of even date therewith; (b) pay the fees and expenses and grant the indemnities contemplated by the ABL Commitment Letter and the ABL Fee Letter; and (c) pay the PRG Work Fee (as defined in the DIP Motion) if and to the extent due and owing by the Debtors;

(xvi)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

(xvii)    scheduling a final hearing (the "Final Hearing") to consider entry of an order granting the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the exhibits attached thereto, the Leone Declaration, the First Day Declaration, the DIP Documents, and the evidence submitted and argument made at the interim hearing held on [_____] (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

      **A.**      **Petition Date**.  On April 5, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

      **B.**      **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

      **C.**      **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

      **D.**      **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Creditors' Committee").

      **E.**      **Notice**.  Proper, timely, adequate, and sufficient notice of the DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

---

[3]  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

F. **Debtors' Stipulations**.    After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest as set forth in paragraph 48 hereof, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows:

(i)    *Prepetition ABL Facility*.    The Prepetition ABL Lenders (as defined below) extended a $300,000,000 first priority senior secured asset-based revolving credit facility (the "Prepetition ABL Facility") pursuant to that certain Credit Agreement, dated as of December 11, 2014 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement," and together with the Prepetition ABL Security Agreement (as defined below) and the other Credit Documents (as defined in the Prepetition ABL Credit Agreement), the "Prepetition ABL Credit Documents"), among the Borrowers, the Guarantors, Bank of America, N.A., as administrative and collateral agent (the "Prepetition ABL Agent"), the lenders party thereto from time to time (the "Prepetition ABL Lenders," and, together with the Prepetition ABL Agent and the other Secured Creditors (as defined in the Prepetition ABL Credit Documents), the "Prepetition ABL Secured Parties"), and the other parties thereto.    As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility was $296,283,409.56, inclusive of $3,716,590.00 in outstanding letters of credit (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, appraisers' fees, field examiners' fees, consultants' fees, financial advisors' fees, other advisors' fees, and related expenses and disbursements), indemnification obligations, Letters of Credit (as defined in the Prepetition ABL Credit Agreement), Secured Bank Product Obligations (as defined in the Prepetition ABL Credit Agreement) and other charges, amounts and costs of

9

whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Borrowers' and the Guarantors' obligations pursuant to the Prepetition ABL Credit Documents, including all "Obligations" as defined in the Prepetition ABL Credit Agreement,  collectively, the "Prepetition ABL Obligations"), which Prepetition ABL Obligations have been guaranteed on a joint-and-several basis by each Debtor (except VER Technologies HoldCo LLC), as a Borrower or Guarantor, and certain of the Debtors' non-Debtor affiliates.  The Debtors are in default of their obligations under the Prepetition ABL Credit Documents.

(ii)    *Prepetition ABL Collateral*.  In connection with the Prepetition ABL Credit Agreement, the Debtors entered into that certain U.S. Security Agreement, dated as of December 11, 2014 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified from time to time, the "Prepetition ABL Security Agreement"), by and between the Debtors, as grantors, and the Prepetition ABL Agent, as collateral agent for the Prepetition ABL Lenders and the other Prepetition ABL Secured Parties.  Pursuant to the Prepetition ABL Security Agreement, the other Security Documents (as defined in the Prepetition ABL Credit Agreement) and the other Prepetition ABL Credit Documents, the Prepetition ABL Obligations are secured by valid, binding, properly perfected, enforceable and nonavoidable first priority liens on, and security interests in, the Collateral (as defined in the Prepetition ABL Security Agreement, the "Prepetition Collateral"), in each case, subject to certain exclusions as set forth in the Prepetition ABL Credit Documents (the "Prepetition ABL Liens"), only to the extent such lien or security interest did not attach as of the Petition Date to the property purported to be subject to such exclusions.

(iii)    *Prepetition Term Loan Facility*.    The Prepetition Term Loan Lenders (as defined below) extended a $400,000,000 second priority, senior secured term loan facility of which $438,200,000 in aggregate principal amount remains outstanding (the "Prepetition Term Loan Facility") pursuant to that certain Prepetition Term Loan Agreement, dated as of December 11, 2014 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Agreement," and together with the Prepetition Term Loan Security Agreement (as defined below) and the other Credit Documents (as defined in the Prepetition Term Loan Agreement), the "Prepetition Term Loan Credit Documents"), among the Borrowers, the Guarantors, Wilmington Trust, National Association, as administrative and collateral agent (the "Prepetition Term Loan Agent"), the lenders party thereto from time to time (the "Prepetition Term Loan Lenders," and, together with the Prepetition Term Loan Agent and the other Secured Creditors (as defined in the Prepetition Term Loan Credit Documents), the "Prepetition Term Loan Secured Parties"), and other parties thereto.    As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loan Facility was $438,200,000 (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Borrowers' and certain of the Guarantors' obligations pursuant to the Prepetition Term Loan Credit Documents, including all "Obligations" as defined in the Prepetition Term Loan Agreement, collectively, the "Prepetition Term Loan Obligations," and together with the Prepetition ABL Obligations, the "Prepetition Secured

Obligations"), which Prepetition Term Loan Obligations have been guaranteed on a joint-and-several basis by each Debtor (except VER Technologies HoldCo LLC), as a Borrower or Guarantor, and certain of the Debtors' non-Debtor affiliates.  The Debtors are in default of their obligations under the Prepetition Term Loan Credit Documents.  For purposes of this Interim Order: "Prepetition Agents" means, collectively, the Prepetition ABL Agent and the Prepetition Term Loan Agent; "Prepetition Secured Parties" means, collectively, the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties; and "Prepetition Secured Debt Documents" means, collectively, the Prepetition ABL Credit Documents and the Prepetition Term Loan Credit Documents.

(iv)    *Prepetition Term Loan Collateral*.    In connection with the Prepetition Term Loan Agreement, the Debtors entered into that certain Security Agreement, dated as of December 11, 2014 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Security Agreement"), by and between the Debtors, as grantors, and the Prepetition Term Loan Agent, as collateral agent for the Prepetition Term Loan Lenders and the other Prepetition Term Loan Secured Parties.  Pursuant to the Prepetition Term Loan Security Agreement, the other Security Documents (as defined in the Prepetition Term Loan Agreement) and the other Prepetition Term Loan Credit Documents, the Prepetition Term Loan Obligations are secured by valid, binding, properly perfected, enforceable and nonavoidable second priority liens on, and security interests in, the Prepetition Collateral that are junior and subordinate only to the Prepetition ABL Liens, subject to certain exclusions as set forth in the Prepetition Term Loan Credit Documents (the "Prepetition Term Loan Liens," and together with the Prepetition ABL Liens, the "Prepetition

Liens"), only to the extent such lien or security interest did not attach as of the Petition Date to the property purported to be subject to such exclusions.

(v)      *Validity, Perfection and Priority of Prepetition Liens and Prepetition Secured Obligations.*  Subject to the challenge rights of parties in interest as set forth in paragraph 48 below, each of the Debtors acknowledges, represents, admits, stipulates and agrees that: (a) as of the Petition Date, the Prepetition Liens were legal, valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (b) as of the Petition Date, subject to the priorities set forth herein, and except as expressly permitted under the Prepetition Secured Debt Documents, the Prepetition Liens were senior in priority over any and all other liens on, and security interests in, the Prepetition Collateral; (c) the Prepetition Secured Obligations constitute legal, valid, binding, enforceable and non-avoidable obligations of and allowed claims against each of the Debtors; (d) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations is subject to any challenge or defense including, without limitation, impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), counterclaims, or cross-claims, pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law, or actions for recovery or disgorgement, against the Prepetition Secured Parties or any respective Releasees (as defined below) arising out of, based upon, or related to

13

the Prepetition Secured Debt Documents, the Prepetition Secured Obligations, or the Prepetition Liens.  As of the Petition Date, there were no liens on or security interests in the Prepetition Collateral *pari passu* with, or having priority over the Prepetition Liens, except as expressly permitted under the Prepetition Secured Debt Documents. Any such liens that are (x) expressly permitted under the Prepetition Secured Debt Documents and (y) senior, valid and prior by operation of law (including any that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code),  are referred to herein as the "Prepetition Permitted Prior Liens," and together with the DIP Permitted Prior Liens (as defined below), the "Permitted Prior Liens".[4]  As used in this Interim Order, "DIP Permitted Prior Liens" means any lien that is senior, valid and prior to the DIP Liens (as defined below) by operation of law or as permitted under the DIP Documents.  The Prepetition Liens were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby.  The right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject and subordinate to the Prepetition Liens and DIP Liens.

(vi)    *No Control.*   None of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or

---

[4] Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Lien is valid, senior, enforceable, prior, perfected or non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, or a Creditors' Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Prior Lien and/or security interests.

arising from this Interim Order, the DIP Facilities, the DIP Documents and/or the Prepetition Secured Debt Documents.

(vii)    *Release*.  The Debtors, on behalf of themselves and their respective estates, forever and irrevocably release, discharge and acquit the DIP Agents, all former, current and future DIP Lenders and Prepetition Secured Parties, and each of their respective former, current and future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest and assigns (each in their capacity as such, a "Releasee" and collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to this Interim Order, the DIP Facilities, the DIP Documents, the Prepetition ABL Facility, the Prepetition Term Loan Facility, the Prepetition Secured Debt Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code or applicable non-bankruptcy law, and (z) any and all claims and causes of action with respect to the validity, priority, perfection, enforceability or avoidability of the liens or claims of the Prepetition Agents, the other

Prepetition Secured Parties, the DIP Agents and/or the DIP Lenders; *provided* that the foregoing release shall not apply with respect to any act or omission of a Releasee that constitutes gross negligence, actual fraud or willful misconduct.   The Debtors further waive and release any defense, right of counterclaim, right of set-off, right of recoupment or deduction to the payment of the Prepetition Secured Obligations and the DIP Obligations which the Debtors may have now or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering this Interim Order.

    G.    **Cash Collateral**.   Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, whether subject to control agreements or otherwise, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing, whether existing on the Petition Date or thereafter, is the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

    H.    **Intercreditor Agreements.** The Prepetition ABL Agent, the Prepetition Term Loan Agent, and others entered into that certain Intercreditor Agreement dated as of December 11, 2014 (as may be amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Intercreditor Agreement").   Pursuant to section 510 of the Bankruptcy Code the Intercreditor Agreement and any other intercreditor agreement or subordination agreement between and/or among any Prepetition ABL Secured Party, any Prepetition Term Loan Secured Party, any Debtor or any affiliate thereof, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Secured Debt Documents (i) shall remain in full force and effect, (ii) shall continue to govern the relative

priorities, rights and remedies of the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties (including the relative priorities, rights and remedies of such parties with respect to the replacement liens and administrative expense claims and superpriority administrative expense claims granted, or amounts payable, by the Debtors under this Interim Order or otherwise and the modification of the automatic stay), and (iii) shall not be deemed to be amended, altered or modified by the terms of this Interim Order or the DIP Documents, unless expressly set forth herein with respect to the DIP Collateral Account.

      I.      **<u>Findings Regarding Corporate Authority</u>**.  Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

      J.      **<u>Findings Regarding Postpetition and Exit Financing and Cash Collateral</u>**

      (i)      *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter into the DIP Facilities on the terms described herein and in the DIP Documents, (b) use Cash Collateral and (c) use extensions of credit under the DIP Facilities on the terms described herein to administer their Cases and fund their operations.  At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed final order (the "<u>Final Order</u>"), which shall be in form and substance acceptable to the DIP ABL Agent and the DIP Term Lenders holding at least a majority in the aggregate of the DIP Term Facility (such DIP Term Lenders, the "<u>Required DIP Term Lenders</u>") and the Prepetition ABL Agent.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)     *Priming of the Prepetition Liens*.  The priming of the Prepetition Liens by the DIP ABL Liens (as defined below), and of the Prepetition Term Loan Liens by the DIP Term Liens (as defined below), under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facilities and this Interim Order, will enable the Debtors to obtain the DIP Facilities and to continue to operate their businesses to the benefit of their estates and creditors.  The Prepetition Term Loan Secured Parties consent to such priming liens and each Prepetition Secured Party is entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any Diminution in Value (as defined below) of each of their respective interests in the Prepetition Collateral (including Cash Collateral).

(iii)     *Need for Postpetition Financing and Use of Cash Collateral*.  The Debtors have an immediate and critical need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the DIP Facilities in order to, among other things, enable the orderly continuation of their operations and to administer and preserve the value of their estates.  The ability of the Debtors to maintain business relationships with their vendors, suppliers and customers, to pay their employees and otherwise finance their operations requires the availability of working capital from the DIP Facilities and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facilities and authorized use of Cash Collateral.

