1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2
                                      .  Chapter 11
3   IN RE:                            .
                                      .  Case No. 18-12794 (KG)
4   CHECKOUT HOLDING CORP., *et al.*,  .
                                      .  Courtroom No. 3
5                                      .  824 N. Market Street
                                      .  Wilmington, Delaware 19801
6                                      .
                                      .  December 13, 2018
7                    Debtors.         .  12:00 P.M.
    . . . . . . . . . . . . . . . . .
8
                        TRANSCRIPT OF HEARING
9               BEFORE HONORABLE KEVIN GROSS
                   UNITED STATES BANKRUPTCY JUDGE
10

11  APPEARANCES:

12  For the Debtors:              Mark Collins
                                  RICHARDS LAYTON & FINGER
13                                920 North King Street
                                  Wilmington, Delaware 19801
14
                                  - and -
15
                                  Gary Holtzer, Esquire
16                                David Zubkis, Esquire
                                  Michael Godbe, Esquire
17                                Kevin Bostel, Esquire
                                  Jessica Liou, Esquire
18                                WEIL GOTSHAL & MANGES LLP
                                  767 Fifth Avenue
19                                New York, New York 10153

20
    Audio Operator:               GINGER MACE
21
    Transcription Service:        Reliable
22                                1007 N. Orange Street
                                  Wilmington, Delaware 19801
23                                Telephone: (302) 654-8080
                                  E-Mail: gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording:
25  transcript produced by transcription service.

1   APPEARANCES (Continued):

2
    For the U.S. Trustee:          Benjamin Hackman, Esquire
3                                  OFFICE OF U.S. TRUSTEE
                                   844 King Street
4                                  Wilmington, Delaware 19801

5   For Second Lien Ad Hoc        Robert Britton, Esquire
    Group:                         PAUL WEISS RIFKIND WHARTON &
6                                    GARRISON
                                   500 Delaware Avenue
7                                  Wilmington, Delaware 19801

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

INDEX

2

<u>PAGE #</u>

3

<u>FIRST DAY HEARING</u>

4

5

#12) Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of Order Directing Joint Administration of Chapter 11 Cases [D.I. 2; filed December 12, 2018].

6

**RULING:**                                                **19**

7

8

#13) Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(c), 364(a), and 503(b)(1) and Fed. R. Bankr. P. 6003 and 6004 for (I) Interim and Final Authority to (A) Continue Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Business Forms and Existing Bank Accounts; and (II) Related Relief [D.I. 3; filed December 12, 2018].

9

10

11

**RULING:**                                                **24**

12

13

#14) Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a) for Interim and Final Authority to Pay Prepetition Wages, Salaries, Commissions, Employee Benefits, and Other Compensation and Maintain Employee Benefit Programs and to Pay Related Administrative Obligations [D.I. 4; filed December 12, 2018].

14

15

**RULING:**                                                **30**

16

17

#15) Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), and 503(b) for Interim and Final Authority to Continue their Insurance Policies and Programs, Pay all Obligations with Respect Thereto, and Related Relief [D.I. 5; filed December 12, 2018].

18

19

**RULING:**                                                **32**

20

21

#16) Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541 for Authority to Pay Certain Prepetition Taxes and Fees [D.I. 6; filed December 12, 2018].

22

**RULING:**                                                **38**

23

24

#17) Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Interim and Final Authority to (I) Maintain and Administer Prepetition Customer Programs and (II) Pay and Honor Related Prepetition Obligations [D.I. 7; filed December 12, 2018].

25

1  **RULING:**                                                  **25**

2  #18) Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 366
   Requesting Entry of Interim and Final Orders (I) Approving Debtors'
3  Proposed Form of Adequate Assurance of Payment to Utility
   Providers, (II) Establishing Procedures Providing Adequate
4  Assurance and Resolving Objections by Utility Providers, and (III)
   Prohibiting Utility Providers from Altering, Refusing, or
5  Discontinuing Utility Service [D.I. 8; filed December 12, 2018].

6  **RULING:**                                                  **33**

7  #19) Application of Debtors Pursuant to 11 U.S.C. § 105(a) and 28
   U.S.C. § 156(c) for Appointment of Prime Clerk LLC as Claims and
8  Noticing Agent Effective as the Petition Date [D.I. 21; filed
   December 12, 2018].
9

10 **RULING:**                                                  **34**

11 #20) Motion of Debtors for (I) Authority to (A) Obtain Postpetition
   Senior Secured Financing, (B) Use Cash Collateral, (C) Grant
12 Adequate Protection to Prepetition Secured Parties, (D) Grant Liens
   and Superpriority Claims, (E) Modify the Automatic Stay, and (II)
13 Related Relief  [D.I. 30; filed December 12, 2018].

14 **RULING:**                                                  **63**

15  #21) Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 362 for
   Entry of Interim and Final Orders Establishing Notification
16 Provisions and Approving Restrictions on (A) Certain Transfers of
   Interests in Debtors and (B) Claims of Certain Worthless Stock
17 Deductions [D.I. 9; filed December 12, 2018].

18 #22) Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, and 503
   and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Authority
19 to Pay Prepetition Trade Claims in Ordinary Course of Business
   [D.I. 10; filed December 12, 2018].
20
   **RULING:**                                                  **27**
21
22 #23) Motion of Debtors for Order (I) Scheduling Combined Hearing to
   Consider (A) Approval of Disclosure Statement, (B) Approval of
23 Solicitation Procedures and Forms of Ballots, and (C) Confirmation
   of Prepackaged Plan; (II) Establishing an Objection Deadline to
24 Object to Disclosure Statement and Plan; (III) Approving the Form
   and Manner of Notice of Combined Hearing, Objection Deadline, and
25 Notice of Commencement; (IV) Conditionally Waiving Requirement of
   Filing Statement of Financial Affairs and Schedules of Assets and
   Liabilities; (V) Conditionally Waiving Requirements to Convene the

1  Section 341 Meeting of Creditors; and (VI) Granting Related Relief
   Pursuant to Sections 105(a), 341, 521(a), 1125, 1126, and 1128 of
2  the Bankruptcy Code and Bankruptcy Rules 1007, 2002, 3017, and 3018
   [D.I. 13; filed December 12, 2018].

3
   **RULING:**                                                **44**
4
   #25) Disclosure Statement for Joint Prepackaged Chapter 11 Plan of
5  Checkout Holding Corp. and its Affiliated Debtors (Solicitation
   Version) [D.I. 12; filed December 12, 2018]
6

7
   <u>EXHIBITS:</u>                                    <u>I.D.</u>  <u>REC'D</u>
8
   Declaration of Robert Del Genio                              16
9
   Declaration of Marc Puntus                                   17
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 12:02 a.m.)

2          (Call to order of the Court)

3                THE COURT:  Good afternoon, everyone.  Thank you.

4     You may be seated.

5                Mr. Collins, good afternoon.

6                MR. COLLINS:  Good afternoon, Your Honor.

7                For the record, Mark Collins of Richards Layton &

8     Finger on behalf of Checkout Holding Corp and its affiliated

9     debtors and debtors-in-possession.

10               THE COURT:  Yes.

11               MR. COLLINS:  Your Honor, on behalf of the

12    company, we first like to thank Your Honor for allowing us to

13    be heard today on our first day motions.

14               THE COURT:  Instead of lunch.

15               MR. COLLINS:  Instead of lunch -- right over

16    lunch.

17               THE COURT:  That's right.

18               MR. COLLINS:  You know that we filed a lot of

19    papers in the last 36 hours.

20               THE COURT:  Yes.

21               MR. COLLINS:  And we do appreciate all of the hard

22    work of you, your staff, the clerk staff, and the U.S.

23    Trustee's office.

24               THE COURT:  And you did a lot of work too.

25               MR. COLLINS:  Well, folks on this side have done a

1  lot of work for sure.

2           THE COURT:  Yes.

3           MR. COLLINS:  Your Honor, I have the pleasure of

4  reintroducing to the court Gary Holtzer.

5           THE COURT:  Mr. Holtzer, nice to see you again.

6           MR. HOLTZER:  Thank you.

7           MR. COLLINS:  And moving his motion *pro hac vice*.

8  Mr. Holtzer is Weil Gotshal & Manges.

9           THE COURT:  Yes.

10          MR. COLLINS:  They are the restructuring counsel

11 to the company.  I'd like to turn the podium over to Mr.

12 Holtzer.  He's going to make some additional introductions on

13 behalf of the company and his professionals and then provide

14 Your Honor with some additional detail of what we hope to

15 accomplish in the coming weeks.

16          THE COURT:  All right, thank you, Mr. Collins.

17          MR. COLLINS:  Thank you, Your Honor.

18          THE COURT:  Thank you, sir.

19          Mr. Holtzer, good afternoon.

20          MR. HOLTZER:  Good afternoon, Your Honor.  Again,

21 thank you for making time for us.  Thank you to the U.S.

22 Trustee for all the help and for all the parties that are

23 assembled here today --

24          THE COURT:  Yes.

25          MR. HOLTZER:  -- who really have worked very

1  tirelessly over the short period of time to bring the

2  transaction into this court for approval.

3          So, let me just start by saying on December 12th,

4  2018 Checkout Holding Corp and ten of its affiliates filed

5  Chapter 11 cases here before this court. Catalina Marketing

6  Corporation, which is the main operating company -- you'll

7  hear us refer to the group as Catalina from time to time,

8  Your Honor.

9          THE COURT:  Okay.  All right.

10          MR. HOLTZER:  Let me make a few introductions.

11          First in the court room, the chief financial

12  officer, Shelly Schaffer.