(iv)     *No Credit Available on More Favorable Terms*.  Given their current financial condition, financing arrangements, and capital structure, the Debtors have been

and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facilities. The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without (x) granting the DIP Agents (for the benefit of themselves and the DIP Lenders) the DIP Liens, the DIP Superpriority Claims (as defined below) and other protections on the terms set forth herein, (y) allowing the Prepetition ABL Obligations to be refinanced in full by the DIP ABL Obligations and (z) allowing any First Out Lender's (as defined in the Prepetition Term Loan Agreement) outstanding First Out Loans to be refinanced by the DIP Term Obligations, on a dollar-for-dollar basis with such First Out Lender's commitment to provide DIP Term Loans.

(v)    *Use of Proceeds of the DIP Facilities*. As a condition to entry into the DIP Agreements, the extension of credit under the DIP Facilities, and the authorization to use Cash Collateral, the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facilities shall be used, in each case in a manner consistent with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of this Interim Order and the DIP Term Documents and subject to such variances

as permitted in the DIP Term Agreement, the "<u>Budget</u>"),[5] solely: (a) upon entry of this Interim Order, to pay in full the Prepetition ABL Obligations; (b) to pay in full the outstanding First Out Loans of the DIP Term Lenders on the Closing Date (as defined in the DIP Term Agreement); (c) for permitted payment of costs of administration of the Cases; (d) for payment of adequate protection payments to the Prepetition ABL Lenders and the Prepetition Term Loan Lenders as provided herein; (d) to provide working capital for the Debtors; and (e) for other general corporate purposes of the Debtors; and (f) payment of the Carve Out in accordance with this Interim Order.

(vi)    *Payment in Full of the Prepetition ABL Obligations*.  The payment in full of the Prepetition ABL Obligations upon entry of this Interim Order is fair and reasonable under the circumstances and reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  The Prepetition ABL Lenders would not have consented to the use of the Prepetition Collateral absent the payment in full of the Prepetition ABL Obligations upon entry of this Interim Order.  In addition, the Prepetition ABL Lenders have provided substantial and valuable accommodations to the Debtors, their non-Debtor affiliates, and other parties-in-interest in exchange for full repayment of the Prepetition ABL Obligations upon entry of this Interim Order, including, without limitation:  (a) providing for the continued use of letters of credit and bank products and services, including, without limitation, p-cards, purchase cards and commercial cards; (b) forbearing from the exercise of remedies against certain non-Debtor affiliates; (c) forbearing from drawing on the Fund L/C (as defined in the Prepetition ABL Credit Agreement); and (d)  providing a commitment for an exit credit facility, in each case subject to the terms, conditions and limitations set forth in the Prepetition ABL

---

[5] A copy of the initial Budget is attached hereto as **Exhibit 1**.

Credit Documents or the ABL Commitment Letter and the ABL Fee Letter, as applicable. Moreover, the payment in full of the Prepetition ABL Obligations remains subject to the rights reserved pursuant to paragraph 48 hereof until the occurrence of ABL Discharge and therefore will not prejudice the rights of general unsecured creditors of the Debtors or any other parties-in-interest in these Cases.

(vii)    *Payment in Full of the First Out Loans*.    In order to satisfy the Debtors' liquidity needs in the weeks leading up to the Petition Date, the First Out Lenders provided the First Out Loans under the Prepetition Term Loan Facility.    The payment and refinancing of the First Out Loans with the proceeds of the DIP Term Loans shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of such existing First Out Lenders to fund amounts under the DIP Term Facility.    Such payment is fair and reasonable under the circumstances and reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.    The First Out Lenders would not have consented to provide their portion of the DIP Term Loans absent the repayment in full of the First Out Loans.    Moreover, the payment in full of the First Out Loans remains subject to the rights reserved pursuant to paragraph 48 hereof and therefore will not prejudice the rights of general unsecured creditors of the Debtors or other parties-in-interest in these Cases.

(viii)    Entry into the ABL Commitment Letter and the ABL Fee Letter, which is critical to the successful reorganization of the Debtors, is in the best interests of the Debtors' estates and creditors.    The terms, conditions, and fees contemplated by the ABL Commitment Letter and the ABL Fee Letter are fair and reasonable and warranted under the circumstances.

21

(ix)     Payment of the PRG Work Fee, to the extent due and owing, which is critical to the successful reorganization of the Debtors, is in the best interests of the Debtors' estates and creditors.  The PRG Work Fee, to the extent due and owing, is fair and reasonable under the circumstances.

K.     **Adequate Protection**.  The Prepetition Secured Parties have negotiated in good faith regarding the Debtors' use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses, in accordance with the terms hereof.  The Prepetition Secured Parties have agreed to permit the Debtors to use the Prepetition Collateral, including the Cash Collateral, in accordance with the terms and conditions set forth herein, including the protections afforded parties acting in "good faith" under section 363(m) of the Bankruptcy Code.  The Prepetition Secured Parties are entitled to the adequate protection as and to the extent of any diminution in value of their respective interests in the Prepetition Collateral, including any such diminution resulting from the sale, lease or use of such Prepetition Collateral by the Debtors, the priming of the Prepetition Secured Parties' security interests in and lien on the Prepetition Collateral by the Carve Out and the DIP Liens (in each case to the extent so provided herein), the imposition of the automatic stay, and/or any other reason for which adequate protection may be granted under the Bankruptcy Code ("Diminution in Value").  Based on the DIP Motion and on the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the Prepetition Secured Parties' consent to the use of the Prepetition Collateral (including the Cash Collateral).  Pursuant to sections 361,

363, 364 and 507(b) of the Bankruptcy Code, as adequate protection the Prepetition Secured Parties, as applicable, will receive adequate protection as more fully set forth in paragraphs 15–23 herein.

**L.**    **Sections 506(c) and 552(b); Doctrine of Marshaling**.  In light of (i) the DIP Agents' and DIP Lenders' agreement to subordinate their liens and superpriority claims, as applicable, to the Carve Out, and (ii) the Prepetition Secured Parties' agreement that their liens shall be subordinate to the Carve Out and the DIP Liens (in each case to the extent provided herein), (a) the Prepetition Secured Parties are each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) the DIP Agents, DIP Lenders, and Prepetition Secured Parties are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code; and (c) the DIP Agent, the DIP Lenders and Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, subject, in the case of clauses (a) and (b) only, to entry of the Final Order.

**M.**    **Good Faith of the DIP Agents; the DIP Lenders and the Prepetition Secured Parties**.

(i)    *Willingness to Provide Financing*.    The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facilities and the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Court that the DIP Facilities are essential to the Debtors' estates, that the DIP Agents and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agents' and DIP Lenders' claims, superpriority claims, security

interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)    *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms and conditions of the DIP Facilities and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable and the best available to the Debtors under the circumstances, are customary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and consideration.  The terms and conditions of the DIP Facilities and the use of Prepetition Collateral (including the Cash Collateral) were negotiated in good faith and at arms' length among the Debtors, DIP Agents and the DIP Lenders and the Prepetition Secured Parties, with the assistance and counsel of their respective advisors.  Use of Prepetition Collateral (including the Cash Collateral) shall be deemed to have been allowed in good faith by the Prepetition Secured Parties, and the credit to be extended under the DIP Facilities shall be deemed to have been allowed, advanced, made or extended in good faith by the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties, as applicable, within the meaning of section 364(e) of the Bankruptcy Code or otherwise.

N.    **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

O.    **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to each of the Prepetition Agents; (iv) counsel to the DIP

Agents; (v) counsel to the DIP Lenders; and (vi) all other parties entitled to notice under the Local Rules.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      <u>Interim Financing Approved</u>.  The DIP Motion is granted as set forth herein, the Interim Financing (as defined herein) is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled or resolved are hereby denied and overruled.

**<u>DIP Facilities Authorization</u>**

2.      <u>Authorization of the DIP Financing</u>.  The Interim Financing is hereby approved.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments, certificates, agreements and documents which may be required, necessary or advisable for the performance by the Debtors under the DIP Facilities and the creation and perfection of the DIP Liens (as defined herein) described in and provided for by this Interim Order and the DIP Documents, including, without limitation, each Debtor providing its joint and several unconditional guarantee of all of the DIP Obligations.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees,

expenses and other amounts described in the DIP Documents and all other documents constituting the DIP Facilities as such become due and without need to obtain further Court approval, including, without limitation, closing fees, unused facility fees, continuing commitment fees, servicing fees, audit fees, appraisal fees, monitoring fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agents' and DIP Lenders' attorneys, advisors, accountants and other consultants, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order or the DIP Documents.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

3.    Authorization to Borrow.  In order to prevent immediate and irreparable harm to the Debtors' estates, from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the Termination Declaration (as defined below), and subject to the terms, conditions and limitations on availability set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to request extensions of credit (in the form of loans and letters of credit) up to an aggregate outstanding principal amount equal to the Line Cap (as defined in the DIP ABL Agreement) under the DIP ABL Facility, and loans up to an aggregate outstanding principal amount of $33,000,000 (excluding amounts

necessary to repay the First Out Loans) under the DIP Term Facility (collectively, the "Interim Financing").

4.    DIP Obligations.    The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee appointed in the Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agents or any of the DIP Lenders, under the DIP Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses, disbursements, Secured Bank Product Obligations (as defined in the DIP ABL Agreement) and all other amounts under the DIP Documents and all "Obligations" (as defined in each DIP Agreements).  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall be due and payable, without notice or demand, on the DIP Termination Date (as defined herein), except as expressly provided in paragraph 34 herein. No obligation, payment, transfer or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined below), and including, without prejudice to the rights of parties-in-interest as set forth in paragraph 48 herein, in connection with any adequate protection provided to the Prepetition Secured Parties hereunder) shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to

550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5.      Bank Products.  From and after the date of the entry of the Interim Order, and consistent with the DIP ABL Agreement in all respects, any Secured Bank Product Provider under, and as defined in, the Prepetition ABL Credit Agreement, shall automatically be deemed a Secured Bank Product Provider, and, therefore, a Secured Creditor, under, and as defined in, the DIP ABL Agreement, and the Secured Bank Product Obligations (as defined in the Prepetition ABL Credit Agreement) owed to such Secured Bank Product Provider under the Prepetition ABL Facility as of the date of entry of the Interim Order shall automatically be deemed Secured Bank Product Obligations, and, therefore, a DIP ABL Obligation, under, and as defined in, the DIP ABL Agreement.  The DIP Liens and related lien priorities provided under this Interim Order shall, for the avoidance of doubt, apply with equal force to all such Secured Bank Product Obligations.

6.      DIP Liens.  In order to secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, each DIP Agent, for the benefit of itself and the DIP Lenders under its respective DIP Facility, is hereby granted, subject to the priorities set forth herein, continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each

of the Debtors and each Debtor's estate, including, without limitation, the following: (a) all Prepetition Collateral; (b) all money, accounts, chattel paper, deposit accounts, documents, equipment, contract rights, general intangibles, payment intangibles, instruments, inventory, patents, trademarks, copyrights and licenses therefor, letter-of-credit rights and investment property and support obligations; (c) commercial tort claims; (d) all books and records pertaining to the other property described in this paragraph; (e) all property of such Debtor held by any DIP Agent or DIP Lender, including all property of every description, in the custody of or in transit to such DIP Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Debtor or as to which such Debtor may have any right or power, including but not limited to cash; (f) all other goods (including but not limited to fixtures) and personal property of such Debtor, whether tangible or intangible and wherever located; (g) subject to entry of a Final Order, the proceeds of the Debtors' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (but not, for the avoidance of doubt, such claims or causes of action themselves); and (h) to the extent not covered by the foregoing, all other assets or property of the Debtors, whether tangible, intangible, real, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing, and in each case to the extent of any such Debtor's respective interest therein. (collectively, the "<u>DIP Collateral</u>"). Notwithstanding the foregoing or anything herein to the contrary, (x) funds of the DIP Term Facility in the DIP Collateral Account and the Debtors' rights under the DIP Term Facility shall

not constitute DIP Collateral with respect to the DIP ABL Facility or the Prepetition ABL Facility; and (y) DIP Collateral shall not include the Debtors' real property leases but shall include all proceeds of such leases.

7.    DIP Lien Priority.

(a)    *DIP Liens*.  The DIP Liens securing the DIP ABL Obligations (the "DIP ABL Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP ABL Liens shall be junior only to the Carve Out and the Prepetition Permitted Prior Liens.  The DIP Liens securing the DIP Term Obligations (the "DIP Term Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP Term Liens shall be junior only to the DIP ABL Liens, the Prepetition ABL Liens, the Carve Out, the Permitted Prior Liens and the Prepetition ABL Adequate Protection Liens (as defined below); *provided* that, solely with respect to the DIP Collateral Account (as defined below), the DIP Term Liens shall be senior to all other liens and junior only to the Carve Out. Other than as set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Cases or Successor Cases.  The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

(b)      *Prepetition ABL Liens*.  The Prepetition ABL Liens shall be senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the Prepetition Collateral, including the DIP Term Liens, the DIP Permitted Prior Liens, the Prepetition Term Loan Adequate Protection Liens and the Prepetition Term Loan Liens, and shall be junior only to the Carve Out, the DIP ABL Liens, the Prepetition ABL Adequate Protection Liens, and the Prepetition Permitted Prior Liens.  For the avoidance of doubt, the Prepetition ABL Liens shall not extend to any funds of the DIP Term Facility in the DIP Collateral Account or the Debtors' rights under the DIP Term Facility.