13          THE COURT:  Ms. Schaffer, good afternoon.

14          MR. HOLTZER:  Sitting next to Ms. Schaffer, David

15  Glogoff who is the chief legal officer of the company.

16          THE COURT:  Nice to have you here.

17          MR. HOLTZER:  Jerry Stokal (phonetic) who is the

18  chief legal officer of the company.

19          THE COURT:  Nice to have you here.

20          MR. HOLTZER:  Jerry Stokal who is the CEO, Your

21  Honor, apologies.  He's traveling and meeting some important

22  clients during this process.  I'm sure he will make his way

23  to the court, at least, once and we will introduce him when

24  he does that.

25          THE COURT:  Okay.

1          MR. HOLTZER:  On our team here, Your Honor, from

2     Weil, my partners, Ronit Berkovich and Jessica Liou.

3          THE COURT:  Yes.

4          MR. HOLTZER:  As well as Kevin Bostel, David

5     Zubkis, Michael Godbe, and Lisa Lansio, all here in the

6     courtroom today.  We'll introduce others, if we need to, but

7     I hope we don't need that.

8          THE COURT:  Okay.

9          MR. HOLTZER:  Also, here in the courthouse today

10    Robert Del Genio from FTI.

11         THE COURT:  Mr. Del Genio, hello.

12         MR. HOLTZER:  Would have seen his declaration and

13    Marc Puntus and Ryan Kielty from Centerview.

14         THE COURT:  Welcome.

15         MR. HOLTZER:  You would have seen Mr. Puntus'

16    declaration as well.

17         THE COURT:  Yes.

18         MR. HOLTZER:  Okay.  Your Honor, just to begin

19    with and we are going to try to make this crisp for Your

20    Honor.

21         We did file an agenda.  Let me offer and approach

22    for the hearing today.  We would like to work our way through

23    the agenda.  We mimic a few adjustments in the ordering of

24    them so that we don't have folks popping up and down too

25    much.

1          THE COURT:  Okay.

2          MR. HOLTZER:  But we're going to give a bunch of

3    folks a chance to present to Your Honor this morning.

4          THE COURT:  Good.

5          MR. HOLTZER:  First, I'll just give a little bit

6    of a brief background.  And then at the end, we have some

7    scheduling to do.

8          THE COURT:  Okay.

9          MR. HOLTZER:  All right, so the essence of the

10   filing, Your Honor, the company filed these cases to

11   implement a restructuring transaction supported by the

12   company's first and second lien debtholders.  And that

13   proposed restructuring will reduce the company's debt from

14   $1.9 billion dollars approximately down to $300 million at

15   exit, Your Honor.

16         The company signed RSAs with the one L's and the

17   two L-Holders and we commenced the solicitation of those

18   classes, which are the only two classes voting on the plan,

19   just before the filing.  And you would have seen that we did

20   file the plan of reorganization and the disclosure statement

21   with the court.

22         THE COURT:  Yes.

23         MR. HOLTZER:  The essence of the restructuring has

24   a 9019 split in the new equity -- 90 to the first, 10 to the

25   seconds; 280 approximately of converted DIP debt which will

1  be on the balance sheet at exit, and 40 of basically a

2  committed exit facility at exit.

3          The voting, to date, just to give Your Honor a

4  sense of the support levels, the one L's have voted, I think,

5  in the 90 percent so far, and there's probably still some

6  being gathered.  And on the two L side, I think we're at the

7  75 percent range and still gathering.

8          THE COURT:  Okay.

9          MR. HOLTZER:  Both of those numbers are the value

10 numbers.  The numerosity numbers have been achieved so far,

11 I've been told.  So, the two classes, again, that are voting

12 on the plan have accepted, based upon the information that we

13 have so far.

14          The general unsecured claims under the plan, Your

15 Honor, with two exceptions, which I'll come to, are scheduled

16 to be unimpaired.

17          THE COURT:  Okay.

18          MR. HOLTZER:  So, first, a few facts about the

19 company.

20          Six hundred employees, headquartered in St.

21 Petersburg, Florida, global leader in personalized digital

22 media marketing.  The company's system essentially can send

23 promotional messages to consumers, and it can gather point of

24 sale data and it uses that in its business to design

25 marketing campaigns and other programs for our customers.

1          THE COURT:  Yes.

2          MR. HOLTZER:  That's the essence of the business.

3          The systems are in 24,000 retail locations in the

4 U.S.  And approximately 20,000 retail locations

5 internationally.

6          The capital structure, Your Honor, is set forth on

7 pages 7 to 10 of Mr. Del Genio's declaration.  If you're like

8 me, you'll struggle, perhaps, to read the charts, so I have a

9 gift for you

10          THE COURT:  All right.

11          MR. HOLTZER:  Which, if I can approach, I'll hand

12 up.

13          THE COURT:  Yes.  Thank you.  That's a nice chart.

14 Thank you.  Oh yes.

15          MR. HOLTZER:  Okay.  Your Honor, with respect to

16 the chart, as I mentioned, there are 11 debtors and there are

17 19 non-debtors on the picture.  Those entities are wholly-

18 owned by the top-level entity on the chart which is PDM

19 Holdings Corporation.

20          In terms of the capital structure, $55 million

21 dollar revolver, approximately we have one billion dollars in

22 first lien debt, and $460 million dollars in second lien

23 debt.  These are credit agreement obligations.  $384 million

24 dollars of unsecured PIK notes, right, with a sole obligor is

25 PDM Intermediate Holdings B Corporation.  You'll see it on

1  the chart there near the top.

2              THE COURT:  Yes.

3              MR. HOLTZER:  The first of the two unsecured

4  claims debt, the plan is not scheduled to pay is that one.

5  We are working hard to reach a resolution, and I believe we

6  will, with the PIK noteholders to support the plan where

7  there is no recovery at that level.  And that's because the

8  value doesn't go to that level.

9              The company is continuing to negotiate with those

10 holders and we hope to be able to announce support from them

11 very shortly.  We're doing that in conjunction with the one L

12 and two L-Holders and their advisors.

13             THE COURT:  Okay.

14             MR. HOLTZER:  They are simply at that level

15 structurally subordinated from the asset value.

16             Lastly, in the capital structure, Your Honor, it's

17 worth mentioning that Berkshire Partners, LLC and its co-

18 investors own 70 percent of the equity.

19             THE COURT:  Okay.

20             MR. HOLTZER:  So, this is a privately held company

21 with private debt.

22             THE COURT:  Yes.

23             MR. HOLTZER:  And under the plan, the existing

24 equity is cancelled.

25             The second category of unsecured claim that is not

1  scheduled to be paid under the plan is NC Ventures, LLC.  We

2  call them NCS.

3          If you look on the chart, you will see them, I

4  think, all the way on the left-hand side.

5          THE COURT:  Yes.

6          MR. HOLTZER:  Right.  That is a joint venture that

7  the Catalina Group has with the Nielsen Company.  It is not a

8  debtor.  Catalina owns 36 percent of the equity of that joint

9  venture.

10          The debtors and the noteholders, the first and

11 second lien lenders, in consultation with each other, as a

12 part of this transaction, determined that certain provisions

13 of the joint venture agreement may limit Catalina's ability

14 to compete in certain respects.

15          Catalina has engaged with Nielsen in an effort to

16 try to amend the joint venture agreement.  If we can't reach

17 an agreement in 30 days, we will proceed to reject that

18 agreement, Your Honor.  Right.  And, again, that claim would

19 be not receive a recovery in the case.

20          The claim for rejection damages, which would arise

21 from that rejection of the NCS Joint Venture Agreement, is

22 treated under the plan, but it doesn't receive any recovery.

23          And just to give some color to Your Honor as to

24 why that is, it's as a result of the fact that the

25 undersecured nature of the one L debts and the DIP liens that

1   you'll hear more about later today, Your Honor, as a result

2   of that, there is simply no distributable value available to

3   unsecured creditors at the entity at which that rejection

4   damage claim would be asserted.

5            In fact, we should state, at the outset, and it is

6   the predicate for the plan, the recoveries to the general

7   unsecured claims which are a 100 cents on the dollar, other

8   than the two that I mentioned, are simply a result of the

9   settlement that the company has worked out between the one

10  L's and the two L's under the plan so that they share their

11  recoveries with the other unsecured creditors, so that this

12  case can be speeded along quickly and the company can proceed

13  to its Chapter 11 as quickly as possible.

14           We are going to try not to have an issue with the

15  NCS item which is the only item outstanding right now at

16  confirmation. And if we can't get it resolved, we will be

17  prepared to move forward either way.

18           THE COURT:  Okay.

19           MR. HOLTZER:  Just turning to the DIP for a

20  second, because the case was filed as a process for

21  implementing the restructuring transaction that I outlined,

22  we have DIP financing that we will present today.  It is, in

23  essence, a bridge to a closing of the transaction.  At a high

24  level, it's $275 million dollars of debtor-in-possession

25  financing approximately with $125 million dollars of new

1  incremental liquidity.

2          I'm going to turn the podium over in a moment, but

3  Jessica Liou, ultimately, will handle the DIP part of the

4  hearing.

5          And, at the end of the hearing, we'll turn back to

6  the schedule, which is very vital to this company as the

7  transaction has certain milestones set in the process that

8  I'm sure Your Honor has read about and we'll come back to the

9  scheduling so that we can make sure we navigate through that

10 in the end.

11         THE COURT:  All right.

12         MR. HOLTZER:  If Your Honor has no more questions,

13 I will turn the podium over to Mr. Zubkis who, I think, is

14 next up.