(c)      *Prepetition Term Loan Liens*.  The Prepetition Term Loan Liens shall be senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the Prepetition Collateral, except that the Prepetition Term Loan Liens shall be junior to the Carve Out, the Permitted Prior Liens, the Prepetition ABL Liens, the Prepetition ABL Adequate Protection Liens and the DIP Liens.

8.      <u>DIP Superpriority Claims</u>.  Subject and subordinate to the Carve Out, upon entry of this Interim Order, the DIP Agents and DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations: (a) except as set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy

Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.

9.      <u>No Obligation to Extend Credit</u>.  Except as expressly required pursuant to paragraph 45 hereof, and subject to the conditions and limitations set forth therein, the DIP Agents and DIP Lenders shall have no obligation to make any loan or advance, or to issue, amend, renew or extend any letters of credit under the DIP Documents, unless all of the conditions precedent to the making of such loans or the issuance, amendment, renewal or extension of such letters of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP ABL Agent or the Required DIP Term Lenders, as applicable, in its or their sole discretion, and in accordance with the terms of the applicable DIP Documents.  In the event that the conditions precedent to the making of any loan or advance, or the issuance, amendment, renewal or extension of any letters of credit under the DIP Documents and this Interim Order have not been satisfied, the DIP Agents and the DIP Lenders may, in their sole and absolute discretion, continue to make any loan or advance, or issue, amend, renew or extend any letters of credit, and any of the foregoing shall constitute DIP Obligations.

10.     <u>Use of Proceeds of DIP Facilities</u>.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facilities in accordance with the Budget, only for the purposes specifically set forth in this Interim Order and the DIP Documents, and in compliance with the terms and conditions in this Interim Order and the DIP Documents.

11.     <u>Payment of the Prepetition ABL Obligations</u>.  The Debtors are authorized to execute and perform the transactions and undertakings set forth in that certain payoff letter (the "<u>Prepetition ABL Payoff Letter</u>"), which are hereby approved in all respects.  Accordingly,

immediately upon entry of this Interim Order, the Debtors are hereby authorized to use proceeds of the DIP ABL Facility and Cash Collateral to pay in cash in full all Prepetition ABL Obligations or, solely with respect to any letters of credit that have not been expired or cancelled and that constitute Prepetition ABL Obligations, provide one or more replacement or backstop letters of credit issued under the DIP ABL Agreement and/or provide that any such letters of credit under the Prepetition ABL Credit Agreement are deemed to be issued under the DIP ABL Agreement. The foregoing transactions in respect of the Prepetition ABL Obligations shall be indefeasible, and the Prepetition ABL Liens shall be automatically released and terminated, upon (a) expiration of the Challenge Deadline (as defined below)  if no Challenge (as defined below) against the Prepetition ABL Secured Parties is timely and properly commenced prior to the end of the Challenge Deadline as provided in paragraph 48 hereof or, (b) in the event that such a Challenge (as defined below) is timely and properly commenced, on the date on which any order or judgment entered by the Court in favor of the Prepetition ABL Secured Parties in such Challenge (each as defined below) becomes final and nonappealable (the "ABL Discharge"). The Surviving Obligations (as defined in the Prepetition ABL Payoff Letter), including the indemnification of the Prepetition ABL Secured Parties by the Debtors as and to the extent provided for in the Prepetition ABL Credit Documents, shall survive the ABL Discharge and the other transactions described in this paragraph 11 and, upon the occurrence of ABL Discharge, shall constitute DIP ABL Obligations.

12.    <u>Payment of the First Out Term Loans</u>.  The Debtors are hereby authorized to use proceeds of the DIP Term Facility to, at the initial closing of the DIP Term Facility, pay in cash in full all First Out Loans.  The foregoing transactions in respect of the First Out Loans shall be indefeasible, and all liens securing the First Out Loans released, upon expiration of the

Challenge Deadline if no Challenge (as defined below) against the First Out Lenders is timely and properly commenced prior to the end of the Challenge Deadline (as defined below) as provided in paragraph 48 hereof; or (b) in the event that such a Challenge is timely and properly commenced, on the date on which any order or judgment entered by the Court in favor of the Prepetition Term Loan Secured Parties in such Challenge (as defined below) becomes final and nonappealable.

**Cash Dominion**

13.    <u>Dominion Account</u>.  Each Debtor shall cause all Cash Collateral, other than funds of the DIP Term Facility, to be promptly deposited in an account designated by DIP ABL Agent (the "<u>Dominion Account</u>"). Prior to the deposit of Cash Collateral to the Dominion Account, each Debtor shall be deemed to hold such proceeds in trust for the benefit of DIP ABL Lenders. The DIP ABL Agent shall be entitled to apply such Cash Collateral to the payment of the Prepetition ABL Obligations (prior to or in connection with the repayment thereof in accordance with paragraph 11 hereof) or the DIP ABL Obligations as authorized by this Interim Order and the DIP ABL Agreement, and any Cash Collateral so applied shall have the effect of creating borrowing availability under, as and to the extent provided in, the DIP ABL Agreement. Notwithstanding the foregoing or any other provisions of this Interim DIP Order or the DIP Documents, no cash advanced under the DIP Term Facility shall be applied to pay the Prepetition ABL Obligations or the DIP ABL Obligations.

**Authorization to Use Cash Collateral**

14.    <u>Authorization to Use Cash Collateral</u>.  Prior to the indefeasible payment in full in cash of the DIP ABL Obligations, subject to the terms and conditions of this Interim Order, the DIP Facilities and the DIP Documents and in accordance with the Budget, the Debtors are authorized to use Cash Collateral until the DIP Termination Date (as defined herein);

*provided* that during the Remedies Notice Period (as defined herein) the Debtors may use Cash Collateral solely to meet payroll obligations and, as agreed by the DIP ABL Agent and the Required DIP Term Lenders, each in its or their sole discretion, to pay expenses critical to the administration of the Debtors' estates.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order.

**Adequate Protection**

15.    Adequate Protection Liens.

(a)    *Prepetition ABL Adequate Protection Liens*.  Subject and subordinate to the Carve Out, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, subject to and until the occurrence of ABL Discharge, the Debtors hereby grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Secured Parties, additional and replacement, continuing, valid, binding, enforceable and perfected postpetition security interests in and liens on the DIP Collateral (the "Prepetition ABL Adequate Protection Liens"), other than amounts in the DIP Collateral Account.  For the avoidance of doubt, the Prepetition ABL Adequate Protection Liens shall not extend to any funds of the DIP Term Facility in the DIP Collateral Account or the Debtors' rights under the DIP Term Facility.

(b)    *Prepetition Term Loan Adequate Protection Liens*.  Subject and subordinate to the Carve Out, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Loan Secured Parties in the

35

Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Secured Parties, additional and replacement, continuing, valid, binding, enforceable and perfected postpetition security interests in and liens on the DIP Collateral (the "Prepetition Term Loan Adequate Protection Liens," and together with the Prepetition ABL Adequate Protection Liens, the "Adequate Protection Liens").

16.     Priority of Adequate Protection Liens.

(a)     The Prepetition ABL Adequate Protection Liens shall be junior only to (i) Carve Out, (ii) the Prepetition Permitted Prior Liens, and (iii) the DIP ABL Liens.

(b)     The Prepetition Term Loan Adequate Protection Liens shall be junior only to (i) the Carve Out, (ii) the Prepetition ABL Liens, (iii) the Prepetition ABL Adequate Protection Liens, (iv) the DIP Liens, and (v) the Permitted Prior Liens.

(c)     Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

17.     Adequate Protection Superpriority Claims.

(a)     *Prepetition ABL Superpriority Claim*.  Subject to the Carve Out, as further adequate protection of the interests of the Prepetition ABL Secured Parties in the

36

Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, subject to and until the occurrence of ABL Discharge, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Secured Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Prepetition ABL Superpriority Claim").

(b)      *Prepetition Term Loan Superpriority Claim*.  Subject in all respects to the Carve Out, as further adequate protection of the interests of the Prepetition Term Loan Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the other Prepetition Term Loan Secured Parties, is hereby granted as and to the extent provided by section 507(b) or the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (together with the Prepetition ABL Superpriority Claim, the "Adequate Protection Superpriority Claims").

18.      Priority of the Adequate Protection Superpriority Claims.  Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; *provided* that the Adequate Protection Superpriority Claims shall be (a) subject to the lien priorities as set forth in paragraph 16 herein and (b) junior to the Carve Out.

19.     <u>Adequate Protection Fees and Expenses</u>.  The Debtors are authorized and directed to pay, without further order of the Court, the reasonable and documented fees and expenses (the "<u>Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of (a) Alston & Bird LLP and one Delaware counsel (if retained), as counsel to the Prepetition Term Loan Agent, (b) Morgan, Lewis & Bockius, LLP, Richards Layton & Finger, and FTI Consulting as professionals for a majority of the Prepetition Term Loan Lenders, and (c) subject to and until the occurrence of ABL Discharge, counsel and other professionals to the Prepetition ABL Secured Parties, as provided in the Prepetition Secured Debt Documents.  The Adequate Protection Fees shall be paid in accordance with the procedures set forth in paragraph 42 hereof.

20.     <u>Additional Adequate Protection – Prepetition Term Loan Secured Parties</u>. As additional adequate protection against any Diminution in Value of the Prepetition Term Loan Secured Parties' interest in the Prepetition Collateral (including Cash Collateral), the Prepetition Term Loan Obligations shall continue to accrue interest at the applicable non-default rate set forth in the Prepetition Term Loan Agreement.

21.     <u>Additional Adequate Protection – Prepetition ABL Secured Parties</u>.  As additional adequate protection against any Diminution in Value of the Prepetition ABL Secured Parties' interest in the Prepetition Collateral (including Cash Collateral), the Prepetition ABL Secured Parties are hereby granted, subject to and until the occurrence of ABL Discharge, additional adequate protection in the form of: (a) continued maintenance and insurance of the Prepetition Collateral in amounts and for the risks, and by the entities, as required under the Prepetition ABL Credit Agreement, the DIP ABL Agreement and this Interim Order and (b) reporting and information rights, including (i) timely compliance with all information covenants and collateral monitoring and reporting obligations set forth in the Prepetition ABL Credit

Agreement and (ii) all information and reports required to be delivered to the DIP ABL Agent and DIP ABL Lenders pursuant to the DIP ABL Agreement.  For the avoidance of doubt, the Prepetition ABL Agent may share any reports received from the Debtors with the Prepetition ABL Lenders and their advisors.

22.    <u>Contingent Prepetition ABL Obligations</u>.  As used herein, "<u>Contingent Prepetition ABL Obligations</u>" shall mean any amount of the Prepetition ABL Obligations subsequently reinstated after the payment thereof because such payment (or any portion thereof) is required to be returned or repaid to any of the Debtors or DIP Lenders. In the event that the Prepetition ABL Agent or any other Prepetition ABL Secured Parties (each in their capacities as such) are ordered by the Court to disgorge, refund, or in any manner repay to any of the Debtors or their estates any amounts ("<u>Disgorged Amounts</u>") leading to Contingent Prepetition ABL Obligations, the Disgorged Amounts, unless otherwise ordered by the Court (including in the order directing such disgorgement, refund, or repayment), shall be placed in a segregated, interest-bearing account, pending a further final, non-appealable order of a court of competent jurisdiction regarding the distribution of such Disgorged Amounts. Any Disgorged Amounts returned to the Prepetition ABL Agent or any other Prepetition ABL Secured Party shall include accrued interest at the default rate set forth in the Prepetition ABL Credit Agreement.

23.    <u>Adequate Protection Reservation</u>.  Subject to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed a finding by the

Court or an admission by the Prepetition Secured Parties that the interests of the Prepetition Secured Parties are adequately protected.