15         THE COURT:  All right, thank you, Mr. Holtzer.

16         MR. HOLTZER:  Thank you.

17         MR. ZUBKIS:  Good morning, Your Honor.

18         THE COURT:  Yes.  Hello, how are you?

19         MR. ZUBKIS:  Good.

20         THE COURT:  Good.

21         MR. ZUBKIS:  David Zubkis, Weil Gotshal Manges on

22 behalf of the debtors.

23         THE COURT:  Yes.

24         MR. ZUBKIS:  It's good to be before you today,

25 Your Honor.

1        THE COURT:  Nice to have you here.

2        MR. ZUBKIS:  One piece of housekeeping before we

3  get started, I'd like to move into evidence the declarations

4  of Mr. Del Genio and Mr. Puntus that Mr. Holtzer just

5  introduced.

6        Mr. Del Genio's declaration is at docket number

7  14.  He is here today and can testify and be subject to

8  cross-examination.

9        THE COURT:  Yes.

10       MR. ZUBKIS:  We would move that into evidence as

11 his direct testimony.

12       THE COURT:  Any objection?

13     (No verbal response)

14       THE COURT:  Hearing none, it is admitted.

15     (Declaration of Robert Del Genio received in evidence)

16       MR. ZUBKIS:  Similarly, with Mr. Puntus'

17 declaration, which can be found at Exhibit 3 to the DIP

18 motion at docket number 30.

19       THE COURT:  Yes.

20       MR. ZUBKIS:  Again, Mr. Puntus is here today in

21 court and can testify and be subject to cross-examination.

22 We would move his declaration into evidence.

23       THE COURT:  All right, any objection to that being

24 admitted?

25     (No verbal response)

1           THE COURT:  Hearing none, it is admitted.

2       (Declaration of Marc Puntus received in evidence)

3           MR. ZUBKIS:  Thank you, Your Honor.

4           As Mr. Holtzer mentioned, if it's acceptable to

5   Your Honor, to minimize transitions between presentations of

6   the various motions, we request that you allow us to go

7   through the agenda slightly out of order.

8           THE COURT:  That's fine, yes.

9           MR. ZUBKIS:  Okay.  Do you want me to go through

10  the modified order or just start going through it?

11          THE COURT:  Just lay it out as you go.

12      (Laughter)

13          MR. ZUBKIS:  Okay.  I'd also like to note, Your

14  Honor, that we provided copies of the pleadings in advance to

15  the United States Trustee.

16          THE COURT:  Yes.

17          MR. ZUBKIS:  And we want to thank you the U.S.

18  Trustee for taking the time to review the motions and orders,

19  and he provided helpful comments.  And we will -- those will

20  be reflected in the orders that we hand up.

21          THE COURT:  All right, wonderful.

22          Mr. Hackman, thank you.

23          MR. ZUBKIS:  And each attorney presenting their

24  respective motions will be handing you blacklines of the

25  modified orders.

1            THE COURT:  Okay.  All right.

2            MR. ZUBKIS:  So --

3            THE COURT:  So, what do you lead with?

4            MR. ZUBKIS:  An old classic, joint admin, right?

5            THE COURT:  Yes, yes.

6            MR. ZUBKIS:  Standard.

7            THE COURT:  It's an oldie, but goodie.

8            MR. ZUBKIS:  Yeah.

9            So, the joint admin motion is number 12.

10           THE COURT:  Right.

11           MR. ZUBKIS:  On the agenda, Your Honor.  And we

12   respectfully request that the Clerk of the Court maintain one

13   file and one docket for all the debtors' Chapter 11 cases

14   under the same case number assigned to debtor, Checkout

15   Holding Corp.  We believe the relief is warranted and will

16   ease the cost of administrative burden on the court and all

17   parties.

18           THE COURT:  All right.  And this is a typical

19   motion that we see in these cases.  Does anyone have any

20   objection?

21       (No verbal response)

22           THE COURT:  Hearing none, I will be pleased to

23   sign that order.  And if you have multiple motions that

24   you're presenting, Mr. Zubkis, you can hand up all of the

25   orders to me.

1          MR. ZUBKIS:  Okay.  Thank you.

2          So, next on the agenda, item number 13, Your

3  Honor, is the motion to maintain the debtors' cash management

4  system.

5          THE COURT:  Yes.

6          MR. ZUBKIS:  The debtors' cash management system

7  collects and transfers funds generated by the debtors'

8  operations.  And is designed to disperse funds to satisfy

9  obligations efficiently.

10          As described in the motion, the system consists of

11  13 bank accounts, 12 of them are at SunTrust, one is at

12  JPMorgan.  It serves to hold $5.25 million dollars in cash

13  collateral, which secures JPMorgan's exposure under a letter

14  of credit that is issued in favor of one of the debtors'

15  vendors.

16          Both JP and SunTrust are authorized bank

17  depositories under the U.S.T. guidelines Region 3.

18          THE COURT:  Yes.  I always look for that and

19  that's the fact.

20          MR. ZUBKIS:  Thank you, Your Honor.

21          With respect to intercompany transfers and

22  transactions, those between the debtors themselves are

23  typical of those found in other multi-entity businesses.  IF

24  the court finds it helpful, I can walk through some of the

25  intercompany transfers that take place between the debtors

1  and their foreign non-debtor affiliates; otherwise, we can --

2           THE COURT:  Why don't you go ahead and present

3  those to me, yes.

4           MR. ZUBKIS:  Okay.  Your Honor, thanks.

5           So, the debtors have certain of their foreign non-

6  debtor affiliates in Europe and Japan.  And these entities

7  operate primarily independently of the debtors and they have

8  their own distinct bank accounts and they require minimal to

9  no funding from the debtors.  So, there's very minimal cash

10 transfers that actually happen between these entities.

11          But the debtors do cover certain overhead costs

12 such as insurance.  Infrastructure and shared costs are

13 reallocated back to the debtors through a series of operating

14 -- not operating agreements, but agreements between the

15 foreign entities and the debtors where the royalties that the

16 debtors receive from the foreign affiliates, they have an

17 allocation for these overhead shared costs.

18          THE COURT:  Okay.  Okay.

19          MR. ZUBKIS:  The debtors also have an affiliate in

20 Costa Rica that employs approximately 90 employees.  These

21 employees help keep down the costs of campaign management and

22 certain operational systems.  This entity provides services

23 to the debtors and invoices to the debtors on a regular

24 basis.

25          THE COURT:  And I think that was covered in your

1   papers.

2          MR. ZUBKIS:  Yeah.

3          THE COURT:  So, certainly, I read it and

4   understood it and I appreciate your presenting it.

5          MR. ZUBKIS:  Okay.  And, finally, the debtors have

6   a corporate credit card program --

7          THE COURT:  Yes.

8          MR. ZUBKIS:  -- that the employees have.

9   Approximately 300 employees that use the program.  The

10  employees themselves are responsible for paying the invoices,

11  but the debtors, to ease the administrative, but the debtors

12  pay it for them.

13          As of the petition date, the debtors' they owe

14  approximately $180,000 under the employee credit card program

15  of $20,000 of which will become due during the interim

16  period, the 21 days.

17          THE COURT:  Okay.  All right.

18          MR. ZUBKIS:  We received some minor feedback from

19  the United States Trustee.  They reflected in our order.  We

20  can walk through them or --

21          THE COURT:  Yes, if you'll bring up the blackline

22  and the order, that would be helpful.

23          Thank you, Mr. Zubkis.  Thank you.

24          MR. ZUBKIS:  So, the U.S. Trustee asked us to

25  clarify paragraph number three --

1          THE COURT:  Yes.

2          MR. ZUBKIS:  -- to include intercompany transfers

3    and their recordkeeping.  We took his comment and the United

4    States Trustee in paragraph seven added a requirement that

5    any deposit accounts will have to be executed in a uniform

6    depository in agreement with the UST.

7          And in paragraph eight, we added paragraph eight

8    which will require the debtors to notify the banks that are

9    parties to the depository agreements.  We will notify them of

10   the existence of these Chapter 11 cases.

11         THE COURT:  Yes.

12         MR. ZUBKIS:  In paragraph nine, the legend that

13   will be on the debtors' existing business forms will include

14   the debtors' case number.  And the UST has requested that we

15   seek court approval before we make any intercompany loans

16   between debtors and non-debtors.

17         THE COURT:  Yes.

18         MR. ZUBKIS:  And, finally, in paragraph 18, the

19   United States Trustee requested that in terms of calculating

20   quarterly fees, they calculate it based on disbursements of

21   each debtor.

22         THE COURT:  Right.  All right.

23         Well this, of course, is an interim order.  Unless

24   someone has an objection, I'll be pleased to sign the order.

25         I recognize that it meets the requirements of Rule

1   6003 and I will be pleased, as I say, to sign.

2            MR. ZUBKIS:   Thank you very much, Your Honor.

3            THE COURT:  I guess, I'll get those orders at the

4   end, is that right?

5            MR. ZUBKIS:  Yeah.

6            THE COURT:  Yes.  Okay.

7            MR. ZUBKIS:  Next, I'd like to move to item 17 on

8   the agenda, Your Honor.

9            THE COURT:  All right.

10           MR. ZUBKIS:  The debtors' motion to maintain

11  administer its customer programs.

12           THE COURT:  Yes.

13           MR. ZUBKIS:  It goes without saying, Your Honor,

14  that to maintain the debtors' relationships with its

15  customers during this restructuring, it's critical that the

16  debtors maintain their existing customer programs.