**Provisions Relating to DIP Financing and Use of Cash Collateral**

        24.   <u>Amendment of the DIP Documents</u>.  The DIP Documents may from time to time be amended, modified or supplemented by the parties thereto without further order of the Court if the amendment, modification or supplement is (a) non-material and (b) in accordance with the DIP Documents and this Interim Order.  In the case of a material amendment, modification or supplement to the DIP Documents, the Debtors shall provide notice (which may be provided through electronic mail or facsimile) to counsel to the Creditors' Committee (if appointed), the U.S. Trustee, the Prepetition Agents and the DIP ABL Agent (in the case of modifications to the DIP Term Document) or the DIP Term Agent (in the case of modifications to the DIP ABL Documents), and parties who have requested notice in the Cases or are affected by the amendment, promptly upon the execution of such amendment, modification or supplement; *provided* that approval of the Court (which may be sought within three (3) business days, and, as to which timeframe no party shall be permitted to object) will be necessary to effectuate any such amendment, modification or supplement; *provided, further,* that such amendment, modification or supplement shall be without prejudice to the right of any party in interest to be heard.

        25.   <u>Budget Maintenance</u>.   The use of borrowings and the use of Cash Collateral under the DIP Facilities shall be in accordance with the Budget, subject in all respects to the variances set forth in the DIP Term Documents.[6]  The Budget shall be approved by, and be in form and substance satisfactory to, the Required DIP Term Lenders in their sole discretion.

---

[6]     NTD: Budget mechanics subject to review, including permitted variance, testing, and non-conforming uses.

The Debtors shall comply with and update the Budget from time to time in accordance with the DIP Term Agreement (provided that any update shall be in form and substance reasonably acceptable to the Required DIP Term Lenders, in their sole discretion, and the DIP Term Agent, in its reasonable discretion).  A copy of any Budget (or updated Budget) shall be delivered to counsel for the Creditors' Committee (if appointed) and the U.S. Trustee after (or if) it has been approved by the Required DIP Term Lenders.  In addition, the Debtors shall deliver to the DIP ABL Agent all Budget updates and related cash-flow forecasts and variance reports contemporaneously with the delivery thereof to the DIP Term Agent and/or DIP Term Lenders.

26.    <u>Budget Compliance</u>.  The Debtors shall at all times comply with the Budget, subject to the variances set forth in the DIP Term Documents.

27.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agents, DIP Lenders, or the Prepetition Agents each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties under the DIP Documents, the DIP Facilities and this Interim Order; and (d) authorize the Debtors to pay, and the DIP Agents, the DIP Lenders and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

28.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.

(a)     This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, taking possession of or control over cash, deposit accounts, securities or other assets, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to entitle the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to the priorities granted herein.

(b)     Notwithstanding the foregoing, the DIP Agents and the Prepetition Secured Parties each are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over cash, deposit accounts, securities or other assets, or take any other action, as they may elect, in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agents or any Prepetition Secured Party (as applicable) chooses, in their sole discretion, to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over any cash, deposit accounts, securities or other assets, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed,

enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order) immediately upon entry of this Interim Order.

(c)     The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agents or the Prepetition Secured Parties all such financing statements, mortgages, control agreements, notices and other documents as the DIP Agents or the Prepetition Secured Parties may reasonably request.  The Debtors are authorized to, and shall, execute and deliver to the DIP Agents and the Prepetition Secured Parties such agreements, financing statements, mortgages, instruments and other documents as the DIP Agents or the Prepetition Secured Parties may reasonably request to evidence, confirm, validate or perfect the DIP Liens or the Adequate Protection Liens, and the failure by the Debtors to execute or deliver any documentation relating to the DIP Liens or the Adequate Protection Liens shall in no way affect the validity, enforceability, nonavoidability, perfection or priority of such liens.

(d)     The DIP Agents and the Prepetition Secured Parties, each in its discretion, may file a photocopy of this Interim Order as a financing statement or other notice of lien or similar instrument, with any filing or recording office or with any registry of deeds or similar office, and accordingly, each officer is authorized to accept and record the photocopy of this Interim Order, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

29.     <u>Protections of Rights of DIP Agents, the DIP Lenders and the Prepetition Secured Parties</u>.

(a)     The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will, whether or not the DIP Obligations have been indefeasibly paid in full in cash, (i) maintain books, records, and accounts to the extent and as required by the

DIP Documents, (ii) reasonably cooperate with, consult with, and provide to the DIP Agents and the DIP Lenders and their advisors all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the DIP Agents or the DIP Lenders) to provide under the DIP Documents or the provisions of this Interim Order, (iii) upon reasonable advance notice, permit consultants, advisors and other representatives (including third party representatives) of the DIP Agents and the DIP Lenders to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees, independent public accountants and other professional advisors (other than legal counsel) as and to the extent required by the DIP Documents, (iv) permit the DIP Agents and the DIP Lenders and their respective consultants, advisors and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets, and (v) upon reasonable advance notice, permit the DIP Agents and the DIP Lenders to conduct, in their reasonable discretion and at the Debtors' reasonable cost and expense, field audits, collateral examinations, liquidation valuations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral (provided that copies of any of the foregoing shall be promptly delivered to the Prepetition ABL Agent (or its advisors) subject to the confidentiality requirements set forth in the Prepetition ABL Credit Agreement).

(b)    The DIP Agents and/or the DIP Lenders shall be entitled to credit bid up to the full amount of the applicable outstanding DIP Obligations, including any accrued interest and expenses, in any sale of any DIP Collateral, and whether such sale is effectuated

through section 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, subject in each case to the provision of consideration sufficient to pay in full in cash any senior liens (including, without limitation, the Prepetition ABL Liens) on the collateral that is subject to the credit bid.

(c)     The Prepetition Secured Parties shall be entitled to credit bid up to the full amount of their respective Prepetition Secured Obligations, including any accrued interest and expenses, in any sale of any Prepetition Collateral, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, subject in each case to the provision of consideration sufficient to indefeasibly pay in full in cash the obligations secured by any senior liens on the collateral that is subject to the credit bid.

30.     <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, or any examiner with expanded powers, subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents or this Interim Order at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Agents' and DIP Lenders' obligation to extend credit under the DIP Facilities, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agents to be applied in accordance with this Interim Order and the DIP Documents.  Notwithstanding anything to the contrary herein, and for the avoidance of doubt, it shall not be a violation of the DIP Documents (subject to any debt incurrence limitations as may be set forth in the DIP Agreements) or this Interim

Order if the Debtors obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) that expressly provides for (a) a provision for termination of the Commitments (as defined in the DIP Agreements) and the indefeasible repayment in full in cash of all of the DIP Obligations contemporaneously with the incurrence of such debt, (b) a full release in favor of the DIP Agents and the DIP Lenders and their respective Releasees and (c) that the initial drawing under such financing are actually used for the purposes described in clause (a).

31.    <u>Cash Collection</u>.  Unless otherwise agreed to in writing by the Required DIP Term Lenders and the DIP ABL Agent, the Debtors shall maintain no accounts except those identified in the one or more orders, in form and substance satisfactory to the DIP ABL Agent in its sole discretion, approving the Debtors' cash-management systems and arrangements (the "<u>Cash Management Order</u>") and the DIP Collateral Account, and all accounts shall be used for the purposes and on the terms and conditions set forth in the Budget and the DIP Agreements. The Debtors shall establish and maintain the Collateral Account (as defined in the DIP Term Agreement, and referred to herein as the "<u>DIP Collateral Account</u>") over which the DIP Term Agent shall have a first priority security interest and sole dominion and control, notwithstanding anything to the contrary in this Interim Order, the DIP Documents or the Prepetition ABL Credit Documents, and the proceeds of the DIP Term Loans shall be funded into the DIP Collateral Account.  For the avoidance of doubt (a) the DIP ABL Secured Parties, the Prepetition ABL Secured Parties, and the Debtors shall not apply any of the DIP Term Loans to make any payment in reduction of the revolving credit loans under the Prepetition ABL Credit Agreement or the DIP ABL Agreement, (b) funds of the DIP Term Facility in the DIP Collateral Account and the Debtors' rights under the DIP Term Facility shall not constitute DIP Collateral with respect to the DIP ABL Facility or the Prepetition ABL Facility; and (c) neither the DIP ABL

Secured Parties nor the Prepetition ABL Secured Parties shall "sweep" any zero-balance disbursement account of the Debtors if such zero-balance disbursement account (x) holds funds advanced under the DIP Term Facility to pay expenses under the Budget and (y) such budgeted expenses have not been paid by the Debtors at the time of the sweep.

32.    <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full in cash of all DIP Obligations and the termination of the DIP Agents' and the DIP Lenders' obligation to extend credit under the DIP Facilities, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Documents; and (b) maintain a cash management system acceptable to the DIP ABL Agent and the Required DIP Term Lenders in their sole discretion.

33.    <u>Disposition of DIP Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the Required DIP Term Lenders and the DIP ABL Agent, and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Term Agent, the DIP Term Lenders or the DIP ABL Agent or from any order of this Court, except as otherwise provided for in the DIP Term Documents, the DIP ABL Documents or otherwise ordered by the Court.

34.    <u>DIP Termination Date</u>.  On the applicable DIP Termination Date (as defined herein), (a) all applicable DIP Obligations shall be immediately due and payable, all commitments to extend credit under the applicable DIP Facilities will terminate, other than as required in paragraph 45 with respect to the Carve Out, except as otherwise agreed by the DIP ABL Agent (in respect of extensions of credit under the DIP ABL Facility) and/or the Required DIP Term Lenders (in the case of extensions of credit under the DIP Term Facility), in each of their sole discretion and (b) all authority to use Cash Collateral shall cease, *provided* that during

the Remedies Notice Period (as defined herein), the Debtors may use Cash Collateral solely to meet payroll obligations and, as agreed by the Required DIP Term Lenders and the DIP ABL Agent, each in its or their sole discretion, to pay expenses critical to the administration of the Debtors' estates.

35.    <u>Events of Default</u>.  The occurrence of any "Event of Default" under, and as defined in, the DIP Documents shall constitute an event of default (collectively, the "<u>Events of Default</u>") under this Interim Order.

36.    <u>Milestones</u>.  As a condition to the DIP Term Loan and the use of Cash Collateral, the Debtors shall comply with the Required Milestones and Operating Covenants (each as defined in the DIP Term Agreement).  The failure of the Debtors to comply with any of the Required Milestones and Operating Covenants (as such may be amended, waived, modified or otherwise extended), if not amended, waived, modified or otherwise extended, subject to the expiration of the Remedies Notice Period (as defined below), shall (a) constitute an Event of Default under the DIP Term Agreement, (b) subject to delivery of a Termination Declaration (as defined below) and the expiration of the Remedies Notice Period (as defined below), result in the automatic termination of the Debtors' authority to use Cash Collateral under this Interim Order, and (c) permit the DIP Term Lenders, subject to paragraphs 37 and 38, to exercise the rights and remedies provided for in this Interim Order and the DIP Documents.

37.    <u>Rights and Remedies Upon Event of Default</u>.

(a)    Immediately upon the occurrence and during the continuation of an Event of Default under the DIP Documents or this Interim Order, notwithstanding the provisions of section 362 of the Bankruptcy Code, but subject to paragraph 38 of this Interim Order, without any application, motion or notice to, hearing before, or order from the Court, but subject to the

terms of this Interim Order  the DIP ABL Agent (subject to the limitations in paragraph 35 of this Interim Order) or the DIP Term Agent (only if acting at the direction of the Required DIP Term Lenders) may declare (any such declaration shall be referred to herein as a "Termination Declaration," and the date which is the earliest to occur of the issuance of any such Termination Declaration and the Maturity Date (as defined in the DIP ABL Agreement or the DIP Term Agreement, as the case may be) shall be referred to herein as the "DIP Termination Date"):  (i) all DIP Obligations owing under the respective DIP Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the respective DIP Facilities, (iii) the termination of the respective DIP Facilities and the DIP Documents only as to any future liability or obligation of the applicable DIP Agents and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the application of the Carve Out has occurred through the delivery of the Carve Out Trigger Notice (as defined below) to the Borrowers.