17           Their primarily line of business is to design and

18  execution of targeted marketing campaign for its customers.

19  These programs, generally speaking, are designed to remedy

20  any value loss due to improper execution of a campaign to

21  encourage increased customer spin through primarily through

22  their rebate program.

23           THE COURT:  Yes.

24           MR. ZUBKIS:  So, unless, Your Honor has any other

25  specific questions, we do request that the court enter the

1  order approving the relief requested in the motion.

2           THE COURT:  Were there any changes that the office

3  of the United States Trustee requested?

4           MR. ZUBKIS:  There were none.

5           THE COURT:  Okay.

6           MR. ZUBKIS:  Just we just added the case caption.

7           THE COURT:  Yes.  Okay.  That's fine.

8           Yes, I'm prepared to sign the order.  I recognize

9  that its essential to the debtors that I do so, and I'll be

10  pleased to do so.

11          Again, is this an interim order?  I think so.

12  Yes, it's an interim order as well.

13          MR. ZUBKIS:  Thank you, Your Honor.

14          Next, I'd like to move to agenda number 22, Your

15  Honor.

16          THE COURT:  All right.

17          MR. ZUBKIS:  The debtors' motion to pay

18  prepetition trade claims.

19          THE COURT:  Yes.

20          MR. ZUBKIS:  In the ordinary course.

21          Your Honor, given that this is a prepackage case,

22  the relief requested is standard, given that all trade claims

23  will be unimpaired and paid in the ordinary course.

24          I'd like to point out that, as usual, you know,

25  the motion only seeks to alter the timing that the amount or

1  priority of these claims.

2          THE COURT:  Yes.

3          MR. ZUBKIS:  The debtors negotiated the terms of

4  the prepackaged plan with this goal in mind; specifically,

5  that trade creditors would be unimpaired to avoid disruption

6  to the normal operation of the business.

7          And with respect to a certain subset of the trade

8  claims, specifically, the critical vendor claims, the lien

9  claims, and the 503(b)(9) claims, which I'll note that they

10  would, otherwise, qualify as critical vendor claims.

11          THE COURT:  Right.

12          MR. ZUBKIS:  They were not 503(b)(9) claims.  In

13  order to maintain the going concern value of the debtors'

14  enterprise and to avoid the risk of key vendors and service

15  providers with holding essential services or refusing to sell

16  goods to debtors, its essential debtors continue to honor

17  these types of claims in the ordinary course.

18          THE COURT:  Yes.

19          MR. ZUBKIS:  And on page 6 of the motion, I can

20  point you, there's a breakdown of these different types of

21  claims and the interim amounts and final amounts we're

22  seeking authority to pay.

23          THE COURT:  Yes.

24          MR. ZUBKIS:  And I'd also note that the debtors

25  are not seeking to pay these amounts immediately or one lump

1 | sum, rather to pay them as they come due in the ordinary
2 | course.
3 |     THE COURT:  All right.
4 |     MR. ZUBKIS:  So --
5 |     THE COURT:  And you've broken out the amount to be
6 | paid during the interim period as well?
7 |     MR. ZUBKIS:  Yes, Your Honor.
8 |     THE COURT:  Yes.  All right, does anyone wish to
9 | be heard?
10 |   (No verbal response)
11 |     THE COURT:  Hearing no one, again, I will sign
12 | this order recognizing that the debtors would suffer
13 | immediate and irreparable harm without the relief.
14 |     MR. ZUBKIS:  Thank you, Your Honor.
15 |     And coming up next is Michael Godbe who will
16 | present the next batch of motions.
17 |     THE COURT:  All right.  Thank you, Mr. Zubkis.
18 |     Mr. Godbe, good afternoon.
19 |     MR. GODBE:  Good afternoon, Your Honor.  Michael
20 | Godbe of Weil Gotshal Manges on behalf of the debtors.
21 |     THE COURT:  Yes, sir.
22 |     MR. GODBE:  With your permission, I'd like to walk
23 | through the following motions in order: wages, insurance,
24 | utilities, and Prime Clerk's retention as claims and noticing
25 | agent.

1              THE COURT:  All right.  That's fine.

2              MR. GODBE:  I'd like to begin with docket number

3    4, agenda item 14, the debtors' motion authorizing payment of

4    prepetition wages and employee benefits.

5              THE COURT:  Yes.

6              MR. GODBE:  Your Honor, employees are the

7    lifeblood of this business. The debtors employ over 580, in

8    addition to the services of various independent contractors,

9    consultants, and temporary workers that make this

10   organization one.

11             As of the petition date, the debtors estimate they

12   have prepetition employee compensation obligations of

13   approximately $1.5 million dollars, $728,000 dollars which

14   are due during the interim period.

15             The breakdown of these amounts is set forth in

16   greater detail in the motion.

17             THE COURT:  Yes.

18             MR. GODBE:  There's also general incentive program

19   and severance guidelines.  These are restricted to non-

20   insiders. No insiders will receive distribution on account of

21   these.

22             In addition to compensation, the debtors provide

23   employees with benefits.  As of the petition date, the

24   debtors estimate they have prepetition employee benefit

25   obligations of approximately $1.1 million dollars, $874,500

1  dollars of which are due during the interim period.

2         The breakdown of these amounts is set forth in

3  greater detail in the motion.

4         THE COURT:  Yes.

5         MR. GODBE:  No employee will be receiving an

6  amount over the $12,850 dollar cap, either in relation to

7  wages or benefits.

8         Today, the debtors seek entry of an interim order

9  authorizing them to pay up to $1.8 million dollars in

10  employee wages and associated obligations in the interim

11  period pending entry of a final order.

12         We have received some informal comments from the

13  United States Trustee, all of which have been resolved and

14  incorporated into the proposed interim order.

15         May I provide a redline of that?

16         THE COURT:  Yes, yes, Mr. Godbe, thank you.

17         Thank you. All right.

18         MR. GODBE:  If you turn to the third page,

19  paragraphs four and five.  To make clear, we are not seeking

20  to pay on account of the Costa Rica program either the

21  general retention or payments under the severance guidelines

22  during the interim period.

23         THE COURT:  Okay.

24         MR. GODBE:  We have not received any other

25  objections, formal or informal, in response to this motion.

1    If Your Honor has no questions regarding the

2   motion, I would ask that Your Honor enter the proposed

3   interim order.

4         THE COURT:  All right, Mr. Godbe.

5         Anyone have any questions or issues?

6      (No verbal response)

7         THE COURT:  Hearing none, I will sign the order.

8         I recognize the essential need to pay wages, and

9   I'll be pleased to sign that order.

10        MR. GODBE:  Thank you, Your Honor.

11        With your permission, the next item on the agenda

12  is docket number 5, agenda item 15, the debtors' motion to

13  continue their insurance policies.

14        THE COURT:  Yes.  Right.

15        MR. GODBE:  As required by statute, contract, and

16  the debtors' business needs, the debtors maintain various

17  insurance policies related to, among other things, general

18  liability, excess liability, directors and officer's

19  liability, worker's compensation, property, crime, and

20  automobile liability.

21        These policies are discussed in further detail in

22  the motion and are set forth on Exhibit C, including the

23  amounts due.

24        The debtors seek authority to maintain these

25  policies and programs and honor their obligations relating to

1 the programs and to renew or enter into new policies and

2 programs in order to manage and limit various risks

3 associated with their operations.

4          The debtors seek, through this interim order, the

5 ability to pay $21,927 dollars in the interim period pending

6 entry of a final order.

7          Debtors also seek to modify the automatic stay to

8 allow worker's compensation claims to proceed, to the extent

9 they are covered by the debtors' worker compensation

10 insurance.

11          THE COURT:  Okay.

12          MR. GODBE:  Since these are fully covered by the

13 policy and, therefore, not have a negative impact on the

14 value of the estate, we believe this relief is appropriate.

15          THE COURT:  All right.

16          MR. GODBE:  The debtors have received no

17 objections to this motion.

18          Unless Your Honor has any questions regarding the

19 motion, I ask that you enter the proposed interim order.

20          THE COURT:  All right, unless anyone wishes to be

21 heard, I'm prepared to sign this order.

22      (No verbal response)

23          THE COURT:  Hearing no one, I will sign the order,

24 Mr. Godbe.  Thank you.

25          MR. GODBE:  Thank you, Your Honor.

1          THE COURT:  You've got to have insurance.

2          MR. GODBE:  With your permission, the next item on

3  the agenda is docket number 8, agenda item 18, the debtors'

4  motion for utilities.

5          THE COURT:  Okay.

6          MR. GODBE:  This motion is customary and proposes

7  to have the debtors deposit two weeks' payment to utility

8  services in a segregated account.

9          The amount of the deposit is $120,000 dollars,

10  just slightly over two weeks' worth of utility payments.

11          The debtors have received no objections to the

12  relief requested.

13          If Your Honor has no questions regarding the

14  motion, then I ask that you enter the proposed interim order.

15          THE COURT:  All right.  Anyone wish to be heard?

16      (No verbal response)

17          THE COURT:  Well, this method is a little bit

18  unusual, perhaps, but we followed it and followed it with

19  success and, hopefully, the debtors will be receptive to any

20  inquiries from the utilities, but, otherwise, I am prepared

21  to sign the order today on an interim basis.

22          MR. GODBE:  Thank you, Your Honor.

23          With your permission, the next item on the agenda

24  is docket number 21, agenda item 19.