(b)      Any Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the DIP ABL Agent (if delivered by the DIP Term Agent), counsel to the DIP Term Agent (if delivered by the DIP ABL Agent), counsel to the Prepetition ABL Agent, counsel to the Prepetition Term Loan Agent, counsel to a Creditors' Committee (if appointed) and the U.S. Trustee.  The automatic stay in the Cases otherwise applicable to the DIP Agents, the DIP Lenders and Prepetition Secured Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"), but subject to paragraph **Error! Reference source not found.** hereof and subject to the Carve Out, the DIP Agents and the DIP Lenders shall be

entitled to exercise their rights and remedies in accordance with the DIP Documents and this Interim Order and shall be permitted to satisfy the DIP Obligations, DIP Superpriority Claim and DIP Liens.  During the Remedies Notice Period, the Debtors and a Creditors' Committee (if appointed) shall be entitled to seek an emergency hearing, and the DIP Agents, the DIP Lenders and Prepetition Secured Parties shall consent to such emergency hearing, within the Remedies Notice Period with the Court; *provided* that the sole issues that may be raised are whether an Event of Default has occurred and/or is continuing and to seek to use Cash Collateral on a non-consensual basis, and the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agents or the DIP Lenders.  Unless the Court orders otherwise, the automatic stay, as to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties shall automatically be terminated at the end of the Remedies Notice Period without further notice or order, and, subject to paragraph **Error! Reference source not found.**, the Prepetition Agents, the DIP Agents and the DIP Lenders shall be permitted to exercise all remedies set forth herein, in the Prepetition ABL Credit Documents, the DIP Documents and as otherwise available at law without further order of or application or motion to the Court.  Notwithstanding anything to the contrary in any Prepetition Term Loan Credit Document or any DIP Document, no Prepetition Term Loan Secured Party may raise any objection to, or oppose, and each Prepetition Term Loan Secured Party shall be deemed to have consented to the release of any Debtor from its obligations under any Prepetition Term Loan Credit Document with respect to the DIP Collateral or to any private or public sale of all or any portion of the DIP Collateral free and clear of any liens and other claims at any time after the occurrence and during the continuance of an Event of Default under the DIP Documents or this

Interim Order if the Required DIP Term Lenders have consented to such release or sale including, without limitation, under section 363 of the Bankruptcy Code (or other similar provision of any applicable law), and in connection with the foregoing, each Prepetition Term Loan Secured Party hereby irrevocably authorizes the DIP Agents to release any Prepetition Term Loan Lien on any of the DIP Collateral.

(c)        Upon entry of the Final Order, without limiting any other rights or remedies of the DIP Agents or the DIP Lenders, or otherwise available at law or in equity, and subject to the terms of the DIP Documents, upon three (3) business days' written notice to counsel to the Debtors and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property, after the expiration of the Remedies Notice Period, that an Event of Default has occurred and is continuing, the DIP Agents, (i) may unless otherwise expressly provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agents (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon, and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable lease or license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses, in either the case of (i) or (ii), without interference from lienholders or licensors thereunder; *provided*, that the DIP Agents (on behalf of the applicable DIP Lenders) shall pay only rent and additional rent, fees, royalties or other monetary obligations of the Debtors that accrue during the period of such occupancy or actual use by DIP Agents calculated on a per diem basis. Nothing herein shall require the Debtors, the DIP Agents or the DIP

Lenders, to assume any lease or license under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agents and the DIP Lenders herein. Nothing shall prevent the rights of a landlord to object to the relief being sought in this subparagraph subject to the Final Hearing.

38. <u>Intercreditor Provisions</u>. The following provisions shall apply unless the DIP ABL Agent, the DIP Term Agent (acting at the direction of the Required DIP Term Lenders), the Prepetition ABL Agent and/or the Prepetition Term Agent (acting at the direction of the Required Prepetition Term Lenders) have otherwise agreed in writing, including, with respect to the DIP ABL Agent and the DIP Term Agent, in a debtor-in-possession intercreditor agreement between them:

(d) Without further order of the Court, upon expiration of the Remedies Notice Period (unless the court determines during the Remedies Notice Period that no Event of Default has occurred or is continuing), the DIP ABL Agent or, after the indefeasible payment in full in cash of the DIP ABL Obligations, the Prepetition ABL Agent shall have the right to take Enforcement Actions with respect to the DIP Collateral (other than the DIP Collateral Account) without any consultation with or the consent of the Debtors, the DIP Term Agent, any DIP Term Lender or the Prepetition Term Loan Secured Parties. In connection with any such Enforcement Action (as defined below), the DIP ABL Agent or the Prepetition ABL Agent (as applicable) may enforce the provisions of the DIP ABL Documents or the Prepetition ABL Credit Documents (as applicable) and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of their sole discretion.

(e) Without further order of the Court, upon expiration of the Remedies Notice Period (unless the court determines during the Remedies Notice Period that no

Event of Default has occurred or is continuing), until the indefeasible payment in full in cash of the DIP Term Obligations, the DIP Term Agent shall have the exclusive right to take Enforcement Actions against the DIP Collateral Account.   In connection with any such Enforcement Action, the DIP Term Agent (acting at the direction of the Required DIP Term Lenders) may enforce the provisions of the DIP Term Documents and exercise remedies thereunder, all in such order and in such manner as the Required DIP Term Lenders may determine in the exercise of their sole discretion.  The net proceeds of any such collateral shall be applied as provided in the DIP Term Agreement to first reduce the DIP Term Obligations.

(f)      Without further order of the Court, upon expiration of the Remedies Notice Period (unless the court determines during the Remedies Notice Period that no Event of Default has occurred or is continuing), and (i) following the indefeasible payment in full in cash of (A) the DIP ABL Obligations and (B) the Prepetition ABL Obligations, in each case that are due and payable or otherwise accrued and owing at or prior to such time (other than contingent indemnification obligations for which no written or oral claim or demand for payment has been made at such time), (ii) with the consent of the DIP ABL Agent and the Prepetition ABL Agent, or (iii) upon expiration of the Standstill Period (as defined below) so long as neither the DIP ABL Agent nor the Prepetition ABL Agent is then pursuing with commercially reasonable diligence an Enforcement Action with respect to all or a material portion of the DIP Collateral (other than the DIP Collateral Account) and the DIP Term Agent has provided the DIP ABL Agent and the Prepetition ABL Agent at least five business days prior written notice, the DIP Term Agent (acting at the direction of the Required DIP Term Lenders) and the Prepetition Term Agent (acting at the direction of the Required Prepetition Term Lenders) shall have the right to take Enforcement Actions with respect to any DIP Collateral or Prepetition Collateral

without any consultation with or (except to the extent obtained in accordance with clause (ii) above) the consent of the Debtors, the DIP ABL Agent or the Prepetition ABL Agent.   In connection with any such Enforcement Action, the DIP Term Agent (acting at the direction of the Required DIP Term Lenders) may enforce the provisions of the DIP Documents and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of their sole discretion.   Following an Enforcement Action pursuant to this paragraph **Error! Reference source not found.**(c), the net proceeds of DIP Collateral (other than the DIP Collateral Account) shall be applied as follows: _first_, to reduce the DIP ABL Obligations in accordance with the DIP ABL Documents; _second_, to reduce the Prepetition ABL Obligations in accordance with the Prepetition ABL Credit Documents; _third_, as provided in the DIP Term Agreement; and _fourth_, after indefeasible repayment in full in cash of the DIP Obligations, in each case that are due and payable or otherwise accrued and owing at or prior to such time (other than contingent indemnification obligations for which no written or oral claim or demand for payment has been made at such time) and the termination of the DIP Facilities, to repay the Prepetition Term Loan Obligations in accordance with the Prepetition Term Loan Credit Documents.

(g)    "Enforcement Action" means, with respect to the DIP Obligations or the Prepetition Secured Obligations, the exercise of any rights and remedies with respect to the DIP Collateral securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies under, as applicable, the DIP Documents, the Prepetition Secured Debt Documents, or applicable law, including, without limitation the exercise of any rights of set-off or recoupment, and the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction or under this

Interim Order.  For the avoidance of doubt, the DIP ABL Agent's exercise of cash dominion does not constitute an Enforcement Action.

39.    "<u>Standstill Period</u>" means the period commencing on the date of an Event of Default under the DIP Term Agreement and ending upon the date which is 150 days after the DIP ABL Agent and the Prepetition ABL Agent have received a notice from the DIP Term Agent with respect to such Event of Default; provided that such period shall be extended for any period during which the DIP ABL Agent or the Prepetition ABL Agent is stayed pursuant to any applicable law, including in the Cases, or by an order issued by the Court or any other court of competent jurisdiction, from exercising any rights or remedies with respect to all or a material portion of the DIP Collateral, provided that in the event that as of any day during such period, no Event of Default under the DIP Term Agreement is continuing, then the Standstill Period shall be deemed not to have commenced.

40.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  The DIP Agents, the DIP Lenders, and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein, and, to the extent applicable, section 364(e) of the Bankruptcy Code.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, as applicable, in the event any or all of the provisions of this Interim Order are hereafter reargued, reconsidered, reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Agents and the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code to the maximum extent set forth therein.

41.  <u>DIP and Other Expenses</u>.  The Debtors are authorized and directed to pay all reasonable and documented prepetition and postpetition fees and expenses of the DIP Agents and DIP Lenders in connection with the DIP Facilities, as provided in the DIP Documents, whether or not the transactions contemplated hereby are consummated, including attorneys' fees, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses.  Payment of such fees and expenses shall be made in accordance with paragraph 42 hereof.

42.  <u>Procedures for Payment of Professional Fees</u>.  Payment of all professional fees and expenses of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties addressed in this Interim Order shall not be subject to allowance by the Court.  Notwithstanding the foregoing, at the same time such invoices are delivered to the Debtors, the applicable professional shall deliver a copy of its invoices to counsel for the Creditors' Committee, the U.S. Trustee and each DIP Agent and Prepetition Agent. The invoices for such fees and expenses shall not be required to comply with the U.S. Trustee guidelines or any particular format, and may be in summary form only, but shall include a general, brief description of the nature of the matters for which services were performed, a list of the professionals who worked on such matters, their hourly rate (if such professionals bill at an hourly rate) and the number of hours each professional billed. The applicable professional reserves all right to redact privileged, confidential or sensitive information from any information provided to any party entitled to notice pursuant to this paragraph 42. For the avoidance of doubt, and notwithstanding anything to the contrary herein, financial advisors subject to the procedures set forth in this paragraph 42 may continue to bill and invoice their time pursuant to their ordinary-course billing and invoicing practices.  The provision of any invoices to the any notice party under this paragraph shall not

constitute a waiver of the attorney-client privilege or any benefits of the attorney work production doctrine, and such invoices shall be subject to and protected under section 107(c)(3)(B) of the Bankruptcy Code.  The invoices shall not be subject to application or allowance by the Court.  Any objections raised by any party entitled to notice of an invoice pursuant to this paragraph 42 with respect to such invoices within ten (10) business days of receipt thereof will be resolved by the Court (absent prior consensual resolution thereof). Pending such resolution, the undisputed portion of any such invoice shall be promptly paid by the Debtors. Such fees and expenses shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever. Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date all reasonable and documented fees, costs and out-of-pocket expenses of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties as provided in the DIP Documents and the Prepetition Secured Debt Documents incurred on or prior to such date without the need for any professional engaged by the DIP Agents or the DIP Lenders to first deliver a copy of its invoice as provided for herein. No attorney or advisor to the DIP Agents or any DIP Lenders shall be required to file an application seeking compensation for services for reimbursement of expenses with the Court.

43.    <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless the DIP Agents and the DIP Lenders in accordance with the terms and conditions of the DIP Documents.

44.    <u>Proofs of Claim</u>.

(a)    The DIP Agents, the DIP Lenders and the Prepetition Secured Parties will not be required to file proofs of claim or requests for approval of administrative expenses  in any of the Cases or Successor Cases in respect of any of the DIP Obligations or the Prepetition Secured Obligations, and no order entered by the Court in relation to the

establishment of a bar date in any of the Cases or Successor Cases (including, without limitation, with respect to any administration claims) shall apply to any claim of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties.  The provisions of this Interim Order (and, upon entry thereof, the Final Order) in respect of the DIP Obligations, the Prepetition Secured Obligations and the Adequate Protection Superpriority Claims and any other adequate protection obligations set forth therein, the DIP Liens, the Adequate Protection Liens and the Prepetition Liens, together with the DIP Motion and the evidence and other materials accompanying the DIP Motion and/or presented at the Interim Hearing, are deemed sufficient to and do constitute sufficient and timely proofs of claim or requests for allowance and payment of administrative expenses in respect of such obligations and their secured status. The books and records of the DIP Agents and the Prepetition Agents shall conclusively establish the amount of each DIP Lender's and Prepetition Secured Party's claims, respectively.

(b)    Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, each of the Prepetition Agents on behalf of itself and its respective Prepetition Secured Parties, (i) is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a single, master consolidated proof of claim in respect of the applicable Prepetition Secured Obligations (including, without limitation, in respect of all guarantees by the Debtors of such Prepetition Secured Obligations) in Lead Case No. [__-_____] (___), which shall be deemed a valid proof of claim against each Debtor in its Case or its Successor Case and (ii) shall not be required to file any agreements, documents or other instruments evidencing such Prepetition Secured Obligations with such single, master consolidated proof of claim.  Any proof of claim filed by the Prepetition Agents shall be deemed to be in addition to and not in lieu of

any other proof of claim that may be filed by any of the Prepetition Secured Parties, respectively. The provisions of this paragraph 43(b) and any master proof of claim filed in accordance herewith are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition ABL Secured Party (or its successors in interest) or Prepetition Term Loan Secured Party (or its successors in interest), as applicable, to vote separately on any plan proposed in the Cases.

45.    <u>Carve Out</u>.