25          THE COURT:  Yes.

1          MR. GODBE:  The application for an order

2    authorizing the retention and appointment of Prime Clerk, LLC

3    as claims noticing and balloting agent to the debtors.

4          THE COURT:  Yes.

5          MR. GODBE:  The debtors are seeking authorization

6    to retain Prime Clerk in accordance with the November 7th,

7    2018 engagement agreement between the two parties.  A copy of

8    the engagement agreement is attached to the Steele

9    declaration which is Exhibit D to the motion, and it is

10   Exhibit 1 to the declaration.

11         Should you require any additional support for the

12   application from the declaration of Benjamin Steele, vice

13   president of Prime Clerk, we have a representative from Prime

14   Clerk who has dialed into the hearing.

15         THE COURT:  All right.

16         MR. GODBE:  Prime Clerk is one of the country's

17   leading Chapter 11 administrators with expertise in noticing

18   and claims processing.  Prime Clerk has provided services

19   substantial similar to those contemplated in this case, in

20   other Chapter 11 debtors in this district.

21         THE COURT:  Yes.

22         MR. GODBE:  Debtors' selection of Prime Clerk to

23   act as the claims and noticing agent has satisfied the

24   protocol for the claims and noticing agents under Section

25   156(c) of Title 28.

1          Debtors obtained and reviewed engagement proposals

2    from three other court-approved claims and noticing agents to

3    ensure selection through a competitive process.

4          The scope of the services to be provided by Prime

5    Clerk is described in greater detail in paragraph 14 of the

6    application.

7          Prime Clerk's rates are competitive and

8    reasonable.  And the debtors have not received any objections

9    to the retention of Prime Clerk or the terms thereof.

10          The debtors respectfully request that you enter

11   the proposed order.

12          THE COURT:  All right.  Does anyone wish to be

13   heard?

14      (No verbal response)

15          THE COURT:  Hearing no one, you have to have Prime

16   Clerk and they do a good job, and I'll be pleased to sign the

17   order.

18          MR. GODBE:  Thank you, Your Honor.

19          My colleague, Kevin Bostel, will present next.

20          THE COURT:  All right, thank you, Mr. Godbe.

21          Good afternoon to you.

22          MR. BOSTEL: Good morning, Your Honor.  Kevin

23   Bostel, Weil Gotshal & Manges on behalf of the debtors.

24          THE COURT:  Yes.

25          MR. BOSTEL:  I'm going to be discussing the

1    debtors' NOL motion, their prepetition tax motion, and talk a

2    little bit about scheduling on the scheduling motion.

3              THE COURT:  Okay.  All right.

4              MR. BOSTEL:  Your Honor, on the agenda is item

5    number 21 is the debtors' NOL motion.  The NOL motion seeks

6    to establish procedures to protect the potential value of the

7    debtors' tax attributes.

8              The proposed procedures would impose restrictions

9    and notice requirements on PDM Group Holdings Corporation.

10   And if you have the chart Mr. Holtzer presented earlier,

11   that's the ultimate parent of the debtors.

12             THE COURT:  That's right.

13             MR. BOSTEL:  The debtors estimate that they have

14   approximately $145 million dollars in NOLs.  These are

15   valuable assets of the estate.  And we believe the procedures

16   that we set forth provide narrowly tailored restrictions that

17   would protect those assets.

18             We provided the proposed order to the U.S. Trustee

19   and we received some minimal comments.  If I may, I can bring

20   up a redline.

21             THE COURT:  Yes.  Yes, thank you.  Thank you.

22             MR. BOSTEL:  I'll briefly walk you through the

23   changes we received.

24             We also had a couple cleanup changes in this

25   motion.  We were discussing after we had filed some

1  additional changes with the first lien ad hoc group, so some

2  of the changes in here represent them and I'll indicate which

3  ones came from who.

4              THE COURT:  Okay.

5              MR. BOSTEL:  So, in paragraph three, we clarified

6  that the consent right is with respect to the ad hoc first

7  lien group, not just the debtors in agreeing to any of these

8  changes.

9              In paragraph four, this was just a cleanup change

10  to clarify the common stock was of the parent company.

11              THE COURT:  Right.

12              MR. BOSTEL:  In paragraph eight, again, making

13  clear that it's just not the debtors would object to this,

14  it's other parties in interest that have a stake in this

15  case.

16              THE COURT:  I assume that request came from the

17  first liens.

18              MR. BOSTEL:  Yes.

19              THE COURT:  Yes.

20              MR. BOSTEL:  In Paragraph 14, those are just

21  clean-up changes for the dates.

22              THE COURT:  Yes.

23              MR. BOSTEL:  Then there were a couple changes that

24  the first liens requested in the exhibit on Page 3 of Exhibit

25  1.

1          THE COURT:  Yes.

2          MR. BOSTEL:  Just some notice clarifications.

3    Then there is a change that's hand-marked on the copy you

4    have at the bottom.  That was a request from the U.S. Trustee

5    that these notices aren't redacted.  We did file with the

6    petitions the equity list so it's public who holds the equity

7    of PDM Group Holdings.

8          THE COURT:  Okay.

9          MR. BOSTEL:  So, there is no need to redact any

10   substantial holdings there.  That change carries through onto

11   Page 4 of the notice there.

12         THE COURT:  Good.

13         MR. BOSTEL:  Again, on Page 5 at the end of the

14   notice clarifying the consent rights of the first lien group.

15         Then, I believe that covers that other than a

16   clarification.  I think it was a defined term that was used

17   wrong at the end, but that's been clarified.

18         THE COURT:  Okay.  All right.

19         MR. BOSTEL:  So, unless Your Honor has any

20   questions, we would request that -- this is being asked to be

21   approved on an interim basis *nun pro tunc* to the petition

22   date.  So, we would ask Your Honor approve the motion.

23         THE COURT:  All right. Does anyone wish to be

24   heard?

25       (No verbal response)

1    THE COURT:  Hearing no one this is not an uncommon

2  motion and I am prepared to enter the order on an interim

3  basis.

4    MR. BOSTEL:  Thank you, Your Honor.

5    Your Honor, next on the agenda is item number 16

6  which is the debtors' motion to seek relief for approving the

7  payment of prepetition taxes and related fees --

8    THE COURT:  Yes.

9    MR. BOSTEL:  -- that was filed at docket number 6.

10  The debtors have your typical standard tax obligations

11  including sales and use taxes, property taxes, income taxes,

12  franchise taxes and other, you know, business and related

13  fees; licensing fees.  By this motion we're seeking interim

14  relief to pay any taxes that come due during the interim

15  period and that amount is $85,000 dollars the debtors expect.

16  Overall, on a final basis we would ultimately be seeking

17  relief to pay approximately 1.5 million.

18    THE COURT:  Okay.

19    MR. BOSTEL:  We did not receive any comments on

20  this.  I did provide a redline, but it's just changing the

21  dates that we had talked about yesterday.

22    THE COURT:  All right.  Unless anyone wishes to be

23  heard I'm prepared to sign the order.

24    (No verbal response)

25    THE COURT:  Hearing no one, I will sign that

1  order.

2          MR. BOSTEL:  Thank you, Your Honor.

3          The next item on the agenda appears at number 23

4  and that is the debtors' scheduling motion filed at docket

5  number 13.

6          THE COURT:  Okay.

7          MR. BOSTEL:  There are a number of items that

8  we're seeking relief for in this motion.  We are seeking

9  approval of a hearing date to schedule a hearing for the

10 combined hearing on the disclosure statement and on

11 confirmation of the plan.  On the petition date we also did

12 file the Chapter 11 plan as Mr. Holtzer indicated.

13         THE COURT:  Yes.

14         MR. BOSTEL:  And the disclosure statement.  Those

15 can be found at docket entries 11 and 12.  We're also seeking

16 to establish a deadline to object to the adequacy of the

17 information in the disclosure statement and the plan itself.

18 We also seek approval of the process by which we solicit

19 votes on the Chapter 11 plan.  And ballots were attached to

20 the motion, the ballots that were used in the solicitation

21 that was already commenced.

22         THE COURT:  Yes.

23         MR. BOSTEL:  We also have a proposed notice to

24 notify the company's creditors of the commencement of these

25 cases and various other deadlines.  We also seek the standard

1   relief of extending the time to file schedules and sofas with

2   the expectation that we'll avoid having to file those and

3   avoid the expense on the estate of doing so.

4             THE COURT:  Right.

5             MR. BOSTEL:  As well as waiving the 341 Meeting

6   conditionally assuming that the plan does not get approved.

7             THE COURT:  Yes.

8             MR. BOSTEL:  So, Your Honor, I will walk --

9   included in the motion on Page 3 was a table that laid out

10  the various dates that we're proposing.

11            THE COURT:  I think January 30th was the date you

12  were looking for, is that right?

13            MR. BOSTEL:  January 30th was the date we were

14  initially focused on for the confirmation hearing, but after

15  conversations with your Chambers yesterday I believe the 31st

16  works better for the court.

17            THE COURT:  That would work better, yes.  That is

18  acceptable to you?

19            MR. BOSTEL:  It's acceptable to the debtors.  I

20  don't know if any other party wants to comment on that, but

21  it's acceptable to us.

22            THE COURT:  All right.  That's fine with me.

23            MR. BOSTEL:  That is at -- I believe we settled on

24  nine a.m. for that hearing.  I think you had offered nine

25  a.m. or three p.m. and nine a.m. worked better.

1          THE COURT:  All right.  I have written down 10

2   o'clock.