(a)    As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or the day of delivery by the DIP ABL Agent or DIP Term Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after delivery by the DIP ABL Agent or DIP Term Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or

otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP ABL Agent or DIP Term Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, the DIP ABL Agent (in the case of a Carve Out Trigger Notice delivered by the DIP Term Agent) or the DIP Term Agent (in the case of a Carve Out Trigger Notice delivered by the DIP ABL Agent), and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP ABL Obligations under the DIP ABL Facility and DIP Term Obligations under the DIP Term Facility, respectively, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP ABL Agent or DIP Term Agent to the Debtors with a copy to counsel to the Creditors' Committee and the DIP ABL Agent (in the case of a Carve Out Trigger Notice delivered by the DIP Term Agent) or the DIP Term Agent (in the case of a Carve Out Trigger Notice delivered by the DIP ABL Agent) (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP ABL Loans under the Aggregate Commitment (as defined in the DIP ABL Term Sheet) (on a pro rata basis based on the then outstanding Aggregate Commitments), in an amount equal to the lesser of (x) the then unpaid amounts of the Allowed Professional Fees and (y) the remaining availability under the DIP ABL Facility at the time the Carve Out Trigger Notice is given (any such amounts actually advanced shall constitute DIP ABL Loans), (ii) to the extent not funded by the DIP ABL Lenders, be deemed a draw request and notice of borrowing by the Debtors for DIP Term Loans under the Commitments (as defined in the DIP Term Agreement) (on a pro rata

basis based on the then outstanding Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Term Loans), and (iii) to the extent not funded pursuant to the preceding clauses (i) and (ii), constitute a demand to the Debtors to utilize all cash on hand as of such date (including such amounts held in the DIP Term Collateral Account or any professional fee account established and funded by the Debtors) and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP ABL Agent in respect to amounts funded by the DIP ABL Lenders or DIP Term Agent in respect of amounts funded by the DIP Term Agent in respect of amounts funded by the DIP Term Lenders, in each case in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (x) be deemed a draw request and notice of borrowing by the Debtors for DIP ABL Loans under the Aggregate Commitment (as defined in the DIP ABL Term Sheet) (on a pro rata basis based on the then outstanding Aggregate Commitments), in an amount equal the lesser of (1) the Post-Carve Out Trigger Notice Cap and (2) the remaining availability under the DIP ABL Facility at the time the Carve Out Trigger Notice is given, after giving effect to any amounts drawn to fund the Pre-Carve Out Trigger Notice (any such amounts actually advanced shall constitute DIP ABL Loans), (y) to the extent not funded by the DIP ABL Lenders, be deemed a draw request and notice of borrowing by the Debtors for DIP Term Loans under the Commitments (as defined in the DIP Term Agreement) (on a pro rata basis based on the then outstanding Commitments) in an amount equal to any unfunded portion of the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Term

Loans), and (z) to the extent not funded pursuant to the preceding clauses (x) and (y), also constitute a demand to the Debtors to utilize all cash on hand as of such date (including such amounts held in the DIP Term Collateral Account or any professional fee account established and funded by the Debtors) and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at the DIP ABL Agent or DIP Term Agent (as applicable) in respect of amounts funded by the DIP ABL Lenders and the DIP Term Lenders (as applicable) in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP ABL Agent or DIP Term Agent gives such notice to such DIP ABL Lenders or DIP Term Lenders (as applicable), notwithstanding anything in the DIP ABL Agreement or DIP Term Agreement to the contrary, including with respect to (1) the existence of a Default (as defined in the DIP ABL Agreement or DIP Term Agreement) or Event of Default, (2) the failure of the Debtors to satisfy any or all of the conditions precedent for DIP ABL Loans under the DIP ABL Facility or DIP Term Loans under the DIP Term Facility, respectively, (3) any termination of the Aggregate Commitments (as defined in the DIP ABL Term Sheet) or Commitments (as defined in the DIP Term Agreement) following an Event of Default, or (4) the occurrence of the Maturity Date, each DIP ABL Lender and DIP Term Lender with an outstanding Aggregate Commitment (as defined in the DIP ABL Term Sheet) (on a pro rata basis based on the then outstanding Aggregate Commitments, but in any event not in excess of the then available Borrowing Base (as defined in the DIP ABL Term Sheet)) or Commitments (as defined in the DIP Term Agreement) (on a pro rata basis based on the then outstanding

Commitments), respectively, shall make available to the DIP ABL Agent or DIP Term Agent, as applicable, such DIP ABL Lender's or such DIP Term Lender's pro rata share with respect to such borrowing in accordance with the DIP ABL Facility or DIP Term Facility (as applicable).

(c)     Application of Carve Out Reserves.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, (x) in respect of the amount funded by the DIP ABL Lenders and/or funded by DIP Collateral, to pay the DIP ABL Agent for the benefit of the DIP ABL Lenders, unless the DIP ABL Obligations have been indefeasibly paid in full, in cash, and all Aggregate Commitments have been terminated, in which case any such excess shall be paid to the Prepetition ABL Lenders in accordance with their rights and priorities as of the Petition Date until indefeasibly paid in full in cash and (y) all remaining funds in the account funded by the DIP Term Lenders shall be distributed to the DIP Term Agent, which shall apply such funds to the DIP Term Obligations in accordance with the DIP Term Agreement until indefeasibly paid in full, in cash.

(d)     All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, (x) in respect of the account funded by the DIP ABL Lenders and/or funded by DIP Collateral, to pay the DIP ABL Agent for the benefit of the DIP ABL Lenders, unless the DIP ABL Obligations have been indefeasibly paid in full, in cash, and all Aggregate Commitments have been terminated, in which case any such excess shall be

paid to the Prepetition ABL Lenders in accordance with their rights and priorities as of the Petition Date until indefeasibly paid in full in cash and (y) all remaining funds in the account funded by the DIP Term Lenders shall be distributed to the DIP Term Agent, which shall apply such funds to the DIP Term Obligations in accordance with the DIP Term Agreement until indefeasibly paid in full, in cash.

(e)    Notwithstanding anything to the contrary in the DIP ABL Documents, the DIP Term Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 45, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 45, prior to making any payments to the DIP ABL Agent, DIP Term Agent, or the Prepetition Secured Parties, as applicable.

(f)    Notwithstanding anything to the contrary in the DIP ABL Documents, DIP Term Documents, or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agents and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agents as provided in paragraphs 45(c) and 45(d) above.

(g)    Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP ABL Loans or DIP Term Loans or increase or reduce the DIP ABL Obligations or DIP Term Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional

Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP ABL Facility, the DIP Term Facility, the Prepetition ABL Facility, or the Prepetition Term Loan Facility, the Carve Out shall be senior to all liens and claims securing the DIP ABL Facility, the DIP Term Facility, the Adequate Protection Liens, and the DIP Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP ABL Obligations, the DIP Term Obligations, or the Prepetition Secured Obligations.

(h)    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(i)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the DIP ABL Agent, DIP ABL Lenders, DIP Term Agent, DIP Term Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP ABL Agent, the DIP ABL Lenders, the DIP Term Agent, the DIP Term Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. Nothing herein shall

be construed to impair the ability of any party to object to any fees or expenses subject to the Carve Out.

(j)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP ABL Obligations and DIP Term Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(k)     <u>Delivery of Weekly Fee Statements</u>.  Not later than 7:00 p.m. (prevailing Eastern Time) on the Thursday of each week starting with the second week following the Petition Date, each Professional Person shall deliver to the Debtors, the DIP ABL Agent, and the DIP Term Agent, a statement setting forth the amount of the fees and expenses, including any success, transaction, back-end, or similar fee (collectively, "<u>Professional Fees</u>") incurred or earned during the preceding week (through Saturday of such week, the "<u>Calculation Date</u>") by such Professional Person, along with a cumulative total and a statement of the amount of such Professional Fees which have been paid to date by the Debtors (each such statement, a "<u>Weekly Statement</u>"); provided, however, a Professional Person that bills by the month shall only have to deliver a Weekly Statement for any success, transaction, back-end or similar fee that is earned and payable.  If the lead counsel for the Debtors or the Creditors' Committee fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due hereunder and such failure continues unremedied for a period of two days, then the DIP ABL Agent and the DIP Term Agent may each issue a Termination Declaration pursuant to Paragraph 37 of this

Interim Order, in either case triggering the DIP Termination Date.  Furthermore, to the extent any Professional Person fails to deliver a Weekly Statement when due hereunder, such Professional Person shall not be entitled to the benefit of the Carve Out with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement by the applicable weekly deadline.

46.    Limitations on Use of DIP Proceeds, Cash Collateral and Carve Out.  The DIP Facilities, the DIP Collateral, the Prepetition ABL Facility, the Prepetition Term Loan Facility, Prepetition Collateral, the Cash Collateral and the Carve Out may not be used in connection with: (a) preventing, hindering or delaying any of the DIP Agents', the DIP Lenders' or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral or the Prepetition Collateral, as applicable; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral or the Prepetition Collateral without the consent of the DIP ABL Agent, the Required DIP Term Lenders or the Prepetition Secured Parties; (c) using or seeking to use any insurance proceeds or tax refunds constituting DIP Collateral or Prepetition Collateral without the consent of the DIP ABL Agent, the Required DIP Term Lenders or the Prepetition Secured Parties; (d) incurring Indebtedness (as defined in the DIP Agreements) without the prior consent of the DIP ABL Agent, the Required DIP Term Lenders and the Prepetition Secured Parties, except to the extent permitted under the DIP Agreements or this Interim Order; (e) seeking to amend or modify any of the rights granted to the DIP Agents, the DIP Lenders or the Prepetition Secured Parties under this Interim Order, the DIP Documents or the Prepetition Secured Debt Documents, including seeking to use Cash Collateral, Prepetition Collateral and/or DIP Collateral on a contested basis; (f) objecting to or challenging in any way the DIP Liens, DIP Obligations, Adequate Protection Liens, Adequate Protection Superpriority

Claims, Prepetition Liens, Prepetition Secured Obligations, DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral (including Cash Collateral), or any other claims or liens, held by or on behalf of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments against any of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties or any of their respective Releasees; (h) litigating, objecting to, challenging or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the DIP Obligations, the DIP Liens, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, the Prepetition Liens, Prepetition Secured Obligations or any other rights or interests of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties; (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations or the Prepetition Secured Obligations; or (j) for any purposes otherwise limited by the DIP Documents, the Prepetition ABL Credit Documents or the Prepetition Term Loan Credit Documents, as applicable; *provided* that the Carve Out and such collateral proceeds (other than Cash Collateral) and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $25,000 in the aggregate, incurred solely by a Creditors' Committee (if appointed), in investigating (but not prosecuting or challenging) the validity, enforceability, perfection, priority or extent of the Prepetition Liens or Prepetition Secured Obligations within sixty (60) days following the selection of counsel to the Creditors' Committee (if any).

47.    <u>Payment of Compensation</u>. Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect

the right of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.  So long as an unwaived Event of Default has not occurred, the Debtors shall be permitted to pay fees and expenses allowed and payable by final order (that has not been vacated or stayed, unless the stay has been vacated) under sections 328, 330, 331 and 363 of the Bankruptcy Code, as the same may be due and payable, as reflected in the most recent Budget provided by the Debtors to the DIP Agents.

48.    Effect of Stipulations on Third Parties.

(a)    *Generally*.  The admissions, stipulations, agreements, releases, and waivers set forth in this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including, without limitation, a Creditors' Committee (if any) and any other official committee that may be appointed in these Cases, unless, and solely to the extent that, a party in interest with standing and requisite authority (other than the Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules challenging the validity, priority, perfection, extent or enforceability of the Prepetition Liens, Prepetition Secured Obligations or any other Prepetition Lien and Claim Matters, or asserting or prosecuting any claims, counterclaims, causes of action, objections, contests or defenses against the Prepetition Secured Parties (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by no later than the earlier of: (A)  five (5) days prior to

the commencement of any hearing to consider confirmation of a chapter 11 plan in the Cases and (B) (1) with respect to the Creditors' Committee (if appointed), sixty (60) calendar days from the selection of counsel to the Creditors' Committee, or (2) with respect to parties in interest with requisite standing other than the Creditors' Committee, seventy-five (75) days from the date of entry of the Interim Order (the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition Secured Parties, or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.

(b)    *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, (i) the Prepetition Secured Obligations shall constitute allowed claims, not subject to any Challenge (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other Challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law) and (ii) the stipulations, agreements, releases and waivers with respect to Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Secured Parties and any other Prepetition Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive and final on any person, entity or party in interest in the Cases, and their successors and assigns, and in any

Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including, without limitation, a trustee, responsible individual, examiner with expanded powers or other representative of the Debtors' estates.  Notwithstanding anything to the contrary herein, if any such proceeding or Challenge is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Matters is specifically and expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment, and any Challenge not brought in such proceeding or Challenge shall be forever barred; *provided* that if and to the extent any Challenges to any Prepetition Lien and Claim Matters are withdrawn, denied or overruled by a final non-appealable order, such Prepetition Lien and Claim Matters also shall be binding on the Debtors' estates and all parties in interest.