3          MR. BOSTEL:  10 o'clock?

4          THE COURT:  Yes.

5          MR. BOSTEL:  I don't think that will be a problem.

6          THE COURT:  Is that all right with everyone?

7          MR. BOSTEL:  I'm sorry, I think it was 10.

8          THE COURT:  Okay.  Good.  All right.  That is fine

9   with the court.

10          Does anyone wish to be heard on this?

11          Mr. Hackman, yes.  Good afternoon.

12          MR. HACKMAN:  Good afternoon, Your Honor; may I

13   please the court, Ben Hackman for the U.S. Trustee.  We have

14   one open issue on this motion.

15          THE COURT:  Okay.

16          MR. HACKMAN:  Its Paragraph 7 of the form of order

17   which says to the extent that Section 1125(b) of the

18   Bankruptcy Code requires the prepetition solicitation of

19   acceptances to be pursuant to an approved disclosure

20   statement the court conditionally approves the disclosure

21   statement.  We don't think it's necessary for Your Honor to

22   do that today.  I don't think the debtors need to put Your

23   Honor in the position of making a finding about the adequacy

24   of the disclosure statement at a first-day hearing.  So, we

25   would respectfully request that this provision be removed.

1        THE COURT:  All right.

2        MR. HACKMAN:  Thank you, Your Honor.

3        THE COURT:  Thank you.

4        MR. BOSTEL:  Yes, Your Honor.  We did include the

5   requirement that the disclosure statement be approved on a

6   conditional basis as we described in the motion.  We

7   indicated that we don't believe or we're not sure if it's

8   necessary, but out of an abundance of caution we would

9   request that it be included in the order.  We're not sure if

10  it is necessary.  We did commence solicitation prepetition as

11  we've indicated.

12        THE COURT:  Yes.

13        MR. BOSTEL:  We did complete it prepetition all of

14  the mailing.  We don't believe including it on a conditional

15  basis prejudices anyone's rights.  If we are establishing a

16  disclosure statement hearing where parties will have an

17  opportunity to object to the adequacy of the information, we

18  just weren't comfortable removing that after the discussions

19  with the U.S. Trustee, but we would request that it remain in

20  the order.  We're open to hear the court's thoughts on it.

21        THE COURT:  Well, I did read it, but I read it

22  kind of quickly, you know, in the little bit of time that I

23  had.  I would prefer that it not be in the order because I

24  don't know that I'm in a position, really, to conditionally

25  indicate my approval.  So, I would prefer that that language

1  be removed.

2              MR. BOSTEL:  We're agreeable to that, Your Honor.

3              THE COURT:  Okay.  All right.

4              MR. BOSTEL:  I think there were a couple other

5  changes.

6              THE COURT:  Yes, I see those.

7              MR. BOSTEL:  So, why don't we just walk through

8  those?

9              THE COURT:  All right.

10             MR. BOSTEL:  The U.S. Trustee requested that we

11 include the email addresses for all the parties so it's

12 easier to contact them on a notice basis.  So, we included

13 that in Paragraph 3.

14             THE COURT:  All right.

15             MR. BOSTEL:  In Paragraph 11 there was a

16 clarification that we're not seeking approval of the RSA at

17 this stage.

18             THE COURT:  No.

19             MR. BOSTEL:  As Your Honor may have noticed in the

20 papers there is a milestone in the RSA to seek approval of

21 the RSA.  So, that motion will be -- you will see that filed

22 shortly.  It's a seven-day requirement, but today we are not.

23 So, that has been removed from Paragraph 1.

24             THE COURT:  Okay.

25             MR. BOSTEL:  I'm sorry, new Paragraph 11 was also

1  a comment from the U.S. Trustee saying that the 341 Meeting

2  will not be required unless the plan is not confirmed in 60

3  days.

4              THE COURT:  Yes.

5              MR. BOSTEL:  And we're okay with that change too.

6              THE COURT:  All right.  That is a typical change.

7              Does anyone wish to be heard?

8        (No verbal response)

9              THE COURT:  All right.  With that one change

10 removing my conditional approval, and we can just strike that

11 out, I will be pleased to sign the order.

12             MR. BOSTEL:  Yeah.  We will send a revised order.

13             THE COURT:  Yes.  Thank you.  I will be pleased to

14 sign that.

15             MR. BOSTEL:  Your Honor, while the United States

16 Trustee was talking Mr. Britton reminded me that in the NOL

17 motion that you had just approved some of the changes that

18 were added from the first lien ad hoc group indicated that

19 they had certain consent rights.

20             THE COURT:  Yes.

21             MR. BOSTEL:  The second lien ad hoc group would

22 also like consent rights over those.  We're okay with that

23 change.  I don't know if Mr. -- and the first lien ad hoc

24 group is also okay with that change.

25             THE COURT:  All right.

1          MR. BOSTEL:  So, we will also submit a further

2   revised order to reflect those changes before Your Honor

3   signs that order.

4          THE COURT:  That's fine with me.  Very well.

5   Thank you.

6          MR. BOSTEL:  Thank you, Your Honor.  That

7   concludes my presentation.  My colleague, Ms. Liou, will take

8   over for the DIP.

9          THE COURT:  Thank you, Mr. Bostel.

10          MS. Liou, good afternoon.

11          MS. LIOU:  Good afternoon, Your Honor; Jessica

12   Liou from Weil Gotshal & Manges on behalf of Checkout Holding

13   Corp., and its affiliated Chapter 11 debtors.

14          THE COURT:  Yes.

15          MS. LIOU:  Before arriving at the podium I was

16   told by Mr. Holtzer I've got 15 minutes or less to get this

17   DIP financing order approved.  So, I hope I don't disappoint

18   him.

19          THE COURT:  I don't have any time limits, but

20   maybe Mr. Holtzer does.

21      (Laughter)

22          MS. LIOU:  So, the DIP financing motion is docket

23   index number 30 and agenda item number 20.

24          THE COURT:  Yes.

25          MS. LIOU:  We also filed the Puntus declaration

1   which was an attachment to the motion and we did file a

2   budget of which if you haven't already seen it we will file a

3   revised and amended version of that budget which has been

4   approved by the relevant parties.

5           THE COURT:  All right.  I did see it, but you're

6   going to revise that, is that right?

7           MS. LIOU:  Yes, that's right.  It was missing a

8   page.  So, we want to get that on file.

9           THE COURT:  Okay.

10          MS. LIOU:  The full version of the budget.  Then

11  in addition to that, if we haven't already, we are filing a

12  motion to seal and a notice which includes JPMorgan's fee

13  letter for certain fees that will be accrued, and due and

14  owing upon the closing of the DIP facility.

15          THE COURT:  That's the only document that will be

16  under seal, is that right?

17          MS. LIOU:  That's right.

18          THE COURT:  Okay.  All right.

19          MS. LIOU:  And that is not on for hearing today,

20  that's on for the second day, but we did want to disclose

21  those terms to Your Honor.  And, of course, the terms of the

22  confidential fee letter are also available to the U.S.

23  Trustee as well to the extent he wants to review it.

24          THE COURT:  Okay.  All right.

25          MS. LIOU:  So, under the debtors' DIP financing

1  motion we are seeking approval of DIP financing including the

2  grant of senior and priming liens and super-priority claims

3  for the DIP lenders, the use of cash collateral and adequate

4  protection of liens and claims to the prepetition first lien

5  parties as part of what would be a typical adequate

6  protection package.

7          THE COURT:  Yes.

8          MS. LIOU:  The debtors have an immediate need for

9  additional financing.  As you know, when they filed on the

10 petition date, they only had about $7.8 million dollars on

11 hand.

12         THE COURT:  Yes.

13         MS. LIOU:  In order to run their international

14 business and their domestic business they're going to need

15 more than that to make payroll to their employees, to pay

16 vendors in the ordinary course.  Needless to say, they also

17 need a cash cushion to reassure their customers who are very

18 large sophisticated retailers and other entities that are

19 sensitive to the amount of cash on hand that the company has.

20 They want to show the market and demonstrate to their

21 customers that they have the liquidity needed not only to

22 complete this Chapter 11 case, but upon emergence from its

23 restructuring it is going to be put in a good position and

24 have a lot of liquidity on its balance sheet.

25         Under the circumstances we believe that the DIP

1  financing is market and the terms are reasonable.  They were

2  heavily negotiated prepetition between the debtors' advisors

3  and the advisors to the prepetition first lien lenders, and

4  then also separately went through another round of

5  negotiations between the prepetition first lien lenders and

6  the prepetition second lien lenders' advisors as well; both

7  the ad hoc groups' advisors.

8           THE COURT:  And I understand you did seek other

9  financing?

10          MS. LIOU:  We did.  Your Honor, we were similarly

11 declined by nine different parties who are not interested in

12 providing the DIP financing.

13          THE COURT:  Right.

14          MS. LIOU:  I think that provides us a pretty high

15 level of confidence that the DIP financing that we have

16 obtained today is the best DIP financing available to the

17 debtors under the circumstances.

18          As you know, the DIP financing is also an integral

19 component of the overall restructuring.  Our DIP lenders are

20 also our prepetition ad hoc first lien lenders as well.  And

21 in connection with the DIP financing they are also agreeing

22 to provide an exit facility of $40 million dollars to provide

23 the incremental liquidity that the company needs upon exit.

24 They, obviously, are also agreeing to an overall

25 restructuring.  Without the prepetition first lien ad hoc

1    group's support and the general support of the first lien

2    lenders and the second lien lenders obtained under the RSA we

3    would not be able to be here today to do a consensual

4    prepackaged plan.