49.    No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

50.    Section 506(c) Claims.  Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Agents, DIP Lenders or the Prepetition Secured Parties, or any of their respective claims, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Agents, DIP Lenders or Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

51.     <u>No Marshaling/Applications of Proceeds</u>.  The DIP Agents, DIP Lenders, and Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order and the DIP Documents notwithstanding any other agreement or provision to the contrary.

52.     <u>Section 552(b)</u>.  Subject to entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

53.     <u>Limits on Lender Liability</u>.  Nothing in this Interim Order, any of the DIP Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, the DIP Lenders or the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Cases.  The DIP Agents and the DIP Lenders shall not, solely by reason of having made loans under the DIP Facilities be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).  Nothing in this Interim Order or the DIP Documents, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, the

DIP Lenders or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

54.    <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agents (on behalf of the DIP Lenders) shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

55.    <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Borrowers and Guarantors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Facilities and the DIP Documents.

56.    <u>Intercompany Obligations</u>.  To the extent any Debtor owes any obligation or indebtedness to any other Debtor or any subsidiary or affiliate of any Debtor (the "<u>Intercompany Obligations</u>"), such Intercompany Obligations shall be subordinated to the DIP Obligations and, subject to the reservation of rights set forth in paragraph 48, the Adequate Protection Superpriority Claims and the Prepetition Secured Obligations, and the guarantees (if any) thereof, until the DIP Obligations and the Prepetition Secured Obligations are indefeasibly repaid in full in cash.

57.    <u>Cooperation Among Parties</u>.  Except in the event not reasonably practicable, the Debtors shall provide copies of all substantive motions, applications, other pleadings and proposed forms of order with respect thereto that affect the rights of the DIP Lenders to the DIP Agents not less than two (2) business days prior to the filing of any such

substantive motions, applications, other pleadings, and proposed forms of order with respect thereto with the Court.

58.    <u>No Superior Rights of Reclamation or Return of Goods</u>.  The rights of a seller to reclaim or return goods are not Permitted Prior Liens and in no event shall any alleged right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) be deemed to have priority over the Prepetition Liens, the Adequate Protection Liens or the DIP Liens.  The Debtors shall not, without the prior consent of the DIP Agents, return goods pursuant to section 546(h) of the Bankruptcy Code.

59.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Agents', the DIP Lenders' and the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the DIP Agents, the DIP Lenders and/or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Creditors' Committee's (if appointed) or any party in interest's right to oppose any of the relief requested in accordance with the immediately

preceding sentence except as expressly set forth in this Interim Order.  Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and any other position which any party in interest deems appropriate to raise in the Cases.

60.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder or otherwise of the DIP Agents, DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee (if appointed) or any party in interest.

61.    <u>Binding Effect of Interim Order</u>.    Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, DIP Agents, DIP Lenders, Prepetition Secured Parties, all other creditors of any of the Debtors, any Creditors' Committee (or any other court appointed committee) appointed in the Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

62.    <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations have been indefeasibly paid in full in cash, and all commitments to extend credit under the DIP Facilities have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP ABL Agent, the Required DIP Term Lenders and the Prepetition ABL Agent (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative

expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP Superpriority Claims or the Adequate Protection Superpriority Claims, other than the Carve Out; (b) without the prior written consent of the DIP ABL Agent, the Required DIP Term Lenders and the Prepetition ABL Agent for any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from DIP Collateral or Prepetition Collateral; (c) without the prior written consent of the DIP ABL Agent and the Required DIP Term Lenders, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents or this Interim Order; or (d) without the prior written consent of the Prepetition Agents, any lien on any of the DIP Collateral with priority equal or superior to the Prepetition Liens or Adequate Protection Liens.  The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP ABL Agent and the Required DIP Term Lenders, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agents or the DIP Lenders.

63.    <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

64.    <u>Discharge</u>.  The DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions

of section 1141(d) of the Bankruptcy Code, unless (a) such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, (b) each of the DIP Agents and each of the Prepetition Agents, as applicable, has otherwise agreed in writing or (c) with respect to the DIP Term Loans, more than half the number of DIP Term Lenders that hold more than two-thirds of the DIP Term Loans (of those that vote) have voted for different treatment in any plan of reorganization of the Debtors.  Except as provided in the immediately preceding sentence, none of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the DIP Obligations in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "Prohibited Plan or Sale") without the written consent of the DIP Agents and the DIP Lenders.

65.    Survival.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Agents, DIP Lenders and Prepetition Secured Parties granted pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases or following dismissal of the Cases or any Successor Cases and shall maintain their priority as provided by this Interim Order until all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been

indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facilities which survive such discharge by their terms), and all commitments to make loans under the DIP Facilities are terminated.  The terms and provisions concerning the indemnification of the DIP Agents, DIP Lenders and the Prepetition Secured Parties shall continue in the Cases, in any Successor Cases, following dismissal of the Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.  In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Secured Parties notwithstanding the repayment in full of or termination of the DIP Obligations.

66.    ABL Commitment Letter and ABL Fee Letter.    The Debtors are authorized, pursuant to sections 105(a), 363, 364 and 507 of the Bankruptcy Code, to (a) enter into (i) the ABL Commitment Letter and (ii) the ABL Fee Letter and (b) pay the fees, costs and expenses and grant the indemnities contemplated thereunder.

67.    PRG Work Fee.  The Debtors are authorized, pursuant to sections 105(a), 363, 364 and 507 of the Bankruptcy Code, and, to the extent due and owing, directed to pay the PRG Work Fee; provided, that, the Debtor shall provide the DIP ABL Agent notice of any such payment two business days prior to it being made.  The PRG Work Fee shall be paid first from any surplus in the Budget.  Any unpaid amount of the PRG Work Fee, if and to the extent due and owing by the Debtors, shall constitute a charge against the DIP Collateral.  The charge shall be (a) senior in all respects to the DIP Term Liens, and (b) junior in all respects to the Carve Out, the DIP ABL Liens, the Prepetition ABL Adequate Protection Liens, the Prepetition Permitted Prior Liens and the Prepetition ABL Liens.  The charge shall entitle PRG (as defined in the Plan Term Sheet) to receive payments from the proceeds of the collection or disposition of the DIP

Collateral as the proceeds become available in accordance with the priority of the charge but shall not otherwise afford PRG any right of collection or disposition against the DIP Collateral.

68.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facilities is scheduled for [_____] before the Honorable [_____], United States Bankruptcy Judge, in Courtroom [_] at the United States Bankruptcy Court for the District of Delaware.  Within two (2) business days hereof, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order and the DIP Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Creditors' Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on [_____], which objections shall be served so as to be received on or before such date by: (i) proposed counsel to the Debtors, Kirkland & Ellis LLP, 300 N. LaSalle, Chicago, IL 60654 Attn: Ryan Bennett and Travis Bayer, and Klehr Harrison Harvey Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, DE 19081, Attn: Morton Branzburg and Domenic Pacitti; (ii) counsel to certain of the DIP Lenders, Morgan, Lewis & Bockius LLP, One Federal Street, Boston, MA, 02110-1726, Attn: Andrew Gallo (andrew.gallo@morganlewis.com) and Christopher L. Carter (christopher.carter@morganlewis.com), and [____, Attn: _____]; (iii) counsel to the DIP ABL Agent, [_____, Attn: ____]; (iv) counsel to the DIP Term Agent, Alston & Bird LLP, 101 South Tryon St., Suite 4000, Charlotte, NC 28280-4000, Attn: Jason

Solomon (jason.solomon@alston.com) and David Wender (david.wender@alston.com); (v) the Office of the United States Trustee; and (vi) counsel to a Creditors' Committee (if appointed).

69.    *Nunc Pro Tunc* <u>Effect of this Interim Order</u>.    This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

70.    <u>Retention of Jurisdiction</u>.    The Court has and will retain jurisdiction to enforce the terms of, and any and all matters arising from or related to, the DIP Facilities and/or this Interim Order.

SO ORDERED by the Court this [_] day of April, 2018.