5              THE COURT:  Right.

6              MS. LIOU:  So, I'll go over some of the basic

7    terms of the DIP facility and then I will highlight some

8    provisions of the DIP order that I think Your Honor will be

9    interested in hearing about.  Then with that I think we can

10   conclude.

11             So, the basic terms of the DIP facility it's a 275

12   million term loan facility; 125 million of it is a new money

13   component.  We are just seeking interim approval of the 60

14   million initial draw.  Upon entry of the final order we will

15   have a second draw of $65 million dollars.

16             THE COURT:  Right.

17             MS. LIOU:  Additionally, upon entry of the final

18   order we are seeking approval of a $150 million dollar roll-

19   up of prepetition first lien debt.

20             THE COURT:  That will take place at the time of

21   the final order being entered, is that right?

22             MS. LIOU:  Upon entry of the final order, that's

23   correct; not relief that we are seeking today.

24             THE COURT:  Right.

25             MS. LIOU:  The interest rate of the DIP facility,

1  the new money loan portion is LIBOR plus 10 percent and the

2  roll-up portion will be accrued interest at LIBOR plus 5.5

3  percent.

4           THE COURT:  Okay.

5           MS. LIOU:  Liens being granted to the DIP lenders

6  for the new money portion of the DIP financing include a

7  first priority lien on previously unencumbered property which

8  primarily is comprised of membership interest in the Nielson

9  JV that you've heard mention of, liens on avoidance actions

10 which will not be relief that we are seeking today that's

11 pushed to the final order, and also liens on one-third of the

12 foreign equity of certain subsidiaries that was not

13 previously encumbered.

14          THE COURT:  Right.

15          MS. LIOU:  We're also requesting approval of a

16 first-priority senior priming lien on anything that was

17 prepetition collateral.  The DIP lenders will also be granted

18 a super-priority administrative expense claim as well.

19          THE COURT:  Yes.

20          MS. LIOU:  And just for Your Honor's reference,

21 although it's not relief we are seeking today for the portion

22 of the roll-up loans, we would eventually seek approval of a

23 first-priority priming security interest in liens on the

24 prepetition collateral and, again, a super-priority

25 administrative expense claim as well once those DIP roll-up

1  loans are approved.

2          THE COURT:  Okay.

3          MS. LIOU:  And all of these liens and claims are

4  going to be junior to any permitted prepetition liens that

5  exist.  That is defined in the DIP order.

6          THE COURT:  Yes.

7          MS. LIOU:  Debtors are also requesting authority

8  to use cash collateral and in addition we are requesting

9  authority to provide to the prepetition first lien lenders

10 certain adequate protection; that includes replacement or new

11 liens on security interest in the DIP collateral which are

12 going to be junior to the DIP liens, super-priority claims as

13 well and the payment of reasonable and documented out of

14 pocket fees and expenses which have been laid out for Your

15 Honor in the DIP order.

16         Also, subject to entry of the final order we will

17 provide for the ability to, upon the commencement of an

18 action asserting claims or defenses against the first lien

19 lenders, payment of about $150,000 dollars into a bucket of

20 funds so that those first lien lenders can defend that

21 action.

22         The DIP order also provides for a three and a half

23 million cap for a carve-out and there will be a separate

24 funding of a carve-out account upon the agent providing a

25 carve-out trigger notice and the carve-out account when it is

1 | funded will include the three and a half million, and also
2 | some additional other funds to pay for U.S. Trustee fees and
3 | other amounts that are laid out in the DIP order.

4 |           THE COURT:  Yes.

5 |           MS. LIOU:  So, a couple things I want to highlight
6 | which is relief that we are not seeking today and will be
7 | reserved for the final order.  Section 506(c) waiver --

8 |           THE COURT:  Right.

9 |           MS. LIOU:  -- in favor of the prepetition first
10 | lien lenders that's not going to be -- we're not going to
11 | seek approval of that today.  That will be limited to the
12 | final order.

13 |           THE COURT:  Okay.

14 |           MS. LIOU:  Same thing for the Section 552(b)
15 | waiver as well with respect to the prepetition collateral.
16 | We do have a waterfall provision laid out in our DIP order,
17 | again, which we will be seeking final approval of.  That
18 | waterfall provision clarifies that the new money portion of
19 | the DIP facility will recover at the option of the required
20 | lenders from previously unencumbered property first, then
21 | from all other DIP collateral.

22 |           We believe that that waterfall provision makes
23 | sense to include because the DIP lenders are providing new
24 | money under this facility.  And given the significant
25 | deterioration of the collateral value prepetition it was

1  clearly needed as an inducement for lenders to provide new

2  money.  And in addition, as we know --

3          THE COURT:  And that's to be approved at the

4  final?

5          MS. LIOU:  Yes, that's right.  And, in addition,

6  as you know, we do have consent from the prepetition first

7  lien lenders to prime their interest in the existing

8  collateral.

9          THE COURT:  Yes.

10          MS. LIOU:  There are also certain DIP fees that we

11  are seeking approval of and I can just briefly run through

12  those.  As you know, there are the JPMorgan fees.  There is

13  also going to be a closing payment of 2 percent of the

14  principal amount of the lender's new money loan.  Then a

15  backstop lender payment of 4 percent of the principal amount

16  of each lenders' aggregate backstop obligations.  Then a

17  ticking premium 5 percent on the aggregate daily amount of

18  unfunded new money commitment of each lender.

19          THE COURT:  You add those up and it spells real

20  money, doesn't it, Ms. Liou?

21          MS. LIOU:  It does, but, you know, I think overall

22  in an aggregate basis we are getting the funding that we need

23  and I think that's what's most important to the business.

24          THE COURT:  Yes.

25          MS. LIOU:  With all of that, Your Honor, I suggest

1  that if you have no questions, we can move onto the proposed

2  DIP order.

3          THE COURT:  Yes, that would be fine.

4          MS. LIOU:  Your Honor, may I approach?

5          THE COURT:  Yes.  Yes, Ms. Liou, you may.  Thank

6  you.

7          I don't think 15 minutes was enough, Ms. Liou.

8          MS. LIOU:  Well, hopefully we'll move pretty

9  quickly through these documents.  What I've just handed you,

10 Your Honor, is a redline of the proposed interim DIP order.

11         THE COURT:  Yes.

12         MS. LIOU:  Very minimal changes.  At the request

13 of the U.S. Trustee's Office we made some clarifying changes

14 into the order.  I am pleased to report that we have fully

15 resolved all of Mr. Hackman's comments and I will walk you

16 through that in a minute.  What I have also handed you is a

17 blackline of the DIP credit agreement.  There were some non-

18 substantive changes made to the DIP credit agreement which I

19 can also walk you through at a very high level because I'm

20 not a banking lawyer.

21         THE COURT:  Yes, absolutely.

22         MS. LIOU:  Okay.  So, let's start with the interim

23 DIP order.

24         THE COURT:  Okay.

25         MS. LIOU:  I first go to Page 16 of the redline.

1  I do have copies if anyone else in the courtroom would like

2  to see copies of either of these documents.  That is

3  Paragraph (f)(v).  There is some additional language added

4  here just to clarify that the payment of Centerview Partners

5  fees are subject to not only entry of the final order, the

6  DIP facility fee that they earned, but also approval of their

7  retention application by the court.

8        Next, I go down to Paragraph (f)(vi) and, again,

9  this is just tweaking of the existing language that the

10 conditions of the DIP facility and the extension of credit

11 under the DIP facility the terms are fair and reasonable.

12       Then on Page 17, Paragraph (f)(vii), and this is

13 language that will actually carry through to multiple other

14 provisions within the DIP order, we clarify that the roll-up

15 portion of the DIP facility will be subject to entry of the

16 final order and also the investigation period established

17 under Paragraph 25 of the order.

18       THE COURT:  Okay.  All right. That's 25, yes.

19       MS. LIOU:  Next I go to Page 20 of the blackline

20 and this is Paragraph 2(d), again it's the same change with

21 respect to the roll-up portion of the DIP facility subject to

22 the final order and the investigation period established

23 under Paragraph 25.  That is the additional language.

24       Also down below at the bottom of Page 20,

25 Paragraph 2(g) we just clarified here that the payment of

1 certain fees and expenses and other amounts are going to be

2 subject to the objection period and review period described

3 in Paragraph 60.  That period is about 10 days.

4          At the end of that paragraph, however, we clarify

5 that not all of the fees will require delivery of a copy of

6 an invoice first before they are approved for payment under

7 the DIP facility.

8          If you go next to Page 22, Paragraph 3 just some

9 minor changes there clarifying that there's going to be a

10 lien on the avoidance actions and the proceeds thereof upon

11 entry of the final order.

12          I'm going to skip ahead because I think the rest

13 of the changes in the next couple pages all relate to that

14 same concept.

15          THE COURT:  All right.

16          MS. LIOU:  Okay.  Page 35, Paragraph 11 in the

17 paragraph that deals with payments to certain parties that

18 are free and clear we just included an additional sentence

19 that clarifies that nothing in this paragraph relieves the

20 debtors' obligations to report their disbursements in the

21 monthly operating report and to pay U.S. Trustee fees on

22 those disbursements.

23          THE COURT:  And I assume that came from the U.S.

24 Trustee?

25          MS. LIOU:  Yes.

1           THE COURT:  Okay.

2           MS. LIOU:  Next I go to Page 44, Paragraph 25 and,

3   again, this just clarifies that the debtors' stipulations

4   will be binding upon the debtors and any successor thereto

5   including a Chapter 7 or 11 Trustee, but other than a trustee

6   appointed or elected during the challenge period.