_____
HON. _____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Budget**

# Project R

**Weekly Cash Flow Forecast**
**Consolidated (US, Canada, and Europe)**
April 02, 2018

($ in '000)
Actuals through   `24-Mar-18`

| | | Week 1 Forecast | Week 2 Forecast | Week 3 Forecast | Week 4 Forecast | Week 5 Forecast | Week 6 Forecast | Week 7 Forecast | Week 8 Forecast | Week 9 Forecast | Week 10 Forecast | Week 11 Forecast | Week 12 Forecast | Week 13 Forecast | Total 13-Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast week: | | | | | | | | | | | | | | |
| | Beginning of week: | 1-Apr-18 | 8-Apr-18 | 15-Apr-18 | 22-Apr-18 | 29-Apr-18 | 6-May-18 | 13-May-18 | 20-May-18 | 27-May-18 | 3-Jun-18 | 10-Jun-18 | 17-Jun-18 | 24-Jun-18 | |
| | End of week: | 7-Apr-18 | 14-Apr-18 | 21-Apr-18 | 28-Apr-18 | 5-May-18 | 12-May-18 | 19-May-18 | 26-May-18 | 2-Jun-18 | 9-Jun-18 | 16-Jun-18 | 23-Jun-18 | 30-Jun-18 | |
| | **Receipts** | | | | | | | | | | | | | | |
| 1 | Equipment Rental and Other Receipts | $ 6,125.2 | $ 5,916.7 | $ 7,521.8 | $ 6,508.1 | $ 6,863.0 | $ 6,100.0 | $ 7,465.8 | $ 6,790.8 | $ 7,577.0 | $ 6,447.3 | $ 7,871.5 | $ 6,674.5 | $ 7,055.3 | $ 88,916.8 |
| 2 | Install Receipts | 132.6 | 469.5 | 210.2 | 203.0 | 446.6 | 115.6 | 908.4 | 56.1 | 380.6 | 27.0 | 13.1 | 2.9 | 3,049.8 | 6,015.4 |
| 3 | Other | - | - | - | - | - | - | - | - | - | - | - | - | 1,500.0 | 1,500.0 |
| | **Total Receipts** | 6,257.8 | 6,386.2 | 7,732.0 | 6,711.1 | 7,309.5 | 6,215.6 | 9,874.1 | 6,846.8 | 7,957.6 | 6,474.3 | 7,884.6 | 6,677.4 | 10,105.1 | 96,432.2 |
| | **Operating Disbursements** | | | | | | | | | | | | | | |
| 4 | Payroll, Benefits and T&E | (4,892.6) | (612.9) | (4,842.6) | (1,156.2) | (4,890.5) | (445.7) | (5,127.8) | (1,143.5) | (5,189.3) | (451.9) | (4,804.2) | (418.0) | (5,214.7) | (39,190.0) |
| 5 | Supplies and Repairs | (24.6) | (274.6) | (631.6) | (645.3) | (734.8) | (377.2) | (397.5) | (447.5) | (450.5) | (450.5) | (438.7) | (438.7) | (443.1) | (5,754.6) |
| 6 | Supplies and Repairs - LED | - | - | - | - | (130.0) | (395.0) | - | (507.4) | (50.0) | (51.6) | - | - | - | (4,198.8) |
| 7 | Freight and Fleet | (527.6) | (433.4) | (337.4) | (412.2) | (412.2) | (556.9) | (556.9) | (556.9) | (556.9) | (715.6) | (715.6) | (715.6) | (715.6) | (7,213.0) |
| 8 | Equipment Costs | - | (250.3) | (2,172.3) | (2,172.3) | (2,832.3) | (830.0) | (830.0) | (880.0) | (880.0) | (880.0) | (880.0) | (880.0) | (880.0) | (14,367.1) |
| 9 | Sub-rentals | (19.5) | (269.5) | (430.1) | (420.8) | (637.0) | (440.6) | (357.9) | (407.9) | (346.0) | (346.0) | (330.2) | (330.2) | (314.4) | (4,650.3) |
| 10 | Facility Costs (incl. Rent) | (1,441.2) | (118.7) | (503.6) | - | (1,317.3) | (55.3) | (535.0) | (3.6) | (1,317.3) | (55.3) | (535.0) | (3.6) | (131.4) | (6,017.4) |
| 11 | Contracted Labor (Per Diem) | (335.0) | (335.0) | (335.0) | (335.0) | (567.2) | (567.2) | (567.2) | (567.2) | (471.8) | (471.8) | (471.8) | (471.8) | (536.9) | (6,032.6) |
| 12 | Taxes and Fees | (47.5) | - | (500.0) | (37.2) | (130.0) | (395.0) | - | (507.4) | (50.0) | (15.0) | - | (500.0) | (57.4) | (2,259.9) |
| 13 | Administrative Expenses | - | - | (36.0) | (36.0) | (36.0) | (36.0) | (36.0) | (36.0) | (36.0) | (36.0) | (28.8) | (28.8) | (28.8) | (374.4) |
| 14 | Insurance | - | - | - | (37.2) | - | (215.0) | - | (3.0) | (193.5) | - | - | - | (196.5) | (645.2) |
| 15 | Other Operating Disbursements | (507.0) | (457.0) | (716.8) | (716.8) | (744.3) | (732.0) | (732.0) | (732.0) | (732.0) | (732.0) | (732.0) | (732.0) | (732.0) | (8,997.9) |
| | **Total Operating Disbursements** | (7,794.9) | (2,751.3) | (11,579.5) | (7,074.0) | (13,535.8) | (4,937.3) | (9,181.7) | (5,403.7) | (10,358.6) | (4,378.3) | (8,936.3) | (4,518.8) | (9,251.0) | (99,701.3) |
| | **Net Operating Cash Flow** | (1,537.1) | 3,634.9 | (3,847.5) | (362.9) | (6,226.3) | 1,278.2 | 692.5 | 1,443.1 | (2,401.0) | 2,096.0 | (1,051.7) | 2,158.6 | 854.2 | (3,269.0) |
| | **Intercompany Trasfers** | | | | | | | | | | | | | | |
| 16 | Intercompany Receipt/Disbursements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | **Total Intercompany Transfers, Net** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **Non-Operating Cash Flows** | | | | | | | | | | | | | | |
| 17 | Fixed Asset Sales | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 650.0 |
| 18 | Restructuring Expenses | - | - | - | - | - | (1,230.0) | - | - | - | (2,862.0) | - | - | - | (4,092.0) |
| 19 | Debt Service - ABL | (217.5) | (3,000.0) | (6,656.9) | - | (877.5) | - | - | - | (1,497.9) | (100.0) | - | - | - | (12,349.8) |
| 20 | Debt Service - Term Loan | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 21 | Equipment Lease Financing Costs | (35.4) | - | - | (278.0) | (390.4) | - | - | (278.0) | (390.4) | - | - | (278.0) | (390.4) | (2,040.7) |
| 22 | Other Non-operating Cash Flows | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **Total Non-operating Cash Flows** | (202.9) | (2,950.0) | (6,606.9) | (228.0) | (1,217.9) | (1,180.0) | 50.0 | (228.0) | (1,838.3) | (2,912.0) | 50.0 | (228.0) | (340.4) | (17,832.5) |
| | **Net Cash Flow** | $ (1,740.0) | $ 684.9 | $ (10,454.4) | $ (590.9) | $ (7,444.2) | $ 98.2 | $ 742.5 | $ 1,215.1 | $ (4,239.3) | $ (816.0) | $ (1,001.7) | $ 1,930.6 | $ 513.7 | (21,101.5) |
| 23 | Beginning Book Cash Balance | $ 7,248.1 | $ 5,508.0 | $ 6,192.9 | $ 5,966.5 | $ 5,891.7 | $ 6,113.0 | $ 6,211.2 | $ 6,953.7 | $ 8,168.8 | $ 6,130.2 | $ 6,423.0 | $ 6,549.4 | $ 8,480.0 | $ 7,248.1 |
| | Net Cash Flow | (1,740.0) | 684.9 | (10,454.4) | (590.9) | (7,444.2) | 98.2 | 742.5 | 1,215.1 | (4,239.3) | (816.0) | (1,001.7) | 1,930.6 | 513.7 | (21,101.5) |
| | **Ending Cash Balance before Revolver Draw** | 5,508.0 | 6,192.9 | (4,261.5) | 5,375.6 | (1,552.5) | 6,211.2 | 6,953.7 | 8,168.8 | 3,929.5 | 5,314.2 | 5,421.4 | 8,480.0 | 8,993.7 | (13,853.5) |
| 24 | Draw/(Paydown) of Revolver (US only) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 25 | Draw/(Paydown) of DIP Loan (US only) | - | - | 10,228.0 | 516.1 | 7,665.5 | - | - | - | 2,200.7 | 1,108.9 | 1,128.0 | - | - | 22,847.2 |
| 26 | Ending Book Cash Balance | 5,508.0 | 6,192.9 | 5,966.5 | 5,891.7 | 6,113.0 | 6,211.2 | 6,953.7 | 8,168.8 | 6,130.2 | 6,423.0 | 6,549.4 | 8,480.0 | 8,993.7 | 8,993.7 |
| | Float (Uncleared Checks + Deposits in Transit) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **Ending Bank Cash Balance** | $ 5,508.0 | $ 6,192.9 | $ 5,966.5 | $ 5,891.7 | $ 6,113.0 | $ 6,211.2 | $ 6,953.7 | $ 8,168.8 | $ 6,130.2 | $ 6,423.0 | $ 6,549.4 | $ 8,480.0 | $ 8,993.7 | $ 8,993.7 |
| | **ABL Availability** | | | | | | | | | | | | | | |
| 27 | Total AR and Equipment | $ 345,227.9 | $ 345,049.9 | $ 345,333.9 | $ 345,609.7 | $ 348,488.5 | $ 347,958.2 | $ 348,577.0 | $ 347,808.4 | $ 349,021.8 | $ 348,196.9 | $ 347,398.3 | $ 348,602.9 | $ 348,313.3 | $ 348,313.3 |
| 28 | Line Limit | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 |
| | **Total Gross Availability** | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 | 300,000.0 |
| 29 | Less: Outstanding Loan Balance | (296,283.4) | (296,283.4) | (296,283.4) | (296,283.4) | (296,283.4) | (296,283.4) | (296,283.4) | (296,283.4) | (296,283.4) | (296,283.4) | (296,283.4) | (296,283.4) | (296,283.4) | (296,283.4) |
| 30 | Less: Outstanding Letters of Credits | (3,716.6) | (3,716.6) | (3,716.6) | (3,716.6) | (3,716.6) | (3,716.6) | (3,716.6) | (3,716.6) | (3,716.6) | (3,716.6) | (3,716.6) | (3,716.6) | (3,716.6) | (3,716.6) |
| | **ABL Headroom/Availability** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | **DIP Availability** | | | | | | | | | | | | | | |
| 31 | DIP Limit | $ 50,000.0 | $ 50,000.0 | $ 50,000.0 | $ 50,000.0 | $ 50,000.0 | $ 50,000.0 | $ 50,000.0 | $ 50,000.0 | $ 50,000.0 | $ 50,000.0 | $ 50,000.0 | $ 50,000.0 | $ 50,000.0 | 50,000.0 |
| 32 | Outstanding DIP Loan Balance | - | - | (10,228.0) | (10,744.1) | (18,409.6) | (18,409.6) | (18,409.6) | (18,409.6) | (20,610.3) | (21,719.2) | (22,847.2) | (22,847.2) | (22,847.2) | (22,847.2) |
| 33 | Outstanding Letters of Credits | (4,500.0) | (4,500.0) | (4,500.0) | (4,500.0) | (4,500.0) | (4,500.0) | (4,500.0) | (4,500.0) | (4,500.0) | (4,500.0) | (4,500.0) | (4,500.0) | (4,500.0) | (4,500.0) |
| | **DIP Outstanding** | (4,500.0) | (4,500.0) | (14,728.0) | (15,244.1) | (22,909.6) | (22,909.6) | (22,909.6) | (22,909.6) | (25,110.3) | (26,219.2) | (27,347.2) | (27,347.2) | (27,347.2) | (27,347.2) |
| | **DIP Headroom/Availability** | 45,500.0 | 45,500.0 | 35,272.0 | 34,755.9 | 27,090.4 | 27,090.4 | 27,090.4 | 27,090.4 | 24,889.7 | 23,780.8 | 22,652.8 | 22,652.8 | 22,652.8 | 22,652.8 |
| 34 | Less: Minimum Liquidity Requirement | (3,280.3) | (3,280.3) | (3,280.3) | (3,280.3) | (3,280.3) | (3,280.3) | (3,280.3) | (3,280.3) | (3,280.3) | (3,280.3) | (3,280.3) | (3,280.3) | (3,280.3) | (3,280.3) |
| | **Ending Liquidity** | $ 47,727.7 | $ 48,412.6 | $ 37,958.2 | $ 37,367.3 | $ 29,923.1 | $ 30,021.3 | $ 30,763.8 | $ 31,978.9 | $ 27,739.6 | $ 26,923.6 | $ 25,921.9 | $ 27,852.5 | $ 28,366.2 | $ 28,366.2 |

**Exhibit B** **to the Restructuring Support Agreement**

**Transactions**

**A. Step I:  Creation of New PRG II and Mergerco for Merger Transaction**

1. PRG Holdings LLC, the parent entity of PRG ("PRG Holdings"), shall form a new intermediate limited liability holding company ("New PRG II") in the State of Delaware.

2. PRG Holdings shall contribute 100% of the equity of PRG to New PRG II, resulting in PRG becoming a wholly-owned subsidiary of New PRG II.

3. New PRG II shall issue to PRG Holdings certain preferred and common equity interests to reflect the preferred and common equity interests of PRG Holdings on a post-closing basis as agreed between PRG and the Supporting Term Loan Lenders.

4. New PRG II shall form a new limited liability company ("VER MergerCo"), which shall be a wholly-owned subsidiary of New PRG II.

**B. Step II:  Merger of VER MergerCo and Reorganized VER**

1. VER MergerCo and Reorganized VER shall enter into a short form Agreement and Plan of Merger which provides for the merger of VER MergerCo with and into Reorganized VER.

2. VER MergerCo and Reorganized VER shall file a Certificate of Merger with the Secretary of State of Delaware pursuant to which VER MergerCo shall be merged with and into Reorganized VER and Reorganized VER shall survive the merger and become a wholly-owned subsidiary of New PRG II (the "Merger").

3. In consideration of the Merger, New PRG II shall issue certain preferred and common equity interests to the Supporting Term Loan Lenders to reflect the preferred and common equity interests of PRG Holdings on a post-closing basis as agreed between PRG and the Supporting Term Loan Lenders.

4. New PRG II, PRG Holdings and the Supporting Term Loan Lenders shall enter into an Amended and Restated Limited Liability Company Agreement of New PRG II as agreed between PRG Holdings and the Supporting Term Loan Lenders and to the extent not specified in such agreement, in a form reasonably acceptable to PRG Holdings and the Supporting Term Loan Lenders.

5. Immediately following the Merger, New PRG II shall contribute 100% of the equity interests in Reorganized VER to its subsidiary PRG, resulting in Reorganized VER becoming a wholly-owned subsidiary of PRG.

**C.  Step III:  Credit Facilities**

1. Upon consummation of the Merger, PRG and its domestic subsidiaries (including Reorganized VER) shall enter into the New First Lien Term Loan and the New Second Lien Term Loan and the PRG Term Lenders shall refinance their current debt holdings in PRG with the New Second Lien Term Loan.

**<u>Exhibit C</u> to the Restructuring Support Agreement**

**Form of Transfer Agreement**

**Form of Transfer Agreement**

**PROVISION FOR TRANSFER AGREEMENT**

The undersigned ("<u>Transferee</u>") (a) hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "<u>Agreement</u>"),[1] by and among the Debtors, each of the Supporting Term Loan Lenders party thereto, the Term DIP Agent, the Term DIP Lenders, PRG, and the Catterton Parties, (b) desires to acquire the Claims described below (the "<u>Transferred Claims</u>") from one of the [Supporting Term Loan Lenders/Term DIP Lenders/Catterton Parties] (the "<u>Transferor</u>") and (c) hereby irrevocably agrees to be bound by the terms and conditions of the Agreement to the same extent Transferor was thereby bound with respect to the Transferred Claims, and shall be deemed a [Supporting Term Loan Lender/Term DIP Lender/Catterton Party] for all purposes under the Agreement and with respect to any and all Claims or interests held by such Joining Party.

The Transferee hereby specifically and irrevocably agrees (i) to be bound by the vote of the Transferor if cast prior to the effectiveness of the transfer of the Transferred Claims, except as otherwise provided in the Agreement and (ii) that each of the Parties shall be an express third-party beneficiary of this Provision for Transfer Agreement and shall have the same recourse against the Transferee under the Agreement as such Party would have had against the Transferor with respect to the Transferred Claims.

Date Executed: _____,

_____
Print name of Transferee

_____
Name:
Title:

Address: _____

_____

_____
Attention: _____
Telephone: _____
Facsimile: _____

---

[1]   Capitalized terms used but not defined herein shall have the meanings given to such terms elsewhere in the Agreement.

**Exhibit B**

**Debtors' Prepetition Structure Chart**