7           THE COURT:  Okay.

8           MS. LIOU:  Then Page 50, Paragraph 30 the

9   additional language just clarifies there that the DIP agent,

10  DIP lenders and prepetition secured parties will not be

11  considered responsible persons, or owners or operators under

12  CERCLA solely because they've made the DIP loan and also the

13  prepetition first lien and second lien loans.

14          THE COURT:  Right.

15          MS. LIOU:  Next I go to Page 54, again this is the

16  conforming language regarding the roll-up loans and being

17  subject to the investigation period.

18          THE COURT:  Yes.

19          MS. LIOU:  And we're almost there.  Page 56,

20  Paragraph 42 just clarifying that any credit bid that the

21  prepetition secured parties will make is going to be subject

22  to Section 363(k) of the Bankruptcy Code.

23          THE COURT:  Okay.

24          MS. LIOU:  The last change Paragraph 45 is just

25  scheduling the time of the second day hearing and we will

1  revise that 9:00 a.m. time to 10:00 a.m. as discussed today.

2          THE COURT:  All right.  That's fine.

3          MS. LIOU:  Sorry, that one is nine a.m.; my

4  apologies.

5          THE COURT:  Oh, okay.  Let me check.  Yes, I think

6  it needs to be nine o'clock.

7          MS. LIOU:  Okay.  My apologies, Your Honor.

8          THE COURT:  Mr. Collins, yes.

9          MR. COLLINS:  Just one comment for Ms. Liou.

10          THE COURT:  Okay.

11          MS. LIOU:  So, next I turn to the DIP credit

12  agreement.

13          THE COURT:  Right.

14          MS. LIOU:  And I'm not going to flip to every

15  single page.  I will just explain conceptually the changes

16  that are reflected throughout the DIP credit agreement.

17          THE COURT:  That's fine.

18          MS. LIOU:  My understanding is that the substance

19  of the changes gets at two things.  One, is that in order to

20  syndicate the loan and make it tradeable we have decided to

21  amend this agreement to reflect that there will be a tranche

22  A which will be the initial 60 million draw related to the

23  new money loan.

24          THE COURT:  Yes.

25          MS. LIOU:  Then there will be a tranche B which is

1  the second 65 million draw related to the new money portion

2  of the loan.

3           THE COURT:  Okay.

4           MS. LIOU:  So, if Your Honor flips through the

5  agreement you will see that that carries throughout the

6  agreement.

7           THE COURT:  Good.

8           MS. LIOU:  The other change that I want to mention

9  is a change to the payment of fees and expenses provision.

10 It's Page 58 of the redline.  It just clarifies that there

11 will be payment of the fees; reasonable and documented fees

12 and expenses of counsel incurred by or prior to the closing

13 date.  That is just a conforming change to make it consistent

14 with language we've already negotiated and agreed to in the

15 DIP order.

16          THE COURT:  Okay.  All right.  Understood.

17          MS. LIOU:  If Your Honor has any questions, I'm

18 happy to answer them.

19          THE COURT:  I don't and I don't know if anyone

20 else wishes to be heard with respect to this motion.

21          Mr. Hackman?

22          MR. HACKMAN:  Good afternoon, Your Honor; Ben

23 Hackman for the U.S. Trustee.

24          I rise to confirm that all of our comments about

25 DIP financing have been resolved and I thank counsel for

1  working with our office on this and the other pleadings on

2  today's agenda.

3          THE COURT:  All right.  Thank you.

4          Look, I recognize the need and the negotiation and

5  -- did you wish to be heard, I'm sorry.

6          MR. BRITTON:  Yes, Your Honor.

7          THE COURT:  Yes, please.

8          MR. BRITTON:  Good afternoon, Your Honor; Bob

9  Britton, Paul Weiss Rifkind Wharton & Garrison behalf of the

10 ad hoc group of lenders.

11         THE COURT:  Yes, sir.

12         MR. BRITTON:  Your Honor, the ad hoc group

13 supports the DIP and the transactions that are set forth in

14 the RSA.

15         I rise only to clarify the record on one point

16 which was the reverse marshaling waterfall provision that was

17 described to Your Honor.  Your Honor, it is correct that

18 subject to entry of the final order as set forth in Paragraph

19 5 of the interim DIP order the required DIP lenders in their

20 sole discretion will have the ability to marshal their

21 recoveries from unencumbered collateral prepetition provided,

22 however, that in the event that the debtors and the one L

23 lenders pursue an alternative transaction, as defined in the

24 restructuring support agreement, all of our rights with

25 respect to allocations and distributions of value pursuant to

1  that plan are preserved notwithstanding this provision in the

2  DIP order.

3           THE COURT:  Okay.  Thank you, Mr. Britton.

4           MR. BRITTON:  Thank you, Your Honor.

5           MR. GREENBERG:  Good afternoon, Your Honor.

6           THE COURT:  Yes, sir.  Good afternoon.

7           MR. GREENBERG:  Scott Greenberg, Jones Day, on

8  behalf of the DIP lenders and the ad hoc first lien group.

9           First of all, Mr. Britton's recitation is correct,

10  that is the negotiation.  I just wanted to say and I think

11  some of these issues have been eluded to and maybe we'll deal

12  with them at final.  As it relates to, you know, the roll-up,

13  which, again, we kicked to final which I think is, obviously,

14  less controversial.  And as it relates to what Mr. Britton

15  referred to as the reverse waterfall and the marshaling I go

16  back to a comment Ms. Liou made and I think her presentation

17  was spot on which was this was a DIP which required

18  enticement and was not the easiest DIP to syndicate in

19  perfect cantor just given the value degradation that you saw

20  in Mr. Puntus' declaration as he kind of explains the decline

21  over the last several months.

22           THE COURT:  Yes.

23           MR. GREENBERG:  Nonetheless, obviously, it's not a

24  small DIP.  $125 million dollars, 60 of which is going out

25  the door, you know, upon entry of Your Honor's order.  So,

1  with that in mind we were able to syndicate the DIP, but

2  these protections were put in place and were integral in us

3  being able to underwrite this DIP as the backstop parties and

4  then go out to the market for the rest of the first lien

5  lenders.

6          That is the last point which I know is spelled out

7  in the pleadings, but just for the record as well other than

8  the backstop fees this is a DIP offered to all first lien

9  lenders pro rata.  So, first lien lenders that sign the RSA

10 can participate in the DIP and the exit, and they also get

11 the benefit of the roll-up.  So, it's not just kind of the ad

12 hoc group that held onto the goodies for themselves, so to

13 speak.

14          THE COURT:  All right.

15          MR. GREENBERG:  Again, just a preview and I think

16 Mr. Puntus' declaration did a very good job of kind of laying

17 out the history.  So, when we get to final if any of these

18 issues arise, we could talk about from the DIP loan lenders

19 perspective why they were integral and necessary for us to

20 underwrite this loan and to backstop it.

21          THE COURT:  All right.

22          MR. GREENBERG:  Thank you, Your Honor.

23          THE COURT:  Thank you, Mr. Greenberg.

24          Anyone else?

25      (No verbal response)

1    THE COURT:  Well, I do recognize that there are
2  some issues that may arise with regard to the final hearing
3  on the DIP, but I certainly recognize that there is the need
4  for the financing and the solicitation that went out.  I
5  recognize from Mr. Puntus' declaration the enticement aspect
6  of everything.  I am prepared to enter the order today and
7  permit the $60 million dollars to be released on an interim
8  basis.  And we will see where we are on the final hearing.
9    MS. LIOU:  Thank you, Your Honor.
10    With that I cede the podium to Mr. Holtzer.
11    THE COURT:  All right.  Mr. Holtzer, yes, you're
12  going to sing.
13    (Laughter)
14    MR. HOLTZER:  I wish.  Maybe at the final hearing.
15    THE COURT:  All right.
16    MR. HOLTZER:  It will give you something to look
17  forward.
18    THE COURT:  Yes.
19    MR. HOLTZER:  Thank you again for the time today,
20  Your Honor, at lunch.  We appreciate it.  And we look forward
21  to moving the case along very quickly.  So, again, thank you
22  very much.
23    THE COURT:  I do too.  I think you've gotten off
24  to a good start.  I appreciate your efforts.  They were fine.
25  I appreciate the presentations as well.

1       MR. HOLTZER:  Thank you, Your Honor.

2       THE COURT:  Mr. Collins, yes.

3       MR. COLLINS:  One logistical item, Your Honor.

4       THE COURT:  Yes, we have orders to sign.

5       MR. COLLINS:  Under the new regime the orders have

6  been uploaded for electronic approval.

7       THE COURT:  Oh, good.

8       MR. COLLINS:  Everything other than the NOL

9  trading order that will be submitted under certification of

10  counsel as we add in the provisions for the second lien

11  lenders.

12       THE COURT:  All right.

13       MR. COLLINS:  All of the other orders including

14  the revised scheduling order with the deletion of Paragraph 7

15  has been uploaded.

16       THE COURT:  Oh, wonderful.  Okay.  So, I can

17  review those and get them on the docket.

18       MR. COLLINS:  Please, Your Honor.

19       THE COURT:  All right.  Yes, we will do that

20  promptly before I eat lunch.  With that folks we will stand

21  in recess.  Obviously, I am available if the need arises.

22  Thank you everyone.

23       (Proceedings concluded at 1:08 p.m.)

24

25

1                            CERTIFICATE

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6
     /s/Mary Zajaczkowski                        December 14, 2018
7    Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25